ORIGINAL

FILED

OCT 18 2010

U.S. COURT OF
FEDERAL CLAIMS

## UNITED STATES COURT OF FEDERAL CLAIMS

OASIS INTERNATIONAL WATERS, INC.,  )
                      )
          Plaintiff,        )
                      )    Case No. **10-707 C**
          v.           )
                      )
THE UNITED STATES OF AMERICA,  )
                      )
          Defendant.    )
                      )

### COMPLAINT

Plaintiff, Oasis International Waters, Inc. ("Oasis"), for its Complaint against Defendant,

The United States of America ("Government"), states as follows:

### PARTIES AND JURISDICTION

1.     Oasis International Waters, Inc. ("Oasis") is a Nevada corporation with its

principal place of business at 14901 S. Heritage Crest Way, Bluffdale, Utah, 84065.

2.     Defendant is the United States of America, acting by and through the United

States Department of Defense, Joint Contracting Command, Iraq/Afghanistan.

3.     This Court has jurisdiction pursuant to 28 U.S.C. 1491.  Oasis brings this action

under the Contract Disputes Act of 1978, 41 U.S.C. 601, *et. seq.*

### FACTS

#### Background Facts

4.     Oasis, the contractor under Contract W27P4A-05-C-0002 (the "Contract"),

provides purified drinking water bottling capabilities and bottled water through six (6) water

purification and bottling plants it owns and operates at Government military bases in Iraq.

5.      Oasis uses a state-of-the-art reverse osmosis process to purify raw Iraqi source water supplied by the Government and bottles the purified water in one-liter plastic bottles produced with on-site, blow-molding equipment.

6.      Oasis serves the water needs of the majority of Government military and civilian personnel in Iraq by producing approximately 396 million one-liter bottles of purified water per year.

7.      The original Contract was awarded on May 25, 2005.  Before that, the Government purchased bottled water from vendors in Kuwait, Jordan and Turkey and shipped it by truck to U.S. military bases in Iraq.  The massive quantity of bottled water needed to meet the Government's needs required thousands of delivery trucks – the Government dedicated approximately 27,500 trucks to this supply effort.  This operation obviously required an enormous expenditure of taxpayer's funds.

8.      Due to the security situation in Iraq at the time, bottled water had to be shipped by guarded convoy, which put soldiers, contractors, equipment and water supplies at significant risk.  The water convoys often became backed up for many miles due to insurgent attacks and took weeks to get life-sustaining supplies of water to the troops.  The attacks also resulted in loss of life and limb, destruction of trucks and water supplies, and greatly increased costs.

9.      The Government recognized that purified bottled water could be produced in Iraq (*i.e.*, on-site) for a fraction of the amount paid to purchase water in Kuwait, Jordan and Turkey and transport it into Iraq.  By awarding the Contract, the Government anticipated saving the huge cost, and eliminating the logistical difficulties, of water supply convoys.

10.     The Government also recognized that building up to eight (8) high-speed water purification and bottling facilities in Iraq was itself a huge logistical challenge and a massive

2

capital investment for the contractor.  Special facilities had to be constructed in a desert-like

environment with materials mostly shipped in to Iraq.  The facilities had to be constructed in

such a way that they were re-locatable.  Then, sensitive and expensive purification, blow

molding and bottling equipment had to be delivered to these facilities, installed, and connected to

each other and sophisticated computer control equipment.  Furthermore, the facilities had to be

operated and maintained to a high level of cleanliness and quality control standards despite the

facilities being located in extreme desert-like conditions.  To make the task even more difficult

and risky, the contractor could expect to be under attack from insurgent military forces.

11.     The Government's challenge was how to structure a contract that provided

incentive to a contractor to invest the approximately $70 million required to **build** eight large,

turn-key, high-speed, water purification and bottling plants in harsh conditions in the middle of a

war zone.  In addition, as much as the Government needed an assured on-site source of bottled

water, the Government was unwilling to commit to purchase any bottled water from yet to be

constructed facilities due to the significant risk of contractor failure.

12.     The Government's solution to this dilemma was to structure the Contract so that it

provided the contractor adequate incentive to take on these huge risks, and it did so by awarding

a contract for a firm, fixed-price amount to construct and commission facilities that were ready

and able to produce an established amount of water that would meet established quality standards

– *i.e.*, to supply water bottling **capabilities**.  In pre-award materials, the Government made it

clear that the Contract awarded would not obligate the Government to purchase any bottled

water.

13.     Thus, as awarded, the Contract was a firm, fixed-price contract that obligated the

Government to pay $50,225,000 in the Contract Base Year, beginning May 25, 2005, for the

3

provision of water purification and water-bottling capabilities only, including the Contract requirement of having all but one of the bottling plants fully operational by the last day of the Base Year (May 24, 2006). The other plant had to be operational 120 days from award. Any water purchased by the Government during the first year was not included in the $50,225,000 firm fixed-price amount and was to be purchased at $3.50 per case.

14.     For the remaining option years, the Government agreed to pay a fixed amount of $112,000,000, which amount was to cover Oasis's costs (and profit) of running the complex operations at multiple facilities/locations, maintaining the water production capability, and producing and bottling huge volumes of water, as well as allowing Oasis to recoup its enormous initial capital investment. For these option years, and included in the $112 million amount, Oasis agreed to produce and deliver to the Government all the water the Government within certain ranges and up to a maximum amount.

15.     American AquaSource, Inc. ("AAS") was awarded the Contract and performed until August 1, 2005, on which date Oasis took over all future contractual responsibilities by and through a tripartite novation agreement signed by the Government. Oasis performed for the full term of the Contract and performed admirably. Oasis is still providing water today under a different Contract.

16.     The Government has touted Oasis's logistical accomplishment of building state-of-the-art water bottling plants in Iraq as a significant Government contracting success. Through this Contract, Oasis supplied purified bottled water to the Government in the war theater for approximately $0.29 per one-liter bottle, a price far below the lowest price at which bottled water can be found on supermarket shelves in the United States. By some estimates, the Contract has saved the Government approximately $1 billion and countless lives.

17.     Oasis performed superbly despite the fact that, due to the military's personnel rotation needs and policies, Oasis had to deal with six or seven contracting officers, many of them with little and even no prior contracting experience, in the period from Contract award to August 2006 when Modification No. P00011 was signed.  As will be shown below, the various contracting officers had multiple differing interpretations of the meaning and effect of the Contract even though they did not participate in formulating the RFP, responding to questions from potential offerors, or in making the award.

**Contract Award and Novation**

18.     On May 25, 2005, the Joint Contracting Command, Iraq/Afghanistan, awarded the Contract to AAS, of St. Joseph, Missouri.

19.     At the time of Contract award, an affiliate of Oasis was involved with other Government contracting and had considerable logistical experience and capabilities in Iraq. Oasis was subsequently incorporated, and Oasis and AAS entered into a joint development agreement in late July 2005.  Immediately thereafter, on August 1, 2005, AAS requested that the Contract be novated and transferred from AAS to Oasis.

20.     Oasis assumed financial responsibility for building the water bottling facilities during the Base Year and provided substantial operational support to AAS beginning August 1, 2005.  Accordingly, Oasis and AAS agreed that their novation agreement would, if approved, be effective as of August 1, 2005.  The Government signed the agreement effective that date evidencing its approval and the change to Oasis as the contractor.

21.     On December 5, 2005, through bilateral Modification No. P00005, the Contract was modified to incorporate the novation agreement including the August 1, 2005 effective date.

**Original Contract Terms and Requirements**

5

22.     The Contract was originally awarded for a term of four years and in the lump sum amount of $386,225,000.  By and through Modification No. P00002 (hereafter, simply "P0000X" or "P000XX"), effective July 15, 2005, the Contract was modified to a one-year contract for the period May 25, 2005 through May 24, 2006 with three (3) one-year options.

23.     As issued **and** as modified by P00002, the amount payable in the Contract Base Year, beginning May 25, 2005, remained a firm fixed-price amount of $50,225,000.

24.     The firm fixed-price payment of $50,225,000 for the Base Year, beginning May 25, 2005, remained as a Contract in the Base Year for water purification and water bottling **capabilities only**, including the Contract requirement to have eight (8) – later six (6) – water-bottling plants operational by the last day of the Base Year, May 24, 2006 – a daunting task during a time of war.  This conclusion is supported by, *inter alia*, the Contract's Scope and Purpose, as stated in Section 2.0, which is "to provide re-locatable purified bottled water **capabilities** at various locations throughout Iraq."  (Emphasis added.)

25.     However, the Contract did not identify the sites where the contractor would construct the water bottling facilities.  The Contract required the Government to identify sites on U.S. military bases in Iraq and to provide construction-ready site locations to the contractor at each site upon or immediately after initial Contract award.  This was particularly important for the first site, which under the Contract was to be fully operational (i.e., constructed, approved and capable of producing purified water in the required amounts) within 120 days of award and also to Davis's plan to have the full Contract year flexibility to construct the remaining five plants.

26.     After Contract award, the Government designated the facility at LSA Anaconda as the initial site and plant to be opened within 120 days of Contract award.  The remaining five

facilities, at Site 2, Taqqadum, or "TQ," Site 3, Al Asad Airbase, or "Al Asad," Site 4,

Qayyarrah West, or "Q-West," Site 5, FOB Speicher, or "Speicher," and Site 6, Camp Victory,

were not required to be approved and capable of producing purified bottled water until May 24,

2006, the last day of the Base Year.

