UNITED STATES COURT OF FEDERAL CLAIMS

_____

OASIS INTERNATIONAL WATERS, INC.,    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )    Case No. 10-707C
                                     )    (Judge Horn)
THE UNITED STATES OF AMERICA,        )
                                     )
            Defendant.               )
_____)


**PLAINTIFF'S BRIEF IN SUPPORT OF ITS POST-TRIAL MOTION FOR
SPOLIATION SANCTIONS**


October 17, 2014                    LAURENCE SCHOR
                                   ASMAR, SCHOR & MCKENNA, PLLC
                                   5335 Wisconsin Ave, NW
                                   Suite 400
                                   Washington, DC  20015
                                   (202) 244-4264
                                   (202) 686-3567 (facsimile)
                                   lschor@asm-law.com
                                   *Counsel of Record for Oasis International Waters,
                                   Inc.*


Of Counsel
Susan L. Schor (sschor@asm-law.com)
Susan W. Ebner (sebner@asm-law.com)
Dennis C. Ehlers (dehlers@asm-law.com)
David A. Edelstein (dedelstein@asm-law.com)
Robert D. Pratt (rpratt@asm-law.com)
ASMAR, SCHOR & MCKENNA, PLLC
5335 Wisconsin Ave, NW
Suite 400
Washington, DC  20015
(202) 244-4264
(202) 686-3567 (facsimile)

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ i

Table of Authorities Cited ........................................................................................... iii

Questions Presented .................................................................................................... vi

Statement of the Case.................................................................................................. vii

Argument ....................................................................................................................... 1

I.   Legal Standards ....................................................................................................... 1

   A.   Spoliation and the Duty to Preserve Evidence ............................................... 1

   B.   Available Sanctions for Spoliation.................................................................. 2

      1.   Adverse Inferences ................................................................................... 4

      2.   Monetary Sanctions ................................................................................. 5

II.   Background: Defendant's Reluctant, Slow, and Incomplete Document Production. .............. 7

   A.   Defendant Did Not Produce the Bulk of the Emails of the Contracting Officers for this
        Contract. ......................................................................................................... 8

   B.   Defendant Did Not Produce Files from the Contracting Officers' Representatives ....... 12

   C.   Emails That Oasis Knows Exist are Missing from Defendant's Production. ................. 13

III.   The Defendant Culpably Failed to Preserve Evidence it Had a Duty to Preserve. ............... 13

   A.   Defendant Failed in its Obligation to Preserve Evidence Required to Be Maintained By
        Statute and/or Regulation .............................................................................. 14

      1.   The FAR Required Defendant to Maintain a Broad Range of Documents in the
           Contract File ............................................................................................ 15

      2.   Army Regulations Required Defendant to Maintain a Broad Range of Documents
           as Records................................................................................................ 16

   B.   Defendant Failed in its Obligation to Preserve Documents Once Litigation was
        Reasonably Foreseeable. ................................................................................ 20

      1.   The Defendant Did Not Institute a Litigation Hold Until Well After Litigation was
           Foreseeable.............................................................................................. 20

      2.   Defendant's failure to timely initiate a litigation hold was grossly negligent........ 26

   C.   Defendant Failed in its Obligations Once Litigation Commenced to Identify, Preserve,
        and Produce Relevant Documents.................................................................... 28

i

     1.    Failure to "find" the PCO system. ......................................................................... 29

     2.    Failure to "find" Dean Carsello ........................................................................... 31

IV.  Defendant's Failures Led to the Destruction of Relevant Evidence and Prejudiced Oasis .. 34

   A.   Iraq.Centcom.Mil Emails .......................................................................................... 34

     1.    A Timely Litigation Hold Would Have Preserved All Relevant Iraq.Centcom.Mil

         Emails ................................................................................................................... 35

     2.    The Loss of these Emails Prejudiced Oasis ........................................................... 37

   B.   Dean Carsello's Documents ........................................................................................ 44

   C.   PCO Servers, Emails, and Backup Tapes ..................................................................... 46

     1.    Lost and Destroyed PCO Tapes Contained Relevant Evidence. ............................ 48

     2.    Destroyed PCO Servers Contained Relevant Evidence. ........................................ 51

   D.   COL Richardson's Documents and Emails .................................................................. 52

   E.   MAJ Rhone's Notes ................................................................................................... 57

   F.   Documents Required Pursuant to the FAR and Records Management Requirements ... 58

V.  Conclusion .................................................................................................................... 59

<u>T</u>ABLE OF <u>A</u>UTHORITIES <u>C</u>ITED

## CASES

<u>AAB Joint Venture v. United States</u>, 75 Fed. Cl. 432 (2007)..................................................24, 27

<u>Apple Inc. v. Samsung Electronics Co.</u>, 888 F. Supp. 2d 976 (N.D. Cal. 2012)..........................27

<u>Bill Strong Enterprises, Inc. v. Shannon</u>, 49 F.3d 1541 (Fed. Cir. 1995) <u>overruled by</u> <u>Reflectone,</u>

<u>Inc. v. Dalton</u>, 60 F.3d 1572 (Fed. Cir. 1995)...................................................................25

<u>Byrnie v. Town of Cromwell, Bd. of Educ.</u>, 243 F.3d 93 (2d Cir. 2001).....................................14

<u>Chapman Law Firm, LPA v. United States</u>, 113 Fed. Cl. 555 (2013)................................. *passim*

<u>Ensign-Bickford Aerospace & Def. Co.</u>, ASBCA No. 57929, 13 BCA ¶ 35,322 (May 23, 2013)...

.......................................................................................................................................23

<u>Garco Constr., Inc.</u>, ASBCA No. 57796, 13 BCA ¶ 35,456 (Oct. 16, 2013). ..............................25

<u>Gerlich v. U.S. Dep't of Justice</u>, 828 F. Supp. 2d 284 (D.D.C. 2011) <u>aff'd in part, rev'd in part</u>,

711 F.3d 161 (D.C. Cir. 2013). ...................................................................................14

<u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 169 F.R.D. 598 (D.N.J. 1997). ................6

<u>Jandreau v. Nicholson</u>, 492 F.3d 1372 (Fed. Cir. 2007)..................................................................3

<u>K-Con Bldg. Sys., Inc. v. United States</u>, 106 Fed. Cl. 652 (2012). ............................................2, 5

<u>Lab. Corp. of America v. United States</u>, 108 Fed. Cl. 549 (2012). ...........................................5, 14

<u>Mazloum v. District of Columbia Metropolitan Police Dept.</u>, 530 F. Supp. 2d 282 (D.D.C. 2008).

.........................................................................................................................................4

<u>Micron Tech., Inc. v. Rambus Inc.</u>, 645 F.3d 1311 (Fed. Cir. 2011). .......................................2, 20

<u>Mosaid Technologies Inc. v. Samsung Electronics Co.</u>, 348 F. Supp. 2d 332 (D.N.J. 2004). ........6

<u>Multiservice Joint Venture, LLC v. United States</u>, 374 F. App'x 963 (Fed. Cir. 2010). ................5

<u>Orbit One Commc'ns, Inc. v. Numerex Corp.</u>, 271 F.R.D. 429 (S.D.N.Y. 2010). ........................47

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., 685 F. Supp. 2d 456

(S.D.N.Y. 2010) abrogated by Chin v. Port Auth. of New York & New Jersey, 685 F.3d

135 (2d Cir. 2012)............................................................................................................33

Phoenix Four, Inc. v. Strategic Res. Corp., 05 CIV. 4837, 2006 WL 1409413 (S.D.N.Y. May 23,

2006). .............................................................................................................................30

Pitney Bowes Gov't Solution, Inc. v. United States, 93 Fed. Cl. 327 (2010). ..............................14

Reilly v. Natwest Markets Grp. Inc., 181 F.3d 253 (2d Cir. 1999). ...............................................4

Renda Marine, Inc. v. United States, 58 Fed. Cl. 57 (2003)................................................. *passim*

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002). ........................4

Sekisui Am. Corp. v. Hart, 945 F. Supp. 2d 494 (S.D.N.Y. 2013)...............................................27

Surowiec v. Capital Title Agency, Inc., 790 F. Supp. 2d 997 (D. Ariz. 2011).............................27

Treppel v. Biovail Corp., 233 F.R.D. 363 (S.D.N.Y.2006). .........................................................47

United Med. Supply Co. v. United States, 77 Fed. Cl. 257 (2007). .........................................4, 24

Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497 (D.Md. 2010).................................3, 5

## STATUTES

41 U.S.C. § 7103 (2012). ...............................................................................................................25

41 U.S.C. § 7104 (2012). ...............................................................................................................25

44 U.S.C. § 3301 (2012). ...............................................................................................................16

## REGULATIONS

FAR 4.801 (2005). ..........................................................................................................................15

FAR 4.803 (2005). ..........................................................................................................................15

FAR 33.311 (2009). ........................................................................................................................26

**OTHER**

*Dep't of the Army, Guide to Recordkeeping in the Army*, Pamphlet 25-403, 3-15 (2008)............16

## QUESTIONS PRESENTED

1.  Whether Defendant spoliated evidence.

2.  Whether, as a result of Defendant's spoliation of evidence, Oasis is entitled to adverse inferences.

3.  Whether Oasis is entitled to recovery of its costs and fees incurred as a result of Defendant's spoliation of evidence.

### STATEMENT OF THE CASE

This contract arises out of a certified claim that Oasis International Waters submitted under Contract No. W27P4A-05-C-0002, as well as a Government counterclaim against Oasis for fraud. Oasis alleges that the Defendant deleted, destroyed, or otherwise failed to preserve relevant documents that it had an obligation to preserve, that this constituted spoliation, and that Oasis has suffered prejudice as a result. As discussed below, Oasis is entitled to both adverse inferences in its favor and its costs and fees incurred as a result of the Defendants' spoliation of evidence.  Specifically, Oasis requests the following inferences:

1. The Government intended to award a services contract.

2. The Government intended to award a contract for capability, not for water.

3. The Government drafted P00003 for the purpose of converting the contract to a commodity contract for the purchase of bottled water.

4. Individuals within Joint Contracting Command – Iraq (JCC-I) believed that Oasis was entitled to $50,225,000 Base Year Firm Fixed Price payment in exchange for establishing the water-bottling capability, with no requirement to produce water.

5. The communications with the base Mayors would have supported Oasis' entitlement to site improvements at Government cost.

6. The Government issued P00006 solely for the purpose of resolving its own funding issues.

7. The emails destroyed discussing the compressed schedule for letting and awarding the Contract would have supported Oasis' interpretation that no water was required in the Base Year.

8. The emails destroyed would have supported the reasonableness of Oasis' interpretation of the Contract.

9. General Scott's emails should have supported Oasis claim that COL Richardson was directed by her superiors to extract concessions from Oasis in exchange for P00011.

10. The Government knew Oasis would have no choice but to accept modifications P00006 and P00011.

11. Contracting Officers were directed by their superiors to issue P00006 and P00011 that changed the Contract structure to Oasis' detriment.

12. Dean Carsello's Risk Analysis and contributing documents supported Oasis' entitlement to Counts 5 and 6.

13. Dean Carsello's Risk Analysis and contributing documents showed that Oasis was never paid for the site improvements claimed for in Count 6.

14. Dean Carsello's Risk Analysis and contributing documents supported the reasonableness of Oasis' claim theory.

15. Individuals within Joint Contracting Command – Iraq (JCC-I) believed that Oasis was entitled to $50,225,000 Base Year Firm Fixed Price payment in exchange for establishing the water-bottling capability, with no requirement to produce water.

16. COL Richardson's documents would have supported Oasis' contractual interpretation that this Contract originally was a capability contract, and that Oasis was due $50.225M for the base year without regard to water produced and/or delivered.

17. COL Richardson's emails to, from and discussing MG Scott would have supported Oasis' claim that she was directed by her superiors to extract concessions from Oasis in exchange for P00011.

18. MAJ Rhone's contemporaneously taken notes during discussions with Oasis about the Claim would support Oasis' subjective belief in the validity of the Claim and objective reasonableness of Oasis' interpretation.

19. The documents in the COR files would have supported Oasis' position that but for Government-caused delays, Oasis would have completed all six (6) plants within the original base year.

<u>**ARGUMENT**</u>

Throughout the performance of the Contract at issue in this case, the United States failed to preserve highly relevant and probative documents that it was required by law to maintain. It deleted or destroyed such documents well after its obligation attached to preserve them in anticipation of litigation. And, it denied or obfuscated the existence of repositories of relevant documents during discovery in this case, causing more documents to be lost to the passage of time. These lost documents – including significant volumes of emails and files from Contracting Officers, Contracting Officer Representatives, and representatives of the ultimate customer (COSCOM) – would have been of great aid to Oasis in the presentation of its case and defense against Defendant's counterclaim, as they would have tended to support certain of Oasis's positions and refute the Defendant's latter-day accusations of fraud. Accordingly, we ask the Court to find that Defendant has committed spoliation, and that Oasis is entitled to both costs (including reasonable attorneys' fees) and adverse evidentiary inferences.

I. <u>**LEGAL STANDARDS**</u>

   A. <u>**Spoliation and the Duty to Preserve Evidence**</u>

   "'Spoliation 'is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" <u>Chapman Law Firm, LPA v. United States</u>, 113 Fed. Cl. 555, 609 (2013).

   "The duty to preserve [evidence] . . . 'attaches not just when a suit is filed, but whenever a party knows or should know that evidence may be relevant to anticipated litigation.'" <u>Id.</u> (quoting <u>AAB Joint Venture v. United States</u>, 75 Fed. Cl. 432, 440 (2007)). "A party, therefore, has an obligation to preserve relevant electronic records, including email correspondence and back-up media, when anticipating litigation." <u>Id.</u> (quoting <u>AAB Joint Venture</u>, 75 Fed. Cl. at 441 (2007)). "The duty to preserve evidence begins when litigation is 'pending or reasonably

foreseeable.'" <u>Micron Tech., Inc. v. Rambus Inc</u>., 645 F.3d 1311, 1320 (Fed. Cir. 2011) (quoting

<u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir.2001)).

A party to litigation need not be specifically threatened with the prospect of litigation in order for it to be required to begin preserving evidence. Rather, the specific factual circumstances can give rise to the duty to preserve evidence in the absence of such an overt threat. "When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." <u>Id.</u> "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." <u>Id.</u> For example, this Court has previously stated that oral notice of differing site conditions can be sufficient to demonstrate that litigation was foreseeable. <u>Renda Marine, Inc. v. United States</u>, 58 Fed. Cl. 57, 62 (2003).