27.     Contract Section 3, Statement of Objectives ("SOO"), Figure 1, specified

minimum daily production volumes, stated in terms of numbers of one-liter bottles of purified

water to be produced at each facility after the Base Year (and, for LSA Anaconda, the remainder

of the Base Year following completion within 120 days and subsequent years), as follows:

Contract No. W27P4A-05-C-002, Section 3, Figure 1

| LOCATION | TOTAL PRODUCTION REQUIREMENT/DAY in 1K Liters (winter/summer/surge) |
|---|---|
| Location 1 | 75-100K liters / 101-150K liters / 151-200K liters |
| Location 2 | 65-100K liters / 101-135K liters / 136-170K liters |
| Location 3 | 35-55K liters / 56-75K liters / 76-100K liters |
| Location 4 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 5 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 6 | 200-300K liters / 301-400K liters / 401-450K liters |
| Location 7 | 80-120K liters / 121-160K liters / 161-200K liters |
| Location 8 | 75-110K liters / 111-150K liters / 151-190K liters |

28.     While the Contract required Oasis's plants to be able to produce within the ranges

of water volumes stated in Figure 1 during the Base Year, and actually produce such amounts in

Option Years 2 – 4, the Contract contains no requirement that Oasis actually produce water in

these Figure 1 amounts/ranges, or even any water, during the Base Year.  It also did not require

the Government to accept delivery of, or pay for, any such water.  This conclusion follows

logically from the fact that five of the six plants did not even need to be operational until the last

day of the Base Year.

29.     As to LSA Anaconda, the Contract called for that facility to have the capability to produce water in the ranges in Figure 1, Location 1 on or before the 120th day following award, with any water produced and taken by the Government to be purchase at $3.50 per case.

**Contract Modifications and Related Events**

30.     During performance, the Contract was amended multiple times by means of written modifications, but only the first eleven (11) numbered P00001 through P00011 are relevant to this action.  Each is discussed in subsections below:

### P00001 – Reduction From Eight to Six Sites/Plants

31.     Contract modification P00001 was a bilateral modification signed on and effective as of May 26, 2005, the day after the Contract was executed.  P00001 reduced the required number of water-bottling facilities from eight to six.  This reduction was requested by the Government and was for the convenience and benefit of the Government because, as will be discussed later, the complexity, required capabilities, and cost of the remaining six facilities were increased.

32.     Effectively, P00001 required the construction of six (6) more expensive, higher capability facilities rather than eight smaller, less expensive plants.  The total daily production capability of the six plants eventually constructed was equivalent to the total daily production capability of the initially planned eight plants.

### P00002 – Change From 4-Year Contract to 1-Year Plus Three 1-Year Options

33.     P00002 was executed and effective on July 15, 2005.  It was ostensibly intended to correct a "mistake" in awarding the Contract as one multi-year, firm fixed-price Contract in the amount of $386,255,000.  The Government explained to Oasis that the change was required because "only the base year award should have been documented on the contract."

34.     Through P00002, the Contract was changed to a firm fixed-price one-year Contract with a Base Year payment of $50,225,000 plus three (3) one-year options priced at the firm fixed-price amount of $112,000,000 per year.

### P00003 – Addition of Not-to-Exceed Quantities to Capability Requirement

35.     P00003 was a bilateral modification signed by AAS on August 7, 2005 and with a stated effective date of August 9, 2005.  Both dates are after the effective date of the novation agreement (August 1, 2005) discussed above.

36.     P00003, *inter alia*, changed the Contract CLIN structure to "reflect Not to Exceed (NTE) quantities at each of the six locations, for the base year and each option year."  P00003 stated that "The dollar value of the base year and options did not change" and that the change was being made only "to provide for efficient contract administration."

37.     While water bottling service capability remained as the overall listed deliverable in the modified Schedule of Supplies/Services, with regard to the Base Year P00003 stated as follows:

| ITEM NO. | SCHEDULE OF SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | NON-PERSONAL SERVICES:  The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 6 separate and independent purified bottle [sic] water plants according to the 20 Mar 05 Statement of Objectives (SOO).  Period of Performance: 25 May 05 through 24 May 06. | | | | |
| | | | | | |
| 0001 0001AA | SITE 1 – LSA Anaconda Purified bottled water (12 / 1-Liter bottles per case) | 2,356,549 (NTE) | Case | $3.50 | $ 8,247,921.00 (NTE) |
| | | | | | |
| 0002 0002AA | SITE 2 – Taqqadum (TQ) Purified bottled water (12 / 1-Liter bottles per case) | 1,928,729 (NTE) | Case | $3.50 | $ 6,750,552.00 (NTE) |
| ITEM NO. | SCHEDULE OF SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
| 0003 0003AA | SITE 3 – Al Asad Purified bottled water (12 / 1-Liter bottles per case) | 1,077,472 (NTE) | Case | $3.50 | $ 3,771,153.00 (NTE) |
| | | | | | |

| 0004<br>0004AA | SITE 4 – Qayyarrah West (Q-West)<br>Purified bottled water (12 / 1-Liter bottles per case) | 1,987,053<br>(NTE) | Case | $3.50 | $ 6,954,684.00<br>(NTE) |
|---|---|---|---|---|---|
| 0005<br>0005AA | SITE 5 – FOB Speicher<br>Purified bottled water (12 / 1-Liter bottles per case) | 1,987,053<br>(NTE) | Case | $3.50 | $ 6,954,684.00<br>(NTE) |
| 0006<br>0006AA | SITE 6 – Camp Victory<br>Purified bottled water (12 / 1-Liter bottles per case) | 5,013,145<br>(NTE) | Case | $3.50 | $17,546,006.00<br>(NTE) |
| | | | | | **TOTAL** |
| | | | | | **$ 50,225,000.00<br>(NTE)** |

Similar tables were included for Option Years 1 – 3. However, for those years the stated

quantities of cases were larger and the total amount for each option year was $112,000,000.00.

38.     Thus, the revised CLINS and Schedule of Supplies/Services, in tabular format,

purported to add required "not to exceed" ("NTE") gross annual volumes of water, stated in

terms of numbers of cases of bottled water (12 one-liter bottles per case), to be produced at each

water-bottling plant in the Base Year as well as each subsequent year. This was the first time

that any such requirement to produce any specified quantities of purified bottled water in any

given year was included in the Contract.

39.     P00003 did not change the Contract from a firm fixed-price Contract, nor did it

change the Base Year price of $50,225,000 (or the price of any option year). P00003 also did

not change the Contract requirement that only one of six water-bottling plants was to be open

before the last day of the Base Year.

40.     Furthermore, P00003 did not change the contract from a "capability" contract to a

commodity or supply contract, as evidenced by the CLINS still requiring Oasis to "perform and

sustain 6 separate and independent purified bottle [sic] water **plants** . . . .", and the SOO's

statement that "the purpose of this contract is to provide re-locatable purified bottled water

**capabilities** at various locations throughout Iraq . . . ." (Emphasis added.)

**P00004 – No Cost Time Extension**

41.     P00004, signed by AAS on September 19, 2005, was issued for the purpose of "provid[ing] the contractor with a no cost time extension." P00004 extended the date for the "first purified bottled water capability [to] be operational" no later than ("NLT") October 4, 2005 (*i.e.*, it added an additional twelve (12) days to the original requirement of 120 days from Contract award, which was September 22, 2005).

42.     By the fall of 2005, Oasis had invested considerable capital completing the water-bottling facility at LSA Anaconda and in preparing to complete the remaining five water bottling facilities by May 24, 2006. By December 2005, the Government still had only tendered one of six sites. It was becoming increasingly apparent that it would be difficult, if not impossible, for Oasis to have production facilities open and operational by May 24, 2006, due to Government delays. Also, Oasis was losing its time flexibility and was being forced into a compressed time period to build five remaining water plants.

**P00005 – Administrative Incorporation of Novation Agreement**

43.     P00005, signed by AAS on December 2, 2005, was issued to "reflect the novation agreement transferring all rights and responsibilities of [the Contract] from [AAS] to [Oasis] in accordance with the attached Novation Agreement dated August 1, 2005." The Novation Agreement entered into by and between AAS, Oasis, and the Government was attached and incorporated. The incorporated Novation Agreement specifies an effective date for the novation of August 1, 2005.

44.     The incorporated Novation Agreement included a Section (a)(1) which provides that Oasis only assumed the obligations of the Contract and any modifications to the Contract "made between the Government and the Transferor [American Aqua Source] before the effective

date of this Agreement" – *i.e.*, before August 1, 2005 – and those modifications made "between the "Government and the Transferee [Oasis], on or after the effective date of this Agreement."

45.     Thus, the obligations contained in Contract modifications assumed by Oasis through P00005 were limited to: a) Contract modifications signed by AAS before August 1, 2005; and b) Contract modifications signed by Oasis on or after August 1, 2005.  The Government was a signatory to the Novation Agreement and, thus, accepted such limitations.

46.     AAS signed modification P00003 on August 7, 2005, and modification P00004 on September 19, 2005, both dates being **after** the effective date of the novation (August 1, 2005).