### B. <u>Available Sanctions for Spoliation</u>

"Sanctions for spoliation arise out of the court's inherent power 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" <u>Chapman Law Firm, LPA v. United States</u>, 113 Fed. Cl. 555, 609 (2013) (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Spoliation sanctions are appropriate if the spoliating party acted with a culpable state of mind. Having a culpable mind means to be "blameworthy or responsible for the conduct at issue. <u>K-Con Building Sys. Inc. v. United States</u>, 106 Fed. Cl. 652, 665 (2012). Spoliation sanctions under a court's inherent authority are appropriate when "the party having control over the evidence had an obligation to preserve it at the time it was destroyed," the evidence was "destroyed with a culpable state of mind," and "the destroyed evidence was

relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Jandreau v. Nicholson, 492 F.3d 1372, 1375 (Fed. Cir. 2007).

"The Federal Circuit has not clarified on the level of culpability required for a finding of spoliation." Chapman Law Firm, 113 Fed. Cl. at 610 (2013). "Although judges of the Court of Federal Claims have disagreed over whether spoliation requires a finding of bad faith, a number of recent decisions have advanced persuasive arguments that the court is not required to find bad faith in order to impose a sanction for spoliation."[1] Id. (citations omitted). "In the absence of a requirement to show bad faith, the court may impose sanctions if the destruction of evidence was 'blameworthy.'" Id. (quoting K–Con Bldg. Sys., Inc. v. United States, 106 Fed. Cl. 652, 666 (2012)). [2]

"The intent of the party who destroyed the evidence is relevant only in that it informs the court's analysis of what, if any, sanctions should be imposed." Id. at 610-11 (citing Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 560 (2012).[3] See also United Medical Supply Co. v.

---

[1] Prior to 2007, some Court of Federal Claims decisions held that bad faith was a requirement for the imposition of severe sanctions. However, as articulated in United Medical, these decisions were based on the mistaken belief that the Federal Circuit had already determined that there was such a requirement. United Medical Supply Co. v. United States, 77 Fed. Cl. 257, 266 (2007) ("As such, as startling as it might seem, the mens rea issue confronting this court appears to be an open question in this circuit."). Among the circuits, there is a sizeable split regarding whether bad faith is a requirement for spoliation sanctions. See generally Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 529 (D.Md. 2010) (discussing the circuit split).

[2] A requirement for bad faith would be particularly problematic in the context of Government Contracts, given the presumption of regularity afforded to Government conduct. Were there such a requirement, the Government would effectively be immunized against spoliation claims.

[3] Even COFC cases that have purported to require bad faith in order to find spoliation have imposed lesser sanctions without a finding of bad faith. See Renda Marine, Inc. v. United States,

United States, 77 Fed. Cl. 257, 270-271 (2007) ("Under this balancing approach, there are no bright lines, at least in terms of mens rea, with the focus instead being on effectively addressing, overall, the spoliation conduct . . . .").

Among the most common sanctions available when a party has spoliated evidence are adverse inferences against the spoliating party and monetary sanctions.

### 1.    *Adverse Inferences*

A number of courts have held that adverse inferences can be granted for gross negligence or even ordinary negligence.  United Med. Supply Co., 77 Fed. Cl. at 271 ("Under this flexible standard, repeated acts of gross negligence, particularly if accompanied by inaccurate representations to the court that serve to mask and perpetuate the spoliation, can be met with the same or a more severe sanction than a single act of bad faith."); Reilly v. Natwest Markets Grp. Inc., 181 F.3d 253, 267 (2d Cir. 1999) ("We do not read either [Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998)] or [Berkovich v. Hicks, 922 F.2d 1018 (2d Cir. 1991)] as an absolute prohibition against granting an adverse inference instruction where there is no bad faith but there is gross negligence. To the contrary, we have previously approved more severe sanctions based solely on gross negligence."); Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 101 (2d Cir. 2002) ("[D]iscovery sanctions, including an adverse inference instruction, may be imposed where a party has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence[.]") (cited by Jandreau v. Nicholson, 492 F.3d 1372, 1375 (Fed. Cir. 2007)); Mazloum v. District of Columbia

---

58 Fed. Cl. 57, 62 (2003) (requiring the Government to restore data from backup tapes at its own cost despite not finding spoliation).

Metropolitan Police Dept., 530 F.Supp.2d 282, 292-93 (D.D.C. 2008) (an adverse inference instruction can be awarded based on even ordinary negligence).

"The party seeking an adverse inference has the burden of establishing that spoliation has occurred.  In addition, the party seeking an adverse inference must 'come forward with plausible, concrete suggestions as to what [the discarded] evidence might have been.'"  Chapman Law Firm, LPA, 113 Fed. Cl. at 610.  It must be demonstrated that "a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."  Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 531 (D.Md. 2010).  The likelihood that the destroyed documents were relevant and helpful can be inferred from other evidence.  K-Con Building Sys. Inc. v. United States, 106 Fed. Cl. 652, 665 (2012) (holding that the character of a large group of destroyed documents can be inferred from a handful of surviving documents that were produced).  The court should impose sanctions that are designed to rectify the specific prejudice suffered by the opposing party.[4]  Lab. Corp. of America v. United States, 108 Fed. Cl. 549, 562 (2012); United Medical Supply Co. v. United States, 77 Fed.Cl. 257, 275-276 (2007).

2. *Monetary Sanctions*

The Court is also within its discretion to award monetary sanctions (including costs and reasonable attorneys' fees) as a consequence of the spoliation of evidence.  Multiservice Joint Venture, LLC v. United States, 374 F. App'x 963, 966 (Fed. Cir. 2010) (holding that the lower court did not abuse its discretion in awarding monetary sanctions in consequence of an attorney's

---

[4] At least one Court of Federal Claims decision has interpreted prejudice as a fourth prong of the test for spoliation sanctions.  K-Con Building Sys. Inc., 106 Fed. Cl. at 665.  Other courts have interpreted it as an element to consider in evaluating sanctions.  This distinction is irrelevant to our case, given that under either framework, spoliation sanctions require a showing of prejudice.

spoliation); Mosaid Technologies Inc. v. Samsung Electronics Co., 348 F. Supp. 2d 332, 335 (D.N.J. 2004) ("Potential sanctions for spoliation include: dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference; *fines; and attorneys' fees and costs*.") (internal footnotes omitted) (emphasis added).  Such costs are appropriate where the spoliating party's conduct imposed additional costs on the non-spoliating party.  See In re Prudential Ins. Co. of Am. Sales Practices Litig., 169 F.R.D. 598, 617 (D.N.J. 1997) (ordering the spoliating party to "promptly reimburse plaintiffs' counsel for all fees and costs associated with the motion for sanctions, the order to show cause, the depositions and discovery in preparation for the depositions, and the preparation and distribution of the Report of Investigation to the Court and counsel.").

Oasis has incurred substantial additional (unnecessary) costs over the last four years to file motions, review backup tapes, take depositions of 30(b)(6) witnesses, and otherwise hunt for documents (and personnel) that Defendant should have produced of its own volition, but instead produced only when the Court directed Defendant to do so.[5]  At every turn, Defendant opposed Oasis' efforts to produce additional documents, driving up costs.  Moreover, as described below, earlier litigation holds would have substantially reduced the cost of litigation, because important repositories of information (PCO) and personnel (Dean Carsello) would have produced documents within the normal course of the Claim review.  Defendant's failure to provide knowledgeable witnesses for relevant time periods dramatically increased the time it took to search the PCO backup tapes.  Oasis has essentially had an attorney dedicated almost exclusively to discovery disputes with Defendant dating back to the start of 2013.

---

[5] As an example, the hard copy contract file was only produced after Oasis noticed obvious deficiencies in the electronic contract file (which Defendant had previously averred was the only contract file), and suggested to Defendant's counsel that they contact Rock Island, IL.

II.   **BACKGROUND: DEFENDANT'S RELUCTANT, SLOW, AND INCOMPLETE DOCUMENT PRODUCTION.**

The Defendant failed to produce many key documents for this contract.  Most of Defendant's productions followed Oasis identifying the repository, with no help from the Defendant. Despite the four-year hunt for documents – with which the Court is very familiar – Defendant's production is still patently deficient.

In total, Defendant has produced approximately 100,000 pages[6] of documentation from various document repositories.[7]  Stip. 168 (identifying the source and date of production of 88,729 pages with "US" bates numbers and 10,660 pages with "DCMA" bates numbers).  The bulk of these productions came from six (6) sources:

- Electronic Contract File: *14,938* pages. (August 2011).  Stip. 168a.

- Major Vazquez' Files: *14,789* pages. (August 2011).  Stip. 168b.

- Kuwait Contract Files: *14,987* pages. (September 2011).  Stip. 168d.

- Hard Copy Contract File: *5,371* pages. (July 2012).  Stip. 168h.

- DCMA Files: *10,660* pages.  (February and April 2013).  Stip. 168l.

- PCO:  approximately *34,259* pages.  (March-June 2014).  Stip. 168u-w.

The remaining approximately *4,500* pages came from 18 smaller productions of varying sizes between August 2011 and March 2014.  Stip. 168a-t. Even after Defendant finally produced (at Oasis' expense) 34,000 pages from PCO.Iraq.net ("PCO") in June 2014, Defendant's production

---

[6] The various productions did include overlapping documents, so the total number of produced pages is actually smaller.

[7] The specific bates ranges of the productions are contained at Stip. 168.

was less than one fourth the size of Oasis' production of *437,819* pages of documents.[8]  Compare Stips. 172 and 173 with Stip 168.  This is not just a difference in quantity: it demonstrates that Defendant destroyed, lost, or otherwise failed to retain important documents that it should have retained and produced.

A.    **Defendant Did Not Produce the Bulk of the Emails of the Contracting Officers for this Contract.**

Defendant failed to produce the majority of the relevant and responsive emails sent or received by the Contracting Officers.  Based on Defendant's statements, these documents appear to have been destroyed in theater unless they were affirmatively selected for preservation in the contract file. And, contrary to testimony offered by witnesses at trial, preservation of emails in the contract file was the exception[9], rather than the rule. This is proven by the emails that Oasis had the good fortune to find despite Defendant's policy of destruction:

| Contracting Officer | Involvement | Emails[10] Produced from Contract File[11] | Emails Produced from Other Repositories |
|---|---|---|---|
| MAJ (ret.) Vazquez | Awarded Contract | 3 | 1592 |

---

[8] Oasis omits from this calculation the 420,000 pages of documents Oasis produced in 2013 as part of its "double-check" production because those documents were largely duplicates.  This production is listed at Stip. 174.

[9] A proximity search for first and last names of the COs was used as part of determining these numbers, so there should be a very small margin of error of plus or minus a few emails. However, as with all electronic searches, accuracy largely depends on how well certain documents were rendered searchable using Optical Character Recognition (OCR).

[10] In order to be as conservative as possible, Oasis calculated these numbers by including any email where a CO was a sender or a recipient at any point in an email chain.  Oasis omitted emails that were attachments to official submissions by Oasis to the Government (*e.g.* Claim).

[11] References to the "contract file" include both the Hard Copy and Electronic versions unless otherwise noted.  While this distinction will matter for later merits pleadings, for the purpose of discussing document retention by Defendant and in the interest of being conservative, Oasis will treat the two files as one.

| 1LT Knapp | Issued P00001 | 4 | 128 |
|---|---|---|---|
| MAJ Lopez | Issued P00002, P00003, and P00004 | 13 | 40 |
| MAJ (ret.) Montler | Issued P00005 | 28 | 20 |
| LTC Davis | Issued P00006 | 222 | 206 |
| COL Richardson | Issued P00011 | 25 | 129 |
| LTC Joel Fortenberry | Issued P00013 | 8 | 382 |
| CDR Klingenberg | Received Claim | 18 | 650 |
| LTC Rhone | Claim Review | 90 | 1023 |
| MAJ Kenneally | Claim Review | 25 | 482 |
| LTC Hobbs | Issued COFD | 2 | 27 |

These numbers demonstrate that the Contracting Officers purportedly only saved a small percentage of their emails in the contract file.  The best example of this is MAJ Vazquez, who personally and fortuitously retained a copy of his .PST file when he left the Iraq theatre.[12] MAJ Vazquez sent or received over 1,500 emails related to the formation and issuance of the Contract, but put only three (3) in the contract file.[13]  The emails recovered from MAJ Vazquez's .PST file of "personally saved" emails were indisputably relevant to this litigation, and include many emails that were used as exhibits and discussed at length at trial, such as the emails where MAJ Vazquez and Max Wyeth negotiated a $222M reduction in the price of the Contract.  *See* JX39, JX40, JX42, JX44, JX45, and JX47.  With respect to LTC Rhone, Oasis was able to recover

---

[12] In this context, a .PST file is a file that contains an entire mailbox from Microsoft Outlook, rather than a single message.

[13] MAJ Vazquez' production numbers directly contradict his testimony at trial, when he testified that he thought he had a "fairly thorough file."  Tr.  3291:23 - 3292:7.

some .PST files from the PCO system, which (together with other sources) contained over 1,000

emails related to this Contract. He had put only 90 emails in the contract file.  The other

Contracting Officers from 2007 and later show similar ratios, with emails placed in the contract

file representing only a small fraction of the emails found through other sources[14]  Oasis does not

claim prejudice from the fact that these emails were produced from repositories other than the

contract file.  However, this demonstrable pattern of not placing emails in the contract file for

preservation is troubling with respect to the Contracting Officers in the early performance period,

including the COs who issued most of the relevant modifications. Oasis received a *total* of 48

emails from MAJ Montler, 53 from MAJ Lopez, and 154 from COL Richardson. To put that in

perspective, even though COL Richardson issued one of the key modifications at issue in this

litigation, the Defendant produced fewer than one tenth as many COL Richardson emails as were

found in MAJ Vazquez's .PST file. Surely, if the complete email account of COL Richardson,

MAJ Lopez, LTC Davis, or MAJ Montler (all heavily involved in the period of water bottling

site selection and changes, plant construction, and otherwise in contact with CORs) had been

produced, their volume of emails would have been similar to that of MAJ Vazquez, and Oasis

would have received thousands of additional relevant emails that have instead been lost.