47.     On or about December 17, 2005, the Government, through Major Montler, then the Contracting Officer ("CO"), advised Oasis by email that the Government was "researching courses of action to modify the current Contract."  In late 2005 and early 2006, the Government advised Oasis that it wanted to change the Contract from a firm fixed-price contract to an IDIQ contract whereby the Government would pay only for the water delivered and accepted by the Government.  Oasis and the Government discussed an IDIQ contract in early 2006, but the matter was dropped.

48.     In early 2006, the Government asked Oasis to agree to extend the Contract Base Year to August 15, 2006.  At about the same time, the Government informed Oasis that, while it had funds to pay the Base Year amount, which the Government indicated would not be paid until all six plants were operational, the Government needed to extend the Base Year period because it needed the additional time to secure funds necessary to exercise the first option year (May 25, 2006 through May 24, 2007), which required a commitment of $112,000,000 of additional funds.

49.    The Government informed Oasis that, because of the Government's funding problems, Oasis would only be able to get paid the Contract Base Year amount if it extended the Base Year to August 15, 2006, and if Oasis produced and delivered 14 million cases of bottled water.

50.    When the Government formally notified Oasis, on March 27, 2006, that it did not intend to exercise the first option year, the reason it gave was that the Government did "not have adequate assurances of funding." The Government stated at that time that its funding problem could be solved if the parties could "negotiate an extension of the initial period based on revising the delivery schedules."

51.    In March 2006, ten (10) months after Contract award, and only about two (2) months before the end of the Base Year, Major Davis, the newly appointed CO, issued a directive stating that the Contract required Oasis to produce and deliver to the Government 14,350,000 cases of bottled water in the Base Year and to open all water bottling facilities by the last day of the Base Year, May 24, 2006. The Government issued other similar directives, by email and orally, in March and April 2006.

52.    At the time the Government made these demands, Oasis had no Contractual obligation to produce and deliver any amount of water by May 24, 2006, much less 14 million plus cases of water.

53.    The Government's orders of March and April 2006 – to open all water bottling plants by May 24, 2006 and to produce 14,350,000 cases of bottled water by that same date – were coupled with threats from the Government that it would not exercise the first option year and that it would terminate the Contact for default if Oasis failed to meet both demands. Specifically, Major Davis stated that the Government would "find it hard" to exercise the first

option year "without the confidence of knowing the terms and conditions under the basic contract would be met by 25 May."

54.     In another March email, Major Davis changed the reason for the request to extend the Base Year, stating that the Government would agree to extend the "Contract base period from 24 May 2006 to 15 August 2006, to allow Oasis to finish building the 6 Bottled Water Facilities and produce the requested bottles of water (14,350,001)."

55.     For the five remaining plant sites for which the Government was obligated to deliver land to Oasis by May 25, 2005, the Government delivered one site in December 2005, two in February 2006, one in March 2006, and the last one (TQ) on July 2, 2006.  There was no Contract requirement that Oasis had a maximum of 120 days or any other time period less than the full Base Year (May 25, 2005 to May 24, 2006) to build the remaining five sites.  Oasis expected to have almost one full calendar year to build each of the other sites.

56.     The Government's demands that Oasis complete construction of all six facilities by May 24, 2006 and produce the stated amount of water were demands for performance (and, with regard to the water production, extra work) were made virtually impossible by the Government's ongoing delays in delivering and, in a number of instances, preparing land suitable for construction, as required by the Contract (*see* discussion *infra*).  The Government was well aware of these facts and circumstances at the time.

57.     In that same time frame, it became apparent to Oasis that, rather than negotiate Contract changes with Oasis, the Government was intent on unilaterally changing the Contract to the format the Government desired through change orders and/or by forcing Oasis to accept fundamental Contract changes that exceeded the scope of performance under the Contract as issued and that Oasis had no opportunity to include in its bid price.

14

58.     In April 2006, the Government demanded that Oasis sign a Contract modification. The Government, through Major Davis, advised Oasis that the first option period would not be exercised, that the Base Year price would not be paid, and that Oasis would be held in breach unless Oasis agreed to such terms.  At that time, Major Davis also advised Oasis that, if it did not agree to the Contract changes he was demanding, the Government might purchase water from Oasis on an as-needed basis (at $3.50 per case) and terminate the Contract.  The Government required that Oasis consent to these changes for no consideration, other than the Government's re-commitment to pay the initial Base Year consideration of $50,225,000 if Oasis, *inter alia*, now delivered 14 million cases of bottled water.

**P00006**

59.     P00006, signed by Oasis on April 13, 2006, contained the following statement of purpose:  "The purpose of this modification is to extend base year period of performance, realign Contract Options, replace Figure 1 – Total Production Requirement/Day, change the payment office, and extend the preliminary notification and notice of intent under FAR clause 52.217-9."

60.     Of relevance to this Complaint, what P00006 actually did, or purported to do, was the following:

a.     first, establish a new "Base Period" and four (4) Option periods such that the original Base Year was extended by approximately 2 ½ months (*i.e.*, from 24 May 2006 to August 2006), shorten what used to be Option Year One to a 5-month "Option One", keep Option Years 2 and 3 (renamed "Option Two" and "Option Three", respectively) a full year in length but now make them run from January to January of the following year, and add a new 7-month "Option Four";

15

b.   second, change the per-facility-per-year water production capability requirements of P00003 to simply total per-period water production capability requirements (*cf.* P00003 CLINS to P00006 CLINS);

c.   third, replace Figure 1 to the SOO from one requiring the capability to produce a certain amount of liters per day in each of the six locations to one providing for "**Estimated** Production Requirement[s]/Day" capability in liters per day at each location (emphasis added);

d.   fourth, replace language in paragraph 6.3 of the SOO from "Remaining purified bottled water capabilities will be established within 365 days after the contract is awarded" to "Remaining purified bottled water capabilities will be established prior to 30 June 2006" (emphasis added); and

e.   fifth, the FAR clause numbered 52.217-9 at Section I of the Contract was modified to provide that the Government needed to give 60 days' notice of any extension of the Contract.

61.      Regarding the first change, P00006 established the following periods of performance, total production capability requirements (in cases), and total period prices:

"Base Period" (May 24, 2005 to August15, 2006) –      14,350,000 –    $50,225,000
"Option One" (August 16, 2006 to January 15, 2007) –  14,285,715 –    $50,000,000
"Option Two" (January 16, 2007 to January 15, 2008) – 32,000,000 –  $112,000,000
"Option Three" (January 16, 2008 to January 15, 2009)–32,000,000 –  $112,000,000
"Option Four" (January 16, 2009 to August 16, 2009) – 17,714,286 –   <u>$62,000,000</u>
                                                            Total  $386,225,000

62.      Whereas P00003 had the last option period (Option Year 3) ending on May 24, 2009, P00006 called for performance of "Option Four" to end on August 16, 2009.

63.      As shown above, even though the performance periods were significantly changed, the total amount that Oasis was to be paid under P00006 was no different than as stated in P00003 – $386,225,000 (including all option periods).  The stated per-case unit price of $3.50

also remained the same.  There was no consideration for the impact on Oasis of these time period modifications or for the Government's delays in furnishing sites for construction of facilities.

64.     Although the task of providing water-bottling **capabilities** at six plants is not explicitly stated in the P00006 Schedule of Supplies/Services (and CLINS), there is no statement of an intent to change the Contract from a "capabilities" contract to a supplies or commodity contract.  In fact, consistent with the prior Contract language, P00006 also references "bottled water capabilities" in modifications to paragraph 6.3 to the SOO and fails to modify the SOO to remove other references to Oasis only providing the capability to produce water during the first year.

65.     From a review of P00006, it appears that the Government attempted to insert the requirement that Oasis deliver 14,350,000 cases of bottled water by the last day of the now extended Contract Base Period by rewriting the CLINS, but neither the statement of purpose in the SF 30 nor any included modifications to the SOO support the addition of that requirement.  Neither is there an increase in Contract price to pay for the water, nor a designation of which facility was to produce the bottles of water.

66.     At the same time the Government was attempting to extract concessions from Oasis by withholding exercise of the first option period, the Government was also threatening Oasis with termination for breach of contract because Oasis had failed, or would fail, to deliver six water bottling plants by June 30, 2006, and because Oasis would fail to produce and deliver 14,350,000 cases of bottled water by August 15, 2006, under the assumption (by the then Contracting Officer) that actual water delivery was required and at not increase in price.

67.     At the time the Government made these demands, it was impossible, or at least commercially impracticable for many reasons, for Oasis to have had all six water-bottling plants

operational by June 30, 2006.  It was particularly impossible with respect to TQ, where a construction site was only first made available to Oasis for construction on July 2, 2006, after the end of the original Base Year, and after which Oasis was promptly instructed to stop construction.

68.     In the spring and early summer of 2006, Oasis was unable to produce sufficient volumes of water at Q-West and Speicher, because the Government failed repeatedly to provide sufficient source water.

69.     The Government's failures to provide adequate water supply at Q-West and Speicher, and failures to deliver construction sites in a timely manner were Government delays beyond the fault or negligence of Oasis, all of which the CO was aware.  Oasis was damaged by the delays and the extra work required to work with unsuitable water.