Defendant's failure to preserve the Contracting Officer's emails created significant

subject matter gaps in Defendant's total production.  Consistent with the limited number of

documents produced from Lt. Knapp, MAJ Lopez, and MAJ Montler, Defendant produced

---

[14] Most of the preserved emails of these later Contracting Officers were preserved because they
were sent to the CO's superiors, with PCO email accounts. Oasis only received PCO backup
tapes from 2007 and later.

almost no emails related to the modifications they signed - P00001[15] (which reduced the number of plants from 8 to 6), P00003[16] (which was later used by LTC Montler and LTC Davis as a vehicle to constructively change the Contract by adding the requirement to produce up to 14,350,000 cases of water to the work scope to receive payment[17]), or P00005[18] (which novated the Contract to Oasis).  Similarly, Defendant produced few emails related to actual site development including: land assignments, site improvements, as well as internal military justification to assist Oasis in moving items into Iraq and the warzone.[19]  While LTC Davis did a comparatively better job preserving emails, he still saved only a fraction of the number that MAJ Vazquez preserved, and preserved only a few emails discussing P00006 (his emails focused more on securing funding for the option period).  The emails discussing P00011 were largely limited to those saved by COL Richardson as part of her Memorandum for Record ("MFR").  Noticeably, that collection is missing almost all of the lead-up to the August negotiations between the parties.  Also missing from Defendant's production are emails between the COs and COSCOM (the customer) discussing the modifications during the Base Year, as well as emails up to JCC-I HQ discussing the status of the plants as they came online.

---

[15] There are no emails related to P00001 in the contract file.  The only emails related to this modification that were found were external emails sent from the 1Lt. Knapp to Max Wyeth requesting his signature on the modification, which were located in MAJ Vazquez's personally retained emails.

[16] Oasis has been unable to find any emails related to this modification.

[17] Moreover Defendant chose not to have Major Lopez testify, despite the fact that Mr. Petsche had testified to his understanding of P00003

[18] Although there are some emails related to the change of name request or novation-related issues, there are no emails specifically addressing this modification.

[19] This is shown, in part, by the fact that Defendant's "expert" on delay almost exclusively relied on Oasis' documents as part of his analysis.

**B.**     **Defendant Did Not Produce Files from the Contracting Officers'**
          **Representatives**

Defendant's production also appears to be missing most, if not all, of the

Contracting Officer Representative ("COR") files.  Although Defendant produced

various COR appointment letters and some COR training certificates, there should have

been Contract-related documents (including emails) generated and maintained by the

CORs at each of the sites as the plant locations were being identified and as the plants

were being constructed that reported on issues related to site relocations, site

improvements, source water, and KBR's interference with Oasis' performance.  As the

Contracting Officer's Representative (COR) Appointment Letter instructs LTC Hay:

> You are further required to maintain adequate records to sufficiently describe
> the performance of your duties as a COR during the life of this contract and to
> distribute such records as applicable. As a minimum, the COR file shall
> contain the following:
>
> a. A copy of the appointment letter from the contracting officer
>
> b. A copy of the contract or appropriate part of the contract and all
> modifications
>
> *c. All correspondence initiated concerning the performance of the*
> *contract*
>
> d. Records of inspections performed and the results
>
> e. Memoranda for record or minutes of any pre-performance conferences,
> meetings or discussions with the contractor, or others, pertaining to the
> contract or contract performance.

PX1109 at 6687 ¶ 5 (emphasis added).  Despite this, there does not appear to be any specific

collection of LTC James Hay's COR File.  This is particularly problematic because of the fact

that LTC Davis tasked LTC Hay with assisting Oasis in its efforts to obtain sites, expedite

materials in the country, and otherwise complete the plants.[20]  Tr. 4027:15-4029:24; 4030:20-

4036:15; 4065:1-4066:17.  He therefore should (by order) have had a large collection of emails

and other documents related to the construction of the plants that never were retained.  Oasis

notes that all CORs were required to maintain these files.

C.   **Emails That Oasis Knows Exist are Missing from Defendant's Production.**

Defendant's production is missing a very large number of emails that were sent to or

from Oasis, and which Oasis produced to Defendant.  See, e.g., PX1078, PX1085, PX1087,

PX1128, and PX1250.[21]  Defendant should have kept these emails, and its failure to do so

further supports Oasis' conclusions regarding the number of emails destroyed by Defendant.

These emails ranged in importance from daily SITREPs all the way up to P00011 negotiations

between COL Richardson and Phil Morrell that certainly should have been preserved.  See, e.g.,

PX1229, PX1232, and PX1233.  Again, Oasis does not claim prejudice from Defendant's failure

to produce emails that Oasis has in its possession, but Defendant's failure to preserve these

emails is indicative of its overall documents preservation efforts.

III.   **THE DEFENDANT CULPABLY FAILED TO PRESERVE EVIDENCE IT HAD A DUTY TO PRESERVE.**

The missing emails, documents, Power Point presentations on plant construction, and

other issues are a direct result of Defendant's failure to take the required steps to preserve

documents.  Defendant had three distinct document preservation obligations: (1) to preserve

documents from the beginning of contract performance pursuant to the FAR and applicable

statutes and regulations; (2) to institute litigation holds from the moment that litigation became

---

[20] LTC Hay was also required to submit monthly reports to the CO.  PX1109 at 6686 ¶ 2d.
These reports were never produced to Oasis.

[21] There are far too many examples to list them all here.  Thousands of emails were not
produced.

"reasonably foreseeable;" and (3) to identify, locate, and produce potential relevant

documentation once litigation began.  They failed to meet each of these obligations.

A.    **Defendant Failed in its Obligation to Preserve Evidence Required to Be Maintained By Statute and/or Regulation[22]**

Defendant's failure to preserve evidence required to be maintained by statute or

regulation constitutes spoliation.  Pitney Bowes Gov't Solution, Inc. v. United States, 93 Fed. Cl.

327, 335–36 (2010) (holding that the destruction of score sheets required to be maintained in the

contract file under FAR raised issues of spoliation); Lab. Corp. of America v. United States, 108

Fed. Cl. 549, 559 (2012) (holding that the VA and GSA had a duty to preserve evidence relevant

to procurement because the FAR required the evidence be maintained in a contract file in part

because of the theoretical potential for litigation); Gerlich v. U.S. Dep't of Justice, 828 F. Supp.

2d 284, 300 (D.D.C. 2011) aff'd in part, rev'd in part, 711 F.3d 161 (D.C. Cir. 2013) ("If a

Department employee had destroyed agency materials in violation of a records disposition

schedule, that destruction would likely warrant a spoliation inference."); Byrnie v. Town of

Cromwell, Bd. of Educ., 243 F.3d 93, 108 (2d Cir. 2001) ("We agree that, under some

circumstances, such a regulation can create the requisite obligation to retain records, even if

litigation involving the records is not reasonably foreseeable. For such a duty to attach, however,

the party seeking the inference must be a member of the general class of persons that the

regulatory agency sought to protect in promulgating the rule.").

In and of itself, the failure to maintain documents explicitly required to be preserved by

statute constitutes, at a minimum, gross negligence on the part of Defendant.  Lab. Corp. of

---

[22] Oasis notes that these statutes and regulations were enacted by Defendant for the purpose of
ensuring that Defendant properly maintained its documents.  If these statutes or regulations place
too great a burden on Defendant to preserve documentation, Defendant can always change the
requirement.

America v. United States, 108 Fed. Cl. 549, 560-61 (2012) (stating that the failure to maintain a

copy of a procurement solicitation in defiance of the FAR would constituent gross negligence or

worse).  Courts have held that gross negligence can be sufficient to award an adverse inference.

1.    <em>The FAR Required Defendant to Maintain a Broad Range of Documents in the Contract File</em>

Pursuant to FAR 4.801(4), Defendant was required to include within the contract file

documentation "sufficient to constitute a complete history of the transaction for the purpose

of…furnishing essential facts in the event of litigation or congressional inquiries."  FAR

4.801(4) (2005).  Under this provision of the FAR, Defendant is responsible for maintaining

documents in case of litigation dating back to prior to the award of the Contract, not just when

litigation becomes foreseeable.  Lab. Corp. of America v. United States, 108 Fed. Cl. 549, 559

(2012) (holding that pre-award documents were spoliated even though there was no specific

reason to foresee litigation at that time).

This requirement in the FAR requires Defendant to maintain a broad collection of

documents because the scope of the litigation is unknown.  In order for the contract file to

establish a "complete history of the transaction" in case of any theoretical litigation, Defendant

must retain most (if not all) work documents (including emails) related to the contract that are

generated by (at a minimum) the Contracting Officer, Contracting Officer Representatives

(CORs), and key contacts with the customer.  This is consistent with FAR 4.803(a), which

includes a list of 41 categories of documents that are required to maintained in the contract file

(if they exist).  FAR 4.803(a) (2005).  Included within those 41 categories of documents is a

catchall provision requiring the contract file to include "[a]ny additional documents on which

action was taken or that reflect actions by the contracting office pertinent to the contract."  FAR

4.803(a)(40) (2005).  The FAR provisions governing what should and what should not be

15

included within the contract file evidence an intent to have a "complete" record, and Defendant's actions (at least with regard to this contract file) were not aligned with that intent.  As discussed above, it was the exception, rather than the rule to preserve emails in the contract file.

<blockquote>2.   <em>Army Regulations Required Defendant to Maintain a Broad Range of Documents as Records</em></blockquote>

Defendant was required by statute and regulation to maintain "records" as part of comprehensive scheme established by Congress decades ago in Title 44 (and Title 18).  The term "record" is defined broadly, to include all "evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them," regardless of physical form or characteristics (<em>i.e.</em>, including emails).  44 U.S.C. § 3301 (2012).  Army regulations[23] implementing and offering guidance on these requirements similarly establishes that a broad range of emails constitute "official records."  Dep't of the Army, Guide to Recordkeeping in the Army, Pamphlet 25-403, 3-15 (2008). ("E–mail messages are official records when they are created or received in the transaction of public business and retained as evidence of official policies, actions, decisions, or transactions.")[24]  As shown by the "examples" of official records in AR 25-403, most emails related to this Contract constitute official records:

> (1) Examples of messages sent by e–mail that typically are records, include—
> (a) Policies and directives.
> (b) **<em>Correspondence or memoranda related to official business.</em>**
> (c) Work schedules and assignments.
> (d) Agendas and minutes of meetings.
> (e) Drafts of documents that are circulated for comment or approval.

---

[23] MAJ Olipane testified at trial that the Iraq.centcom.mil system was following army regulations in theater.  Tr. 5314:2-11.

[24] This documents was previously filed by Defendant as part of its June 6, 2013 Status Report identifying applicable document retention policies.  Doc 209-2 at A424.  Part 3-15 is located on page A458.

(f) Any document that initiates, authorizes, or completes a business transaction.
(g) Final reports or recommendations.
(h) ***Information supporting or affecting decisions made in conduct of Government business.***
Id (emphasis added).

Further supporting this position is the fact that the "examples" of emails that are not official records are either personal or non-informational:

(2) Some examples of messages that typically do not constitute records are—
(a) Personal messages and announcements not related to official business.
(b) Copies of extracts of documents distributed for convenience or reference.
(c) Phone message slips.
(d) Announcements of social events, such as retirement parties or holiday celebrations.
Id.

As AR 25-403 shows, most (if not all) non-social work related emails constitute official records and should be preserved. Donna Sherman similarly confirmed that "an email that contains a discussion in relation to a party's understanding of a government contract constitute [sic] a record." Tr. 6110:2-5.

It is not Oasis' position that all work-related emails should be kept in perpetuity. Rather, it is Oasis' position that all work related emails need to be kept – at a minimum[25] – as long as they are necessary for business purposes. Defendant itself agreed with this position in its June 6, 2013 filing. *See* Doc. 209 at 5-6 (reviewing and discussing regulations it believes are applicable. The question is when a document becomes no longer necessary for business purposes. In the context of government contracts, Oasis believes any email related to a contract should be kept as long as a contractor can bring a claim (*i.e.,* six years after the contract ends). It is only at that point that it can be determined that a work-related email is no longer necessary for business

---

[25] The longer retention periods for certain forms of "official records" need not be addressed as Defendant should have preserved the relevant documentation under even this minimal standard.

purposes.  This position is supported by the disposition schedule identified by Defendant in its

June 6, 2013 for "General Procurement Correspondence Files:"

> "Event is 2 years after cutoff on action documents or when no longer needed for current operations for non-action documents; whichever applies. Keep in CFA[26] until event occurs and then until no longer needed for conducting business, but not longer than 6 years after the event, then destroy."
> Doc. 209 at 6.

All work emails related to a government contract can be useful for business needs as long as the

contract is ongoing or litigation is possible and therefore should be maintained through that

period.[27]  If the email meets the definition of an "official record, it by definition can have value

should a future dispute arise.

The implicit assumption of Defendant's litigation position – that any email records

remaining in an officer's email account when he or she rotated out of theater were no longer

needed for any business purpose – is that the emails of that officer became useless the moment

he or she left theater.  That is nonsensical, and the decision of the Government not to call MAJ

Lopez, the author of P00003, which was used by LTC Montler and LTC Davis to support their

Contract position that P00003 modified the Contract's Statement of Objectives to include the

delivery of 14.35M cases of water in specific amounts from sites that were not required to be

operational until the last day of the Base Year of the Contract, is one of the primary examples of

why emails should have been saved.  Moreover, these emails were important because they would

have offered the replacing Contracting Officer with institutional memory that otherwise would

be missing (*i.e.,* the ability to look at their predecessors' emails to see why they did what they

---

[26] CFA stands for "current file areas."

[27] Defense against a Claim or use in fraud counterclaim certainly qualifies as a "business purposes."

did).  This is consistent with the JCC-I practice,[28] described below of passing the work emails from an officer to their replacing officer when they rotate out of theater.

Defendant's actions regarding the 30(b)(6) witnesses for CENTCOM document retention policies have sowed confusion, forced Oasis to incur additional costs, and wasted a considerable amount of time.  Among other issues[29] with Defendant's 30(b)(6) witnesses, Ms. Pelletier later learned a substantial portion of her testimony was flawed because JCC-I was not subordinate to CENTCOM (a fact Defendant did not disclose), and revealed this fact for the first time during trial.  ***Oasis requests its costs and fees incurred in relation to the erroneous 30(b)(6) testimony of Ms. Pelletier.***

_____

[28] This practice appears to have been compliant with email record retention up until 2009, when the emails were not collected and preserved when the Iraq.centcom.mil email system was shut down.  It was therefore at that point that emails were spoliated.

[29] Defendant in 2014, for the first time offered a distinction between "CENTCOM" and "Iraq.centcom.mil" email systems.  Defendant also switched at the last minute its 30(b)(6) witness for emails in Iraq from Scott Macchio and Ms. Pelletier to MAJ Olipane.  Docs. 209 and 303 (identifying the deposition in Colorado as being solely for Air Force policies and the deposition in Tampa as being for CENTCOM, without any mention of a separate "iraq.centcom.mil" system).  Defendant further never informed Oasis that Ms. Pelletier learned right after her deposition that JCC-I emails were not subject to "CENTCOM" retention policies.  Tr. 2292:20-2293:23; 2348:12-2349:3.  Defendant kept this information to itself, despite the fact that the parties spent months arguing over the testimony of Ms. Pelletier including the exchange of letters in March 2014 and in Joint Status Reports.  Doc. 327.  The parties exchanged letters on this very subject in March 2014 and Defendant never mentioned that Ms. Pelletier had essentially recanted her testimony.  Notably, cross-examination of Ms. Pelletier during trial demonstrated that Defendant had prepared to spring this on Oasis, rather than avoiding the unfair surprise by alerting Oasis in advance.  Defendant's actions further effectively prevented Oasis from having a document retention 30(b)(6) witness on emails in Iraq, because it believed Ms. Pelletier had served that purpose.