70.     In July, the Government informed Oasis that it may be held in breach of contract for failing to perform the requirements of P00006 of having all six water bottling facilities open by June 30, 2006 and producing and delivering 14 million cases of bottled water by August 15, 2006.  The Government's threat was made despite the Contracting Officer's full knowledge of the late and/or non-delivery of sites to Oasis and, more particularly, to intimidate Oasis whose principals had "mortgaged" everything they owned to perform the Contract.  The Government officials with whom Oasis personnel interacted were aware of Oasis's highly-leveraged financing structure and the impact of delays to its financing (including the possible incurrence of significant penalties), facility completion ,and ultimate production of bottled water by Oasis.

71.     In furtherance of its attempts to intimidate Oasis and gain concessions by threat, the Government advised Oasis, at this time, that it was only obligated by P00006 to pay Oasis for

the water the Government had accepted, which amounted to approximately one-half of the Base Year consideration of $50,225,000 owed under the Contract (and P00006).

### P00007 – Change of Government Accounting/Appropriation Information

72.     P00007, with an effective date of April 17, 2006, changed only an accounting and appropriation designation in block 21 of SF 30.

### P00008 – Incorporation of Clause Against Human Trafficking, Etc.

73.     P00008, with an effective date of May 17, 2006, incorporated FAR clauses prohibiting human trafficking, inhumane living conditions and withholding of employee passports.

### P00009 – Government's Exercise of First Option Period

74.     P00009, notifying Oasis that the first option period (August 16, 2006 to January 15, 2007) was being exercised, was delivered to Oasis in June 2006 but was dated August 13, 2006.

75.     Although the Government specified an effective date of August 13, 2006, Oasis would later learn that the Government wrote that (future) date in P00009 to allow the Government to use execution of the first option period as pressure to extract significant Contract concessions from Oasis.  Among these was an attempt to cover up the Government's failure to provide facility sites in a timely manner so that they could be constructed during the original Base Year.

76.     More specifically, after P00009 was released, the Government told Oasis that the Government would not follow through with the first Contract option period beginning August 16, 2006 unless Oasis agreed to contract changes demanded by the Government.  The Government issued a proposed contract modification to Oasis which proposed to change the

Contract to an IDIQ contract.  The Government's proposal to change the Contract to an IDIQ contract was later dropped.

77.     However, other concessions demanded by the Government were embodied in Contract modification P00011 (discussed below).

78.     In issuing P00009 and exercising the first option period, the Government committed to pay Oasis $50,000,000 to perform the first option period.

79.     The effective date of P00009 was later changed back to June 13, 2006 by and through unilateral P00010.

**P00010**

80.     P00010, dated July 28, 2006, was actually issued to Oasis after the next modification, P00011, was executed on August 12, 2006.  In other words, P00010 was backdated by the Government to reflect a fictional execution date of July 28, 2006.  P00010's stated purpose was "to correct clerical errors found in blocks 3 and 16C. of modification P00009.  Blocks 3 and 16C. of P00009 read as 13 August 2006.  This modification corrects the dates of Block 3 and 16C. to read as 13 June 2006."

**P00011**

81.     On August 12, 2006, the parties executed P00011.

82.     As shown by the first stated purpose, P00011 modification confirmed the original intent and understanding of both parties to the Contract that the Base Year payment was for Oasis to provide water production capability only.

83.     P00011 also purported to do, *inter alia*, the following things:

a.     Reduce the total Contract (with all options) firm fixed-price amount from $386,225,000.00 to $374,620,833.55, a reduction (without consideration or any negotiation or

agreement by Oasis of any specific sum for any specific reason) of $11,604,166.45, which Oasis believed to be a Government manipulation to work around funding limitations which had nothing to do with Oasis and of which the Government had been aware for months;

b. More specifically, reduce the Base Period (which was then winding down) firm fixed-price amount from $50,225,000 to $47,954,167, a retroactive reduction (without consideration or any negotiation or agreement by Oasis of any specific sum for any specific reason) of $2,270,833, which Oasis believed to be a Government manipulation to work around funding limitations which had nothing to do with Oasis; and

c. Modify the Contract payments going forward for Option Period One in that, by and through P00006, P00009 and the backdated P00010, the Government had elected to exercise the first option (August 16, 2006, through January 15, 2007) at the stated price of $50,000,000, but P00011 purported to reduce the $50,000,000 firm fixed-price amount for Option Period One to approximately $46,666,667, a reduction of $3,333,333 (without consideration or any negotiation or agreement by Oasis of any specific sum for any specific reason), an action which Oasis believed to be a Government manipulation to work around funding limitations which had nothing to do with Oasis;

d. Change the Contract requirement that the Government deliver all raw water to the Oasis building where the purification equipment was located by requiring Oasis to expend approximately $600,000 for water-supply infrastructure at Speicher and Q-West, work that was required only because the Government was unable to meet its contractual obligation to deliver water supply to the bottling plants at those two locations;

e. Imposing penalties for any failure by Oasis to achieve the prescribed Acceptable Quality Level ("AQL") at any location on any given day (which provision the Government later

used to impose "penalties" for the delayed opening of TQ in the amount of $2,053,333, *see* discussion *infra*).

84.     Oasis submitted claims to recover the imposed reductions in the Contract price made by the Government.  The Contracting Officer, in refusing to pay the Oasis claims, justified his refusal to pay the claims on the grounds that the Government had not received any consideration for bilateral modification P00001, which reduced the number of water-bottling plants from eight to six.

85.     The Contracting Officer's reference to P00001 was merely an after-the-fact rationalization to create an appearance that some consideration was yet to be received by the Government when, in fact, it had been received by the modifications to the facilities themselves. The Contracting Officer failed completely to reference P00011 as the basis for these reductions or to support their validity.

86.     The Government continued its pattern of coercion of Oasis by withholding exercise of the first contract option until after Oasis signed P00011.

87.     In P00011 itself, the Government acted to protect itself from exceeding available funding by demanding and extracting concessions from Oasis through P00011 on the ground that the Government was entitled to financial concessions because Oasis had not opened TQ by June 30, 2006.  This was itself impossible because the Government did not deliver land for construction at TQ until July 2, 2006, and then asked Oasis to delay construction until August 2006.

88.     The Government refused to make progress payments to Oasis and refused Oasis' request for payment of a portion of the Contract Base Period consideration for those facilities (ultimately two) that were open and operational before May 24, 2010.

89.     At no time was there any discussion, negotiation, or agreement to any specific deductions from the established Contract price that are identified in P00011.

90.     Despite the clear confirmation in P00011 that the purpose of the Base Year was to establish the capability to produce water in certain ranges, and that the full Contract sum to be paid was to cover, at least in part, the cost of the construction and creation of the capability, the Government chose to separately order the delivery of 5,605,020 cases of bottled water from those working sites other than LSA Anaconda during the Base Year.  The Contract specifically provides that the cost per case of bottled water purchased by the Government would be $3.50. The total value of the water delivered and accepted by the Government from the non-LSA Anaconda site during the Base Year is $19,617,570.

91.     In his final decision, the Contracting Officer admits that the Contract was for a firm fixed-price that did not obligate the Government to purchase any water during the Base Year.  The Contracting Officer assumes that "the intent was clearly to purchase at least some water from each of the sites if it was available."  This assumption is made by an individual not present at the time the Contract was solicited, questions answered, or award made and no supporting document is cited as authority.

92.     In the final decision, the Contracting Officer states that the funds allocated for the creation of the Contract capability also covered the price of purchasing water.  There is no provision in this Contract that specifically allocates the Base Year amount for any more than one (1) Liter of water, as set forth in P00011 (*see* CLIN LOT 1, sub-CLIN 0001).

93.     Oasis submitted invoices for the payment of the water which were not paid by the Government.

94.     With regard to LSA Anaconda, the Government received 3,100,972 cases of bottled water produced at that site. Oasis submitted invoices to the Government in the amount of $10,853,402 for the price of the water at $3.50 per case as set forth in the Contract.

95.     The Contracting Officer refused to pay for the water produced at LSA Anaconda and stated, in his final decision, that "Oasis was paid in full for all bottled water produced during the Base Year."

**Facts Related to the Government's Failure to Provide Sites, Delays, and Acceleration, as well as Differing Site Conditions Encountered**

96.     The Contract requires the Government to designate locations for the water-bottling facilities and to deliver to the contractor "[p]roduction facility real estate" in secure areas of six bases in Iraq upon or immediately after award (May 25, 2005).

97.     The Government would not let bidders pre-inspect the construction sites, nor did the Government provide any geological or geophysical maps or results of any geological or geophysical testing on any sites designated for the contractor to construct water-bottling plants.

98.     In pre-award questions and answers ("Q&A"), the Government assured bidders that the Government would provide "production facility real estate," that would be "level" and that the land site preparation required would be "minimal." The Government promised to deliver flat, graded land reasonably prepared for installation of water-bottling facilities at each of the six water bottling sites. In other words, the Government assumed all risks of site conditions being level land and requiring minimal site preparation, as warranted by the Government.

99.     At each and every site, the Government failed to **designate timely** and to deliver "[p]roduction facility real estate" and thereby delayed performance by Oasis.

100.    Moreover, while at certain sites the Government met its contractual obligations and provided grading services, fill and gravel necessary to deliver level land that required only

minimal site preparation before construction could start, at other sites it failed to do so, as set forth below in the allegations with respect to individual water-bottling sites.

101.     By the fall of 2005, Oasis had invested considerable capital completing the water-bottling facility at LSA Anaconda (which site was delivered late by the Government) and in preparing to complete the remaining five water bottling facilities by May 24, 2006.  The LSA Anaconda site had been opened on schedule and was producing bottled water, notwithstanding the Government delays.  Oasis was ready, willing and able to move forward with construction at the five remaining sites.