**B.      Defendant Failed in its Obligation to Preserve Documents Once Litigation was Reasonably Foreseeable.**

Defendant took no affirmative steps prior to October 2010 (or more likely 2011) to preserve evidence for this litigation.[30] MAJ Olipane, who oversaw the Iraq.Centcom.mil system from February through August 2009, was unaware of any litigation holds put in place for this Contract.  Tr. 5372:11-15.  LTC Hobbs, who denied the Claim, was unaware of any litigation hold put in place for this Contract through when he left in January 2010.  Tr. 3662:18-3663:9. MAJ Vazquez[31], LTC Davis[32], and LTC Rhone[33] were not contacted until 2011.  In addition, contracting officers were not given guidance on when they should start preserving documents. Tr. 2880:19-23 (COL Richardson); 3662:10-23 (LTC Hobbs). In short, the evidence demonstrates that Defendant made no effort to identify and preserve documents relevant to this litigation until well after Oasis had already filed its Complaint in this Court. This is in direct violation of the obligation to preserve evidence as soon as litigation is "reasonably foreseeable." See Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1320 (Fed. Cir. 2011); Chapman Law Firm, LPA v. United States, 113 Fed. Cl. 555, 609 (2013).

1.      *The Defendant Did Not Institute a Litigation Hold Until Well After Litigation was Foreseeable.*

Despite this obligation, Defendant did not institute a litigation hold until years after litigation was reasonably foreseeable; in fact, it did not do so until well after litigation was already underway.

---

[30] Oasis was not privy to Defendant's litigation document hold filing with the Court, and therefore infers these dates from the testimony elicited at trial.

[31] Tr. 3292:17-3293:3.

[32] Tr. 4160:15-23.

[33] Tr. 5938:22-5939:20.

Oasis submits that there are at least five (5) distinct dates between 2006 and 2009 on which this litigation was "reasonable foreseeable" and Defendant should have begun preserving evidence.

<blockquote>

a)   <u>October 2006: A Dispute Arises Regarding Al Taqqadum (TQ) Delays</u>
</blockquote>

Pursuant to P00011, Oasis was penalized $46,666 for every *unexcused* day after September 1, 2006 that TQ was not online and producing requested water.  JX2 at 115, Section 16.0.  Due to a series of delays outside of Oasis' control, and without its fault or negligence, as of late September 2006, TQ was not fully complete.  JX468.  On September 25, 2006, Oasis submitted to Defendant a request for 40.5 days of excusable delay[34] related to the construction of TQ.  <u>Id</u>.  Oasis submitted a detailed breakdown – by day, by cause – of the thirteen (13) different delay events Oasis alleged occurred, as well as explanations for the effect the less obvious delays had on Oasis' schedule.  <u>Id</u>.   If Defendant agreed with all of the delays alleged, Oasis would have had until October 12, 2006 to finish construction before incurring any of the daily $46,666 penalties.[35]   At a rate of $46,666 per day, 40.5 days of excusable delay had a value to Oasis of $1,889,973.  On October 4, 2006, Marcus Overbay (on behalf of and copying LTC Joel Fortenberry) emailed Oasis and informed it that Defendant agreed with eight (8) days (total value

---

[34] According to P00011, excusable delays were "occurrence[s] beyond the reasonable control of the Contractor and without its fault or negligence such as acts of God or the public enemy, acts of the government in either its sovereign or contractual capacity, fire, floods, epidemics, quarantine restrictions, unusually severe weather, and delays of common carriers…[as well as] government directed relocation of the facilities or cases of military caused delays."  JX2 at 115-116.

[35] According to the PWS Summary Matrix, the penalties at TQ could not start until September 1. JX2 at 117.

$373,328) of the 40.5 requested.[36]   JX474.   On October 26, 2006, the parties signed P00013

agreeing to eight (8) days of excusable delay.   JX2 at 149.   Unlike P00004 – a modification

which granted Oasis 12 days of excusable delay for construction of Anaconda – P00013 did not

have a release of claims.   Compare JX2 at pg. 79, Box 14 with JX2 at 149, Box 14.

At this point, both parties were aware that the remaining 32.5 days of delay were still in

dispute, and it was reasonably foreseeable that Oasis would pursue the $1,516,645[37] in excusable

delays in Court.[38]   First, as Paul Jeffries described in an email on October 8, 2006, Defendant

knew that a "battle" would be coming at a later date regarding the other 32.5 days of delay:

> Marcus and our New Lt Cor (sic) want to wait and see what our completion
> date is before giving us addl (sic) days, they do not like to approve in advance.
>
> I recommend we sign for the 8 and see how the site comes out before we battle
> for more.   They understand we will come back with the same issues if
> additional days were needed.

JX 476. Second, as Paul Jeffries testified, the parties did not arrive at the eight (8) days via open

negotiations, but instead, Defendant insisted that it would only agree to 8 days of delay over

Oasis' protests:

> Q. Did they give you a reason for why they were only allowing eight?
>
> A. No, they just said we would allow eight and that was the end of the
> discussion. So, we tried to say, wait a minute, and have that argument, but their
> -- you know, there are just times when this is what we've decided, that's it.
> There was no further dialogue about it."

Tr. 1412:1-7. Mr. Jeffries testimony is supported by the fact that Defendant denied obviously

excusable delays, the most glaring example being delays incurred when Defendant closed a base.

---

[36] Oasis was not actually paid $373,328, rather that amount of penalties was not assessed against
Oasis.

[37] 32.5 days * $46,666 = $1,516,645

[38] The $46,666 per day penalties are the basis of Count 7.

*Compare* JX480 (allowing delays 1.1, 1.2, 2.1, 2.2, and 3.1) with JX467 (delay 4.1 requesting three (3) days of delay for the BIAP shutdown). Even COL Richardson agreed that Oasis should have been excused for those delays. Tr. 2577:21-2578:4.

At this point, it was reasonably foreseeable that Oasis would pursue the additional 32.5 days of excusable delay ($1,516,645) at a later date through litigation and Defendant should have begun preserving evidence in advance of litigation.

> b)    November 17, 2007: Oasis Informs the Government of a
>        Forthcoming Claim

On November 17, 2007, Oasis' counsel sent a formal letter informing Defendant that Oasis intended to file the Claim that is the subject of this litigation. JX598 at 5989. At this point, Defendant was obligated to begin preserving evidence because it was aware that claim would be submitted. See Ensign-Bickford Aerospace & Def. Co., ASBCA No. 57929, 13 BCA ¶ 35,322 (May 23, 2013) (holding that Plaintiff was required to begin preserving evidence once it began preparing a claim). The evidence shows that Defendant *acted* as if litigation was foreseeable (except by preserving evidence). The Defendant took Oasis's actions seriously, and, in December 2007, tasked Mr. Carsello with investigating the matter. See JX519, JX520, JX522 – 25, JX528, and JX529.

In addition, through its communications with Oasis, Defendant was aware of the specific accusations that Oasis was raising, which would become a large part of the filed Claim. In late 2007, Dean Carsello understood that Oasis believed General Scott had forced COL Richardson to coerce Oasis into signing P00011. Tr. 4279:12 - 4281:13. See also PX1273 (discussing in December 2007 Oasis' allegations of duress); JX516 at 54224 (discussing in January 2008 Oasis' allegations of duress). Given the specificity and severity of Oasis' accusations, litigation

was reasonably foreseeable at this point – as was the subject matter of that litigation. The

Defendant could and should have begun preserving relevant evidence.  It did not.

c)     <u>July 4, 2008: Oasis Submits its Claim</u>

On July 4, 2008, Oasis submitted the Certified Claim to CDR Klingenberg.  Tr. 5945:13-

21. Applicable case law overwhelming supports a duty to preserve documents arising *no later*

than the filing of a Claim.[39]  In fact, most of the case law holds that the duty to preserve

documents attaches even earlier. <u>See Renda Marine, Inc. v. United States</u>, 58 Fed. Cl. 57, 60-61

(2003) (rejecting Defendant's argument that litigation was *only* foreseeable when the claim was

filed, and holding that litigation was reasonably foreseeable when Defendant issued a cure notice

– months before the Plaintiff filed its claim.);[40] <u>AAB Joint Venture v. United States</u>, 75 Fed. Cl.

432, 442 (2007) ("The Court agrees with Defendant that the duty to preserve evidence did not

attach until July 2002, when the *REAs*[41] were filed and when Defendant could reasonably have

anticipated the instant litigation." (emphasis added)); <u>United Med. Supply Co. v. United States</u>,

77 Fed. Cl. 257, 264 (2007) ("Defendant does not contest that it had a duty to preserve evidence

arising *at least as early* as the filing of plaintiff's CDA claim, which plainly revealed the

relevancy of certain documents, including credit card receipts involving transactions with third-

party vendors." (emphasis added) ). If the duty to preserve documents attaches *before* the filing

of a certified claim, then it attaches *upon* the filing of a certified claim *a fortiori*. ***Importantly, in***

---

[39] Oasis has been unable to find a single government contracts spoliation case where the Court
held that the duty to preserve evidence did not arise – at a minimum – with the filing of a claim.

[40] The United States "contends, however, that "[i]n a CDA case ... it would appear that this
obligation arises when the contracting officer receives a claim.... [because] at that point, the
contracting officer is on notice of a matter that could lead to litigation." <u>Renda Marine, Inc. v.
United States</u>, 58 Fed. Cl. 57, 60 (2003) (alterations in original).

[41]  If an REA triggers a duty to preserve evidence, then by definition a CDA Claim would trigger
such a duty.

24

**each of these cases, it was United States'[42] position that the filing of a Certified Claim triggered the obligation to begin preserving evidence.** See also Garco Constr., Inc., ASBCA No. 57796, 13 BCA ¶ 35,456 (Oct. 16, 2013) ("Rather, we agree with the government that . . . the obligation to preserve documents arose on 24 May 2011 when a certified claim was finally submitted to the government.").  The Defendant cannot now make an argument that, for some reason, its duty to preserve evidence did not attach until 2-3 more years had passed after Oasis filed its claim.

Moreover, the nature of the claim process under the Contract Disputes Act ("CDA") supports a holding that – *at a minimum* - filing a certified claim triggers an obligation to begin preserving evidence.  First, a certified claim requires a level of detail that would sufficiently put Defendant on notice of the basis of the dispute as well as what documents should or should not be preserved.  Second, a certified claim is the first step on a statutorily-defined process of litigating against the Government.  See 41 U.S.C. § 7103(a) (requiring that a contractor submit a claim in writing to the contracting officer for a final decision); 41 U.S.C. § 7104(b)(1) (allowing the contractor to appeal the contracting officer's final decision to the Court of Federal Claims).  Third, a claim serves no purpose *other* than to initiate a formal dispute regarding the contractors' entitlement to compensation.  See Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541, 1549-51 (Fed. Cir. 1995) overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1579 n.10 (Fed. Cir. 1995) (recognizing that while a Request for Equitable adjustment may serve a "contract administration" function, a CDA claim does not).

---

[42] The Department of Justice represented Defendant before the Court of Federal Claims and Agency Counsel represented the Defendant before the Armed Services Board of Contract Appeals.

d)      January 2009: The Government Decides to Deny the Claim

By January 2009, the Government had decided to deny the entirety of Oasis' $50M

Claim.  At this point, contracting personnel within Joint Contracting Command – Iraq ("JCCI")

were circulating a draft Contracting Officer's Final Decision ("COFD") denying the Claim.

PX1297.  LTC Rhone agreed as well that by this point the Government was "leaning strongly"

towards denying the Claim.  Tr. 5929:20-5930:15.  Once the Government set the ball in motion

to deny the $50M Claim (a substantial amount particularly in comparison to the total value of the

Contract - $386M), it was reasonably foreseeable that Oasis would pursue the Claim in Court.

e)      October 18, 2009: The Government Issues a Final Decision

LTC Hobbs issued the Contracting Officer's Final Decision ("COFD") on October 18,

2009, which denied Oasis' $50M Claim in its entirety.  JX587.  The COFD – as required by

statute - included language describing Oasis litigation rights after the denial.  FAR

33.311(a)(4)(v) (2009).  It was reasonably foreseeable to think that Oasis would take advantage

of those rights.

2.      *Defendant's failure to timely initiate a litigation hold was grossly negligent.*

In July 2008[43], Defendant knew it should implement a litigation hold for documentation

related to Oasis' Claim.[44]  As discussed above in Section III (B)(1)(c), *supra*, it has been

---

[43] Oasis believes that Defendant's failure to implement a litigation hold in October 2006 and November 2007 amounts to normal negligence.  While Defendant should have foreseen litigation at that point, Oasis does not believe Defendant's conduct at that point rose to the level of gross negligence.

[44] Despite the repeated filings by the United States taking the position that document preservation should begin with the filing of a claim, prior lead counsel for Defendant took the position during a status conference with the Court that preservation need only begin at the initiation of litigation, effectively reading "anticipation" and "foreseeable" out of the spoliation standard.

Defendant's position since *2003* (Renda v. United States) that the Government is required to preserve evidence *at the absolute latest* once a certified claim has been submitted.  After Renda Marine in 2003,[45] it should have been standard procedure by Defendant to issue a litigation hold when a claim is filed.  A prolonged failure to institute a litigation hold – when Defendant knew a litigation hold should be implemented - has been held to constitute gross negligence. Sekisui Am. Corp. v. Hart, 945 F. Supp. 2d 494, 507-08 (S.D.N.Y. 2013) (finding that a party's 15-month delay in issuing a litigation hold constituted gross negligence); Apple Inc. v. Samsung Electronics Co., 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012) ("By failing to do as little as issue a litigation hold notice to any employees for eight months after its preservation duty arose, and by further delaying issuance of litigation hold notices to several key custodians, the Court finds that [Plaintiff] acted with not just simple negligence but rather conscious disregard of its duty to preserve."); Surowiec v. Capital Title Agency, Inc., 790 F. Supp. 2d 997, 1007 (D. Ariz. 2011) (finding gross negligence and granting an adverse inference instruction where Defendant's failure to implement a litigation hold until six months after the duty to preserve arose resulted in loss of relevant evidence).