102.     By December 2005, the Government still had only tendered one of six sites (LSA Anaconda).  It was becoming increasingly apparent that it would be difficult, if not impossible, for Oasis to have all six facilities open and operational by May 24, 2006 due to Government delays.

103.     Oasis complained regularly to the Government about the delays and demanded that the Government tender production facility real estate at all six sites as required by the Contract.  The Government did not comply.

104.     The Camp Victory site was delivered to Oasis in a condition suitable for construction on December 1, 2005.  The Government then delayed in delivering (in a condition amenable for construction) the four remaining sites, delivering them as follows:  February 2006 (Q-West and Speicher), March 2006 (Al Asad) and July 2006 (TQ).

105.     Oasis expended an unplanned and additional $808,423 on necessary site preparation expenses because the Government failed to deliver level "[p]roduction facility real estate" requiring only "minimal" site preparation at LSA Anaconda, TQ, Al Asad, and Camp Victory.

106.   Oasis claimed for these additional costs in its claim dated June 8, 2008.  The Contracting Officer denied the claims.

**LSA Anaconda – WPS1**

107.   As noted above, the Government designated LSA Anaconda, also identified as Water Production Site 1 ("WPS1") as the one water-bottling facility that was to be open and capable of producing bottled water within 120 days of Contract award.

108.   The Government delayed 29 days after award – from May 25, 2005 to June 22, 2005 – to designate real estate at LSA Anaconda.  The Government then delayed an additional 23 days before tendering "production facility real estate," because the site designated was not level and required grading and site preparation.

109.   The Government performed some grading and site preparation work at the LSA Anaconda site.  However, even after the Government's initial site preparation work, the LSA Anaconda site required substantial additional site preparation work in order to be compliant with the Contract.

110.   When normal and anticipated seasonal rain came in the fall of 2005, it became apparent that the site preparation provided by the Government was inadequate and that the site required substantial grading, earth compaction, and gravel fill for ongoing site access and for flood abatement.  An operational water-bottling facility could not have been constructed at the LSA Anaconda site after the initial grading provided by the Government.

111.   Oasis requested that the Government provide the necessary grading, fill and soil compaction services required to render the site compliant with the Contract requirement that the Government deliver level land requiring minimal site preparation.  The Government refused and failed to provide the same.

112.    While the Government refused to provide necessary site preparation work, the Government ordered Oasis to open the LSA Anaconda facility on an expedited time schedule.

113.    Oasis had no choice but to perform grading and site preparation at LSA Anaconda, because the Government had refused or failed to provide such services, on the one hand, and was demanding expedited performance from Oasis, on the other.

114.    On August 3, 2005, Oasis spent $10,150 for medium and heavy equipment rental to complete final grading work that was left incomplete by the Government.  Oasis spent an additional $88,610 for site preparation work necessary to make the LSA Anaconda site usable for a purified water-bottling facility.  Without these improvements, it would have been impossible to open a production facility at LSA Anaconda.

115.    Notwithstanding Government delays, the LSA Anaconda facility was opened on time and with the required capability to bottle water.

### Camp Taqqadum – "TQ" – WPS2

116.    The Camp TQ water-bottling site was delivered to Oasis for construction on July 2, 2006, one year and one month late and over one month after the date for Oasis to deliver an operational **bottling plant** at TQ.  Total Government delays were 483 days.

117.    On August 25, 2005, the Government designated and issued a deed to Oasis to use the "Lake Side" site at TQ for its water-bottling facility.  The Government then delayed construction for several months while it decided whether to build the TQ plant at all.

118.    On February 19, 2006, the Government changed its site designation and assigned Oasis to the "Spring Lake/Hotel California" site at TQ.

119.    After designating the site, the Government brought earth moving and grading equipment to the TQ "Spring Lake/Hotel California" site to provide the grading necessary to

27

deliver level land capable of supporting a water-bottling plant. However, instead of preparing the "Spring Lake/Hotel California" site for Oasis to use, the Government dug deep pits on the water plant site to remove dirt that the Government used on other projects elsewhere on TQ.

120.    Oasis requested that the Government grade and prepare the "Spring Lake/Hotel California" site for water-bottling plant construction. The Government refused and further refused even to return the pits to their original condition to restore the significant damage it had caused.

121.    On March 6, 2006, the Government changed its designation again when it issued a deed to Oasis for the current location at TQ.

122.    As delivered, the TQ site required substantial grading to make it level land suitable for production of a water-bottling facility. The Government provided the grading services, completing the work and first authorizing Oasis to begin construction on the site on July 2, 2006.

123.    At about the same time the TQ site was delivered, the Government was attempting to negotiate restructuring of the Contract to an IDIQ format. As part of these discussions, the Government asked Oasis to delay construction at TQ because the Government was not sure whether the TQ site would be used or whether another site, Tallil Adder, might be better suited for the plant. The Government then instructed Oasis to delay construction on the TQ site for another 45 days, until August 15, 2006, while the Government again decided whether a water-bottling facility would be needed at TQ at all.

124.    Oasis was authorized to begin construction of the TQ facility on or about August 11, 2006, and the facility was completed on an accelerated basis.

125.    While the Government did not even provide land at TQ to Oasis until July 2, 2006, and did not authorize Oasis to begin construction there until on or about August 11, 2006, the Government nevertheless notified Oasis in March and April 2006 that Oasis was in breach for not having the TQ facility open, threatening Oasis with default termination for failing to have the TQ site completed and operational by May 24, 2006.

126.    The Government later imposed millions of dollars in penalties from Oasis for the Government's own delays at Camp TQ.

**Al Asad – WPS3**

127.    The Government failed and refused to deliver level land capable of supporting a water-bottling facility at Al Asad in a timely manner, as required by the Contract, and despite Oasis's request. The site provided to Oasis at Al Asad was not feasible for use as a water-bottling facility without substantial site preparation. Nevertheless, the Government demanded that Oasis open the Al Asad facility.

128.    Due to the Government's failure and refusal to provide a level site, Oasis had no choice but to hire a contractor to prepare the site at a cost to Oasis of $224,100, and Oasis spent $158,110 in materials and equipment to abate the flooding and to correct water damage to the Al Asad site. The total expenditure by Oasis necessary to render the site capable of supporting a water-bottling facility was $382,210. Without these site improvements, it would have been impossible to open a water-bottling facility at Al Asad.

129.    The Al Asad site was not ready for construction and installation of a water-bottling facility until March 12, 2006, after Government delays of 311 days and substantial improvements to the site. Once the site was ready, Oasis built the Al Asad plant in only 135 days, and the facility was complete and producing bottled water by July 25, 2006.

130.    Despite the Government delays, in March and April 2006, the Government notified Oasis it was or would be in breach for failing to have the Al Asad site completed and operational by May 24, 2006.  Also, in April 2006, the Government threatened Oasis with default termination for failing to have the Al Asad site ready on time.  And, at about that same time, the Government notified Oasis it would not pay Oasis the Base Year Contract price because Oasis failed to have the Al Asad site ready on time.  Moreover, at the time, the Government threatened not to exercise the first option year.  These threats were made even though it was impossible for Oasis to open that facility by May 24, 2006 due to Government-caused delays.

131.    These Government threats of non-renewal and default termination were intended to coerce Oasis to accept Contract changes through P00006.

132.    In July 2006, the Government again threatened to withhold Contract renewal and terminate the Contract for default because Oasis had failed to have the Al Asad plant and all other facilities constructed and operational on time.  These threats were merely a guise to extract Contract concessions from Oasis.

133.    If production facility real estate had been delivered to Oasis by the Government in a reasonably timely manner, the Al Asad facility would have been open and capable of producing the specified type and amount of purified bottled water by May 24, 2006.

**Q West – WPS4**

134.    On December 19, 2005, after changing site designations once, and after a total of 216 days of delay, the Government issued a deed for an alternative site at Q-West.

135.    The second site was not ready to accept a water purification and bottling facility in that, *inter alia*, it was not level, "production facility real estate" as required by the Contract.

Oasis encountered another 63 days of delay in self-performing (through a contractor, and at considerable expense) the grading services.

136.    The Q-West site was ready for construction on February 16, 2006, 338 days late.

137.    The Government then demanded that Oasis accelerate its performance and have the Q-West plant open on short notice.  Oasis constructed the Q-West plant in 133 days.  The plant was inspected and approved on June 29, 2006.

138.    Despite the fact that the Government made it impossible for Oasis to open the Q-West facility by May 24, 2006 by failing to make suitable land available until February 16, 2006, the Government nevertheless notified Oasis, in March and April 2006, that Oasis was in breach for not having the Q-West facility and all other facilities open and threatened Oasis with default termination for failing to have the Q-West site completed and operational by May 24, 2006.

139.    At about the same time, the Government notified Oasis it would neither exercise the first contract option nor pay Oasis the Base Year price because Oasis failed to have all the sites completed and operational by May 24, 2006.

140.    Under the Contract, the Government was obligated to provide source water for purification and bottling.  After Q-West opened, the Government failed to provide sufficient volumes of usable source water to allow Oasis to operate the plant.  Therefore, Oasis was unable to produce the necessary volumes of water at Q-West.