Defendant herein should not be allowed to blame its failure to retain documents on the war environment.  While Oasis agrees that specific instances of unforeseeable document loss (*e.g.*, "an insurgent attack") could excuse the failure to retain the particular documents affected (and only those documents), no Government witness identified a specific instance of such document loss.  Instead, Government witnesses confirmed that the war environment should not have (and did not have) an effect on document retention.  MAJ Olipane explained that he would

---

[45] Defendant tripled-down on its position that a Claim necessitates a litigation hold in 2007 (a year prior to when Oasis filed its Claim.  See AAB Joint Venture v. United States, 75 Fed. Cl. 432, 442 (2007); United Med. Supply Co. v. United States, 77 Fed. Cl. 257, 264 (2007).

have had no issue putting a litigation hold in place for the Iraq.centcom.mil system in Iraq.  Tr. 5374:23-5375:4.  Mr. Saikali testified that the PCO system suffered no data loss as a result of its location in a warzone, and confirmed that document retention policies do not change in a war zone.  Tr.  333:13-334:5. Ms. Pelletier similarly stated that document retention policies are not lowered in a war zone.  Tr. 2272:5-7.  COL Richardson herself appeared to downplay the significance of the war zone to her work.  Tr. 2800:4-6 ("we were in a war zone, blah-blah-blah").  Finally, any attempt by Defendant to blame its failure to preserve documents on the war environment should be rejected because Defendant appears to have ***made no attempt*** to preserve documents prior to the initiation of litigation.

**C.      Defendant Failed in its Obligations Once Litigation Commenced to Identify, Preserve, and Produce Relevant Documents**

Even once litigation began, Defendant did not instate a litigation hold immediately. Moreover, Defendants' efforts to identify and preserve evidence even during the discovery process were inadequate and resulted in a years-long failure to "find" both Dean Carsello and the Project and Contracting Office ("PCO") system.

As a preliminary matter, Oasis notes that if Defendant had put a litigation hold in place in 2008, as it knew it was supposed to, there would have been no need to "find" the PCO system or Dean Carsello because Dean Carsello was involved in the Claim Review and had used the PCO system to send emails.  As such, Defendant can offer no excuse for why it failed to preserve the Carsello and PCO documents beginning in 2008.  However, instead of correcting its error once litigation began (by finding and preserving the PCO and Carsello documents), Defendant compounded its mistake, by taking three years after the initiation of litigation to find PCO and Mr. Carsello, allowing additional documents to be lost and greatly increasing the costs of discovery to Oasis.

28

1.      *Failure to "find" the PCO system.*

Despite Defendant's claims to the contrary, the PCO system is very important to this litigation.  First, the large plurality of documents produced by Defendant in this case were produced from the PCO system.  Compare bates ranges in Stip. 168u-w with Stip. 168a-t.  Second, email accounts for individuals important to this Contract were found on the PCO system.  As examples, email accounts for the following individuals were found on the PCO system and contained responsive documents: (1) MG Scott, (2) MG Urias, (3) Dean Carsello, and (4) COL Bachinsky.  Stip. 170.  Third, PCO documents were directly relevant to Oasis' Claim were found on the PCO system. (*e.g.*, PX1146 (discussing P0006 and the fact that this was a service contract); PX1175 (discussing Defendant's instruction to slow down bottling at Victory); PX1211 (identifying land as the cause of TQ delays); PX1256) (forwarding COL Richardson's Water White Paper to MG Scott).  Fourth, weekly status reports (though only a handful) discussing the Oasis Contract to JCC-I superiors were produced off the PCO system. (*e.g.*, PX1079 at 6554; PX1084 at 6571; PX1103 at 6659; PX1367 at 9446).  Fifth, Claim review documentation directly refuting elements of Defendant's Counterclaim were found on the PCO system.  E.g., PX1273 (discussing how COL Richardson believed a commodity contract would have been illegal).  Defendant herein argued expressly and implicitly that "everyone knew this was a contract for the end product," bottled water, just like they bought under the BPAs from Kuwait, Jordan, and Turkey.

Had Defendant conducted a proper investigation after litigation was initiated in October 2010, it would have easily found the PCO system.  Every Military and Government personnel involved in the Claim review process either had a PCO account (*i.e.*, Dean Carsello and COL Bachinsky) or was communicating with individuals who had PCO accounts (*i.e.*, LTC Rhone,

MAJ Kenneally, CDR Klingenberg, and LTC Hobbs).  Stip. 171.  Some simple questioning of

these Government employees should have revealed the existence of the PCO system.  Defendant

could have also easily learned about PCO from the personnel who ran JCC-I's information

management services.  Don Unverrich (Chief of Information Management for JCC-I from 2007

through 2010[46]) testified that he knew that JCC-I superiors had PCO accounts.[47]  Tr. 6136:6-

16.[48]  Mr. Unverrich also knew about the PCO backup tapes, and testified that he briefed MG

Scott that backup tapes for PCO were being taken to Virginia.  Tr. 6165:20-6166:4.  All of this

demonstrates that even after litigation began, Defendant's efforts to identify repositories of

documents relevant to this litigation were woefully inaccurate, and constitute gross negligence.

Phoenix Four, Inc. v. Strategic Res. Corp., 05 CIV. 4837, 2006 WL 1409413, *5-6 (S.D.N.Y.

May 23, 2006) (finding that defendants' counsel was grossly negligent in failing to take

reasonable steps to locate and identify one server that contained potentially relevant information,

as "[c]ounsel has the duty to properly communicate with its client to ensure that 'all sources of

relevant information [are] discovered.') (citing Zubulake v. UBS Warburg LLC, 229 F.R.D. 422,

432 (S.D.N.Y.2004) ("Zubulake V")).

　　　　Once Oasis identified PCO, and the Court ordered an investigation of the system,

Defendant still failed to find the PCO backup tapes and then never made any attempt to read the

---

[46] Tr. 6125:7-6126:19.

[47] It is unclear if Defendant contacted Mr. Unverrich in 2010 regarding JCC-I documents.  If it had, it should have learned about PCO, suggesting he was not contacted.  However, Don Unverrich testified that someone came to him looking for documents for this case in 2010.  Tr. 6263:17-6264:22.  Bizarrely, that inquiry was never raised by Defendant during the pre-trial process and did not lead to Defendant finding the backup tapes or servers in Winchester, VA.

[48] Importantly, because of the remote email access available to PCO, Mr. Unverrich could not speak one way or the other as to what other individuals had PCO accounts. Tr. 6132:20-6134:15.  Mr. Wells confirmed that remote access to PCO through webmail existed.  Tr. 4481:23-4482:20.

backup tapes in connection with this litigation.  On May 31, 2013, the Court ordered Defendant

to investigate the PCO system and report back on a weekly basis.  Doc. 205.  Defendant

concluded its investigation into the PCO system by declaring that the servers in Winchester, VA

were dead and the PCO system was unimportant, and without locating the 1,500 backup tapes

also located in Winchester, VA.  Docs. 229 and 235.  Defendant did this despite speaking with

Roger Burgess in June 2013.  Mr. Burgess obviously knew about the backup tapes…because he

had apparently already destroyed five (5) of these tapes.[49]  Tr. 6211:10-6012:20.  Had Oasis not

continued to push Defendant on this point (more accurately had Oasis not found the SIGIR

report online that said CENTCOM migrated to PCO), Defendant would have concluded its

investigation without the PCO tapes ever being found.  See Doc. 252 at pg. 2 (first discussing

SIGIR report in a Joint Status Report with the Court).  Finally, Defendant never gave Oasis a

30(b)(6) witness who could testify regarding PCO prior to 2009.  Tr. 275:22-276:19; 288:12-21;

294:5-295:20. Defendant's failure to find the PCO system prejudiced Oasis by allowing

documents to be destroyed and substantially increasing costs to Oasis, as discussed in § IV(c),

*infra*.

> 2.    *Failure to "find" Dean Carsello*

It is undisputed that Dean Carsello was not contacted by the Counsel for Defendant and

put on notice about this litigation until April 2013. PX1315 ¶ 7.  In an attempt to justify its

failure to contact him sooner, Defendant has repeatedly (and inaccurately) downplayed Mr.

Carsello's involvement in this case.  Doc. 208 at 12:21-13:9 ("Mr. Carsello was tangentially

---

[49] Oasis is not suggesting that Defendant knew about the tapes at this point and withheld that
information from the Court, rather Oasis believes that either Mr. Burgess withheld this
information from Counsel for Defendant or Counsel for Defendant failed to adequately
investigate in a way that would solicit this information.

involved in the claim at best."); Doc. 266 at 23:14-24:10 (referring to Mr. Carsello as a

"tangential witness."). Doc. 351 at 23:9-15 (calling Mr. Carsello a "peripheral witness"). In

reality, Mr. Carsello was the key player involved in the Government's response to and final

decision denying Oasis' Claim, being involved from notice to denial:

1. November 2007 – Mr. Carsello investigated Oasis' allegations of duress. PX1273 (discussing in December 2007 Oasis' allegations of duress); JX516 at 54224 (discussing in January 2008 Oasis' allegations of duress)

2. July 2008 – Mr. Carsello originally was tasked with reviewing and issuing a decision on the Claim. Tr. 4307:5-12. *See also* PX1280 at 8039 (listing Mr. Carsello as one of two contacts for the Claim review).[50]

3. Fall 2008 - Dean Carsello was part of the group of Government personnel who came up with the idea of resolving the Claim as part of the follow-on Contract.[51] Tr. 4367:15-4369:4.

4. December 2008 - Mr. Carsello was still the one in charge of the Claim Review process. PX1292; Tr. 5901:12-5902:13.

5. January 2009 – Mr. Carsello made the original recommendation to deny the Claim. Tr. 5900:6 – 5910:10; PX 1296 at 8101.

6. January 2009 – Mr. Carsello commented on a draft COFD.[52] Tr. 4370:10-4376:8; PX1297.

7. February 2009 – Mr. Carsello was JCC-I's "conduit" to Oasis. PX1288 at 8070.

8. February 2009 – Mr. Carsello recommended to COL Bachinsky and MAJ Kenneally that the Claim be denied. Tr. 4379:8-11; PX1301.

9. March 2009 – Mr. Carsello set up a meeting between COL Richardson and MAJ Kenneally to discuss the Claim. PX 1310.

10. Summer 2009 - Mr. Carsello was one of three individuals LTC Hobbs spoke with regarding the Claim prior to issuing the COFD. Tr. 3524:24 – 3525:9.

---

[50] This document is required to be maintained in the contract file and should have lead Defendant directly to either CDR Klingenberg or Mr. Carsello.

[51] Given that Defendant alleged as part of its counterclaim that it was Oasis that attempted to trade the Claim for a follow-on Contract, Defendant had an affirmative obligation to actually find the individual who came up with that plan.

[52] The substance of the denial is very similar to the COFD actually issued in October 2009. Compare PX1297 with JX581.

In total, Mr. Carsello had a longer involvement with this Contract Claim than any other Government employee and his importance to this litigation should not be in dispute. Moreover, he was one of the architects and initiators of the Defendant's offer to have Oasis "trade its Claim" in exchange for receiving a follow-on contract. Defendant identified this "trading" of the Claim as a specific basis for its fraud counterclaim. Doc. 35 at 24 of 29. Had Defendant saved and produced what should have been numerous intra-Government emails discussing this, it could not reasonably and in good faith have raised this argument with the Court.[53]

Defendant's failure to conduct an adequate internal inquiry[54] that should have easily identified Mr. Carsello constitutes gross negligence. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., 685 F. Supp. 2d 456, 471 (S.D.N.Y. 2010) abrogated by Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135 (2d Cir. 2012) ("Thus, after the final relevant *Zubulake* opinion in July, 2004, the following failures support a finding of gross negligence, when the duty to preserve has attached: to issue a written litigation hold; ***to identify all of the key players and to ensure that their electronic and paper records are preserved***; to cease the deletion of email or to preserve the records of former employees that are in a party's possession, custody, or control; and to preserve backup tapes when they are the sole source of relevant information or when they relate to key players, if the relevant information maintained by those players is not obtainable from readily accessible sources." (emphasis added)).

---

[53] Even after finding Mr. Carsello, Defendant still failed to remove this disproven point from its Amended Counterclaim in June 2014. Doc. 353. Similarly, Defendant did not remove the accusation that LTC Rhone believed Alan Morrell had confessed that the Claim was fraudulent, even though Defendant now had in its possession PX1291. Id.

[54] Defendant has claimed that that "No Government witness identified Mr. Carsello to us as a person who might have discoverable information." Doc. 179 at pg. 2 FN1. If this is true, based on the facts described above, Counsel for Defendant did not do an adequate job asking its witnesses who might "have discoverable information."

The record before this Court reflects that every CO who reviewed the Claim knew the important role Dean Carsello was playing in the review process and could have identified him as someone who gave advice on the claim.  Tr. 4392:11-4394:3; PX1296 at 8101; PX1301.  The COs also apparently relied on his advice in preparing the Claim denial.  The need for Mr. Carsello to preserve all his records and documents would have been clear to the Government as Oasis believes it is clear to the Court.  LTC Rhone was "shocked" when he learned in May 2013 that Dean Carsello was only contacted in April 2013 about the litigation.  Tr. 5899:24-5900:2.  The inadequate job Defendant did in identifying witnesses is confirmed by the fact that Defendant did not contact CDR Klingenberg – the CO who physically received the Claim – until May 2013 when the Court ordered that he be made available for deposition. Tr. 5975:22-5976:10; Doc. 205.  CDR Klingenberg (who (1) reviewed the Claim, (2) set the original deadline for issuing a decision on the Claim, and (3) prepared the first CCIR admitting that the Claim was not fraudulent) should have been one of the first COs contacted.  Tr. 5945:13-21; PX1280; and JX552; 5958:10-5963:24.  Had the Government contacted CDR Klingenberg in 2010, he would have directed the Government straight to Dean Carsello because he knew Mr. Carsello was going to issue a decision on the Claim.  Tr. 5976:14-23.  Defendant's failure to find Dean Carsello prejudiced Oasis by allowing his documents to be destroyed and substantially increasing costs to Oasis, as discussed in detail in § IV(b), *infra*.

## IV.   DEFENDANT'S FAILURES LED TO THE DESTRUCTION OF RELEVANT EVIDENCE AND PREJUDICED OASIS

### A.   Iraq.Centcom.Mil Emails

The most significant repository of documents that was destroyed was the email accounts of the Contracting Officers, the members of their contracting staff, and their superior officers. With the exception of MAJ Vazquez (who decided to preserve his own emails), there is not a

single Contracting Officer for whom Oasis received a complete production of emails.  But, had

Defendant implemented a litigation hold in November 2007 or July 2008, the complete email

record of all of the contracting officers would have been preserved.