141.    When Oasis did receive source water from the Government, the water supplied was often filled with sludge and mud – it looked like chocolate milk – which damaged Oasis's equipment and was, as a practical matter, unusable.  During the month of July 2006, the Q-West facility (which was then open) attempted to produce at maximum production capacity (472,500

cases).  Oasis was able to produce only 96,900 cases that month due to the condition of the Government-supplied water.

142.    As a result of the Government's Contractual failures and concomitant demands for performance, Oasis was forced to spend an unplanned and additional $300,000 to deliver and to install a Pall Aria pre-filtration system.  As discussed below, Oasis was required to bear the expense of this equipment.

143.    In July 2006, the Government used Oasis's inability to produce sufficient volumes of bottled water from Q-West, a problem due exclusively to the Government's failure of performance, as a basis for demanding contract concessions from Oasis in P00011, including a contract amendment that forced Oasis to purchase equipment to address the Government's source water delivery deficiencies.  The Government also used this argument to threaten Contract non-renewal.

144.    If "production facility real estate" had been delivered to Oasis by the Government in a reasonably timely manner, the Q-West facility would have been open and capable of producing purified bottled water by the last day of the Base Year.  Also, Q-West would have met any contract production volume obligation but for the Government's failure to meet its obligation to provide a sufficient flow of usable source water.

**Camp Speicher – WPS5**

145.    The Government issued a deed for the initially selected site at Camp Speicher on August 13, 2005.

146.    The Speicher site initially designated was not "level production facility real estate" and was not suitable for building a water-bottling facility.

147.   The Government, at Oasis's request, provided grading and site preparation as required by the Contract.  After long Government-caused delays, the Government finally delivered the Speicher site to Oasis, in level condition and ready for construction, on February 3, 2006, 325 days late.

148.   The Government then promptly demanded accelerated construction performance by Oasis.  Oasis completed construction in 137 days, and the Speicher site was constructed and fully operational by June 20, 2006.

149.   Although the Government made it impossible for Oasis to open the Speicher facility by May 24, 2006, as stated above, the Government nevertheless notified Oasis, in March and April 2006, that Oasis was in breach and threatened Oasis with default termination for failing to have the Speicher site completed and operational by May 24, 2006.  In March and April 2006, the Government also notified Oasis it would not exercise the first option because Oasis had failed, or would fail, to have the Speicher site completed and operational by May 24, 2006.

150.   After Speicher opened, the Government failed to provide sufficient volumes of usable source water to allow Oasis to operate the plant.  Obtaining a supply of usable water at Speicher became a daily struggle between the Government and its lead contractor, KBR.

151.   The limited supply of water provided to Oasis severely restricted Oasis's ability to produce the required volume of water.  During the month of July 2006, the Speicher plant (which was by then operational) attempted to produce at maximum production capacity but could not.  Although Oasis could have produced 542,500 cases of bottled water at Speicher in July 2006, Oasis was able to produce only 320,460 cases due to the Government's repeated failure to meet its Contractual obligation to supply water for purification and bottling.

152.    Although the Government was solely responsible for providing water supply to Oasis's plants, Oasis was told to re-engineer the Speicher water supply for a raw water supply source that Oasis could take directly from the wells in Speicher, rather than from KBR.  The cost to Oasis for this work was $300,000.

153.    As alleged with respect to Q-West, in July 2006, the Government used Oasis's inability to produce sufficient volumes of bottled water from Speicher, a problem due exclusively to the Government's failure of performance, as a ground to demand contract concessions from Oasis in P00011, including forcing Oasis to purchase equipment at its own expense to address the Government's water delivery deficiencies.  The Government also used this argument as a ground for Contract non-renewal.

154.    If "production facility real estate" had been delivered to Oasis by the Government in a reasonably timely manner, the Speicher facility would have been open and capable of producing purified bottled water by the last day of the Base Year.  Also, Speicher would have met any contract production volume obligation but for the Government's failure to meet its obligation to provide a sufficient flow of usable source water.

### Camp Victory – WPS6

155.    The land deeded to Oasis for use as the Camp Victory bottling plant was at lake level.  The land had been flooded for long periods of time and, because of its propensity to flood, conditions ranged from soft and muddy during the dry season to waterlogged during the rainy season.

156.    As delivered to Oasis, the Camp Victory site was unsuitable for use as a water-bottling facility without a massive amount of grading, earth compaction and fill.

34

157.   The Government provided some site preparation work at Camp Victory through a Government-supplied contractor.  That work was inadequate to render the site usable for a water-bottling facility without substantial additional work, as it was still too wet and muddy due to grading and site elevation problems.

158.   Despite the Government's failure and refusal to properly prepare the site, it demanded accelerated performance from Oasis, forcing Oasis to retain a contractor to complete site preparation and grading services.

159.   The Iraqi company Oasis hired, Teksen, had to clear debris (some 30-plus truckloads of trash left on the site) and then raise the production pad site by two feet to avoid flooding of the production facility due to the site elevation.  Oasis paid Teksen a total of $70,000 for its work.  All together, Oasis was forced to spend $211,583 in fill materials and equipment rental and other costs for site improvements.  Without these improvements, it would have been impossible to open a water-bottling facility at Camp Victory.

160.   The pad site was ready for construction on December 1, 2005, which amounts to a 191-day delay as a result of the Government's failure to deliver "production facility real estate."

161.   In early 2006, despite having delayed designation and delivery of a suitable site until December 1, 2005, the Government ordered Oasis to accelerate completion of the Camp Victory facility.  The Government notified Oasis that it would be in breach if it did not have the Camp Victory facility and all other facilities open and operational by May 24, 2006.

162.   In March and April 2006, the Government also notified Oasis it would not exercise the first option year and would not pay Oasis the Base Year amount if Oasis failed to have the Camp Victory site, and all other sites, completed and operational by May 24, 2006.

163.    After the Camp Victory site was completed on an expedited schedule, the Government, through Major Davis, directed Oasis to produce the maximum possible bottled-water volume at that site.

**TQ Penalties**

164.    Oasis was only authorized to proceed with construction of water bottling facilities at TQ on or about August 11, 2006.

165.    P00011, signed August 12, 2006, imposed new penalties applicable in the event Oasis was unable to meet certain minimum **quality** water production levels.

166.    Specifically, through Section 16.0 of the new PWS (dated August 12, 2006) added to the Contract by P00011, the Government claimed the right to impose a monetary sanction of .5% of the total monthly price for each day the Acceptable **Quality** Level ("AQL") for any facility was not met or surpassed and quantities of purified water were not available to meet the demand from the Class 1 Water Yard on site – *i.e.*, for each day that Oasis did not meet specified purified water quality and production levels due to an issue of "contaminated water", defined by Section 16.0 as "[w]ater creating a health risk if consumed."

167.    Section 11.1 of P00011 further specified that all "water capabilities" were now to be "fully established prior to 15 October 2006." Because all water production facilities except TQ were "fully established" certified and producing water at the time P00011 was signed, the requirement of P00011 that all water production facilities be "fully established" by October 15, 2006 relates solely to TQ. Thus, Oasis was obligated to have the TQ facility operational by October 15, 2006.

168.    Section 11.2 specified that Oasis was obligated to produce "up to the amounts depicted in paragraph 3.2 as directed by the COR and/or Contracting Officer."

169.    The P00011 AQL penalties dealt with quality of water issues and were not meant to be in the nature of liquidated damages.  Thus, they did not apply to a failure to have TQ operational by a given date but, even if they did, they could not and should not have been applied to Oasis's inability to timely complete TQ and/or were incorrectly applied.

170.    Furthermore, Section 16.0 of P00011 extended the date for commencement of production at TQ by each day of an occurrence beyond the reasonable control of the Contractor or for a "military caused delay."  Section 16.0 also allows the COR and CO to excuse Oasis from the daily production requirements of P00011.

171.    Oasis documented at least 22 days of justifiable delay due to excusable occurrences and military delays.  This is in addition to the Government's severe delays in making the site available and authorizing Oasis to begin construction.

172.    Oasis completed TQ on or about October, 23, 2006.

173.    The Government erroneously interpreted P00011 as implementing the minimum AQL production requirements of Sections 16.0 and 3.2 effective September 1, 2006.  However, neither the COR nor the CO issued orders for delivery of any daily volume of bottled water from TQ during the period September 1, 2006 through October 23, 2006.

174.    The Government required Oasis to pay a total of $2,053,333.20 under Section 16.0 for the period September 1, 2006 through October 22, 2006 for allegedly failing to meet the production requirement of Sections 16.0 that Oasis produce the production amount stated in Section 3.2 of the Contract.

175.    Oasis did not owe, and does not owe, any amount under Section 16.0 of the Contract for failure to meet AQL production minimum amounts at TQ during the period September 1, 2006 through October 22, 2006, or any other period.

37

176.   Even if the AQL standards and penalties were meant to serve as liquidated damages, and/or applied to TQ, all delays were Government-caused and Oasis was entitled to day-for-day extensions of time, which the Government failed to grant.

177.   Oasis submitted a claim for the $2,053,333.20 wrongfully withheld as a penalty under P00011, Section 16.0.

**Combined Impact of Government's Interferences, Delays, Disruptions, and Failure to Pay, as well as Assessments of Penalties**

178.   As a result of the site-by-site delayed turnover of by the Government, combined with the additional construction work required at most of the sites, Oasis's ability to complete the sites according to its plan was extended, disrupted, and made more costly.