> 1.   *A Timely Litigation Hold Would Have Preserved All Relevant*
> *Iraq.Centcom.Mil Emails*

With respect to CDR Klingenberg, LTC Rhone, MAJ Kenneally, COL Bachinsky, and

LTC Hobbs (as well as the other JCC-I superiors overseeing the Claim review),[55] their email

accounts would have been preserved in their entirety, as these officers were in theater after that

point.  Tr. 5374:23-5375:4; PX1296; JX581.  In fact, even a litigation hold implemented in

January 2009 would have directly preserved all but CDR Klingenberg's email account.  Id.

With respect to the earlier contracting personnel (*e.g.,* MAJ, Vazquez, MAJ Lopez, MAJ

Montler, MAJ Davis, LTC Richardson, LTC Fortenberry, COL. Boyles, COL. Rust, MG Urias,

MG Scott, BG Halstead, and LTC Hay), uncontroverted testimony by two Government

personnel at trial established that the Iraq.centcom.mil emails of these individuals would have

remained available well after the individual left the theatre:

First, Mr. Burgess testified to an email server function called email "journaling," which

backs up every email sent by the system separate from the individual users email account:

> Exchange servers, especially military Exchange servers or Exchange servers
> built for the U.S. Government, are required to have what's known as
> journalling (sic) installed and Active, which is whenever an email comes in or
> gets sent out, the Exchange server makes a copy of this email and saves it to its
> database.  And whenever the Exchange server gets backed up, that gets saved.
> So, I could, out of my mailbox, to save some space, delete mail all day long. I
> could have a zero size mailbox, but every email that I've ever sent and every

---

[55] Defendant never produced emails from Dean Carsello's Iraq.Centcom.mil account, despite his
now readily apparent importance.

email that I had ever received would still be logged in the journal in complete format, including attachments.

Tr. 6219:15-6220:2. Mr. Burgess confirmed that even if a user's individual email account is deleted, the exchange server maintains a copy of everything else separately. Tr. 6220:11-21. He further stated that he'd "never seen it done any other way." Tr. 6220:25-6221:1. According to Mr. Burgess, the Government implements this kind of redundancy, "specifically for situations like this." Tr. 6221:2-4. This would have allowed access to *all* relevant emails from *all* contracting personnel even as late as 2010. Defendant chose not to question the witness on this subject during re-direct, and this testimony is uncontroverted.

Second, CDR Klingenberg testified on direct examination that it was the practice of JCC-I (at Camp Victory) to physically transfer the work emails from the email account of Contracting Officer to Contracting Officer when individuals rotated out of Iraq:

> What our ***standard procedure*** was is we would give them to the next person that was taking your job. So, like the gentleman before me, the commander before me, he turned over his .pst file to me, obviously removing his personal emails, and then I did the same."

Tr. 5951:12-20 (emphasis added). On Cross-examination, CDR Klingenberg confirmed that he was referring to the Iraq.Centcom.mil email accounts. Tr. 5952:16-5953:15. He further confirmed that the process was to physically transfer the emails from the prior CO's email account into the replacement CO's email account. Tr. 5952:16-25. This process of email passing would have ensured that the 2006 work emails of MAJ Vazquez, MAJ Lopez, MAJ Montler, etc. would have been in CDR Klingenberg's email account in 2008. In doing this, JCC-I could ensure that rotating service members out of theater ever 3-4 months would not eliminate the institutional memory necessary to administer a contract. Had Defendant implemented a litigation hold at any time between 2007 and 2010 (*i.e.*, when the Iraq.Centcom.mil email system

36

was still active), Defendant should have been able to recover all of the work emails related to this Contract going back to Contract award simply by collecting the active (current) email accounts of the JCC-I personnel working at Victory (or in the case of their superiors, in the International Zone) in 2009 or 2010.  Defendant never retrieved any active email accounts from JCC-I on the Iraq.Centcom.mil.  Stip. 169.  Instead, it improperly allowed these servers to be de-activated, knowing that Oasis' Claim had not only been filed, but was denied in its entirety.  A proper litigation hold would have prevented this and Defendant should be held accountable for its failure to even try and preserve documents.

2.    *The Loss of these Emails Prejudiced Oasis.*

Instead of the comprehensive production that a litigation hold would have ensured, Oasis received only those emails that were hand selected by Government personnel for inclusion in the contract file (or fortuitously found from secondary sources).  As testified by Alan Morrell – who was on the ground in Iraq and actively working with the COs on a day-to-day basis-- there were lots of internal emails being sent within the Government discussing the Contract mess.  See Tr. 844-851.  The result is that several types of documents went largely unproduced by Defendant: (1) emails discussing the key modifications to this Contract, (2) emails discussing delays related to the construction of the plants, (3) emails relating to claim review, and (4) MG Scott's emails.

a)    Emails discussing the Base Year Complications

Oasis received almost no emails between the COs and their superiors discussing the major issues with the Contract that arose during the Base Year.  This was not a minor Contract, it was for the capability to produce bottled water for troops in the desert, and it was fairly common knowledge that this was a high visibility contract.  JX266.  P00003, which implemented the first case requirements into the Contract, would have needed to be explained.  In particular, if the

Government (as it asserts now) was correct that 14,350,000 cases had to be delivered during the Base Year, in order for Oasis to be paid $50,225,000, why did the Government feel the need to insert a modification identifying the number and location where they were to be produced? Further, a modification that extended the due date for the plants (P00006) would have had to be run up the chain. We know this type of communication was occurring because of the handful of weekly internal SITREPs Oasis has received. In particular, there should be internal emails up the chain regarding P00011 given its substantial effect on how Oasis was being paid. Leaving aside (for now) the merits of what Oasis should have been paid under the Contract, it was only being paid on a per case basis through August 2006. COL Richardson could not have made such a substantial change without significant input up the chain of command. She would have had to convey to her superiors why she felt that the Government owed Oasis the balance of the $50,225,000 at the end of the base year without regard for how much water was produced. *See* PX1256 at 7852 ("Original agreement was structured to pay per case-with the remainder of the dollars due at the end of the period of performance."). As discussed above, Oasis received only a limited number of these internal emails discussing these modifications.

Similarly, Oasis received a minimal amount of emails between the COs and their customer, COSCOM, who would have certainly been involved with (if not approved) the significant modifications during the Base Year, given that they had a substantial effect on troop allocation, the need to continue purchasing water from other sources, and the timeline for getting soldiers off the road. While the COs ultimately issued the modifications, it is unreasonable to think they would not have considered and consulted the customer. Oasis therefore requests the following inferences:

**Inference**:  The Government intended to award a services contract.

**Inference**:  The Government intended to award a contract for capability, not for water.

**Inference**:  The Government drafted P00003 for the purpose of converting the contract to a commodity contract for the purchase of bottled water.

**Inference**:  Individuals within Joint Contracting Command – Iraq (JCC-I) believed that Oasis was entitled to $50,225,000 Base Year Firm Fixed Price payment in exchange for establishing the water-bottling capability, with no requirement to produce water.

b)      Emails discussing delays in construction of the plants

Oasis faced substantial obstacles in its efforts to set up the six (6) plants during the base year.  Site changes, non-contractual sites, convoy delays, interference by other Government contractors, and inadequate source water are just some examples of the issues Oasis faced.  These delays and disruptions were the responsibility of the Government and it was the only the Government that could help solve these issues.  This was all thoroughly documented in Oasis' production, including (as discussed above) a substantial number of emails and other correspondence Oasis sent to Defendant that Defendant never produced.  From very early on, Oasis pushed to resolve these problems and to get the base "Mayors" (personnel in command) to allocate sites and fix inadequate sites that had been already awarded.  Tr. 832:7-833:16.  Despite the fact that issues with land pervaded the entire Base Year (and in the case of TQ through into the extended Base Year), Oasis received only a small number of internal communications between COs, COSCOM, and base Mayors.  These communications would have been helpful to Oasis because the Mayors at several sites (including TQ, Qayyarrah West (Q-West), and Speicher) ultimately agreed to either partially or primarily provide site improvements at the Government's expense.  Tr. 924:3-18 (Speicher); JX550 at 4230 (TQ); JX550 at 4233 (Q-West).  The emails supporting that improvement would assist Oasis in its efforts to recover the cost of site improvements, which Oasis was forced to perform and later claimed as part of Count 5.

**Inference**:  The communications with the base Mayors would have supported Oasis' entitlement to site improvements at Government cost.

In addition, the emails discussing the logistical issues Oasis faced and the Government's response to those issues would have directly impacted the Base Year scheduling issues.  In particular, email communications between the COs and the CORs would have shed light on the parties' responsibilities for any slips in the timeline.  Oasis saw examples of these emails in the personally retained emails of MAJ Vazquez.  For example, he directed a COR (CAPT Patrick Sturgill) to expedite the awarding of land, because he believed if land was awarded after 30 days, the Government would be responsible for associated delays.  PX1060.  However, Oasis did not receive many of these types of communications from the later COs, because they did such a poor job of saving emails in the contract file and did not personally preserve their emails for production.  These emails would have directly assisted the Oasis witnesses whose testimony was that it was the Government's fault that the six (6) plants were not completed in the first year and that the only reason for P00006 was the Government's own internal funding issues (Paul Morrell, Alan Morrell, and Dan Petsche).  See also PX1133 and JX324 (showing that Oasis had no interest in the extension of the Base Year).  Oasis therefore requests the following inference:

**Inference**:  The Government issued P00006 solely for the purpose of resolving its own funding issues.[56]

c)      Emails discussing claim review

Among the missing emails are those of the contracting personnel who investigated the merits of the Claim, considered and rejected the possibility of fraud, and ultimately denied the Claim in its entirety.

---

[56] Count 4 of Oasis' Claim seeks compensation for the extension of the Base Year created by P00006.

In failing to implement a litigation hold, Defendant allowed these individuals' email accounts to be deleted, and relevant documents (*e.g*., those discussing the claim) were lost.  Although some relevant emails were retained within the contract file (see Chart in § II(a), *supra,* most were not.   For example, there were only a handful of emails in the file evidencing Claim-related discussions among JCC-I Contracting Officers and their superiors.  See e.g., PX1296.  However, Oasis later received a larger number of additional emails from other sources (including PCO).  See e.g., JX552, PX1290, PX1292 – 95, and PX1301.  Importantly, we know the review of the Claim did not stay at the level of Contracting Officer.  JCC-I superiors were involved in discussions over email and were receiving "weekly" reports on the Claim as part of the JCC-I weekly SITREPs.  See PX1368 at 9455; PX1369 at 9464; 1370 at 9474; PX1282; PX1284; and PX1285.   Oasis received a small number of the weekly reports from PCO (none from the contract file), but only a small fraction of the number of "weekly" reports that should exist over the course of a four (4) year contract.

The loss of these emails and others discussing the pressing issue of water for the troops, existing bottled water contracts, and ordering of water in 2006, prejudiced Oasis because these documents easily could have supported Oasis' interpretation of the Contract – that no water was required in the Base Year.  They also would have implicitly supported the reasonableness of Oasis' interpretation.  Moreover, none of the individuals who reviewed the Claim even raised the possibility of fraud for any reason (let alone the contractual interpretation). Tr. 5963:13-16 (CDR Klingenberg); 4341:17-4342:17 (Dean Carsello); 5916:23-5920:14; 5924:13-16 (LTC Rhone); 3657:25-3659:20 (LTC Hobbs, MAJ Kenneally, and COL Bachinsky).  This appears to be because the Government – as part of its review – found support for Oasis' position that no water was required in the base year.  As detailed by Paul Jeffries in a memorandum summarizing a

phone call he had with Dean Carsello in October 2008, the Government specifically considered

Oasis' contractual interpretation and (while they did not agree with the interpretation) they

determined that it was a reasonable:

> "Dean asked to discuss the claim briefly, he indicated that a few of the items were manageable, not worry some for them, but the **core claim that points to no water being expected in the first period of performance was a BIG issue. And while they did not agree with that position,,, he seemed to think the error occurred in a delay between the military intent to let the contract and when they actually did ..which compressed timelines leaving little time for production** ...that being said, if the fact that no water was expected (and they don't believe it is) that it would cause the contract to be illegal and that with a claim of this size, a illegal contract would have significant consequences to all parties involved."

JX557 (all punctuation in original) (emphasis added).

As this email shows, Government personnel came to the conclusion that an "error" in the timing

of the Contract supported (or at the very least explained) Oasis' understanding that no water was

required in the base year. The fact that Defendant never produced any documents discussing this

timing error or explaining how the Government came to this conclusion shows that Defendant

destroyed these documents – which indisputably would have helped Oasis. This position is

supported by the fact that neither Dean Carsello nor any of the COs ever thought this Claim was

fraudulent. Counsel for Defendant admitted during trial that the Contracting Officers who

reviewed the Claim never thought this Claim was fraudulent, but said they do not determine

whether the Department of Justice alleges fraud. Tr. 5997:11-19. Counsel for Defendant's

decision to override the decision of trained Contracting Officers four (4) years after the fact is

based on supposition without the benefit of the very documents these individuals reviewed or

discussions they had. Moreover, as trial moved forward, the bases of that supposition have been

discredited, as more information was produced (reluctantly) by Defendant. See PX1291 (LTC

Rhone's asterisk that he did not think Alan Morrell was admitting to fraud); Tr. 4367:15-4369:4

(Mr. Carsello admitting the Government came up with the idea to trade the Claim for a follow-on

contract).

In order to rectify the consequences of Defendant's actions, Oasis requests the following

two inferences:

> **Inference**: The emails destroyed discussing the compressed schedule for letting and awarding the Contract would have supported Oasis' interpretation that no water was required in the Base Year.

> **Inference**: The emails destroyed would have supported the reasonableness of Oasis' interpretation of the Contract.

Absent these inferences, Defendant will essentially be allowed to have prosecuted a fraud

counterclaim against Oasis, while receiving the benefit of having destroyed the very evidence

that would prove Oasis' theory of the Contract is not supportable.

d)  General Scott's Emails

MG Scott had a history of trying to alter the Contract to Oasis' detriment.  PX1201 (MG

Scott orders COL Richardson to blackmail Oasis into selling half its company); JX557 at 4493

(Dean Carsello told Oasis that General Scott was the "ongoing issue in P0023 and the last

renewal."  MG Scott's interactions with this Contract went beyond trying to drive a hard bargain

and became a vendetta:

> 'I know that "He who shall not be Named" HATES this contract.'[57]

> -Col. Richardson, January 14, 2008.

> PX1273 (emphasis in original).

---

[57] COL Richardson confirmed during her testimony that she was referring to General Scott.  Tr. 2641:21-23.