179.   The resulting delays and disruptions also impacted the ability of Oasis to have all six sites ready for production by the end of the Base Year.  This deprived Oasis of the opportunity to produce water for sale to the Government at full production capability if the Government chose to purchase the water at $3.50 per case.

180.   The Government's actions were ignored by the various Contracting Officers who, instead, used the Government-caused delays as a basis to assess penalties, to threaten default, and to extend the Contract Base Year without any compensation to Oasis.  The Government also used the Government-caused delays as an excuse not to pay Oasis as well as to reduce the amount of the ultimate Base Year payment that it did make.

181.   Oasis claimed damages for the combined effects of these Government wrongful actions and sought $11,175,063.  The Contracting Officer denied the claim using the excuse that for Oasis to have been fully ready to produce the identified ranges of water at each facility would have exceeded the minimum needs of the Government as of the end of the original Base Year.

He further stated that "Oasis was compensated for the actual amount of water produced, consumed and inventoried legally in the Base Year of the Contract."

182.    The Contracting Officer assumed that there was a full agreement between the parties on every aspect of P00011 and that Oasis accepted the reductions and the totally uncompensated extension of the Base Year.  The Contracting Officer's decision identifies no supporting rationale for these assumptions or the denial of this claim element.

**Oasis's CDA Claim and Contracting Officer Final Decision**

183.    On June 20, 2008, Oasis submitted its claim to the Contracting Officer claiming that the foregoing facts supported its claims for amounts payable under the Contract, equitable adjustment, breach of contract, delay, acceleration, duress, lack of consideration, misrepresentation, mistake and other grounds.

184.    On October 18, 2009, the Contracting Officer issued a decision denying all of Oasis' claims in full.

185.    Although Oasis disputes much of the final decision, the Contracting Officer does explicitly agree (at paragraph 6.a.) that the Contract for the Base Year was a capabilities contract, stating as follows:  "Because this is a firm fixed price contract, Oasis would have been entitled to the full $50,225,000 if the Government chose not to purchase any water during this period."

186.    The instant Complaint was filed within 12 months of the Contracting Officer final decision.

**Count 1**
**Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for Water TakenFrom Sites Other Than LSA Anaconda**

187.    Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

188.    The Base Year of the Contract between the parties provided that Oasis was to create a capability to produce bottled water at six locations by May 24, 2006.  Any water that happened to be produced could be purchased by the Government at a price of $3.50 per case if the Government chose to, in fact, take the water.

189.    For those facilities located at sites other than LSA Anaconda, the Government took 5,605,020 cases of bottled water that had been produced by Oasis at the various sites.

190.    The value of the cases taken, per the Contract, was $19,617,570 ($3.50 per case x 5,605,020 cases), and the Government failed to pay for the same.

191.    Oasis submitted a claim in the amount of $19,617,570 for the price of the water. The Government failed to pay the claim.

192.    The Government's failure to pay is a breach of Contract entitling Oasis to full payment of the $19,617,570 plus interest.

193.    In addition, or alternatively, the Government's wrongful taking of the water without paying for it was a breach of the duty of good faith and fair dealing for which Oasis is entitled to payment of the $19,617,570 plus interest.

### Count 2
**Breach of Contract For Improper Assessment of a Liquidated Damages Penalty Against Oasis for Failing to Have All Six Facilities Open By the End of the Base Year, or Alternatively, for Reducing the Base Year Contract Price Without Consideration**

194.    Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

195.    The Contract required Oasis to have the first site (LSA Anaconda) open and capable of producing bottled water by the end of 120 days from award, and the remainder of the facilities open and capable of production by the end of the Base Year as extended.

196.    Oasis was not able to complete construction and commissioning at the TQ facility/site by the end of the Base Year.

197.    The reasons for Oasis's inability to complete the TQ facility were all the responsibility of the Government.  Those Government actions responsible for the delay included a failure to designate the site until July 2006, a failure to properly prepare the site in a timely manner, and other delays, disruptions, and failures to pay during the course of construction.

198.    The incurred delays were all beyond the control and without the fault or negligence of Oasis or its subcontractors and suppliers.

199.    The Government assessed $2,270,833 in liquidated damages or penalties against Oasis without basis in Contract, fact or law.

200.    To the extent that any liquidated damages or penalties were assessed based on the AQL provisions of the PWS in P00011, this assessment and/or method of calculation was contrary to the terms of the Contract.

201.    The assessment of a penalty for late delivery of the site at TQ was wrong as a matter of Contract, fact and law, and constituted a breach of Contract.

202.    Alternatively, the reduction in the Base Year Contract price of $2,270,833 was a reduction in the Contract price without consideration to Oasis in violation of regulation and law.

203.    The Contracting Officer's finding that the reduction "can be traced to consideration owed to the USG" for a reduction of the total number of sites from eight to six is wrong as a matter of Contract, fact, and law.  This reduction, accomplished through P00001, was in exchange for Oasis's having to make material modifications to the remaining six facilities/plants in order to meet the same/unchanged bottled water production capability requirements.

204.    The Contracting Officer's denial of the claim was wrong as a matter of Contract, fact and law.

205.   Oasis is entitled to damages in the amount of $2,270,833 plus interest.

### Count 3
### Breach of Contract For Improper Reduction of the Option
### Period One Price Without Consideration

206.   Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

207.   The Contract, as executed, established the firm fixed-price amount for Option Year 1 as $112,000,000.

208.   Through P00006, the Government reduced the length of the first option year to five months and the price to $50,000,000.

209.   Through P00009, the Government exercised the first option period in the total firm fixed-price of $50,000,000.

210.   In and through P00011, the Government reduced the price for the first option period by $3,333,333.

211.   There was no negotiation of this amount and no agreement regarding this specific reduction.  Moreover there was no justification or consideration for the reduction, as the number of sites and bottled water capability identified under the Contract remained the same.

212.   The reduction in the option period one amount was fails for lack of consideration and was in violation of regulation and law.

213.   The Contracting Officer's finding that the reduction "can be traced to consideration owed to the USG" for a reduction of the total number of sites from eight to six is wrong as a matter of Contract, fact and law.  This reduction, accomplished through P00001, was in exchange for Oasis's having to make material modifications to the remaining six facilities/plants in order to meet the same/unchanged production capability requirements.

214.   Therefore, the Contracting Officer's denial of the claim was wrong as a matter of Contract, fact and law.

215.   Oasis is entitled to damages in the amount of $3,333,333 plus interest.

### Count 4
### Breach of Contract Resulting from Government Acts and Omissions
### Impacting and Damaging Oasis During the Base Year, as Extended

216.   Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

217.   The Base Year of the Contract between the parties provided that Oasis was to create a capability to produce bottled water at six locations by May 24, 2006.  Any water that happened to be produced could be purchased by the Government at a price of $3.50 per case if the Government chose to, in fact, take the water.

218.   The Government was obligated under the Contract and, consistent with the duty of good faith and fair dealing, to provide sites in a timely manner and in a status capable of being used for installation of a water purification and bottling plant, and to provide raw water of a suitable quality to be further purified by the processes which the Government knew were going to be utilized by Oasis.

219.   As a result of the site-by-site delayed turnover of sites by the Government, combined with the additional construction work required at most of the sites, and the Government's delayed and reduced payments, Oasis's ability to complete the sites according to its plan was extended, disrupted, and made more costly.

220.   The resulting delays and disruptions also impacted the ability of Oasis to have all six sites ready for production by the end of the Base Year.  This deprived Oasis of the opportunity to produce water for sale to the Government at full production capability if the Government chose to purchase the water at $3.50 per case.

221.    The Government's actions were ignored by the various Contracting Officers who, instead, used the Government-caused delays as a basis to assess penalties, to threaten default, and to extend the Contract Base Year without any compensation to Oasis.  The Government also used the Government-caused delays as an excuse not to pay Oasis as well as to reduce the amount of the ultimate Base Year payment that it did make.

222.    Alternatively, the Government, by and through its wrongful acts and omissions, and unjustified delays and disruptions, caused Oasis to extend its Base Year construction work and related expenses without compensation.

223.    Moreover, on those sites where it was prepared to produce water, the Government's wrongful acts and omissions, and unjustified delays and disruptions, as well as delays and reductions in the amount of payments, prevented Oasis from realizing the full benefit of its contractual bargain by being unable to achieve full production and sell it to the Government at $3.50 per case.

224.    Oasis claimed damages for the combined effects of these Government wrongful actions and sought $11,175,063.  The Contracting Officer denied the claim using the excuse that for Oasis to have been fully ready to produce the identified ranges of water at each facility would have exceeded the minimum needs of the Government as of the end of the original Base Year. He further stated that "Oasis was compensated for the actual amount of water produced, consumed and inventoried legally in the Base Year of the Contract."

225.    The Contracting Officer assumed that there was a full agreement between the parties on every aspect of P00011 and that Oasis accepted the reductions and the totally uncompensated extension of the Base Year.  The Contracting Officer's decision identifies no supporting rationale for these assumptions or the denial of this claim element.

226.    The Contracting Officer's denial is wrong as a matter of Contract, fact and law and the failure to pay constitutes a breach of Contract.