This was confirmed by the testimony of Paul Jeffries, who stated that COL Richardson told him that the only way the contract would continue was if Oasis made concessions to get P00011 issued.  Tr. 1363:18-1365:19;1374:21-1375:9;1377:19-1379:6;1397:19-1398:16.  Despite this clear and distinct connection to the Oasis Contract, Defendant did not produce emails from General Scott's Iraq.centcom.mil email account and (as noted in the chart in § II(a), *supra*) only produced two (2) of his emails from the contract file. Stip 169.  Given that MG Scott was not located at Camp Victory (with the COs for this Contract), MG Scott would have likely communicated his intentions and/or orders via email.  Had Defendant implemented a litigation hold in November 2007 (and possibly July 2008)[58], it would have preserved the email accounts of MG Scott and there would be an answer on the extent of his ultimate influence, at the least, if not control over this Contract.  Oasis therefore requests the following adverse inferences:

> **Inference**:  General Scott's emails should have supported Oasis claim that COL Richardson was directed by her superiors to extract concessions from Oasis in exchange for P00011.

> **Inference**:  The Government knew Oasis would have no choice but to accept modifications P00006 and P00011.

> **Inference:**  Contracting Officers were directed by their superiors to issue P00006 and P00011 that changed the Contract structure to Oasis' detriment.

## B.    Dean Carsello's Documents

As noted in § III(c)(2), *supra*, the record in this case supports a conclusion by the Court that Dean Carsello was an important actor under the Oasis Contract and Claim and that Defendant should have contacted Mr. Carsello prior to April 2013 to preserve his documents.  At no point did Defendant produce any non-electronic documents from Mr. Carsello.  Instead, his

---

[58] Defendant could not identify exactly when MG Scott was rotated out of theater in 2008.  Stip. 11.  If MG Scott was in theater approximately 100 days prior to July 4 (March 2008), his emails would have been recoverable.  Tr. 5366:6-5367:11.

handwritten documents were contained in one or more boxes (along with his copies of the Contract and the Claim) that he personally threw out around October 2012.  Tr. 4389:6-25; PX1315 at ¶ 8.  Within that collection was a written "risk analysis" of Oasis' Claim. Tr. 4253:12-24.  Essentially, this was an evaluation of the validity of the eight (8) counts of Oasis Claim.  Tr. 4346:5-24.  His evaluation was based on the substantial work (including his communications with COL Richardson) he put into the reviewing the Claim.[59]  Tr. 4263:12-22. Mr. Carsello felt confident enough in his determination that he advised MAJ Rhone that the site condition counts of Oasis' Claim (Counts 5 and 6) were "valid." PX1290 at 8075; Tr. 4331:6-4332:2; PX1283 ("In discussions tonight with Mr.Carsello, he believes there is some merit to their claim estimated to be at least $2M dollars, the total claim is approximately $50M").  In addition, after conducting his "risk analysis" and reviewing the Claim for "validity" he never thought any part of the Claim was fraudulent. Tr. 4341:17-4342:17.  These documents would have been available to Oasis in discovery had Defendant contacted Mr. Carsello even into 2012, two (2) years after the Complaint was filed.

Defendant further failed to preserve two electronic repositories of Mr. Carsello's documents.[60]  Defendant never searched Mr. Carsello's "SATX" email account that he was using (separately and at times in conjunction with his PCO email account).  See e.g., PX1290.; 4345:3-7. This account was never searched for responsive documents. Tr. 4345:3-24.  Further, Defendant never searched the *separate* work computer that he used to contact COs regarding the

---

[59] Mr. Carsello testified that he thought the 40 hours he spent was a substantial amount.

[60] While Defendant, after assuring the Court that there were no additional Carsello documents to produce, finally did agree to a forensic search of Mr. Carsello's computer (which produced several additional documents, including Claim-related emails.)  These emails included, for example, Carsello's statement that the Claim had at least $2M of validity (PX1283) and his later advice to the CO to issue a complete denial of the Claim (PX1308) in spite of this. Nevertheless, Defendant never searched these other electronic repositories.

Claim between November 2008 and March 2009.  Tr. 4412:20-4413:4.  This computer was

destroyed in 2009 without any effort to preserve data off of it.  Tr. 4413:5-4414:6.  The emails

and documents stored on this computer and email account would have supported the conclusions

reached by Mr. Carsllo in his "risk analysis" and their destruction prejudiced Oasis.

Had Defendant implemented a litigation hold at the filing of the Claim, Mr. Carsello

would have known to preserve his "risk analysis," supporting notes, and documents from his

"SATX" account and work computer.  Alternatively, if Defendant had found Mr. Carsello prior

to Fall 2012, this "risk analysis" and Mr. Carsello's notes would have been preserved.  Oasis

therefore requests the following adverse inferences:

> **Inference**:  Dean Carsello's Risk Analysis and contributing documents supported Oasis' entitlement to Counts 5 and 6.

> **Inference**:  Dean Carsello's Risk Analysis and contributing documents showed that Oasis was never paid for the site improvements claimed for in Count 6.

> **Inference**:  Dean Carsello's Risk Analysis and contributing documents supported the reasonableness of Oasis' claim theory.

### C.      PCO Servers, Emails, and Backup Tapes.

As demonstrated by the documents at trial, the PCO system was an important repository

of documents.  As testified to by Mr. Unverrich and Mr. Wells, it should have been identified by

Defendant prior to June 2013 for preservation.  Had Defendant implemented a litigation hold in

2007-2009, there would have been no issue of broken servers, lost backup tapes, or inadequate

30(b)(6) witnesses, because the servers were still actively in use through 2011.[61]  Instead,

Defendant allowed the PCO system to become "lost" and the information on it to become more

difficult to retrieve.  Instead of being able to retrieve emails directly from the active email

---

[61] PCO email accounts could send and receive emails from other non-secured email accounts, including Iraq.Centcom.mil.  Tr. 6136:3-24.

accounts of users, Oasis was forced to retrieve data from backup tapes for which Defendant had almost no documentation, except for a spreadsheet even its own 30(b)(6) witness could not read. Tr. 302-311 (Defendant objecting that Mr. Saikali – the Government's 30(b)(6) witness on PCO – lacked sufficient information to testify regarding Defendant's list of PCO tapes – PX1399). Any and all costs incurred by Oasis in its attempt to investigate, restore, and produce documents from the PCO system are directly the result of Defendant's failure to act.  See Renda Marine, Inc. v. United States, 58 Fed. Cl. 57, 62 (2003) (not finding spoliation, but requiring the Government to pay the cost of recovering data off backup tapes where a proper litigation hold would have eliminated the need to go to backup tapes); Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y.2006) ("permitting the downgrading of data to a less accessible form— which systematically hinders future discovery by making the recovery of the information more costly and burdensome—is a violation of the preservation obligation.")[62] **Oasis requests its costs and fees incurred in reviewing, processing, and handling the PCO system tapes.**

In addition to the costs Oasis incurred by having to restore backup tapes, Defendant prejudiced Oasis by losing (and destroying) backup tapes and allowing the PCO servers in Winchester, VA to become unreadable and unusable.

---

[62] Case law disagrees on whether allowing data to move from an accessible media source to a less accessible media source constitutes "spoliation."  However, the distinction is irrelevant, as even cases that have held that this is not "spoliation" have required the party whose evidence was moved to backup tapes to pay the cost of restoring data.  Compare Renda Marine, Inc. v. United States, 58 Fed. Cl. 57 (2003) with Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n. 4 (S.D.N.Y.2006).  Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 437 (S.D.N.Y. 2010).

1.    _Lost and Destroyed PCO Tapes Contained Relevant Evidence._

The PCO email system was active and users were sending emails over the PCO system starting in at least 2005.[63]  Stip 178.  Mr. Saikali testified[64] that the PCO system should have had backup tapes as far back as 2005 because the system and email accounts were active.  Tr. 298:24-299:8.  However, Oasis was not provided with any 2005-2006 PCO backup tapes.  PX1399 at 8686 (identifying January 2007 as the earliest backup tapes).  In addition, Oasis was not given all of the backup tapes listed on the index of PCO tapes that was included with the boxes of PCO tapes when they arrived in Winchester, VA in 2010.  Once the tapes finally arrived in Winchester, VA, Defendant still failed to secure them.  Mr. Burgess on his own and without obtaining approval of Ms. Sherman (who was responsible for the tapes) destroyed the five (5) earliest PCO "Exchange" tapes listed on the Index provided by Defendant.  Compare PX 1346 (identifying the tapes destroyed by Mr. Burgess) with PX1399 at 8687-8688 (showing that the tapes were the earliest in time on this index).

The circumstances surrounding the destruction of these tapes are troubling.  Donna Sherman submitted a Declaration – designed to end the discussion of PCO and defeat Oasis' Motion to Compel – attesting that all of the PCO tapes are supposed to be kept in the RHA boxes and that she didn't know of any other tapes.  However, Ms. Sherman knew about the five (5) tapes Mr. Burgess had, and failed to disclose her knowledge or discuss them in her declaration.[65]

---

[63] In addition to email servers, the PCO system also had group and individual share drives.  Tr. 4476:7-16.  Oasis recovered data from both types of share drives off the PCO system.

[64] Mr. Saikali caveated his statement by saying he wasn't there.  Given that Defendant was not able to provide a 30(b)(6) for PCO who could testify prior to 2009, Oasis believes Defendant should be held to this statement.

[65] Notably, when Oasis asked to depose Ms. Sherman during the January 29, 2014 status conference, counsel for Defendant refused to agree to allow Oasis to speak with her.  Doc. 308 at 50:21-51:8.

Compare PX 1327 ¶ 5 (no other place tapes should reside) with (6060:115-6061:5) (admitting she checked out the 5 tapes to Roger Burgess).  Ms. Sherman also apparently did not remember checking the tapes out to Mr. Burgess as of Defendant's June 6, 2014 filing of Declarations related to the PCO tapes, even after seeing the note she supposedly wrote.  PX1348 at ¶7 (Ms. Koenig attesting that Ms. Sherman thought the tapes had been sent to On Track Data Recovery).  Ms. Sherman and Mr. Burgess also offered contradictory testimony regarding who wrote the "check out" note.  Compare PX1347 at ¶6 (declaration stating that Mr. Burgess "wrote the note.[66]") with (6060:115-6061:5) and (6060:115-6061:5) (Sherman admitting she wrote the note).  In addition, Mr. Burgess' Declaration discussing the circumstances of him taking and destroying the tapes does not mention Donna Sherman even once, despite the fact that he claimed she knew about him having the tapes and had approved it.  PX1347; Tr. 6204:3-6205:3 (discussing his omission of Ms. Sherman).  Moreover, Mr. Burgess claimed he picked the tapes randomly, however as discussed above, he specifically took the five earliest tapes on the tape index listed as Exchange tapes.  It is highly unlikely that Mr. Burgess went to 20 boxes, guessed the correct box that had the earliest email tapes, then randomly selected (in pairs) tapes out of a box with dozens of tapes in it.  More likely, he used the slips of paper in the boxes (which identified what the tapes were) to identify the specific tapes he wanted to take.  The information on the slips was the basis of the spreadsheet created by Records Holding Area ("RHA") that was exhibit PX1339. Tr. 6041:1-6042:15.  Finally, Mr. Burgess spoke with counsel for Defendant in

---

[66] When questioned about this inconsistency Mr. Burgess claimed he was discussing a different note he wrote that was a "two-by-five yellow sticky note."  Tr. 6202:15-6204:2.  However, the note Oasis found was a "two-by-five yellow sticky note" that only appears black and white as an exhibit because of the way it was photocopied.

June 2013 and it never came out that they had 1500 PCO tapes.[67]  Tr. 6212:13-15.  The information Oasis received regarding PCO was piecemeal, always designed to "end the discussion" on whether further evidence exists, and at this point Oasis suggests the Court should be skeptical of Defendant's representations regarding PCO.

Both Ms. Sherman and Mr. Burgess repeated the same "line" that the tapes should never have made it to Winchester, VA.  However, neither of them was remotely qualified to challenge the decision of the military to preserve these tapes, a fact that (as discussed above) MG Scott was aware of and allowed to continue.  The fact of the matter is that a decision was made to secure these tapes and the servers in Winchester, and by allowing tapes to be lost or destroyed (and the servers to become disabled) Defendant spoliated evidence.

These backup tapes were intended as a form of data recovery.  Mr. Saikali confirmed that these tapes were designed to retain data once it was removed from the PCO servers.  Mr. Saikali testified that backup tapes existed for simple data restoration, and not just disaster recovery.  Tr. 289:4-290:11.  In fact, the only reason data could ever be removed from the active PCO servers was if it was kept on the backup tapes, because all data has to be kept.  290:12-22.  Mr. Unverrich also testified that backup tapes were restored for ordinary data retrieval other than disaster recovery.  He further explained that it was fairly ordinary to restore data from backup tapes and that there was a form to fill out to get the tapes restored.[68]  Tr. 6166:10-6167:6.

---

[67] Mr. Burgess and Ms. Holsclaw also offered inconsistent testimony regarding whether inquiries had been made regarding the PCO system.  Mr. Burgess said that nobody ever came looking for the servers, but Ms. Holsclaw said someone came looking for the servers in 2011-2013 and Mr. Burgess was the one who looked at them.  Compare 6223:19-22 with 6262:24-6263:21.

[68] Mr. Wells confirmed instances when they restored data off backup tapes for non-disaster reasons.  Tr. 4487:8-19; 4521:21-4522:25.

Had Defendant implemented a litigation hold in 2007-2010, while the PCO system was being actively run by TKCC (and later DSCI), all of the tapes should have been recovered.  Mr. Saikali, Defendant's 30(b)(6) witness, could not testify as to what happened to the pre-2007 tapes, and given that Defendant could not offer anyone to testify on the subject, the presumption should be that they were destroyed after relevant litigation holds should have gone into place. [69] The backup tapes that were lost would have contained relevant information that would have assisted Oasis.  While Oasis received many responsive documents off the PCO backup tapes from 2007-2009, Defendant's failure to save the 2005-2006 tapes prevented Oasis from receiving the bulk of the 2005-2006 emails (the critical Base Year) for the JCC-I superiors for this Contract who all had PCO accounts.  The same type of documents discussed in § IV(a)(2), *supra,* should have been found on the PCO system in that date range.  We know this, in part, because JCC-I superiors were using the PCO system for work related activities.  Oasis therefore requests the same adverse inference due to Defendant's spoliation of the PCO backup tapes.

> **Inference**: Individuals within Joint Contracting Command – Iraq (JCC-I) believed that Oasis was entitled to $50,225,000 Base Year Firm Fixed Price payment in exchange for establishing the water-bottling capability, with no requirement to produce water.
> **Inference**:  The Government issued P00006 solely for the purpose of resolving its own funding issues.