227.    Therefore, Oasis is entitled to full payment of the claimed $11,175,063 plus interest.

### Count 5
### Breach of Contract Resulting from Government Failure to
### Provide Suitable Construction Sites

228.    Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

229.    The Contract required the Government to designate locations for the water-bottling facilities and to deliver to the contractor flat, graded land reasonably prepared for installation of water-bottling facilities at each of the six water bottling sites.

230.    More specifically, the Government had the Contractual duty to provide "[p]roduction facility real estate" in secure areas of six bases in Iraq upon or immediately after award (May 25, 2005).  The Government assured bidders that the Government would provide "production facility real estate," that would be "level" and that the land site preparation required would be "minimal."

231.    Additionally, the Government assumed all risks of site conditions to achieve the establishment of "level land" and requiring minimal site preparation, as warranted by the Government.

232.    At various sites, the Government failed to meet its Contractual obligations in that it failed to provide Oasis level land that required only minimal site preparation before construction could start, and/or land that it knew or had to know was suitable for the purpose intended.

233.    Oasis was ready, willing and able to move forward with construction at all sites in an efficient manner to ensure construction completion by the end of the Contract Base Year.

234.    The Government's failure to meet its Contractual obligations with regard to site identification, preparation and conditions was a breach of Contract.

235.    Alternatively, the Government's acts and omissions constituted a series of compensable constructive changes to the Contract entitling Oasis to the full costs incurred in accomplishing the final site preparations that allowed them to install the bottled water facilities.

236.    The Government's failure to provide installation-ready sites in a timely manner also entitled Oasis to the additional time required to make the sites ready and the time impact resulting from those initial delays.  The Government refused to timely extend the Contract time as requested by Oasis, thereby creating an acceleration of activities requirement which Oasis met.

237.    As a result of the Government's acts or omissions, Oasis expended an unplanned and additional $808,423 on necessary site preparation expenses.

238.    Oasis claimed for these additional costs but the Contracting Officer denied the claims without justification.

239.    Therefore, Oasis is entitled to full payment of the claimed $808,423 plus interest.

**Count 6**
**Breach of Contract and/or Constructive Change for Failure to Provide**
<u>**Suitable Water at the Purification Facilities as Required by the Contract**</u>

240.    Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

241.    The Contract required the Government to provide suitable raw water in adequate amounts to meet the Government's identified capability requirements for purification purposes at the plant buildings at each site.

242.    Additionally, the Government assumed all risks of failing to achieve a level of water suitability or purity and to pipe that water to the purification building site for use by Oasis.

243.    At Camp Speicher and Camp Q-West, the Government failed to meet its Contractual obligations in that it failed to pipe the raw water from its source to the plant buildings and to assure that the quantity and quality of the water was suitable for purification purposes.

244.    Oasis was ready, willing and able to move forward with water production at these sites in an efficient manner, and based its purification and filtering equipment needs on the Government's stated obligations.

245.    The Government's failure to meet its Contractual obligations with regard to piping the raw water from its source to the plant buildings and to provide adequate amounts of water suitable for purification purposes was a breach of Contract.

246.    As a result, Oasis was forced to construct piping and other infrastructure to bring raw water to the buildings and to provide additional filtration and purification capabilities above and beyond those required by the Contract and its plan.

247.    Alternatively, the Government's acts and omissions constituted a series of compensable constructive changes to the Contract entitling Oasis to the full costs incurred in constructing the infrastructure and installing the additional purification and filtration equipment/facilities.

248.    The Government's above failures forced Oasis to perform additional work which required additional time to complete the site work.  The Government refused to extend the Contract time as requested by Oasis, thereby creating an acceleration of activities requirement which Oasis met.

249.    As a result of the Government's acts or omissions, Oasis expended an unplanned and additional $600,000.

250.    Oasis claimed for these additional costs but the Contracting Officer denied the claims without justification.  The Government's failure to pay for the Oasis additional work is a breach of Contract.

251.    Oasis is entitled to full payment of the claimed $600,000 plus interest.

### Count 7
### Breach of Contract For Unjustified Imposition of Penalties for Late Opening of TQ and/or Wrongful Reduction in Contract Price

252.    Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

253.    Oasis was only authorized to proceed with construction of water bottling facilities at TQ on or about August 11, 2006.  P00011, signed August 12, 2006, imposed new penalties applicable in the event Oasis was unable to meet certain minimum **quality** (AQL) water production levels.

254.    Section 11.1 of P00011 further specified that all "water capabilities" were now to be "fully established prior to 15 October 2006."  Because all water production facilities except TQ were "fully established" certified and producing water at the time P00011 was signed, the requirement of P00011 that all water production facilities be "fully established" by October 15, 2006 relates solely to TQ.  Thus, Oasis was obligated to have the TQ facility operational by October 15, 2006.

255.    The P00011 AQL penalties dealt with quality of water issues and were not meant to be in the nature of liquidated damages.  Thus, they did not apply to a failure to have TQ operational by a given date but, even if they did, they could not and should not have been applied to Oasis's inability to timely complete TQ and/or were incorrectly applied.

256.    Furthermore, Section 16.0 of P00011 extended the date for commencement of production at TQ by each day of an occurrence beyond the reasonable control of the Contractor or for a "military caused delay."  Section 16.0 also allows the COR and CO to excuse Oasis from the daily production requirements of P00011.

257.    Oasis documented at least 22 days of justifiable delay due to excusable occurrences and military delays, in addition to the Government's severe delays in making the site available and authorizing Oasis to begin construction.

258.    Oasis completed TQ on or about October, 23, 2006.

259.    The Government erroneously interpreted P00011 as implementing the minimum AQL production requirements effective September 1, 2006.  However, neither the COR nor the CO issued orders for delivery of any daily volume of bottled water from TQ during the period September 1, 2006 through October 23, 2006.

260.    The Government required Oasis to pay a total of $2,053,333.20 under Section 16.0 for the period September 1, 2006 through October 22, 2006 for allegedly failing to meet the production requirement of Sections 16.0 that Oasis produce the production amount stated in Section 3.2 of the Contract.

261.    Oasis did not owe, and does not owe, any amount under Section 16.0 of the Contract for failure to meet AQL production minimum amounts at TQ during the period September 1, 2006 through October 22, 2006, or any other period.

262.    Even if the AQL standards and penalties were meant to serve as liquidated damages, and/or applied to TQ, all delays were Government-caused and Oasis was entitled to day-for-day extensions of time, which the Government failed to grant.

263.    Oasis submitted a claim for the $2,053,333.20 wrongfully withheld as a penalty under P00011, Section 16.0.  Oasis did not owe, and does not owe, any amount under Section 16.0 of the Contract for failure to meet quality water production minimum amounts at TQ during the period September 1, 2006 through October 22, 2006.

264.    The Contracting Officer denied the claim, once again finding incorrectly that the reason for the Government's reduction in the Contract payment was to provide consideration to the Government for reducing (in P00001) the number of bottling plants from eight to six.

265.    The Contracting Officer's denial of the claim was wrong as a matter of Contract, fact and law.

266.    The Government's reduction in the Contract price was a breach of Contract and Oasis is entitled to damages of $2,053,333.20 plus interest.

### Count 8
### Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for Water TakenFrom Site LSA Anaconda

267.    Oasis incorporates herein, as if fully set forth, paragraphs 1 through 186 above.

268.    The Base Year of the Contract between the parties provided that Oasis was to create a capability to produce bottled water at six locations by May 24, 2006.  However, one location was to be completed and operational within 120 days of award.  That location was LSA Anaconda.

269.    Any water that happened to be produced following completion could be purchased by the Government at a price of $3.50 per case if the Government chose to, in fact, take the water.

270.    From LSA Anaconda, the Government took 3,100,972 cases of bottled water that had been produced by Oasis.

271.    The value of the cases taken, per the Contract, was $10,853,402 ($3.50 per case x 3,100,972 cases), and the Government failed to pay for the same.

272.    Oasis submitted a claim in the amount of $10,853,402 for the price of the water. The Government failed to pay the claim because the Contracting Officer found that Oasis was paid in full for all bottled water produced during the Base Year.  This statement is incorrect as a matter of Contract, fact and law.  The only monies paid to Oasis during the Base Year were to compensate Oasis for the capability to produce bottled water.

273.    The Government's failure to pay is a breach of Contract entitling Oasis to full payment of the $10,853,402 plus interest.

274.    In addition, or alternatively, the Government's wrongful taking of the water without paying for it was a breach of the duty of good faith and fair dealing, entitling Oasis to payment of $10,853,402 plus interest.

WHEREFORE, the Court should find that Oasis International Waters, Inc. is entitled to the relief requested in Counts 1 – 8 above in the total amount of $50,711,957, plus interest, and enter judgment in favor of Oasis International Waters, Inc. in that amount.

Respectfully submitted,

October 18, 2010

Laurence Schor
Asmar, Schor & McKenna, PLLC
5335 Wisconsin Ave, NW
Suite 400
Washington, D.C.  20015
(202) 244-4264
(202) 686-3567 (facsimile)
lschor@asm-law.com
*Counsel of Record for Oasis International Waters, Inc.*

<u>Of Counsel</u>
Susan L. Schor (sschor@asm-law.com)
Dennis C. Ehlers (dehlers@asm-law.com)
David A. Edelstein (dedelstein@asm-law.com)
Asmar, Schor & McKenna, PLLC
5335 Wisconsin Ave, NW
Suite 400
Washington, D.C.  20015
(202) 244-4264
(202) 686-3567 (facsimile)