### 2. <u>Destroyed PCO Servers Contained Relevant Evidence.</u>

The PCO servers moved from the International Zone in Iraq to Winchester, VA between 2009 and early 2011. [70]  The process of the move should have resulted in no data loss and

---

[69] To date, Defendant has not been able to offer any explanation for the SIGIR report that stated that the CENTCOM system moved to PCO in 2005.  PX1341; Tr. 334-339.

[70] During this process, the servers briefly stopped at Camp Victory (2009) and Ashburn, VA (2010).

everything that was on the servers in 2009 should have remained there throughout the migration to Winchester, VA in 2011.  Tr. 326:14-328:11.  Mr. Saikali testified that when the servers arrived in Winchester, VA they were working and accessible.  Tr. 328:12-329:17.  Mr. Wells[71] testified that when the system was turned over to USACE, they were given a training session, all necessary passwords (twice), and should have been able to retrieve the data contained on the system.  Tr. 4539:11-4542:17; 4552:4-4553:9.  In fact, the undisputed evidence is that the Servers in Winchester could have been restored in 2011 by spending 20-30 hours of tech time.  A litigation hold at this point could have recovered any responsive data form the servers at a fairly inexpensive cost.[72]  It was only after a lightning strike in 2012 that the cost to restore the servers expanded to around $300,000 (6239:24-6241:22).  Defendant also never located the PCO Tape Library, which Mr. Wells testified was turned over to Winchester, VA in 2011.  Tr. 4485:-16-4486:4; 4488:15-4489:8; 4544:20-4545:21.  Assuming the backup tapes contained everything that was located on the servers (there is not a way to confirm this at the moment), Defendant's failure to act earlier essentially priced Oasis out of pulling data off the servers and forced Oasis to go the more expensive route of finding and reproducing documents from the backup tapes. This is further support for Oasis being awarded its costs in restoring the PCO backup tapes.  See Renda Marine, Inc. v. United States, 58 Fed. Cl. 57, 62 (2003).

### D.   COL Richardson's Documents and Emails

It is an undisputed fact that COL Richardson took her 2006 Iraq.centcom.mil emails with her when she left Iraq, because between 2007 and 2009 she forwarded a number of them to Dean Carsello.  See JX520, JX522 – 29, and PX1302.  However, COL Richardson did not send all of

---

[71] Mr. Wells worked for DSCI, which administered PCO, and was involved with the system from 2008-2010.  4513:10-4515:20.

[72] Mr. Saikali agreed with this statement.  Tr. 331:11-332:2.

her Oasis emails to Mr. Carsello.[73]  We can infer this because she forwarded him the bulk of

these emails in 2007, but forwarded him an additional email in 2009.  PX1302.  She, therefore,

had to have been searching a larger collection of emails and was picking and choosing between

which emails to send him. This is consistent with the fact that she testified that she wanted to

take a "*full copy* "of all her emails with her when she left Iraq, and the fifteen emails she sent Mr.

Carsello were far short of all the emails she sent regarding Oasis.  Tr. 2836:14-24.

What is unknown is where those 2006 emails were stored and retrieved from by COL

Richardson.  COL Richardson told Mr. Carsello she was going to "dig up emails from Oasis" to

send him.  JX515.  However, at trial, COL Richardson, denied having any knowledge of where

those emails came from, what happened to them, or where her other Oasis emails were.  Tr.

2851:8 - 2866:4 (discussing a series of 2006 emails Richardson forwarded to Dean Carsello in

late 2007).  It is very unlikely that COL Richardson forgot where these email were.

COL Richardson testified at trial that this was the only time she had been accused of

coercion by a contractor and that it made her mad:

> So, I -- I -- when I had heard what was going on with Oasis, I was very
> disappointed, upset, angry. In the -- in the Air Force, our first core value is
> integrity first, and what Oasis was claiming was that I had no integrity, that I
> wasn't fair in dealing with them. So, I was -- I was -- I was angry about that."

Tr. 2535:10-17. In response to that accusation, she went looking for emails that she thought

might exonerate[74] her, and forwarded these emails to Mr. Carsello, many with her added

comments.  COL Richardson further believed the emails were important and wanted to send

---

[73] COL Richardson testified that she did not recall if she had additional emails she did not
forward to Mr. Carsello.  Tr. 2872:16-22.

[74] Oasis disputes that the emails reveal anything other than COL Richardson had successfully
convinced Oasis that General Scott was the force behind the P00011 concessions Oasis had to
make.

them to MAJ Kenneally as she reviewed the Claim.  PX1310 ("Does she have copies of the emails?").  She would not have forgotten where those emails were, and it is far more likely that she destroyed whatever repository held the documents at some point after 2009 and does not want to admit that.  COL Richardson was adamant that the emails did not come from her hard drive[75], because she claimed was not successful in saving her emails to her hard drive.  Tr. 2587:4-7.  She further testified that she did not have access to her Iraq.centcom.mil email account after she left. Tr. 2587:1-3.  She therefore either is incorrect about her hard drive not working and retrieved the emails from there in 2009, or she had a second separate (never produced) collection of all[76] her Iraq.centcom.mil emails.  In either event, in 2009 she had a full set of her emails that could have been preserved if Defendant had implemented a litigation hold in 2007-2009.

The emails COL Richardson destroyed would have supported Oasis' Claim.  COL Richardson ultimately agreed with Oasis' interpretation of the Contract as being for capability:

> In looking through the original contract and intent behind it, I have found **additional evidence to indicate that the methodology you suggested is probably the most reasonable interpretation of the contract**. The overriding reason for this contract was to get trucks off the roads. A "**water production capability**" located at a base eliminates the need to ship water onto that base.

JX414 (emphasis added). She also wrote in her water "white paper, " submitted to MG Scott, that Oasis was owed the balance of the $50.225M at the end of the base year no matter how much water was delivered and agreed this was a FFP contract.  PX1256 at 7852 and PX1183.

---

[75] The hard drive was either thrown out by COL Richardson when she purportedly could not retrieve her emails or was lost in transit from Iraq to San Antonio to Hawaii despite its being in a sealed container as represented to the Court by the Government.

[76] There is absolutely no reason to believe that she would have singled out only those few emails for preservation when she had intended to download all of her emails onto her hard drive.

This interpretation is consistent with Oasis' contractual interpretation and is something she would have had to "run up the chain" to her superiors for comment.  PX1256 (thanking her direct superiors for "top cover.").  She also later wrote to Dean Carsello that this Contract could not be a commodity contract, because that would have been illegal.  PX1273.  Importantly, COL Richardson effectively ignored the changes attempted by the Government at P00003 and P00006, which added in the requirement to produce 14,350,000 cases of water not originally contained in the Contract, a constructive change.  This is again something she would have had to obtain clearance to do.  The documents COL Richardson reviewed to come to these conclusions as well as the emails she sent discussing these conclusions would have either been contained in her files that she saved when she came back to the United States, or in her "Pearl Harbor" file.  PX1201.  Oasis therefore requests the following inference:

> **Inference:** COL Richardson's documents would have supported Oasis' contractual interpretation that this Contract originally was a capability contract, and that Oasis was due $50.225M for the base year without regard to water produced and/or delivered.

COL Richardson's emails also would have provided insight into MG Scott's activity with regard to the Oasis' Contract.  Oasis has alleged that MG Scott pressured COL Richardson to demand concessions from Oasis in order to continue the Contract at the time of P00011 – something that COL Richardson denied on the stand.  However, COL Richardson's testimony regarding MG Scott was inconsistent with her writings.[77]  During trial, COL Richardson spoke very highly of MG Scott, testifying "as I left the theater, General Scott took very good care of me."  Tr.  2655:19-2656:7. She further testified that he gave her awards, accolades, and was a big reason she is now a Colonel.  Tr. 2635:15-2636:5.  However, every time she discussed him in

---

[77] Notably, neither of the documents to be discussed below came from the contract file, but came from other sources after Oasis pushed for more productions.

writing, she expressed a strong amount of disdain for him, referring to him as "you know who[78]" and "he who must not be named.[79]"  PX1201; PX1273.  It is notable that the second reference was in 2008 – almost two (2) years after she stopped serving under him – indicating that her dislike of MG Scott remained with her.  Further, COL Richardson wrote to Mr. Carsello that MG Scott "HATES" the Oasis Contract.  PX1273.  When she was asked on the stand point blank whether MG Scott hated the Contract, she testified that the very idea that a General could hate a Contract was ludicrous:

> Q. Ma'am, General Scott hated this contract, didn't he?
>
> A. No, sir.
>
> Q. He didn't hate this contract?
>
> A. Sir, that's -- he was a two-star general in Iraq.  The idea that anyone -- well, a professional contracting officer would hate a contract, I -- in what respect? I can hate -- well, not really. I can hate what people do. ***So, murder, I don't like that, but to assign -- to assign an emotion like General Scott hated this contract, he never told me he hated it. As far as I know, he did not hate the contract. I'm not even sure how that would manifest itself if he did hate the contract.*** And he was not the contracting officer, and the contract was there when I was there, it was there when I left. I -- I --

Tr. 2639:15-2640:5 (emphasis added). When confronted with the email contradicting her, her response was that she "didn't remember writing that." Tr. 2642:1-9.  In sum, the small number of non-contract file documents we received from COL Richardson show that her testimony regarding MG Scott should be viewed skeptically, and Oasis believes the additional documents she had but later destroyed after 2009 would have shown that MG Scott forced her into obtaining concessions and reducing the total Base Year to which Oasis was entitled, order to get paid (most of) the balance of the FFP Base Year price.  Oasis therefore requests the following inference:

---

[78] Tr. 2617:10-13.

[79] Tr. 2641:21-25.

**Inference:** COL Richardson's emails to, from and discussing MG Scott would have supported Oasis' claim that she was directed by her superiors to extract concessions from Oasis in exchange for P00011.[80]

E.   **MAJ Rhone's Notes**

LTC Rhone testified at trial that he almost always took notes of conversations and meetings he had.  Tr. 5880:25-5881:3; 5936:11-5940:3.  He further testified that he took notes during his discussions with Oasis personnel about the Claim.  Tr. 5937:4-8.  LTC Rhone still had his notes with him when he rotated out of Iraq in January 2009.  Tr. 5937:9-12.  The notes were eventually lost during his later moves between 2009 and 2011.  In the end, the only notes he could find were a single page attached to his declaration.  Tr. 5938:6-21.  The remaining notes would have supported Oasis in its defense against the counterclaim because they would have detailed what led LTC Rhone to conclude that (1) the Claim was not fraudulent and (2) Oasis actually believed in every part of the Claim.  5916:23-5920:14; 5924:13-16; PX1291 at 8080.  Had Defendant implemented a litigation hold at any point up to and including January 2009, these notes would have been saved.  Defendant, who used LTC Rhone's partial, incomplete, executive summary to support its counterclaim would have seen these notes, which would have covered the discussion with Alan Morrell referenced in the counterclaim, and in all likelihood, Defendant could not have used LTC Rhone's affidavit to support its counterclaim in good faith.[81]  Oasis, therefore, requests the following inference:

---

[80] Oasis is seeking compensation for these concessions wrongly extracted by Defendant as Counts 2, 3, 6, and 7.

[81] Despite learning that LTC Rhone did not believe Alan Morrell was admitting to fraud, Defendant never amended

**Inference**: MAJ Rhone's contemporaneously taken notes during discussions with Oasis about the Claim would support Oasis' subjective belief in the validity of the Claim and objective reasonableness of Oasis' interpretation.[82]

F.     **Documents Required Pursuant to the FAR and Records Management Requirements**

As discussed in § III(a), *supra*, Defendant had an obligation from the beginning of the Contract to preserve evidence pursuant to the FAR and statute and regulation.  This is a second basis on which Defendant should have preserved the Emails of its Contracting Officers dating back to the very beginning.  For this reason, Oasis incorporates § IV(a), *supra*, herein, and requests the same inferences described therein.

In addition, beyond the Contracting Officers' emails, the destruction of the COR files, which should have been kept and incorporated into the contract file,[83] prejudiced Oasis.  As LTC Davis testified, the CORs were the ones who were heavily involved in the efforts to resolve the logistical issues faced by Oasis in the Base Year in setting up the plants.  Tr. 4027:15-4029:24; 4030:20-4036:15; 4065:1-4066:17.  LTC Hay's COR file should have included the emails and other correspondence he sent to Mayor cells, Army logistical officers, and other individuals in order to expedite the construction of the plants.  These emails would have detailed the substantial Government-caused delays to Oasis' timeline for construction of the plants and the efforts to resolve numerous transportation and related problems, including TQ delays.  Oasis would not have been privy to the internal Government communications on this topic, and Defendant produced few such emails.  Had Defendant produced those files, they would have detailed the

---

[82] While ultimately the Court will have to make these determinations, the fact that a CO assigned to review the Claim came to the conclusion that Oasis believed in the Claim should be persuasive evidence, and the contemporaneous notes detailing why the CO came to that conclusion would have been helpful to Oasis in support of this position.

[83] LTC Davis agreed that a COR File should be included within the contract file.  Tr.  3975:21-24.

Government-caused issues and their effects on the schedule, and further supported Oasis'

position that it was solely Government delays that caused Oasis to finish constructing some of

the plants after the end of the original Base Year.

> **Inference**: The documents in the COR files would have supported Oasis'
> position that but for Government-caused delays, Oasis would have completed
> all six (6) plants within the original base year.

## V.     CONCLUSION

For the reasons discussed above, Oasis requests the Court to make the specific adverse

inferences discussed in this Brief. Oasis also requests fees and costs associated with its various

motions and costs incurred by Oasis as a result of Defendant's failure to preserve documents as

required by law.

Respectfully submitted,

October 17, 2014

/s/ LAURENCE SCHOR
Asmar, Schor & McKenna, PLLC
5335 Wisconsin Ave, NW
Suite 400
Washington, DC  20015
(202) 244-4264
(202) 686-3567 (facsimile)

*Counsel of Record for Oasis International Waters, Inc.*

Of Counsel
Susan L. Schor (sschor@asm-law.com)
Susan W. Ebner (sebner@asm-law.com)
Dennis C. Ehlers (dehlers@asm-law.com)
David A. Edelstein (dedelstein@asm-law.com)
Robert D. Pratt (rpratt@asm-law.com)
Asmar, Schor & McKenna, PLLC
5335 Wisconsin Ave, NW
Suite 400
Washington, DC  20015
(202) 244-4264
(202) 686-3567 (facsimile)

## <u>CERTIFICATE OF FILING</u>

I hereby certify that on the 17th day of October, 2014, a copy of the foregoing PLAINTIFF'S BRIEF IN SUPPORT OF ITS POST-TRIAL MOTION FOR SPOLIATION SANCTIONS was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/Laurence Schor</u>