# In the United States Court of Federal Claims

**No. 10-707C**
**Filed: August 31, 2016**
**Reissued: December 1, 2017[1]**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| **OASIS INTERNATIONAL WATERS, INC.,** | * | |
| | * | |
| Plaintiff, | * | **Trial; Counterclaim; Fraud;** |
| v. | * | **False Claims Act; Special Plea** |
| | * | **in Fraud; Contract Disputes** |
| **UNITED STATES,** | * | **Act.** |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * | * | |

## O P I N I O N

**Laurence Schor**, Asmar, Schor & McKenna, PLLC, Washington, D.C., for plaintiff. With him were **Susan L. Schor, Dennis C. Ehlers, David A. Edelstein, Robert D. Pratt,** and **Allison G. Geewax**, Asmar, Schor & McKenna, PLLC, Washington, D.C.

**James P. Connor**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Tanya B. Koenig**, Trial Attorney, Commercial Litigation Branch, **Stephen C. Tosini**, Senior Trial Counsel, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice.

## HORN, J.

Plaintiff, Oasis International Waters, Inc. (Oasis), is a contractor which performed a bottled water contract with the United States military in Iraq during the Iraq War. Oasis is a Nevada corporation for which the principal place of business is in Utah. After the end of contract performance, plaintiff filed a certified claim, which was denied in its entirety.

---

[1] The court issued a series of opinions in the above captioned case on August 31, 2016, April 7, 2017, and November 21, 2017. In response to the court's November 21, 2017 Order, the parties agreed that all three opinions could be issued without redactions. After reviewing the opinions, the court agrees with the parties and the original opinions are hereby unsealed and reissued without redaction.

Plaintiff filed a complaint in the United States Court of Federal Claims, and, subsequently, defendant filed fraud counterclaims against plaintiff. A trial was held regarding plaintiff's breach of contract claims, as well as defendant's fraud counterclaims.

## FINDINGS OF FACT

As stipulated by the parties, "[a]fter the start of the Iraq War but prior to the award of the contract at issue in this case, the Army procured all of its Iraq bottled water requirements from Turkey, Kuwait, and Jordan and shipped it by truck into Iraq and to the various U.S. military bases in Iraq." United States Air Force Colonel Renee M. Richardson, who served as one of the contracting officers on the contract at issue in this case from May 2006 until October 2006,[2] explained at trial that "[t]he previous approach was bringing bottled water in from Turkey, Jordan, and Kuwait, of course, which put soldiers on the road for the transportation." As noted in a draft Statement of Work for the bottled water solicitation at issue in this case:

> Up to the present time bottled water has been purchased from sources outside of Iraq. This practice necessitates large numbers of convoys and escorts to transport the bottled water from Kuwait, Jordan, and Turkey. There are numerous complications and delays getting trucks across the borders, particularly in Turkey. Producing bottled water locally would significantly reduce the number of convoys required to transport water as well as reduce the likelihood of battle related injuries.[³]

The parties have stipulated that:

> On or about March 2, 2005, Maj. Vazquez, a contracting officer with Joint Contracting Command-Iraq (JCC-I, later Joint Contracting Command-Iraq Afghanistan – JCC-I/A), serving at Camp Victory, issued a Request for Information (RFI) "to get information on contractors capable of providing the following capabilities for construction of re-locatable water purifying and bottling facilities for distribution at several locations in Iraq. Locations will be identified at a later date and time. These facilities are to produce clean drinkable bottled water per all USDA and FDA standards and requirements."

---

[2] In 2006, Colonel Richardson was a Lieutenant Colonel.  When she testified at trial, Colonel Richardson was a full Colonel.  The court refers to Colonel Richardson as a Colonel in this opinion.

[3] The final version of the Statement of Work included in the awarded contract was the same as the draft Statement of Work, except the final version removed the following sentence: "There are numerous complications and delays getting trucks across the borders, particularly in Turkey."

The RFI generated interest from 71 vendors, and, on April 3, 2005, the government posted Solicitation No. W27P4A-05-R-0002 (the solicitation).[4] Proposals were due by May 3, 2005, and the government received 22 bids in response to the solicitation, and answered 145 questions.  A sample of the questions and answers reveals the bidders were uncertain about the pricing, capabilities, land in Iraq and the obligations of the government, only some of the concerns were clearly answered by the government.  For example, one part of question 33 stated: "Is our offer to give the cost per liter with the personnel built in, seperate [sic] to the cost of the plant and equipment?" The government replied: "All Costs per liter are to be included." Likewise, question 40 asked: "Start up Cost: Since the bid is predicated upon the deliverables per litre bottle of water, can we assume that all costs(inc personnel and equipment deployment to site) incurred between contract award and water production will fall upon the successful bidder?" The government replied: "Yes. It is up to you how you determine the cost per litre taking into account all costs associated with this endeavor."

There were a number of questions regarding the obligations of the government. Question 2 asked, "[i]f projected demand falls short, what are the minimum volume requirements? Is there a required minimum quantity the Government will procure?" The government responded: "There are no minimums. The minimum is zero." Additionally, question 35, referring to question and answer 2, asked:

> The answer to Question #2 states that there are no minimum purchase quantities. This decision places an unreasonable amount of financial risk on the contractor, and will likely severely limit the competition for this RFP [Request for Proposals]. Request that the Government guarantee minimum purchase quantities base [sic] on the estimated quantities that appear in the RFP.

The government responded:

> The levels of liters required are in the range. This is roughly the production per day. You might have a day where your levels are lower, however, the Government contract is a Firm Fixed Price not Indefinite Delivery / Indefinite Quantity. The Government is entering into a one year contract with three option years. The only thing that could prevent the basic year from occurring is a Government decision to Terminate for Convenience or default of the contractor to perform to the requirements and the Government would then Terminate for Default.

One bidder questioned the potential for installment payments, asking: "Would the Government authorize progress or installment payments recognizing 1) the significant capital investment with establishing new capability and, 2) the ability to credit progress payments with actual deliveries?" to which the government responded that: "The first payment will be made once the contractor has the first plant operational and has had an approved first article test accepted without conditions."

---

[4] The government issued 11 amendments to the solicitation.

In response to questions 44 and 89 regarding site conditions, the government indicated that for the land provided, "[s]ite prep should be minimal," and would be "as flat land as possible." In the answer to question 89, the government stated that "[t]he water source has been identified and deemed to have sufficient amounts by the government to support the operation." The government also noted in answer to question 89, however, "[i]t is up to you what you do in order to meet the Government's requirements and timeframe for delivery."

One of the 22 bids was submitted by American AquaSource, Inc. (American AquaSource), and signed by Max Wyeth, President of American AquaSource. Attached with the American AquaSource proposal was a spreadsheet showing the volumes of production and an estimate for when each site would begin water production. American AquaSource's bid assumed a price of $3.50 per case of water, or a total of $50,225,000.00, based on the production of 14,350,000 cases.[5] At trial, Mr. Wyeth explained that he calculated the $50.225 million figure "using our average forecast of demand, we came up with a case number that would be produced per year, and multiplied that by the case cost."[6]

Major Vazquez contacted Mr. Wyeth to clarify the proposal and to submit a "total cost per year for all four years and the Grand total." Mr. Wyeth provided Major Vazquez with a base year price of $50,225,000.00 and three option year prices of $186,000,000.00, totaling $608,225,000.00. Mr. Wyeth confirmed in his correspondence "that the 3.50 price is the only price, regardless of the winter/summer/surge period, for all years within the contract."

After negotiations between Mr. Wyeth and Major Vazquez, in which Major Vazquez asked Mr. Wyeth to reconsider the option year prices, on May 11, 2005, Mr. Wyeth submitted an amendment to the American AquaSource proposal, which included a revised "Summary of Pricing Schedule" with a proposed base year price of $50,225,000.00 and three option year prices of $112,000,000.00, for a total contract price of $386,225,000.00. The parties have stipulated that, "[o]ther than AquaSource's proposed price, all other offerors whose proposals were found technically acceptable

---

[5] The court notes, however, for the basis of estimate in the American AquaSource proposal, American AquaSource assumed annual production of 384 million bottles or 32 million cases of water.

[6] Counsel for defendant emphasized during Mr. Wyeth's testimony:

Q: So, just so the record is clear, the $50.225 [million] in your proposal is based upon $3.50 per case?

A: Yes.

offered prices in excess of $1 Billion."[7] Major Vazquez awarded contract no. W27P4A-05-C-0002 (the contract) to American AquaSource on May 25, 2005. The contract called for base year price of $50,225,000.00 and three option year prices of $112,000,000.00, for a total contract price of $386,225,000.00.[8] Major Vazquez signed the contract on behalf of the government. Mr. Wyeth signed on behalf of American AquaSource.

After the contract was awarded to American AquaSource, Paul Morrell contacted Mr. Wyeth, and subsequently, Mr. Wyeth exchanged several emails with Phil Morrell and Dan Petsche, then the Vice President for Contracts and Compliance for Al-Morrell Development in June 2005 discussing the bottled water project.[9]  Paul Morrell testified that "[o]ur original intent with American AquaSource was to sell our assets to him, as it appeared that he didn't have the resources and the funding to acquire our assets, much less build the factories. It morphed or migrated into a partnership between Max and Phil and myself." Paul Morrell explained that, initially:

> Al-Morrell Development was essentially the performance arm of the operation. We built the facilities. We financed them. All the employees were employed by Al-Morrell Development. It was basically the part of the organizations that really did all the performance. . . . Max's responsibility was to provide water bottling expertise, because Phil and I were -- had never built a water bottling plant prior to this.

The original arrangement changed, because as Paul Morrell testified:

> Initially, Mr. Wyeth told us that he had the financing lined up, and he just needed time. He didn't have time, because the first facility had to be up --

---

[7] The military's own Independent Government Cost Estimate, estimated a total base year cost of $149,145,842.23, or almost three times American AquaSource's proposal for the base year, to construct and operate eight water bottling facilities in Iraq. Morrell International, Inc., a corporation whose Chief Executive Officer was Phil Morrell, also submitted a proposal which provided for a base year price of $899,725,000.00, option year prices of $831,287,500.00 per year, for a contract total of $3,393,587,500.00. Phil Morrell testified at trial, however, that that was a "bad bid," and he had intended to bid at $5.50 per case of bottled water.  Phil Morrell indicated that the request "needed to be right around $5.50 per case," for "somewhere around the 32 million cases per year."

[8] The cover page to the contract stated the estimated dollar amount as "$386,225,000.00." At trial, Major Vazquez testified that this amount was in error and that the amount should have been $50,225,000. Subsequently, on July 15, 2005, United States Air Force Major Marc A. Lopez, who served as the contracting officer on the contract from June 2005 until September 2005, executed modification P00002 on behalf of the government, which changed the dollar amount from "$386,225,000.00" to "$50,225,000.00 (NTE)," because "[o]nly the base year award should have been documented in the contract."

[9] Mr. Wyeth testified that at the time he "signed this contract" he had no relationship with Al-Morrell Development, Paul Morrell, Phil Morrell, or Paul Jeffries.

we're talking July, and we had basically 90 days to get the first facility up. So, we really didn't have time. . . . So, our understanding was he would continue to try to bring his financing option to the table, get money in the bank. In the meantime, Phil and I would self-fund this first plant so that we could meet the contractual deadlines. Over the course of the fall, it became clear that Mr. Wyeth's options were not going to come to fruition, and AMD [Al-Morrell Development] -- initially it was a parallel track. We were trying to obtain financing on behalf of AMD while we were waiting for his financing to come into place. Ultimately his financing failed, and the AMD financing did come into place late in the year or early the next year.

Therefore, in July 2005, Phil Morrell, Al-Morrell Development, Mr. Wyeth, and American AquaSource entered into a joint development and pre-incorporation agreement to form a new corporation to fulfill the contract, with the agreement reflecting that the purpose of American AquaSource's contract was to "build up to six (6)[10] water bottling plants in the country of Iraq."[11] Initially, the corporation was called Iraqua, Inc., but later changed its name, on July 15, 2005, to Oasis.[12] Subsequently, in the fall of 2005, Phil Morrell, Al-Morrell Development, Mr. Wyeth, and American AquaSource signed an addendum to the joint development and pre-incorporation agreement, assigning American AquaSource's contract to Oasis. The addendum required Mr. Wyeth, of American AquaSource, to execute a novation agreement. The novation agreement was to be a modification to the contract, and ultimately was modification P00005, discussed below. On December 5, 2005,[13] "American Aqua Source, Inc.," "Oasis International Water, Inc.," and the "United States of America" "enter[ed] into this Novation Agreement. . . as of August 1, 2005."[14] The modification stated that the "purpose of this modification" was to reflect the novation

---

[10] As explained below, although the contract, as executed, required 8 water bottling plants, the contract was modified by modification P00001 to require only 6 water bottling plants.

[11] Paul Morrell testified that "Phil [Morrell] and Max [Wyeth] were owners in Oasis, and Phil and I were owners in Al-Morrell Development, but we made a very -- Phil and I made a very practical decision that if we were going to invest our funds into the business, that our company was going to own the assets."

[12] Paul Morrell testified that "Oasis was originally called Iraqua. Everybody loved that name except the bankers. The bankers wouldn't allow us [to] own a bank account with that name Iraqua on it, literally, so we changed the name to Oasis."

[13] Mr. Wyeth, then-president of Oasis and American AquaSource, signed the modification on behalf of Oasis on December 2, 2005. Major Montler signed for the military on December 5, 2005.

[14] At the time of the novation, Mr. Wyeth testified he was "out of the loop" and his interest in Oasis was eventually bought out by the Phil Morrell and Paul Morrell. Mr. Wyeth also was not involved in the completion of the bottled water plants. Oasis accepted Mr. Wyeth's resignation as president of Oasis on January 5, 2006.

agreement transferring all rights and responsibilities of the bottled water contract from American AquaSource to Oasis. The modification also stated that, "[a]ll other terms and conditions of the contract remain unchanged."

Paul Morrell was the Chief Executive Officer of Al-Morrell Development from August 15, 2005 through January 2006, and, thereafter, has served as President of Al-Morrell Development. Paul Morrell was also the Chief Executive Officer of Oasis from August 15, 2005 through January 2006, and, thereafter, has served as President of Oasis. Phil Morrell was Chairman of Oasis from July 2005 through December 2012.  Paul Jeffries served as both the Chief Executive Officer and Chief Financial Officer of Al-Morrell Development and Oasis. Mr. Jeffries served as Chief Financial Officer of Al-Morrell Development and Oasis from June 2005 through January 2006, and, subsequently, served as Chief Executive Officer of Al-Morrell Development and Oasis from January 2006 through 2010. Mr. Jeffries was replaced as Chief Financial Officer of Al-Morrell Development and Oasis by Neil Vos, who served as Chief Financial Officer from February 16, 2006 until June 2011. As noted above, Dan Petsche was the Vice President for Contracts and Compliance for Al-Morrell Development when initially discussing the contract with Max Wyeth, and he also was the Vice President for Contracts and Compliance for Oasis from 2005 through October 31, 2011. At all times, Paul Morrell and Phil Morrell[15] had a controlling interest in Oasis, and after Mr. Wyeth was bought out and resigned as president, Paul Morrell and Phil Morrell controlled 100% of Oasis.

<u>The Contract</u>

As noted above, Major Vazquez awarded contract no. W27P4A-05-C-0002 to American AquaSource on May 25, 2005. Item no. 0001 of the contract was "NON-PERSONAL SERVICS [sic]" (capitalization in original) and indicated:

> The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO). Period of Performance: 25 May 05 through 24 May 06.

The unit price was listed as "$3.50/case" for all amounts of water produced. Following the item no. 0001 were three items for the three option years, item no. 1001, item no. 2001, and item no. 3001, changing only the period of performance.[16] After item nos. 0001, 1001, 2001, and 3001, there was a summary of the pricing schedule which stated:

---

[15] Phil Morrell and Paul Morrell are brothers.

[16] The identical nature of the three options is reflected in the typographic error of "NON-PERSONAL SERVICS" in each of the three option years. (capitalization in original).

## SUMMARY OF PRICES FOR BASE YEAR AND THREE OPTION YEARS

**TOTAL BASE YEAR**          $50,225,000.00

**FIRST OPTION YEAR**        $112,000,000.00

**SECOND OPTION YEAR**       $112,000,000.00

**THIRD OPTION YEAR**        $112,000,000.00

**GRAND TOTAL (Base Year and Three Option Years)**      $386,225,000.00

(capitalization and emphasis in original). The period of performance was listed in the contract as:

> BASIC PERIOD        25 May 2005 - 24 May 2006
> OPTION PERIOD I     25 May 2006 - 24 May 2007
> OPTION PERIOD II    25 May 2007 - 24 May 2008
> OPTION PERIOD III   25 May 2008 - 24 May 2009

(capitalization in original). The statement of objectives for the "purified bottled water services" contract explained:

> The purpose of this contract is to provide re-locatable purified bottled water capabilities at various locations throughout Iraq Area of Operations (AO). Contractor shall produce the amounts of bottled water as outlined in Figure 1. Contractor shall ensure bottled water capability is able to relocate upon notification by the Contracting Officer (CO) due to military operational requirements. Bottled water capabilities shall be established in the order as listed in Figure 1. Actual locations will be given to the contractor that wins award. The contractor shall provide all the mechanical equipment required to produce and prepare for shipment the required amounts of bottled water. The first bottled water site shall be operational 120 days after the contract is awarded. This includes military inspection and acceptance. After contract award, additional bottled water sites shall be established within the remainder of days from contract award. A full 365 days from contract award, all sites will be fully operational.[17]

Figure 1, referenced in the statement of objectives, identified the production requirements at each of the bottled water facilities at different points in the year.

---

[17] The objectives to the contract further indicated that "[t]he contractor shall ensure purified bottled water capability is able to relocate upon notification by the CO."

| LOCATION | TOTAL PRODUCTION REQUIREMENT/DAY in 1K Liters (winter/summer/surge) |
|---|---|
| Location 1 | 75-100K liters / 101-150K liters / 151-200K liters |
| Location 2 | 65-100K liters / 101-135K liters / 136-170K liters |
| Location 3 | 35-55K liters / 56-75K liters / 76-100K liters |
| Location 4 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 5 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 6 | 200-300K liters / 301-400K liters / 401-450K liters |
| Location 7 | 80-120K liters / 121-160K liters / 161-200K liters |
| Location 8 | 75-110K liters / 111-150K liters / 151-190K liters |

(capitalization in original). Figure 1 contemplated three different production requirements: winter, summer, and "surge." Colonel Richardson testified, explaining the different requirements, as follows:

[D]uring the winter, the weather was a lot more reasonable in Iraq; the highs were around the eighties, nineties. In the summer, temperatures got up to 135 degrees, requiring soldiers to drink more just to stay cool and to stay hydrated. During surge, what that's really talking to is battle operations. Our soldiers wind up wearing 60, 70, 80 pounds' worth of gear and then going out into . . . tanks, which causes them to sweat and causes them to need more water.

The tasks section of the contract instructed, in part: "The contractor shall provide re-locatable purified water bottling capability for producing and packaging required amounts of one liter bottles of water per day as outlined in Figure 1," "Contractor shall provide, operate, maintain, and repair all the mechanical equipment required to accomplish the Government's objectives," "Contractor shall ensure bottled water meets or exceeds all US Government quality standards," and "Contractor shall operate the purified bottled water capabilities with enough personnel to meet the Government's requirements." Regarding payment to the contractor, the invoicing section of the contract stated:

Invoicing shall occur monthly. The contractor shall invoice to the Contracting Officer Representative (COR), by the 5th of each month, for the total of all liters in [sic] produced, per location, for the entire previous month. The

CORs will prepare the DD250s and will submit them with the contractor's invoice to the Contracting Officer (CO), no later than the 10th of each month.

Bottled Water Facilities

Although the original contract required eight bottled water facilities, on May 26, 2005, the day after contract award, United States Air Force Lieutenant Marion Knapp executed a no-cost modification P00001 on behalf of the government reducing the required number of water bottling facilities from eight to six, to which American AquaSource agreed. The six bottled water facilities were: LSA Anaconda (Anaconda), Camp Victory, Al Asad Airbase, Qayyarrah West (Q-West), Speicher, and Camp Taqaddum (TQ). Major Vazquez indicated that land would be provided to the contractor no later than 30 days after contract award. Although the answer to question number 44 regarding the solicitation indicated that "[s]ite prep should be minimal," defendant had to provide site preparation at every location except Al Asad.[18]

Anaconda, the first bottled water facility, was contractually required to be operational by September 22, 2005. Major Lopez executed modification P00004 on September 18, 2005, on behalf of the government, granting a 12-day extension of the requirement for Anaconda's certification until October 4, 2005. Although Anaconda began producing water on October 10, 2005, Anaconda was not audited and certified operational until December 14, 2005, after producing almost 2 million liters of water.

Camp Victory, the second bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Camp Victory on September 4, 2005. Camp Victory was certified operational on April 7, 2006, and began producing bottled water on April 12, 2006. Al Asad, the third bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Al Asad on August 22, 2005. The contractual deadline to complete Al Asad was extended to June 30, 2006, and Al Asad was certified operational on July 24, 2006.

Q-West, the fourth bottled water facility, was initially required to be operational by May 24, 2006.  The military authorized land for Q-West on September 11, 2005, but on December 19, 2005, directed and authorized land at a different location for the Q-West plant. The contractual deadline to complete Q-West was extended to June 30, 2006, and Q-West was certified operational on July 9, 2006. Plaintiff indicated it encountered challenges with the water source at Q-West. Alan Morrell[19] testified that "we opened Q-

---

[18] In the case of Al Asad, plaintiff claims that: "Defendant refused to provide site prep at Al Asad, Oasis was forced in December 2005 to hire its own subcontractor to prep the site, which included filling borrow pits dug by the military, at a cost of $224,100," and further spent "$158,110 to abate the flooding and repair the damage caused to the site," as a result of the work done by another contractor, Kellogg, Brown and Root, at an adjacent site.

[19] Alan Morrell "was an Oasis consultant from late June 2005 through October 2005. He was the Oasis Contract and Compliance Administrator from October 2005 through March

West and started drawing from that irrigation line, we started getting turbid water, water so turbid that it was filled with mud and sand. And at that time, it was so significant that we couldn't purify it." As a result, "what it did is it . . . immediately fouled all of our [equipment] -- we didn't have an ultra filtration system there because it didn't call for one." Moreover, the "ROWPU [Reverse Osmosis Water Purification Unit] was immediately filled with mud, and fouled. And each set of those membranes is $26,000. And they were ruined. And we couldn't keep them clean and operational enough to operate and make water there as a result." In order to fix the problem, Alan Morrell testified that Oasis "purchased a Pall Aria from northern New York and we also took an additional ROWPU system that we had used at Balad and recommissioned it, repiped and replumbed the lines at Q-West and solved the problem."

Speicher, the fifth bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Speicher on August 13, 2005. The contractual deadline to complete Speicher was extended twice, finally to June 30, 2006, and Speicher was certified operational on June 20, 2006, and began producing bottled water on June 24, 2006. Initially, Oasis believed they would receive water provided by the government via a ROWPU.  Alan Morrell testified, however, that "we opened the factory, we start producing, and within 48 hours, KBR [Kellogg Brown & Root] came in and just railed on us for consuming their ROWPU'd water. And they got -- they got their KBR COTR [contracting officer's technical representative] or contractor officer's representative for that site involved and they shut down our water." As a result, Alan Morrell testified that:

> [t]hey're [Oasis' contracting officer and COSCOM (United States Corps Support Command)] beating us up for delivering quantities, but they're refusing to give us the water they're required to provide us. So, we're dealing with that at Speicher, and we're dealing with a lack of water delivery at Q-West to a level we can produce there, too, and we're all running for a completed amount of or quantity of water, but we can't get to it.

As a solution, Oasis purchased from an American company a "BEV 9 reverse osmosis system, and in the spring of 2007, installed it, commissioned it, and began to draw well water."

Camp Taqaddum, or TQ, the sixth bottled water facility, was initially required to be operational by May 24, 2006. Although the military initially authorized the land for TQ on August 24, 2005, the military directed Oasis to use land at different locations twice, the second time in March 2006. The contractual deadline to complete TQ was likewise twice extended, to June 30, 2006, and then to October 15, 2006. The site preparation for TQ was completed by July 2, 2006, and on August 11, 2006, Colonel Richardson confirmed for Oasis to construct the plant at TQ. TQ was completed on October 23, 2006, and despite Oasis requesting 40.5 days of excusable delay on September 25, 2006, United States Air Force Lieutenant Colonel Joel R. Fortenberry, who served as the contracting

---

2007. He was Director of Contracts and Compliance from March 2007 through November 2008. He was Project Management Director from November 2008 through December 2009."

officer on the contract from October 2006 until early 2007, executed modification P00013 on behalf of the government, granting plaintiff only eight days of excusable delay for TQ. TQ was certified operational on October 25, 2006.

<u>Relevant Modifications</u>

During contract performance there were a series of relevant modifications to the contract. As noted above, after contract award, P00001 reduced the number of bottled water facilities from eight to six, and on July 15, 2005, Major Lopez executed modification P00002 on behalf of the government, which changed the dollar amount from "386,225,000 (estimated)" to "50,225,000 (NTE)." Subsequently, on August 9, 2005, Major Lopez and Mr. Wyeth executed P00003, which added a "NTE," not to exceed, limitation on the quantity of water produced at each plant, and did not require the government to purchase any minimum number of cases produced by the contractor. Pursuant to P00003, the not to exceed "case quantity was a total of 14,350,000 cases of water," and, as modified in P00002, the not to exceed price was $50,225,000.00. As explained above, P00004 granted a twelve day extension of the requirement for the certification of the Anaconda bottled water plant, and P00005 was the novation agreement.

    *a. P00006*

Prior to the execution of modification P00006, on March 27, 2006, United States Air Force Major James E. Davis, who served as the contracting officer on the contract from September 2005 until January 2006, sent Oasis a letter titled "Preliminary Notice of Government Intent to Exercise Option CLINs 1001-5, Contract W27P4A-05-C-0002 for $112M," which stated: "The Government must withhold its intent to exercise the option," which meant the contract would come to an end. The letter informed Oasis that "[t]he contracting office does not have assurance of adequate funding."[20] On April 3, 2006, Paul Jefferies sent Major Davis a draft proposal, which would form the basis of modification P00006, and included a way to include a base year amount of 14,350,000 cases of bottled water at $3.50 per case for a total of $50,225,000.

Modification P00006, which was executed on April 14, 2006 by Major Davis and Phil Morrell, extended the base year of the contract from May 24, 2006 to August 15, 2006, and required that the bottled water capability be established at the six sites by June 30, 2006. Therefore, modification P00006 extended the contractual deadline for bottled water plants to be operational to June 30, 2006. According to P00006, the bottled water plants were to be operational in the following order: (1) Anaconda, (2) Camp Victory, (3)

---

[20] Phil Morrell testified that "I told them [the government] that would be a really bad thing to get a letter like that, because that letter would put us in default with our banker. And that letter did put us in default with our banker, and it cost us $3 million to pull our -- our contract out of default." Phil Morrell also testified that Oasis had "already been told that by Colonel Hay, that they [the government] didn't have the funding to continue on this."

Speicher, (4) Q-West, (5) TQ, and (6) Al Asad.[21] P00006 also required the production of 14.35 million cases of water during the base period of the contract, and removed the "Not To Exceed" requirements established in modification P00003. Finally, the option years were realigned to match the extension of the base year, so the first option period would run from August 16, 2006 until January 15, 2007, the second option period would run from January 16, 2007 until January 15, 2008, and the third option period would run from January 16, 2008 until January 15, 2009. P00006 also added a fourth option period that would run from January 16, 2009 until August 16, 2009. The amount of water in the base period, the first option period, and the newly added fourth option period were different than the second and third option years. After modification P00006 to the contract, the periods of performance, quantities of water, and amounts due Oasis were:[22]

| ITEM NO. | SCHEDULE OF SUPPLIES/ SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Purified bottled water (12 / 1 Liter bottles per case) | | CASE | $3.50 | |
| 1001 | BASE Period 24 May 2005 to 15 August 2006 | 14,350,000 | | | $50,225,000.00 |
| 2001 | OPTION ONE 16 August 2006 to 15 January 2007 | 14,285,715 | | | $50,000,000.00 |
| 3001 | OPTION TWO 16 January 2007 to 15 January 2008 | 32,000,000 | | | $112,000,000.00 |
| 4001 | OPTION THREE 16 January 2008 to 15 January 2009 | 32,000,000 | | | $112,000,000.00 |
| 5001 | OPTION FOUR 16 January 2009 to 16 August 2009 | 17,714,286 | | | $62,000,000.00 |

(capitalization in original).

*b. P00011*

As noted above, United States Air Force Colonel Richardson served as the contracting officer on the contract from May 2006 until October 2006. By June 2006, Oasis personnel, including Paul Morrell, Phil Morrell, Alan Morrell, Mr. Jeffries and Mr. Petsche and Colonel Richardson had begun negotiations to further modify the contract. Both parties had financial challenges, defendant obtaining the funding to exercise the first option, and plaintiff, which would be in default with its lenders if the contract was terminated for convenience.[23] Internally, Oasis considered the following proposal, as noted in an August 1, 2006 email from Paul Morrell:

---

[21] At the time modification P00006 was executed, Anaconda and Camp Victory were already operational.

[22] Colonel Richardson testified, the modifications "changed the end date of option four from 16 August 2009 to 16 July 2009. So, it actually decreased the period of performance for the contractor."

[23] As indicated in plaintiff's post-trial brief, "[d]uring the P00011 discussions, Oasis had an outstanding debt of over $70 million."

I've tried a lot of complicated algorithms to try to make a solution that is equitable to both the Military and US. I've concluded that the most equitable approach for everyone is the following: We gat [sic] paid a flat $112,000,000/year just as the contract states or $9,333,333/month (5/6th of that until TQ comes online). We agree to deliver up to 32,000,000 cases per year in aggregate with an annual reconciliation if the actual deliveries exceed that amount.

The parties discussed several options for how to proceed moving forward, and ultimately, on August 8, 2006, Oasis, at Colonel Richardson's request, provided her a draft proposal, which was consistent with the internal Oasis proposal.[24] The draft proposal indicated two options:[25]

**Option II**.  Complete the construction of TQ in Oct 2006.

Close Base Period

| Item No. | Description | | PRICE | |
|---|---|---|---|---|
| 1001 | BASE Period of Performance from 24 May 2005 to 15 August 2006 | | $50,225,000 | |
| | Allocation for uncompleted Plant (TQ) 1/6th | .167 | ($ 8,370,833) | |
| | Allowance for capital purchases to complete TQ.  Allowed due to military delay of Land. | | $ 5,500,000 | Estimate |

---

[24] Paul Jefferies testified at trial that "we were still being asked for significant concessions, beyond what was outlined that I've tried to outline here. . . . I mean to the tune of $30 million of concessions yet beyond what's on this page." Mr. Jefferies also indicated that:

We didn't really make an offer. The negotiations began with Paul [Morrell] and I sitting in a room with [Colonel] Renee [Richardson], and I believe her assistant was there, and they told us that they were being pushed a particular direction, that she would need concessions from us to pay out the balance of the funds owed or she would have to move in this other direction.

[25] The first option contemplated modifying the contract to not build TQ, but the parties decided to build the TQ plant.

| | Funds to Purchase Pall Aria to filter QW Water. | 1 | $ 300,000 | |
| | Purchase RO's to improve SP water flow | 1 | $ 300,000 | |
| | Creation and distribution of Water information campaign posters "its just water" | 100+ | 0 | |
| | conversion and support of Class 1 Water sites at each of its locations | 5 | 0 | |
| | Previous invoices through 8.5.06 | | (23,268,860) | |
| | **Net Due Oasis At Close of Clin 1001 08.15.06** | | **$24,685,307** | |

On August 12, 2006, Paul Morrell and Colonel Richardson executed modification P00011, which was generally consistent with the draft proposal[26] and established a payment structure by which Oasis would be paid $9,333,333.33 per month, independent of the amount of water delivered, moving forward in the option periods. P00011 also modified the fourth option period, ending on July 16, 2009.

The modification explained:

The purpose of this modification is to do the following:

1. Provide a revised CLIN structure to reflect monthly pricing based upon water production capability.

2. Replace the Contract Statement of Objectives, with Performance Work Statement, dated 12 August 2006, provided as Attachment 1 to this modification.

3. Incorporate the contractor's Quality Assurance Plan into the contract provided as Attachment 2 to this modification.

4. Incorporate the List of Critical Equipment into the contract, provided as Attachment 3 to this modification.

5. Insert Special Clause, titled "Equipment Leased by the Government", into the Contract.

---

[26] Alan Morrell who earlier had testified about the water issues at the various plants indicated that regarding the lack of water at Speicher, "on P00011, because this was such a hot issue, again, part of the negotiation was a concession that we would sort this problem out," and Oasis "bought another BEV 9 reverse osmosis system." Alan Morrell also testified that "[p]art of the concessions that were demanded from us in P00011 were two site improvements to solve water issues. One was Speicher, and the other was Q-West."

6. Insert clause DFARS 252.232-7007, "Limitation of Government's Obligation" (May 2006) into the Contract.

7. Replace Contract Section J, List of Documents, Exhibits and Other Attachments.

8. Decrease the contract amount by $11,604,166.45 from $386,225,000.00 to $374,620,833.55.

9. Decrease the contract funded amount by $5,604,166.35 from $100,225,000.00 to $94,620,833.65.

10. Change the end date of Option 4 from 16 August 2009 to 16 July 2009.

On August 15, 2006, as part of P00011, Oasis submitted a final invoice to close out the base year in the amount of $24,542,387.00. The total amount of water produced in the base year was 8,705,992 cases, which translated to $30,470,972.00 at $3.50 per case. In addition, from the time the contract was awarded to the end of the base year, Oasis submitted nine invoices for payment at $3.50 per case, totaling approximately $23 million, which the government paid.[27]

The contract ended on July 16, 2009, and Oasis performed on the contract until that date. Subsequently, Oasis and the government entered into a separate, follow-on contract regarding bottled water in Iraq. The issues in this opinion relate solely to the base year of the original contract.

---

[27] As reflected in the joint stipulations, and as agreed to by the parties regarding invoices for the base year of the contract: On December 31, 2005, Oasis submitted an invoice to the Government for 293,160 cases of water from Anaconda at 3.50 per case, for a total of $1,026,060. On January 31, 2006, Oasis submitted an invoice for 356,400 cases of water from Anaconda at $3.50 per case for a total of $1,247,400.00, and on February 28, 2006, Oasis submitted an invoice for 508,680 cases of water from Anaconda at $3.50 a case, for a total of $1,780,380.00. On March 31, 2006, Oasis submitted an invoice for 664,320 cases of water from Anaconda at $3.50 per case, for a total of $2,325,120.00. One month later, on April 30, 2006, Oasis submitted an invoice for 910,020 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $3,185,070.00. On May 31, 2006, Oasis submitted an invoice for 1,126,920 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $3,944,220.00. On June 15, 2006, Oasis submitted an invoice for 1,381,140 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $4,833,990.00. On July 1, 2006, Oasis submitted an invoice for 297,540 cases of water from Anaconda and Speicher at $3.50 a case, for a total of $1,041,390.00. Finally, on July 31, 2006, Oasis submitted an invoice for 1,150,900 cases of water from Anaconda, Q-West, Speicher, and Camp Victory, for a total of $4,028,150.00.

Certified Claim

Prior to the filing of the certified claim, Phil Morrell sent an email to Paul Morrell and Paul Jeffries on August 4, 2006, with his thoughts on the contract, as follows:

**Capabilities for Time Period not Quantity**

- Funding was received for purchase of water, but it [sic] the contract was a capabilities contract
- Should have 2 Contracts
  - Capabilities Contract
  - Product Procurement Contract
- Funding was received for Contact# _____
- Contract#____ is a capabilities contract not a procurement contract
- $50 million on the table is for capability not water procurement

The general assumption from everybody is that the price of water in the CLIN is somehow associated with the price of capabilities.

(emphasis in original). At trial, Phil Morrell explained his view of the contract:

When I studied the contract, including when I talked to -- told Max [Wyeth] that he could get a progress payment, which I did tell Max, way back in the early days, probably a week into the -- two weeks into the contract, that he could get a progress payment. Based on all the historic contracting that I had done, and the way that I submitted my bid, the anticipation that was there would be, you know, progress payment capabilities, or -- in the contract. So, looking at Max's bid, he had put $58 million in for what appeared to be the construction capabilities, and then out of the $58 million, based on -- and I read this somewhere, I think it was in the FAR firm fixed price area -- it says that you -- if it's for equipment, then you have to deduct the salvage value of the equipment, and then you could bill for whatever that was. So, that -- I didn't actually sit down and do the numbers because that's just not what I do, but I – I suggested that we bill against the $52.25 million or $50.225 million as capabilities.

Paul Morrell stated at trial that he agreed with Phil Morrell about the contract being a capabilities contract after executing P00011 and considering Colonel Richardson correspondence,

she's commenting on the proposal . . . specifically, the 9.33 million per month for capabilities going forward, and she's saying she thinks that's a reasonable approach, but this is one of the first times where I hear a contract officer say the same thing that Phil has been saying for most of the year, that this is a water production capability contract. And Colonel Richardson goes on, through the -- post-P00011, and she's very clear that it's a water

production capability contract and it has been all along. They've just been administering it as if it weren't.

On June 20, 2008, Paul Morrell signed the certified claim, and on July 4, 2008, Oasis submitted its certified claim to the government. At the beginning of the certified claim, Paul Morrell, as President of Oasis, stated: "I certify that the claims stated herein are made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the Contract adjustment for which the contractor believes the Government is liable." During his testimony at trial, Paul Morrell reaffirmed these statements. On direct examination, Paul Morrell testified about the certified claim:

Q. Did you read and review the entire claim and its parts before you signed the certification?

A. Yes.

Q. You also submitted a signed affidavit as a part of this claim, correct?

A. Yes.

Q. Did you have any involvement in putting together the damages claimed in the claim that was submitted?

A. Yes.

. . .

Q. Did you review the amount of the claim before you signed the certification?

A. Yes.

Q. Did you believe that the amount claimed accurately reflected the amounts which the Government of the United States owed Oasis at the time you signed the claim?

A. Yes.

Q. Do you believe today that the amounts included in the claim are owed to Oasis?

A. Yes.

Q. Did anyone from the military ever inform you that he or she thought that the claim was fraudulent or false in any way?

A. No.

Paul Morrell also submitted a sworn affidavit in support of Oasis' certified claim at the time he submitted the certified claim, in which he stated:

> During the period May 2005 to the present, I was responsible for the day-to-day management of Contract W27P4A-05-C-0002 (the "Contract") and had responsibility for all aspects of Oasis' performance of the Contract I also had overall responsibility for the cost and accounting issues involving Oasis' performance of the Contract. This Affidavit is based on my first-hand knowledge, the collective corporate knowledge of Oasis and the corporate records of Oasis maintained in the ordinary course of business.

Mr. Vos, the then-Chief Financial Officer of Oasis, also submitted a sworn affidavit in support of Oasis' certified claim, in which he indicated: "I am responsible for all aspects of finance, bookkeeping and accounting. Along with my staff I supervised the accounting for construction, cost projections, purchase orders, purchase order approvals, accounting classification, weekly, monthly and annual reconciliations."[28]

The certified claim identified eight claims for which plaintiff sought payment: Claim 1[29] was a "Claim for all bottled water supplied in the Contract base year, as extended to August 15, 2006, excluding bottled water supplied from Camp Anaconda through May, 2006 (5,605,020 cases of bottled water)," and plaintiff sought $19,617,570.00. Claim 2 was a "Claim for penalty wrongfully assessed for failure to open Camp TQ on time," which plaintiff ascribed "solely as a result of Government-caused delays and disruptions," and for which plaintiff sought $2,270,833.00. The certified claim indicated that Claim 3 was a "Claim for reduction in Contract consideration for first option period (August 15, 2006 through January 15, 2007) resulting from P00011," and for which plaintiff sought $3,333,333.00. Claim 4 was a "Claim for water bottling capabilities services provided through extension of Contract base year," and plaintiff valued Claim 4 at $11,175,063.00. Claim 5 sought $808,423.00 as a "Claim for cost of site improvements required," specifically at Anaconda, Camp Victory, Al Asad, and TQ. Claim 6 was a "Claim for cost of water supply improvements at Camp Speicher and Camp Qwest," and plaintiff sought $600,000.00.[30] Claim 7 was a "Claim for other penalties assessed re: Government delays

---

[28] In addition to Paul Morrell and Mr. Vos, Lawrence Schwartz, a certified public accountant, and Alan Morrell also submitted a sworn affidavit in support of the certified claim.

[29] Although plaintiff and defendant typically refer to the claims in the certified claims as "counts," unless quoting from the parties, the court refers to the claims as claims, and the counts filed in plaintiff's complaint in this court as counts.

[30] In Claim 6, the water supply improvements, as alleged by plaintiff, refer to "the need to purify the non-compliant source water supplied by Defendant at Speicher and Q-West."

of TQ opening," related to the "44 days of TQ AQL[31] penalties erroneously assessed to Oasis due to Government-caused delays in establishing TQ in the first Option Period" and was valued by plaintiff at $2,053,333.00. The plaintiff's certified claim reflected a total amount claimed for the first seven claims of "$39,858,555." Below the total for the first seven claims, plaintiff's certified claim indicated: "Alternative additional claim for water supplied from Camp Anaconda during initial Contract base year ending May 2006, 3,100,972 cases of bottled water: $10,853,402."[32]

The certified claim restated the claims and the dollar figures at the end of the certified claim in the "Summary of Claims," and also stated:

As set above, the same base claim amount results from calculations based on breach of contract principles, as follows:

a. The Contract provides for a firm, fixed-fee, Contract base-year payment to the contractor of $50,225,000.

b. Oasis was entitled to the entire firm, fixed-fee, Contract base-year payment of $50,225,000, plus $3.50 per case for each case of water produced, from all sites through August 15, 2006, less, at most, the amount of water delivered from Camp Anaconda through May 24, 2006. Oasis produced 5,605,020 cases of water (excluding water produced at Camp Anaconda in the Contract base year ending May 24, 2006) at a contract price of $3.50 per case and is entitled to payment of $19,617,570.

c. Oasis provided water-bottling capability services for an additional 2.67 months when the Contract base year was extended to August 15, 2006, due to Government delays and breaches of contract.

(internal citations omitted). The certified claim indicated the plaintiff's view that:

The Contract is not a model of clarity. The amount payable in the Contract base year is a firm, fixed-price amount of $50,225,000. . . . However, the Contract, as written, does not require delivery of any bottled water in the

---

[31] The parties have stipulated that "AQL" is an acronym for Acceptable Quality Level.

[32] As referenced below, the defendant refers to Claim 1 and Claim 8 together under its claim for "Fraudulent Double Billing For $30 Million In Bottled Water." In summarizing its certified claim in this court, plaintiff also referred to the Claim 1 and Claim 8 together, stating: "Counts 1 and 8 – Recovery of $30,470,972 for the cost of the cases of water that was offset against the Base Year firm-fixed price, as well as the non-invoiced water Defendant also took at the time of P00011." The figure of $30,470,972.00 reflects the combined value of Claims 1 and 8 in the certified claim. The court notes that the parties consider the "Alternative additional claim for water supplied from Camp Anaconda" as "count 8." The court refers to the alternative additional claim as Claim 8.

Contract base year. In the Contract base year, Oasis was entitled to a firm, fixed-fee payment of $50,225,000. The Contract provides that the entire payment is for water purification and water-bottling capabilities. Under the Contract, bottled water was a separately priced commodity to be paid for by the Government at the price of $3.50 per case under a separate CLN.

(internal citations omitted). The certified claim also indicated:

While Oasis delivered some bottled water during the Contract base year, Oasis invoiced the Government for that water and the Government paid those invoices. The primary deliverable item in the Contract base year is water purification and water-bottling *capabilities,* as specified in CLN 00001, as follows: The Contractor shall provide all labor, tools, supervision, personnel, equipment transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants. The Government made it very clear in the pre-award documentation that the Government was not obligated to purchase *any* bottled water under the Contract. In response to a pre-award question of whether the Government would guarantee purchase of any minimum quantity of water, the Government stated emphatically that it was obligated to purchase "zero" bottled water through the Contract. The only reasonable interpretation of the statement that the Government was not required to purchase any water is that the entire Contract base-year, fixed-fee payment of $50,225,000 was a mobilization payment for delivering water-bottling capabilities.  Stated otherwise, if the Government was required to purchase "zero" water, it logically follows that "zero" water was included in the firm fixed fee of $50,225,000. The Contract price of $3.50 per case thus applies to all water delivered in the base year.

(internal citations omitted; emphasis in original).

The government did not issue a decision on Oasis' certified claim for over 15 months after it was submitted, and the claim was passed between, and considered by, a number of contracting officers and personnel, including United States Navy Lieutenant Commander Klingenberg, who was the contracting officer when Oasis submitted its certified claim on July 4, 2008, United States Air Force Major Jamie Rhone, who served as the contracting officer from July 2008 until January 2009,  and Dean Carsello, a Joint Contracting Command Iraq Afghanistan (JCC-I/A) policy analyst, who was involved in reviewing the claim in 2008 and 2009. Ultimately, United States Air Force Major Hobbs denied Oasis' certified claim in its entirety when he issued the Contracting Officer's Final Decision on October 18, 2009.

One year later, on October 18, 2010, plaintiff filed its complaint in the United States Court of Federal Claims. Plaintiff's complaint alleged eight counts, and the complaint mostly tracks the claims raised in the certified claim, with the same dollar amounts, albeit framed as breaches of contract in the complaint. The first count, "**Breach of Contract,**

**and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for water TakenFrom [sic] Sites other than LSA Anaconda**" seeks damages in the amount of $19,617,570.00, plus interest. (emphasis in original). The second count, "**Breach of Contract For Improper Assessment of a Liquidated Damages Penalty Against Oasis for Failing to Have All Six Facilities Open by the End of the Base Year, or Alternatively, for Reducing the Base Year Contract Price Without Consideration**," seeks  damages in the amount of $2,270,833.00, plus interest. (emphasis in original). The third count, "**Breach of Contract For Improper Reduction of the Option Period One Price Without Consideration**" seeks damages in the amount of $3,333,333.00, plus interest. (emphasis in original). The fourth count of the complaint, "**Breach of Contract Resulting from Government Acts and Omissions Impacting and Damaging Oasis During the Base Year, as Extended**" seeks damages in the amount of $11,175,063.00, plus interest.  (emphasis in original). The fifth count, "**Breach of Contract Resulting From Government Failure to Provide Suitable Construction Sites**," seeks damages in the amount of $808,423.00, plus interest. (emphasis in original). Oasis' sixth count, "**Breach of Contract and/or Constructive Change for Failure to Provide Suitable Water at the Purification Facilities as Required by the Contract**" seeks $600,000.00, plus interest. (emphasis in original). The seventh count of the complaint, "**Breach of Contract For Unjustified Imposition of Penalties for Late Opening of TQ and/or Wrongful Reduction in Contract Price**," seeks $2,053,333.20 plus interest. (emphasis in original). Finally, the eighth count of the complaint, "**Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for Water TakenFrom [sic] Site LSA Anaconda**," seeks damages in the amount of $10,853,402.00, plus interest. (emphasis in original).

Defendant filed an answer to Oasis' complaint on February 15, 2011, and, more than a year later, on April 12, 2012, filed a motion to amend the pleadings and include fraud counterclaims. In its post-trial brief plaintiff argues that "[e]ssentially, no Government personnel who reviewed the Claim ever reported, suggested, or even mentioned that the Claim was false or fraudulent prior to the Department of Justice's involvement in this litigation." As discussed below, the defendant indicates that the "Department of Justice possesses sole authority to assert fraud counterclaims." (citing 28 U.S.C. §§ 516 (2012), 2508 (2012); 31 U.S.C § 3730(a) (2012); and Hernandez, Kroone, & Assocs. v. United States, 110 Fed. Cl. 496, 528 (2012), recons. denied, 2013 WL 3199299 (Fed. Cl. Mar. 29, 2013)). Plaintiff is correct that none of the government personnel called at trial stated a belief that Oasis' certified claim was fraudulent at the time they considered the claim.

Oasis responded to the amended answer and counterclaims on May 10, 2012, however, on June 6, 2014, defendant moved to again amend its pleadings and filed a second amended answer and counterclaim. In the interim, during highly contested, and at times uncooperative, discovery the parties filed numerous motions related to discovery, the production of documents, how documents were maintained, how documents were to be produced, and in what format, and who would bear the costs, spoliation, whether or not various privileges applied to various documents, as well as motions to compel, motions to strike, and motions to quash. The court held numerous status conferences and hearings to try and resolve the varying disputes between the parties, issued

numerous orders, including publishing one substantive, lengthy opinion on attorney-client privilege and work product.  See Oasis Int'l Waters, Inc. v. United States, 110 Fed. Cl. 87 (2013).

The parties also filed motions for summary judgment and motions in limine in advance of the trial, and after trial, filed lengthy post-trial briefing materials. The effect of the discovery disputes, and difficult relationships, resulted in discovery deadlines being repeatedly pushed back, and trial dates repeatedly postponed. After defendant's motion to file a second amended answer and counterclaim was filed, a six week trial was held. Initially, this opinion addresses the fraud counterclaims raised by defendant.  Next, the court will unscramble the issues of contract interpretation, duress, and damages, if any, raised by the case. The court also will separately address plaintiff's allegation of spoliation.

## DISCUSSION

<u>Fraud Counterclaims</u>

In defendant's second amended answer and counterclaim, "[d]efendant asserts counterclaims pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, the Forfeiture of Fraudulent Claims Act (also known as the Special Plea in Fraud), 28 U.S.C. § 2514, and the anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 7103." Defendant alleges in the counterclaim that Oasis submitted a certified claim to the contracting officer, seeking an additional roughly $50 million in July 2008 and that in the certified claim:

> Oasis sought $44,516,868 million under a novel claim that the original contract provided for both: (1) a $50,225,000 payment for "mobilization," even though the $50,225,000 contract grand total for the base year required the sale of 14,350,000 cases; and (2) an additional $3.50 for each case of bottled water during the base year. The certified claim also requested $600,000 for the improvements at Speicher and QW, despite the fact that the Army had already reimbursed those costs as part of the August 2006 modification (P00011).

In its post-trial brief, defendant argues that "Oasis executives in Utah embarked on a plan to gouge the military for as much money as possible before war's end," and claims that "Oasis's fraud took an extremely simple and classic form. Oasis would submit a certified claim seeking, among other things, payment for more than $30 million for bottled water and for $600,000 in other expenses for which it had already been paid. This attempt to get paid a second time is fraud."

The court notes that plaintiff expressed frustration about how and when the defendant's amended the answer and the counterclaim.  In its post-trial briefs plaintiff explained:

In advance of trial, Defendant made a last minute request to amend its counterclaim. Defendant made this request because Defendant's original Amended Answer was unclear as to which counts it alleged were fraudulent. Instead of clarifying the issue, Defendant further muddied the waters regarding its counterclaim (days before trial) by filing a series of pleadings between June 6, 2014 and July 7, 2014, which alleged inconsistent theories of fraud and multiple different combinations of counterclaims Defendant alleged were fraudulent.[33]

(internal citations omitted).

Plaintiff states that "[t]he Government advances its counterclaim under three statutory bases: the False Claims Act, the Forfeiture of Fraudulent Claims Act / Special Plea in Fraud statute, and fraudulent claims provision of the Contract Disputes Act," and contends that "[a]lthough these statutes differ in wording and remedy, each has two primary requirements that are relevant to this action: (1) the Government must demonstrate that the claim is actually false, and (2) the Government must demonstrate that the contractor acted knowingly." Plaintiff argues that "[t]he Government's counterclaim fails on each element. Oasis's claim can't be fraudulent, because it is not false. Oasis did not submit it 'knowing' that it was false or with intent to deceive, either," and "Oasis' full and honest explanation in the claim itself of the factual assertions and legal theories underpinning it belie any assertion that Oasis was trying to deceive the Government." Plaintiff requests that the court "find that no part of Oasis' Claim is false or otherwise fraudulent." Plaintiff also states that "the *actual* evidence that goes to the merits of the case shows that Oasis' contractual interpretation is correct . . . and that there is no fraud." (emphasis in original). Plaintiff further argues that "[t]o recover on a fraud theory,

---

[33] As plaintiff correctly cites, in the June 6, 2014 motion to amend, defendant requested:

We respectfully request that the Court allow us to change the phrase "counts 1, 3, 4, and 8 of Oasis's complaint," to "*counts 1, 2, 4, and 8* of Oasis's complaint" at paragraphs 318 and 139 of the amended counterclaim because "we are seeking fraud penalties with respect to those counts of the complaint in regard to Oasis's contention that it is entitled to a lump-sum base period annual payment of $50,225,000, plus $3.50 per case for any water delivered during the base period.

But in defendant's July 2, 2014, pre-trial brief, defendant argued that "*Counts 1, 3, 4, 6, 7, and 8*, of the complaint all hinge on Oasis's novel theory concocted solely for its certified claim that Oasis is entitled to payment of a flat fee of $50,225,000 plus $3.50 per case of water delivered during the contract base period." Defendant, by contrast, notes that "Oasis now complains that this was a 'last-minute' request, but fails to mention that it did not oppose the Government's motion to amend," and argues "[i]nstead of responding to the substance of several of the Government's fraud arguments, Oasis attempts to re-litigate the Court's grant of our motion to amend the fraud counterclaim for a clerical error." It appears, therefore, that defendant is now only pursuing fraud counterclaims for claims 1, 2, 4, 6, and 8.

the Government must prove that Oasis' claim is actually false. But the Government has not – and cannot – prove this, because Oasis' claim is not false. The Court should reach this conclusion even if it ultimately disagrees with Oasis's claim, since there is a wide gap between 'incorrect' and 'fraudulent.'" The court initially considers the fraud counterclaims for the purposes of this opinion, as if, hypothetically, defendant, and not plaintiff, has the correct interpretation of the contract, and, the court must determine if the plaintiff, even potentially having an incorrect interpretation of the contract, intended to commit fraud in its certified claim, had actual knowledge of the falsity of the claim or acted with reckless disregard of the truth or falsity of the claim.

The court notes that for the majority of the parties' briefing, the parties do not differentiate between the various statutes and generally only discuss "fraud." Indeed, as noted above, plaintiff contends that "[a]lthough these statutes differ in wording and remedy, each has two primary requirements that are relevant to this action . . . ." By contrast, although defendant clearly identifies the standards for each of the counterclaims, after discussing fraud in considerable detail for the Special Plea in Fraud statute, it generally refers to its rationale in the Special Plea in Fraud section for support for its False Claims Act and Contract Disputes Act arguments.[34]

### a. Special Plea in Fraud

In defendant's second amended answer and counterclaim, defendant asserts that:

Oasis attempted to practice fraud against the United States in the proof, statement, establishment, or allowance of the portions of the claim identified in the paragraphs above [in the defendant's second amended answer and counterclaim]. In particular, Oasis submitted at least one certified claim with the intent to cause the Government to pay Oasis amounts to which it knows it is not entitled.

According to defendant, "Oasis, therefore, is liable for the forfeiture of its certified claim for $50,711,957, in its entirety pursuant to 28 U.S.C. § 2514."

In its post-trial brief defendant contends that "Oasis's Entire Claim Is Forfeited Under The Special Plea In Fraud." Most directly, defendant claims that "Oasis's intentional attempt to be paid twice for the same water constitutes fraud." Plaintiff responds that "[a]t an absolute minimum, the frank and open nature of the claim alone negates the Government's arguments under the Special Plea in Fraud and CDA [Contract Disputes Act] fraudulent claims provision, both of which require an *intent* to deceive the Government." (emphasis in original).

The Special Plea in Fraud statute provides:

---

[34] For example, as noted below, in its post-trial brief regarding the False Claims Act defendant states: "Oasis is liable under the False Claims Act for the same reasons that its claim must be rejected under the Special Plea in Fraud."

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514; see also Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d 1348, 1365 (Fed. Cir. 2013), reh'g denied, 563 F. App'x 769 (Fed. Cir.), cert. denied, 135 S. Ct. 167 (2014). In Kellogg Brown & Root, the United States Court of Appeals for the Federal Circuit unequivocally held that "[o]n its face, the statute is limited to those circumstances where the Government proves fraud 'in the proof, statement, establishment or allowance' of a claim not in the execution of a contract." Id. at 1366 (footnote omitted).

Previous decisions by Judges of the United States Court of Federal Claims have indicated that:

> [t]he statutory forfeiture contemplated by 28 U.S.C. § 2514 is broad.  Earlier, the Court of Claims held that, upon a finding that claims are based on "a contract under which [a contractor] practiced fraud against the Government," as defined by this statute, "all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514." Little v. United States, 138 Ct. Cl. 773, [778,] 152 F. Supp. 84, 88 (1957).

Veridyne Corp. v. United States, 83 Fed. Cl. 575, 586 (2008); see also Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. 488, 496 (2011), aff'd, 728 F.3d 1348 (Fed. Cir. 2013), reh'g denied, 563 F. App'x 769 (Fed. Cir.), cert. denied, 135 S. Ct. 167 (2014). In AEY, Inc. v. United States, the court noted that Little has served as the basis for decisions in this court holding that fraud in the performance of a contract leads to forfeiture of all claims arising out of the contract." AEY, Inc. v. United States, 114 Fed. Cl. 619, 628 (2014).

As articulated by a Judge of the United States Court of Federal Claims:

> In order to satisfy § 2514, however, the fraud alleged must be related to the contract at issue. Little v. United States, 138 Ct. Cl. 773, 152 F. Supp. 84, 87-88 (1957). Fraud in an unrelated transaction will not lead to forfeiture under this statute. However, when fraud is committed in regard to the very contract upon which the suit is brought, the court will not divide the contract and allow recovery on part of it. Id.; UMC Electronics v. United States, 43 Fed. Cl. 776, 791 (1999), aff'd, 249 F.3d at 1340 ([Fed. Cir.] 2001).

> In order to prevail in its defense of fraud under 28 U.S.C. § 2514, the "burden is on the government to establish by clear and convincing evidence that the claimant has committed the fraud alleged." Glendale [Federal Bank, FBS v. United States], 239 F.3d at 1379; UMC Electronics, 43 Fed. Cl. at 791 (internal citation omitted). This requirement has more specifically been rendered in the following way: "in order that a misrepresentation be fraudulent . . .  it must be both consciously false and intended to mislead." E. Allan Farnsworth, Farnsworth on Contracts, § 4.12 (2d Ed.1998). Thus, for the purposes of § 2514, the government must show: 1) that the plaintiff made a false statement to the government knowing that it was false; and 2) that this statement was intended to deceive the government. Glendale, 239 F.3d at 1379.

Am. Heritage Bancorp v. United States, 61 Fed. Cl. 376, 385-86 (2004). In Brown Construction Trades, Inc. v. United States, 23 Cl. Ct. 214, 216 (1991), the court explained the breadth of the statutory intent in 28 U.S.C. § 2514:

> This statute has been held to require the forfeiture of any claim affected by fraud, whether intrinsic to the claim or in the presentment of the claim. Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. 619, 641, 124 F. Supp. 608, 620 (1954) ("this statute goes further than merely banning fraudulent claims.  It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim.").

> The Court of Claims has ruled that where fraud is committed in the course of a contract to which the suit pertains, it may not isolate the affected part and allow suit to proceed on the remainder.  The practice of a fraud on part of a contract condemns the whole.  The rule is set out in Little v. United States, 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 87-88 (1957):

>> It is true that the forfeiture statute [28 U.S.C. § 2514] was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government.  But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it.  Since plaintiff's claims are based entirely upon contract V3020V-241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

> Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government.  See also New York Mkt. Gardeners' Ass'n v. United States, 43 Ct. Cl. 114, 136, 1907 WL 832 (1908).

Brown Constr. Trades, Inc. v. United States, 23 Cl. Ct. at 216; see also Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 435-36 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995). But see Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 499.[35]

As noted above, in an appeal from the trial court, in Kellogg Brown & Root, the United States Court of Appeals for the Federal Circuit noted that the government had argued for "a finding of fraud, supporting forfeiture, 'when fraud in the contract performance undermined the legitimacy of the contract upon which the plaintiff sought compensation.'" Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1365-66. The Federal Circuit, in Kellogg Brown & Root, quoting from the trial court decision regarding the Brown Construction decision, indicated that:

> This is an impermissibly broad reading of the law. The Court of Federal Claims correctly limited the statute:
>
> > A valid cause of action under [the Forfeiture Statute] must be tied to the submission of a claim, whether in producing false proof to support a claim, see, e.g., [Kamen Soap Prods. Co. v. United States, 124 F. Supp. 608, 622 (Ct. Cl. 1954)]

---

[35] In Kellogg Brown & Root Services, Inc. v. United States, the Court of Federal Claims questioned the holding in Brown:

> Several decisions have seized upon this language as justification that all claims must be forfeited by a contract that is "tainted" by fraud, without regard to the alleged fraud's connection to a submitted claim. See, e.g., Brown Constr. Trades, Inc. v. United States, 23 Cl. Ct. 214, 216 (1991). In doing so, these cases overlook Little's predicate factual finding that false proof had been submitted in a related claim under the contract.
>
> . . .
>
> In analyzing the applicability of the forfeiture statute, the Brown Construction court expanded the scope of the targeted conduct under the statute, while somehow relying on Little, 152 F. Supp. at 87–88, Kamen Soap, 124 F. Supp. at 620, and New York Market, 43 Ct. Cl. at 114, by stating that "28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government." Id. (emphasis added). As a consequence, the court effectively read out of the law the requirement that the fraud relate to the "proof, statement, establishment, or allowance" of claim, a hallmark of every precedential Court of Claims case analyzing claims under the forfeiture statute. See also Ab–Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 435–36 (1994) (repeating that forfeiture statute requires forfeiture of all claims tainted by fraud without requiring such fraud relate to "proof, statement, establishment, or allowance" of a claim), aff'd, 57 F.3d 1084 (Fed. Cir. 1995) (unpublished table decision) (per curiam).

Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 500.

(forfeiting claim because falsified documentation was submitted in presentation of claim), or in falsely establishing the claim, see, e.g., [N.Y. Mkt. Gardeners' Ass'n v. United States, 43 Ct. Cl. 114, 136 (1908)] (Government's objection to claim based on contractor's not fulfilling contract specification, i.e., "establishment" of a false claim).

Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1366 (quoting Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 501) (alterations in original); see also Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. 338, 379 (2014); AEY, Inc. v. United States, 114 Fed. Cl. at 628-29;[36] Ulysses, Inc. v. United States, 110 Fed. Cl. 618, 649 (2013) ("[S]uch an expansive reading of the FFCA [Forfeiture of Fraudulent Claims Act] is not warranted by the language of the statute.").

Under the Special Plea in Fraud statute, "the government must 'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'"[37] Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1341 (Fed. Cir.) (quoting Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir.), reh'g denied (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 558 U.S. 990 (2009); see also Veridyne Corp. v. United States, 758 F.3d 1371, 1376-77 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1365 ("To prevail, the Government must prove its allegations by clear and convincing evidence."). In Glendale Federal Bank, FSB v. United States, the United States Court of Appeals for the Federal Circuit "explained that '[t]o prevail under [28 U.S.C. § 2514] the government is required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended

---

[36] As noted in AEY, "[i]n upholding the trial court's decision in KBR I, the Federal Circuit did not address that court's interpretation of the continuing validity of Little. The Federal Circuit only confirmed the invalidity of much of its progeny." AEY, Inc. v. United States, 114 Fed. Cl. at 629.

[37] Defendant argues "[a]lthough the prevailing standard in the Federal Circuit is clear and convincing evidence, the United States respectfully submits that the proper standard is preponderance of the evidence," arguing that the United States Supreme Court has "'[d]eclined to depart from the preponderance-of-the-evidence standard generally applicable in civil actions.'" (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983)). Even if the court were to agree with defendant, the Federal Circuit's binding precedent has made it clear that this court is to apply the "clear and convincing" standard of proof under the Special Plea in Fraud statute. See Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1341; Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1365.

to defraud the government by submitting those claims.'"[38] <u>Glendale Fed. Bank, FSB v. United States</u>, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (brackets in original) (quoting <u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d at 1362); <u>see also</u> <u>Young-Montenay, Inc. v. United States</u>, 15 F.3d 1040, 1042 (Fed. Cir. 1994) ("Under 28 U.S.C. § 2514, the government bears the burden of proving that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." (citing <u>McCarthy v. United States</u>, 670 F.2d 996, 1004, 229 Ct. Cl. 361, 373 (1982), <u>abrogated</u> <u>on</u> <u>other grounds by</u> <u>Slattery v. United States</u>, 635 F.3d 1298 (Fed. Cir. 2011))); <u>Veridyne Corp. v. United States</u>, 105 Fed. Cl. 769, 808, <u>modified</u>, 107 Fed. Cl. 762 (2012), <u>aff'd</u> <u>in</u> <u>part</u>, <u>rev'd in</u> <u>part</u>, 758 F.3d 1371 (Fed. Cir.), <u>reh'g</u> and <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2014);[39] <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 73 Fed. Cl. 547, 584 (2006) ("The contractor must knowingly present the false claim with the intention of being paid for it."), <u>aff'd</u>, 557 F.3d 1332 (Fed. Cir.), <u>reh'g</u> and <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir.), <u>cert.</u> <u>denied</u>, 558 U.S. 990 (2009); <u>O'Brien Gear & Mach. Co. v. United States</u>, 219 Ct. Cl. 187, 199, 591 F.2d 666, 672 (1979); <u>Miller v. United States</u>, 213 Ct. Cl. 59, 68, 550 F.2d 17, 22 (1977); <u>Kamen Soap Prods. Co. v. United States</u>, 129 Ct. Cl. 619, 641, 124 F. Supp. 608, 620 (1954).

Mere negligence, inconsistency, or discrepancies are not actionable under the Special Plea in Fraud statute.  <u>See</u> <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 73 Fed. Cl. at 584; <u>Veridyne Corp. v. United States</u>, 105 Fed. Cl. at 801; <u>Grand Acadian, Inc. v. United States</u>, 105 Fed. Cl. 447, 458 ("'Proof of negligence or ineptitude does not meet the standard of clear and convincing evidence; rather, "[a]n intent to deceive the Government must be proved."'" (quoting <u>Alcatec, LLC v. United States</u>, 100 Fed. Cl. 502, 517 (2011) (quoting <u>Miller v. United States</u>, 213 Ct. Cl. at 68, 550 F.2d at 22), <u>aff'd</u>, 471 F. App'x 899 (Fed. Cir. 2012))), <u>appeal</u> <u>dismissed</u> (Fed. Cir. 2012).  The United States Court of Appeals for the Federal Circuit has described the clear and convincing evidence standard as follows:

"A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt.  Clear and convincing evidence has been

[38] The "clear and convincing" standard applies to proof under the Special Plea in Fraud statute, 28 U.S.C. § 2514, as opposed to the preponderance of the evidence standard applicable to the False Claims Act, 31 U.S.C. § 3729, and the Contract Disputes Act, 41 U.S.C. § 604.  <u>See</u> <u>UMC Elecs. Co. v. United States</u>, 249 F.3d 1337, 1338-39 (Fed. Cir. 2001) ("The government must prove a violation of the Contract Disputes Act and False Claims Act by a preponderance of the evidence. Under the Special Plea in Fraud, the government must prove its allegations by clear and convincing evidence." (citing <u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d at 1362)).

[39] The trial court in <u>Veridyne</u> also indicated that, regarding 28 U.S.C. § 2514, "[a] predicate for forfeiture under this statute is the establishment of fraud, although the statute itself does not articulate the elements of fraud."  <u>Veridyne Corp. v. United States</u>, 105 Fed. Cl. at 801.

described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is '*highly probable.*'"

Am-Pro Prot. Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoting Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)) (emphasis in original); see also Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 525 (citing Am-Pro Prot. Agency, Inc. v. United States, 281 F.3d at 1239–40 (other citation omitted)).

"The court may . . . consider circumstantial evidence in making its determination." Alcatec, LLC v. United States, 100 Fed. Cl. at 517 (citing Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. at 642, 124 F. Supp. at 620).  With respect to the court's analysis of circumstantial evidence to demonstrate clear and convincing evidence of fraud, the United States Court of Claims explained:

About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts. Every event in the universe is linked to every other event. One cause produces an effect, and that effect in turn becomes a cause thus all events from the beginning of time are woven into one complete pattern. It is difficult, therefore, to make up a story that is not part of this one continuous design. It is like a patch on a suit of clothes—it may be made out of the same cloth, may look the same in the middle, but will show around the edges, because it is not a part of the original garment. Likewise a made-up story will not fit into the scheme of events, because it is not a part of it. It will not, therefore, stand close examination.  One made-up story calls for another and the last fabrication will not tally with the next fact.

Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. at 642, 124 F. Supp. at 620.

Once fraud is established, "[t]he use of the word 'shall' [in 28 U.S.C. § 2514] makes the judgment of forfeiture obligatory on the court; the court has no discretion to turn a blind eye to an attempt, whether successful or not, to commit fraud in the statement of a claim against the United States." Am. Heritage Bancorp v. United States, 61 Fed. Cl. at 385; see also Farkas v. United States, 57 Fed. Cl. 134, 146 (2003) (quoting Miller v. United States, 213 Ct. Cl. at 68, 550 F.2d at 22), aff'd, 95 F. App'x 355 (Fed. Cir. 2004) ("Section 2514 amounts to a 'silver bullet' which, in the present case, would require that [plaintiff's] claim be forfeited if it is shown by clear and convincing evidence that [plaintiff] acted or made false or misleading statements with the 'intent to deceive the Government.'"). Forfeiture under the Special Plea in Fraud statute "carries no monetary penalties other than the forfeiture itself." Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584. "The forfeiture counterclaim carries no monetary penalties other than the forfeiture itself." Id.; see also Barren Island Marina, Inc. v. United States, 44 Fed. Cl. 252, 257 (1999) ("The plain meaning of the statute [28 U.S.C. § 2514] is that the value of the forfeiture is not restricted or even linked to the value of the loss sustained by the government. For this reason, the forfeiture is not, strictly speaking, a remedy. Additionally, because forfeiture under § 2514 requires demonstration of fraud-intentional conduct-the

forfeiture is more akin to punishment."), <u>appeal</u> <u>dismissed</u>, 54 F. App'x 329 (Fed. Cir.), <u>vacated by</u> 57 F. App'x 427 (Fed. Cir.), <u>and</u> <u>appeal</u> <u>dismissed</u>, 66 F. App'x 878 (Fed. Cir. 2003).

Although the Special Plea in Fraud Statute does not require the court to render a judgment of forfeiture when a contractor practices fraud against the government "in some other unrelated transaction," when a contractor commits fraud "in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it." <u>Little v. United States</u>, 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 88 (1957). The claims that a contractor asserts in court, therefore, may be forfeited as long as the fraudulent conduct that serves as the basis for the forfeiture is related to the contract from which the claims are derived.  <u>See</u> <u>Daff v. United States</u>, 31 Fed. Cl. 682, 697 (1994) ("Although . . . fraud does not have to occur in the court proceeding itself, it plainly has to be relevant to the present assertion of a claim in court, arising out of the same transaction or contract." (citing <u>Little v. United States</u>, 138 Ct. Cl. at 778, 152 F. Supp. at 87–88), <u>aff'd</u>, 78 F.3d 1566 (Fed. Cir.), <u>reh'g</u> <u>denied</u>, <u>reh'g</u> <u>en banc</u> <u>suggestion</u> <u>declined</u> (Fed. Cir. 1996); <u>see also</u> <u>Veridyne Corp. v. United States</u>, 105 Fed. Cl. at 806 ("A plaintiff's claim will be forfeited under 28 U.S.C. § 2514 even if only part of its claims is [sic] false."  (citing <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1341)); <u>Barren Island Marina, Inc. v. United States</u>, 44 Fed. Cl. at 256 ("Based on the <u>Little</u> case, there is no question that all claims arising under the contract are subject to forfeiture."). A fraudulent invoice submitted to a contracting officer during the performance of the same contract that is the subject of a contractor's claims, therefore, may result in the forfeiture of the contractor's claims under the Special Plea in Fraud statute. <u>See</u> <u>Tyger Constr. Co. v. United States</u>, 28 Fed. Cl. 35, 61 (1993) ("The statute does not specify where such claims must be presented in order to invoke the statute.  Claims for payment before a contracting officer are as subject to 'proof, statement, establishment, or allowance' as are claims before the Court of Federal Claims."); <u>see also</u> <u>Jerman v. United States</u>, 96 Ct. Cl. 540, 552 (1942).

As a starting point, for defendant's counterclaim to be successful, defendant must demonstrate that the counterclaim is "tied to the submission of a claim, whether in producing false proof to support a claim, . . . or in falsely establishing the claim." <u>Kellogg Brown & Root Servs., Inc. v. United States</u>, 728 F.3d at 1366 (citations omitted).  The defendant has alleged that the Special Plea in Fraud counterclaim is related to the demand of an "additional $50 million" in Oasis' July 2008 certified claim, which, if proven would satisfy this requirement. As indicated above, in its post-trial briefs defendant continues to pursue its counterclaims for 5 of Oasis' claims in the certified claim: Claims 1, 2, 4, 6, and 8.[40]

---

[40] As noted above, although defendant's positions changed shortly before trial regarding which claims the government believed were fraudulent, in its post-trial briefs, defendant stated that "in June 2014, the Government moved to amend its fraud counterclaim to make clear that our counterclaims addressed counts one, two, four, six, and eight of Oasis's counterclaim, and not count three."

**Claim 2**

The court first addresses Claim 2. Claim 2 in the certified claim was a "Claim for penalty wrongfully assessed for failure to open Camp TQ [Camp Taqaddum] on time," which plaintiff states was "solely as a result of Government-caused delays and disruptions," and for which plaintiff sought $2,270,833.00. **[JX 549, p. 00004172]** Defendant argues that "because Oasis's contract interpretation is implausible in light of the unambiguous terms of the contract and all extrinsic evidence, count two constitutes fraud."  Defendant contends that:

> Count two, which seeks $2.2 million relating to TQ, stems entirely from Oasis's attempts to invalidate P00011 through a claim of economic duress. As part of P00011, the Government paid Oasis $24 million, which included $5.5 million for TQ, a plant that Oasis still had not yet completed by August 2006. The claimed $2.2 million corresponds to one-sixth of the $50.225 million, minus the $5.5 million that the Government paid to Oasis for TQ as part of the P00011 negotiations. Even though Oasis voluntarily agreed to P00011, which closed out the base year, Oasis seeks an additional $2.2 million for TQ in its certified claim.

(internal citations omitted). Plaintiff argues that "the Court should disregard Defendant's 'fraudulent duress' interpretation," arguing that "[w]ith regard to Defendant's new 'fraudulent duress' argument related to Count 2, Defendant argues that fraudulent duress is not a new theory, but instead additional evidence to support its claim that Oasis' contractual interpretation is frivolous." Because the court has deferred the issues of contract interpretation and economic duress, the court likewise, at this time, defers the resolution of the counterclaim pursuant to the Special Plea in Fraud for Claim 2.

**Claim 1 and Claim 8**[41]

Claim 1 of the certified claim is a "Claim for all bottled water supplied in the Contract base year, as extended to August 15, 2006, excluding bottled water supplied from Camp Anaconda through May, 2006 (5,605,020 cases of bottled water)," for which plaintiff sought $19,617,570.00. Claim 8 was for "water supplied from Camp Anaconda during initial Contract base year ending May 2006, 3,100,972 cases of bottled water: $10,853,402." Defendant, in its post-trial brief, claims that "Oasis's Double Billing For $30 Million In Bottled Water Is Fraudulent On Its Face," and explains that "Oasis invoiced the Government for all bottled water delivered during the base period of the contract, and the United States paid each and every one of those invoices." Defendant argues that "Oasis sought payment for the exact same bottled water a second time in counts one and eight of its certified claim." Defendant insists that "Oasis devised its convoluted contractual interpretation as a fig leaf for its double-billing. It did so to sow confusion with the

---

[41] As indicated above, the defendant refers to Claim 1 and Claim 8 together under its claim for its theory of "Fraudulent Double Billing For $30 Million In Bottled Water." Plaintiff responds to defendant's allegations in a similar way, and, therefore, the court considers Claim 1 and Claim 8 together.

successor contracting officers assigned to the claim years after contract award and the underlying events." Defendant also argues:

> Counts one and eight of Oasis's certified claim demand payment of $30,470,942 for 8,705,992 cases of water, at $3.50 per case. Oasis concedes that it was paid $23,411,780 of this amount, at $3.50 per case. Oasis's contention that it is entitled to be paid twice for the same water cannot withstand any reading of the contract or the record . . . .

(internal citations omitted).

In its post-trial brief, plaintiff responds that regarding any allegation of double-billing, "*i.e.* claiming for money that has already been paid to Oasis. The Court heard the evidence and measured the credibility of the Oasis witnesses and should find the Defendant's allegations contrived, baseless, and not true." Plaintiff argues that, from Oasis' perspective, "Defendant [is] ignoring matters of record with the Base Year payments in order to create a 'double billing' counterclaim that does not actually exist and that no one but Defendant's counsel ever thought was the case."

Plaintiff notes that:

> [w]ith respect to Counts 1 and 8, the Defendant asserts these counts seek payment for $30,470,942 worth of water that the Government already paid for during contract performance. Oasis agrees with the Government that, during the base year, Oasis invoiced and was paid for some water -although the facts demonstrate that this was actually $23,411,780, *not* the full amount of Counts 1 and 8. In fact, Oasis said as much in its Claim.

Plaintiff argues in its post-trial briefs that:

> In its simplest form, Oasis' argument is that, due to the increase in scope of work directed by Defendant, Oasis is entitled to a total of $80,695,942 for the original Base Year capability and the water produced in the Base Year ($50,225,000 for capability plus $30,470,942 for water). Defendant only paid Oasis $47,954,167 for the expanded Base Year. The total amount of Counts 1, 2 and 8 seek, in their entirety is $32,741,775, *i.e.*, the difference between $80,695,942 and $47,954,167.

(footnote omitted). Moreover, plaintiff states:

> Defendant's argument that these counts are "double billing" elevates semantics over reality, as its entire "double billing" allegation basically boils down to a question of whether Oasis identified correctly which pot of money each dollar paid should have been allocated to. Since it was the Defendant who paid the money, Oasis based its claim calculations on its best

understanding of the facts and documents that identified what was being paid; since money is fungible, this distinction makes no difference in reality.

At closing argument, counsel for plaintiff stated that:

> any double billing argument, Your Honor, is an exercise in semantics. Oasis' argument is that due to the increase in scope of work directed by defendant, Oasis is entitled to a total of $80,695,942 in the original base year. For capability and water produced, it's the $50,225,000, plus the total $30 million in water, Your Honor. That's how much we think counts 1, 2 and 8 should add up to.[42]

Plaintiff's view is that:

> After P00011, the water payments were converted to the firm-fixed capability payment for capability that it always should have been. Prior to P00011, Oasis invoiced for water (as directed by the Government) and was paid a total of $23,411,780. When P00011 was signed, the amount of the base year capability fee was reduced (wrongfully, Oasis contends) from $50,225,000 by $2,270,833 (Count 2) to $47,954,167. But, rather than submit an invoice for $47,954,167, Oasis submitted an invoice in the amount of $24,542,387, *i.e.* the *exact difference* between the $47,954,167 (reduced) capability fee and the $23,411,780 that Oasis had already been paid. The only way that P00011's $47,954,167 capability fee can be considered fully paid is by *converting* the Government's prior payments from being payments for "water at $3.50/case" and into being payments of P00011's firm-fixed-price capability Base Year fee. Therefore, as of the Defendant's payment of Oasis's P00011 invoice, Oasis was paid *exactly* $47,954,167 for "0001 Purified Bottled Water Production Service…" and *exactly* $0 for "water at $3.50/case" during the base year or base year extension. Under this rubric, the amounts stated by Oasis for Count 2 ($2,270,833) and Counts 1 and 8 (collectively, $30,470,942) are correctly stated. In the aggregate, counts 1, 2, and 8 add up in to $32,741,775.

---

[42] Plaintiff's counsel elaborated that:

> Counts 1, 2 and 8 seek the difference between capability and water and what the government actually paid us in the base year, which is $47,954,167. We tried to allocate the difference, which is $32 million and change, amongst counts 1, 2 and 8, which are the things that we believe were taken from us. Counts 1 and 8 seek water payments. Count 2 seeks the difference between $50 million and $47 million. We thought the $47 million was capability, which is why count 2 is $2 million and counts 1 and 8 are $30 million.

(emphasis in original). Plaintiff contends, even if the government's interpretation is correct, "if Oasis was wrong about what happened to the pre-P00011 payments, the only effect is that approximately $23 million of Oasis's claim gets moved from Counts 1 and 8 to Count 2." Moreover, plaintiff argues:

> Absent the conversion of Government payments from "water" to "capability," the *only* payment made by the Government against this firm fixed price was the $24,542,387 payment made after P00011. So, the correct amount of Count 2 would have been $25,682,613 ($50,225,000-$24,542,387). This is an increase of *exactly* $23,411,780 – *i.e.* a dollar-for-dollar offset of the reduction in Counts 1 and 8.

(emphasis in original). Therefore, plaintiff concludes that "[u]nder no reasonable interpretation of the facts can Oasis be accused of intentionally and fraudulently double billing for money it was already paid." Although the cases plaintiff cites for its argument that money is fungible, i.e., <u>Mack v. Secretary of Department of Health & Human Services</u>, No. 90-1427V, 1995 WL 507581, at *3 (Fed. Cl. 1995) ("Money is fungible.") and <u>United States v. Karam</u>, 201 F.3d 320, 327 n.8 (4th Cir. 1999), are not cases on fraudulent counterclaims, or even government contract claims, the court accepts plaintiff's reasoning. Even if the rationale behind the plaintiff's theory is incorrect, the court agrees that, within the framework articulated by plaintiff in the certified claim, and as testified to at trial by Phil Morrell, and especially, Paul Morrell, who signed the certified claim, the certified claim was not an attempt to double bill the government; the certified claim was an attempt to recover on plaintiff's capabilities theory of the contract. The court had considerable opportunity to hear testimony, and observe, Paul Morrell, in particular, during the trial.  Although there are two differing theories of contract interpretation before the court, which will be addressed in a following opinion, the court is convinced, after sitting through the trial and reviewing the evidence in the record, that the certified claim was presented in good faith and without the requisite intent to defraud.

> Defendant protests plaintiff's fungible argument, arguing that:

> Oasis is mistaken on many levels. First, it is undisputed that Oasis (1) invoiced the military for tens of millions of dollars of water at $3.50 per case, (2) was paid those invoices at $3.50 per case, and (3) asks to be paid again for those same cases of water at $3.50 per case. Oasis cannot obfuscate its clear double-billing simply by suggesting that earlier payments were "convert[ed]" to payment for something else and came from a different "pot of money."

Defendant further takes issue with plaintiff's characterization of the certified claim, namely that plaintiff is seeking to be paid for its capabilities, and, then, the produced water. The defendant repeatedly cites to <u>Veridyne Corp. v. United States</u>, 758 F.3d 1371, for the proposition that "[a]ttempts to obtain double-payment are fraudulent." Defendant points to language by the Federal Circuit that "Veridyne's invoice could have induced the government to pay twice for the same expenses. Veridyne's invoicing violated the

statute." <u>Veridyne Corp. v. United States</u>, 758 F.3d at 1381.  Defendant argues that Oasis attempted to "obfuscate its double-billing by advancing a convoluted contract interpretation under which it argues that Oasis was entitled to be paid $50.225 million to produce no water."

In <u>Veridyne</u>, the contract at issue was a contract award by the Small Business Administration's (SBA's) small business set-aside program, and the Federal Circuit noted "the SBA has delegated the authority to negotiate with the SBA-qualified contractor to the Department of Transportation, and by extension, the Maritime Administration ('MARAD'), 'the SBA is responsible for approving the resulting contract before award,' and the formal contract is between the SBA and the SBA-qualified contractor." <u>Id.</u> at 1374. The Federal Circuit noted that "[i]n March 1995, MARAD awarded to the SBA an indefinite delivery, indefinite quantity cost-plus-award-fee contract for services related to MARAD's logistics program. Later that month, the SBA awarded a subcontract containing the same terms as its contract with MARAD to Veridyne for one base year and up to four option years." <u>Id.</u> Subsequently,

> [i]n March 1998, Veridyne submitted a proposal to MARAD for a new indefinite delivery, indefinite quantity, cost-plus-award-fee contract. Correspondence between Veridyne and MARAD before the submission specified that estimates for the new contract would not exceed "$3,000,000 in the aggregate."  As a result, the "proposed" cost specified in the proposal, including the five additional option years, was $2,999,949.00.

<u>Id.</u> The new contract was awarded to Veridyne, but eventually, due, in part, to MARAD's cost overruns, the new contract was investigated, including whether the new contract had been fraudulently awarded, and MARAD's Chief Counsel instructed MARAD officials that MARAD was not to make payments to Veridyne on any contract. <u>See id.</u> "At the time of the December stop order, invoices numbered 260–264 were outstanding to MARAD and had not been paid. After the stop order, Veridyne continued to do work for MARAD and submitted three additional invoices, numbered 265–267. MARAD never paid Veridyne the amounts invoiced in 260–267." <u>Id.</u> Veridyne, thereafter, submitted invoices 260–267 as certified claims.   In the Court of Federal Claims, the government alleged fraud counterclaims of the Special Plea in Fraud, the False Claims Act, and under the antifraud provision of the Contract Disputes Act. The Federal Circuit determined, in part:

> In invoice 267, Veridyne had rebilled MARAD for previously unpaid expenses. But instead of making clear that the expenses were rebilled expenses, Veridyne included the rebilled lease expenses as part of overhead, making it difficult to identify these as twice-billed items. Therefore, while it is not unsupported to rebill for unpaid expenses, Veridyne's invoice could have induced the government to pay twice for the same expenses. Veridyne's invoicing violated the statute.

Veridyne Corp. v. United States, 758 F.3d at 1381.[43] Defendant contends that "[t]he same is true here, as Oasis filed a certified claim seeking to be paid for $30 million in water already paid for by the military." Plaintiff argues that

> the essence of Veridyne's fraud was its attempt to hide from the Government its plan to be paid twice. Here, by contrast, Oasis' certified claim explicitly acknowledged that invoices were submitted for "water" during the base year, and that payments were made by Defendant on these invoices; the Claim then explains in detail why Oasis believes those payments cover only the water bottling capability and not the water actual [sic] produced, and why Oasis believes it is entitled to additional payment for water.

Although plaintiff does not address if double-billing on its face would be fraudulent, which this court believes would be the case, the court agrees with plaintiff that Oasis' theory and position was clear in its certified claim. Oasis stated in the certified claim that, "[w]hile Oasis delivered some bottled water during the Contract base year, Oasis invoiced the Government for that water and the Government paid those invoices. The primary deliverable item in the Contract base year is water purification and water-bottling *capabilities.*" (emphasis in original). The certified claim made plain plaintiff's view that:

> Oasis provided water-bottling <u>capability services</u> for an additional 2.67 months when the Contract base year was extended to August 15, 2006, due to Government delays and breaches of contract. As explained in 6.0 paragraph 33, Oasis is entitled to a payment of $11,175,063 for the water-bottling <u>capability services</u> provided during the extended Contract base-year performance.

(emphasis added). In discussing modification P00011, the certified claim stated:

> Through P00011, Oasis was paid $23,411,780 for the 6,689,080 cases of bottled water delivered through July 2006 and $24,542,387 for delivery of water-bottling capabilities in the Contract base year. Accordingly, Oasis submitted an invoice in the amount of $24,542,387 for delivering water-bottling capabilities to the Government on August 15, 2006, and the invoice was paid. The net effect of P00011 was: 1) to reduce the Contract consideration for delivering purified water-bottling capability by $25,682,613 from $50,225,000 to $24,542,387; 2) to provide the Government all water produced, on hold and deliverable as of August 15, 2006, without paying Oasis any consideration, thereby damaging Oasis in the amount of $7,059,192 (2,016,912 cases x $3.50); and 3) to pay nothing for water-

---

[43] On appeal, the Federal Circuit noted that the United States Court of Federal Claims had decided that the plaintiff in <u>Veridyne</u> forfeited its claims against the United States pursuant to the Special Plea in Fraud Statute and plaintiff did not appeal that forfeiture finding. The Federal Circuit affirmed the lower court's finding that Veridyne violated the Contract Disputes Act. <u>See</u> <u>Veridyne Corp. v. United States</u>, 758 F.3d at 1376, 1381.

bottling capabilities for the period May 26, 2006, through August 15, 2006, which cost Oasis $11,170,061.

(internal citations omitted). In sum, the Oasis certified claim, and the affidavits of the Oasis personnel, including Paul Morrell, articulate a clear theory of plaintiff's claims. The certified claim alone is over fifty pages and provides specific calculations and details of how Oasis formed its views of the contract. This is significant, because as demonstrated at the trial and in the record before this court, defendant's witnesses and even some of plaintiff's witnesses, did not all share plaintiff's contractual view included in the certified claim. It was, therefore, incumbent upon Oasis to clearly articulate its theory of recovery in its certified claim. The court agrees with plaintiff that "Oasis' claim clearly and openly stated the basis for the claim, including the contractual interpretation that the Government now alleges to be fraudulent."

As indicated above, the court is convinced, whether correct or incorrect, plaintiff articulated its theory of its claims in the certified claim with specificity, and Paul Morrell, the certified claim signatory, convincingly testified in support of his intent in crafting and certifying the certified claim in a way that does not support a finding of fraudulent intent. The novation of the contract and the many modifications to the contract, including some after difficult negotiations, allowed for sufficient room for differing interpretations in good faith. Whichever, plaintiff's or defendant's interpretation of the contract is found to be the prevailing one will direct whether plaintiff can recover damages, but the court rejects defendant's allegations of fraud, as it relates to the allegation of double billing for the Special Plea in Fraud counterclaims.

## Claim 6

Claim 6 was a "Claim for cost of water supply improvements at Camp Speicher and Camp Qwest," namely, "the need to purify the non-compliant source water supplied by Defendant at Speicher and Q-West," and for which plaintiff sought $600,000.00. Defendant contends that "Count six, like counts one and eight, also explicitly seeks to double-dip and is reason enough for forfeiture of Oasis's entire claim," and notes that "Count six also seeks payment of the same $600,000 a second time." Defendant reiterates that, "[a]s with the bottled water already paid for and billed a second time in the certified claim, Oasis also sought the same $600,000 a second time in its certified claim." Defendant further argues that "[r]ather, and despite Alan Morrell's unequivocal representation that in his declaration accompanying the certified claim that Oasis, in fact, incurred $600,000 in costs for the improvements at issue, Oasis has admitted that this figure is merely an 'estimate.' Accordingly, count six is fraudulent and unsupported for this reason as well." Indeed, defendant alleges that "Oasis thus certified a claim to recover $600,000 that it not only was already paid, but that it also may have never even incurred."[44]

---

[44] Whether plaintiff actually incurred the costs was not fully addressed at trial, although plaintiff contends in its post-trial briefs that it did incur the costs. In its post-trial briefs, plaintiff points to the contracting officer's final decision which addressed the Speicher and Q-West fixes:

Plaintiff argues that "Defendant's fraud allegations with respect to Count 6 rest *only* on an allegation of double billing. Like its double-billing allegation on counts 1 and 8, Defendant's fraud argument on Count 6 is a thin veneer of semantics that seeks to obscure the facts. It is also contradicted by the Defendants' [sic] own documents and witnesses." (emphasis in original).   Plaintiff also contends that "[t]he Government's allegation of double-billing with respect to Count 6 is also remarkably similar to the semantic trick that it attempted with respects to Counts 1 and 8. It should be rejected for the same reason; *i.e.* it ignores fungibility of money which would result (even if the Government is right) in claim amounts merely shifting between counts."   Plaintiff notes that "[d]efendant cites to the fact that Oasis used part of the $24M to pay for the fixes at Speicher and Q-West as evidence that Oasis was paid for those fixes. This is a senseless argument as it ignores the fact that money is fungible and that things must be paid for when purchased," and argues that "[t]his is [sic] should be rejected." Finally, plaintiff argues that "[i]n order to demonstrate fraud, Defendant must prove not only that Oasis was already paid $600,000 for those fixes, but also that Oasis had the requisite intent necessary to support a finding of fraud. Defendant has proven neither."

Despite plaintiff's arguments, Claim 6 involves different issues than Claim 1 and Claim 8.   Claim 6 specifically addresses water fixes at two of the bottled water plants, Speicher and Q-West. As noted above, according to Alan Morrell, the water source at Q-West was "filled with mud and sand. And at that time, it was so significant that we couldn't purify it," and the result was the "ROWPU [Reverse Osmosis Water Purification Unit] was immediately filled with mud, and fouled. And each set of those membranes is $26,000. And they were ruined. And we couldn't keep them clean and operational enough to operate and make water there as a result." In order to fix the problem, Alan Morrell testified that Oasis "purchased a Pall Aria from northern New York and we also took an additional ROWPU system that we had used at Balad and recommissioned it, repiped and replumbed the lines at Q-West and solved the problem." By contrast, at Speicher, plaintiff testified that another contractor, Kellogg Brown & Root, disrupted their water source, and given the demands to produce water, plaintiff was forced to purchase a "BEV 9 reverse osmosis system, and in the spring of 2007, installed it, commissioned it, and began to draw well water." In his affidavit that accompanied the certified claim, Alan Morrell further explained that:

> The contractor and the USG mutually agreed as part of P00011 that Oasis would cover the costs of water supply improvements. Oasis had the right to request for equitable adjustment for the cost to improve the water supply at Camp Speicher and Camp Qwest and chose not to do so. Not requesting this equitable adjustment is an indication that P00011 was agreed to by both parties in good faith. This claim element is denied.

Defendant argues that the final decision is not relevant because "Oasis was *already paid* $600,000 for those improvements as part of P00011." (emphasis in original).

In Speicher (because of the Governments choice to deliver ROPU water from a KBR facility) Oasis was asked to solve the problem by re-engineering the plant for a raw water supply source that Oasis could take directly from the wells in Speicher. The cost was set at $300,000 to deliver that fix which consisted of a new ROPU skid capable of delivering purified water from the raw source. It is interesting to note that after the money was spent and the equipment placed, the KBR facility (that had limited water) then asked to deliver again as we were first in line for the raw source. We now get ROPU water in Speicher again. In Qwest, we were asked to solve the water quality problem as our water often looked like chocolate milk because it was so muddy. That fix required another $300,000 to deliver and install a Pall Aria pre-filtration system; we now use this system in advance of our ROPU units. These two "fixes" required an additional $600,000 dollars worth of concessions and cost to P00011.

The steps that plaintiff took to address water fixes at Speicher and Q-West were addressed in the negotiations during the modification for P00011. Alan Morrell testified regarding the lack of water at Speicher, "on P00011, because this was such a hot issue, again, part of the negotiation was a concession that we would sort this problem out," and "[s]o, we, again, went back to Minnetonka, Minnesota, and were forced to re-engineer that factory" and "bought another BEV 9 reverse osmosis system." He also testified that "[p]art of the concessions that were demanded from us in P00011 were two site improvements to solve water issues. One was Speicher, and the other was Q-West."

The draft proposal requested by Colonel Richardson and submitted by Oasis indicated:

**Option II**.  Complete the construction of TQ in Oct 2006.

Close Base Period

| Item No. | Description | | PRICE | |
|---|---|---|---|---|
| 1001 | BASE Period of Performance from 24 May 2005 to 15 August 2006 | | $50,225,000 | |
| | Allocation for uncompleted Plant (TQ) 1/6th | .167 | ($ 8,370,833) | |
| | Allowance for capital purchases to complete TQ.  Allowed due to military delay of Land. | | $ 5,500,000 | Estimate |

| | | | | |
|---|---|---|---|---|
| | Funds to Purchase Pall Aria to filter QW Water. | 1 | $   300,000 | |
| | Purchase RO's to improve SP water flow | 1 | $   300,000 | |
| | Creation and distribution of Water information campaign posters "its just water" | 100+ | 0 | |
| | conversion and support of Class 1 Water sites at each of its locations | 5 | 0 | |
| | Previous invoices through 8.5.06 | | (23,268,860) | |
| | **Net Due Oasis At Close of Clin 1001 08.15.06** | | **$24,685,307** | |

The final version of modification P00011 provided for Oasis to be paid $9,333,333.33 per month, independent of the amount of water delivered, and explained:

The purpose of this modification [P00011] is to do the following:

1. Provide a revised CLIN structure to reflect monthly pricing based upon water production capability.

2. Replace the Contract Statement of Objectives, with Performance Work Statement, dated 12 August 2006, provided as Attachment 1 to this modification.

3. Incorporate the contractor's Quality Assurance Plan into the contract provided as Attachment 2 to this modification.

4. Incorporate the List of Critical Equipment into the contract, provided as Attachment 3 to this modification.

5. Insert Special Clause, titled "Equipment Leased by the Government", into the Contract.

6. Insert clause DFARS 252.232-7007, "Limitation of Government's Obligation" (May 2006) into the Contract.

7. Replace Contract Section J, List of Documents, Exhibits and Other Attachments.

8. Decrease the contract amount by $11,604,166.45 from $386,225,000.00 to $374,620,833.55.

9. Decrease the contract funded amount by $5,604,166.35 from $100,225,000 00 to $94,620,833.65.

10. Change the end date of Option 4 from 16 August 2009 to 16 July 2009.

Although the court referred to the draft version submitted by Oasis to Colonel Richardson above, plaintiff contends that regarding the defendant's citation to the draft version:[45]

> It is telling that Defendant does not actually cite P00011 to support its argument that Oasis was paid $600,000 for the source water fixes at Speicher and Q-West. Nor can Defendant, as P00011 – despite allocating responsibility for the source water fixes at Speicher and Q-West to Oasis – includes no reference to any compensation being paid to Oasis for those fixes. Similarly, Defendant does not cite to a single post-P00011 document to support its argument that Oasis was paid $600,000 for the source water fixes at Speicher and Q-West. This is because Col. Richardson's post-modification documents demonstrate that Oasis was not compensated for the source water fixes at Speicher and Q-West.

(internal citations omitted).

Plaintiff also correctly notes that the memorandum for record which Colonel Richardson drafted for her superiors stated that the water fixes were resolved "at no additional cost." Defendant argues that "[t]he memorandum does not support Oasis's position, as it states that '[a]s part of the negotiations, the Contractor, at *no additional cost*, agreed to provide a solution to the water problems at Q-West.' The 'no additional cost' language refers to 'no additional cost' beyond the total base year figure provided earlier in the memorandum." (emphasis added by defendant; internal citations omitted).

The entirety of the section of the memorandum of record devoted to Q-West states:

> A 16-mile long pipe transports water from the source to the base including supply to the bottled water facility—locals have been "tapping" into the pipe. In addition, Q-West Camp demands have outstripped the supply of "raw" water. At the time of the subject negotiations (July 2006), the water source was [sic] to the bottled water facility was inadequate and the water quality extremely poor. It required Contractor to provide twice the amount of purification equipment to produce purified water. This site condition was not anticipated when the Contractor conducted his site visit to assess the water supply. The Contractor anticipated a $300K cost to upgrade equipment to enable successful processing of the water (Tab B).

---

[45] Paul Jefferies testified regarding the draft version, "there were a number of other items that weren't here and this draft doesn't reflect our final agreement, which is we provided that Pall Aria and that RO [reverse osmosis] for free and installed them accordingly."

> As part of the negotiations, the Contractor, at no additional cost, agreed to provide a solution to the water problems at Q-West.

The court believes the document could have been clearer if Colonel Richardson had intended for her superiors to understand that it meant no additional cost in the addition to the amount in the base year. Colonel Richardson testified at trial, that, in her view, Oasis seeking $300,000.00 for Q-West "constitutes fraud in my mind," and testified "Speicher, once again, that $300,000 was what Oasis -- the price tag Oasis put on what it would cost them to rectify the situation we had at Speicher, to fix it," and claimed that seeking payment for the water fixes was the same as "[c]harging us twice for the same service or supply constitutes fraud, and that was paid for under P00011. So, for them to come back and say they want to be paid for it again is a foul." Regardless, plaintiff's view is that "Oasis was paid $47,954,167 in the base year, against a contractual firm fixed price of $50,225,000. It was paid $0 dollars as compensation for the Speicher and Q-West water fixes, which the parties agreed cost $600,000."

> Alternatively, plaintiff argues that:

> the Court could believe the Government that Oasis was actually "paid" $600,000 for the Speicher and Q-West water fixes. Under this scenario, the correct amount of Count 6 would have been $0. But, again, what about Count 2? Count 2 seeks the difference between the contract's firm fixed price for capability of $50,225,000 and the amount that Oasis was actually paid for capability in the base year. Oasis was paid a *total* of $47,954,167 in the base year. If $600,000 of that was compensation actually paid for additional work (the water fixes), then only $47,354,167 was the capability fee. The correct amount of Count 2 would have been $2,870,833 ($50,225,000 - $47,354,167). In the aggregate, Counts 2 and 8 still total $2,870,833.

Regarding the comparison to Claim 2, defendant argues that "Count two has nothing to do with water filtration equipment, or even Camp Speicher or Camp Q-West, the plants for which Oasis claims it purchased that equipment. Rather, count two relates to alleged 'penalties' as a result of Oasis's delay in building Plant TQ," and argues that Oasis's double-billing for water filtration equipment at Camp Speicher and Camp Q-West could not have been a "reasonable misunderstanding." The court, however, understands the calculations by plaintiff to be reasonable and defensible, as plaintiff was trying to calculate its damages in the aggregate when it certified its claim.  The plaintiff's understanding of the contract as a capabilities contract which entitled them to the payment of approximately 50 million dollars in the base year, regardless of water production, also lead to their approach in calculating the claim submitted. Therefore, the court agrees with plaintiff that, "[a]t best, Defendant has proven that the negotiating parties had a different understanding about whether that [sic] fixes were compensated, which does not constitute fraud." (citing Ulysses, Inc. v. United States, 110 Fed. Cl. at 645).

**Claim 4**

Claim 4 was a "Claim for water bottling capabilities services provided through extension of Contract base year," and plaintiff valued Claim 4 at $11,175,063.00. The certified claim for Claim 4 indicates:

> Oasis provided water-bottling capability services for an additional 2.67 months when the Contract base year was extended to August 15, 2006, due to Government delays and breaches of contract. As explained in 6.0 paragraph 33, Oasis is entitled to a payment of $11,175,063 for the water-bottling capability services provided during the extended Contract base-year performance.

Defendant alleges that Oasis "Fraudulently Seeks Costs Never Incurred" in Claim 4. Defendant contends that:

> Oasis also seeks millions more stemming from its knowingly baseless interpretation of the contract. Specifically, count four further inflates Oasis's baseless attempt to recover a $50.225 million "mobilization" fee by extrapolating from that amount to claim an additional $11 million "monthly capabilities fee" resulting from the extended base year. In addition to being fraudulent due to Oasis' frivolous contract interpretation, *Commercial Contractors*, 154 F.3d at 1366, this count seeks damages for delay when Oasis admitted that it did not incur any additional mobilization costs due to the extension of the base period.[46]

Defendant argues that "Paul Morrell admitted that the $11 million that Oasis seeks in count four is not for increased construction costs incurred by Oasis during the extended base period,"[47] and states, "[y]et Oasis seeks an additional $11 million as a monthly

---

[46] Regarding defendant's argument that plaintiff's claims are for costs it did not incur, plaintiff argues that "[t]his is the new theory that Oasis objects to Defendant advancing. Defendant's only response – that it is additional evidence in support of its argument that Count 4 is fraudulent – is unavailing, because that would mean it was entitled to add, after trial, any new basis for fraud because it had alleged fraud generally." In response, defendant argues that "Oasis takes issue with the fact that the Government supported its fraud claims with trial evidence that Oasis apparently did not anticipate. This action by the Government is not only appropriate, but also necessary to ensure that the fraud counterclaims conform with the trial evidence." (internal citation omitted).

[47] On cross-examination, defendant's counsel asked Paul Morrell:

> Q: Let's turn to Count (d), which is also Count 4 of the complaint, and that's entitled "Claim for extension of base year period."

capability fee despite this fact. In sum, there were no increased mobilization costs, yet that is exactly what Oasis seeks. Therefore, Oasis admits that it seeks to recover damages that it admits it never incurred. That is fraud." Defendant also argues that, "[i]t is clear that Oasis knew that the contract did not provide payment of a penny more than $3.50 per case of bottled water," and its claim was an attempt to provide plaintiff tens of millions of dollars "to which Oasis knew it was not entitled under the contract." In response, plaintiff argues:

> Defendant's new theory, that Count 4 is fraudulent because it seeks costs never incurred, is without merit, as Defendant apparently does not understand the basis of Count 4. Count 4 does not seek any specific construction or delay costs. Instead, as Oasis alleged from the very beginning, it was entitled to additional compensation because Defendant forced Oasis to perform the Base Year "service" of the Contract for an additional period of time without consideration or cause. . . .

As noted above, this court can "consider circumstantial evidence in making its determination." Alcatec, LLC v. United States, 100 Fed. Cl. at 517 (citing Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. at 642, 124 F. Supp. at 620 (noting that intent can be determined "by placing the questioned documents and statements alongside well-known and established facts")). For support of circumstantial evidence, defendant points to the "uniform" testimony of the contracting officers that "Oasis also never told any military contracting officer that it believed it was due $50.225 million to make the facilities operational, plus $3.50 per case for water delivered to the military."[48] Defendant also argues, citing Daewoo Engineering & Construction Co. v. United States, 73 Fed. Cl. 547, that "[t]he extent to which Oasis's corporate officers disavowed Oasis's certified claim is further evidence of an intent to defraud." It is undisputed that some of Oasis' officers had a different view of the contract than the Paul Morrell and Phil Morrell. Mr. Jeffries, the Chief Financial Officer of Oasis during the period when the contract was novated to Oasis,

---

> So, you contend that the base year performance involved the Government paying the contractor $50,225,000 in a mobilization payment for the construction of the sites, right?
>
> A: That's correct.
>
> Q: And the contractor would own the sites after they were completed?
>
> A: That's correct.
>
> Q: And this $11 million claim, just to be clear, is not for increased construction costs incurred by Oasis during the extended base period, correct?
>
> A. That's correct.

[48] As discussed below, the court notes that Phil Morrell testified that he explained his view of the contract to multiple Army officials, most specifically, Colonel Hay.

testified that he viewed the contract as providing a cap of the $50.225 million figure in the base year.  He also testified that:

> For my purpose, the way I operated was that we would have $50 million that we would draw down at $3.50 a case and we would submit an invoice at the end and get that money, and there was a disagreement at corporate, Phil, Paul, about the rest of the contract interpretation. So, those two dichotomies existed throughout, one of which I operationalized by drawing down the water and submitting an invoice, and one they operationalized by executing this proceeding because they and counsel believe that, you know, that it should be slightly different.

Mr. Jeffries also testified, however, that "ultimately it was what Paul [Morrell] and Phil [Morrell] and legal counsel believed were the appropriate things to include in the claim." Mr. Neil Vos, Oasis' Chief Financial Officer, testified that it was his "understanding" for "the contract to allow only payments of $3.50 per case." Defendant claims that "[j]ust like Mr. Jeffries's testimony, Mr. Vos's testimony alone is also more than sufficient to show an intent to defraud." Furthermore**,** Max Wyeth, the president of American AquaSource when it was awarded the original contract, testified that he based the $50,225,000.00 figure in the base year by "using our average forecast of demand, we came up with a case number that would be produced per year, and multiplied that by the case cost," which was "[t]he number of cases times $3.50." Mr. Wyeth further testified the $50,225,000.00 was a "gross revenue figure," calculated on the cases to be produced and sold at $3.50 per case. As noted above, Mr. Wyeth was also briefly president of Oasis in 2005, although he admitted to being "out of the loop" after the novation agreement was executed, and was at odds with Paul Morrell and Phil Morrell when he left Oasis.  Even years later, at the trial, it was apparent to the court in observing the parties that tension still existed between Mr. Wyeth and Paul Morrell and Phil Morrell.

Based on the foregoing, defendant contends that, "every Oasis witness, including its CEO (Paul Jeffries), CFO (Neil Vos), former President (Max Wyeth), as well as Paul Morrell, Alan Morrell, and Phil Morrell, testified that the contract did not allow for the $50 million that Oasis seeks in its certified claim, including the $30 million in water that Oasis was already paid for by the military." Plaintiff responds that "[t]his assertion is demonstrably false. At best, some of Oasis' witnesses (Paul Jeffries and Neil Vos) who did not have final authority on contract matters, did not agree with the interpretation underlying the Claim," and "Neither of the Morrell's [sic] testified that they did not believe in the contract interpretation underlying the Claim."

As noted above, plaintiff does not challenge that officers of Oasis did not agree with Paul Morrell and Phil Morrell on the type of contract Oasis was performing.  Instead, plaintiff argues that "Oasis, like any corporation, is made up of a number of individuals, with different titles and different responsibilities. Ultimately, the decision-making authority for Oasis rested in the hands of Paul Morrell and Phil Morrell."  It was Paul Morrell who signed the certified claim, and it was Phil Morrell and Paul Morrell who made the business decision to, through the joint development and pre-incorporation agreement, form the

entity that would ultimately perform the contract, and, then as the majority owners of Oasis, to direct Oasis to assume the contract upon novation from American AquaSource. Plaintiff correctly notes that "[m]ost of the case law in the fraud arena focuses on the beliefs of the person who signed the claim," citing to <u>Daewoo Engineering & Construction Co. v. United States</u>, 73 Fed. Cl. 547, as well as to two recent decisions of the undersigned.[49]   Paul Morrell, the signatory to the certified claim, testified at trial that he believed in the claim when he signed it and believed in the same during his testimony in this case.  At trial, Paul Morrell testified as follows:

> Q: Did you review the amount of the claim before you signed the certification?
>
> A: Yes.
>
> Q: Did you believe that the amount claimed accurately reflected the amounts which the Government of the United States owed Oasis at the time you signed the claim?
>
> A: Yes.
>
> Q: Do you believe today that the amounts included in the claim are owed to Oasis?
>
> A: Yes.
>
> Q: Did anyone from the military ever inform you that he or she thought that the claim was fraudulent or false in any way?
>
> A: No.

The court accepts plaintiff's statements that, in contrast to Daewoo's project manager, J.W. Kim, the certifying official in <u>Daewoo</u>, "Paul Morrell did not certify an inflated claim for the purposes of settling lower but rather certified a claim for the correct amount he believed should be paid but he concluded he would probably recover less."

The court believes that the most relevant individual regarding a determination on whether or not fraud was committed is the signatory of the certified claim, in this case Paul Morrell. Although plaintiff's parade of horribles, i.e., "Defendant's position would essentially require any company (no matter how large) to confirm that every influential officer (both past and present) who is in any way connected to a potential claim agrees with the claim," is extreme, the court understands how the plaintiff can contend that "[a] contractor who does not risks a counterclaim from the overzealous Government attorney. Defendant's position would also elevate a reasonable disagreement among board

---

[49] Plaintiff cites to the undersigned's decisions in <u>Gulf Group General Enterprises Co. W.L.L. v. United States</u>, 114 Fed. Cl. 258 (2013) and <u>Chapman Law Firm, LPA v. United States</u>, 113 Fed. Cl. 555 (2013), <u>aff'd</u>, 583 F. App'x 915 (Fed. Cir. 2014).

members to an admission of fraud." Disagreement among non-signatories, alone, cannot be proof of fraud.  As indicated above, the court found Paul Morrell to be a truthful witness, and sincere in his belief in the validity of the certified claim he signed. The court also found Phil Morrell, and his explanation for the terms of Oasis' contract with the government, and his understanding of the type of contract Oasis was to perform, to be believable. The court is sympathetic with plaintiff that "Defendant provides nothing to contradict Paul Morrell's sworn testimony that his opinion and understanding evolved and he changed his mind, and that the right amount was claimed."[50] Nor can the defendant rely on the testimony of Mr. Wyeth, the originally signatory for the contract, to prove the intent of the certified claim.  As plaintiff contends, Mr. Wyeth "left the company more than two years before the Claim was filed, and was actively in dispute with both Morrell brothers from late 2005 until he left the company. Even assuming his understanding of the Contract is relevant to contract interpretation, it is irrelevant to the question of whether Oasis submitted a fraudulent claim."[51] Furthermore, Oasis did not exist as a corporation when Mr. Wyeth was awarded the contract on behalf of American AquaSource. Mr. Wyeth testified that when he signed the American AquaSource contract he had no relationship with Al-Morrell Development or with Paul Morrell or Phil Morrell. Given the evolution of the contract, including fundamental changes to the contract, especially after modifications P00006 and P00011, the reduction from the number of bottled water plants from eight to six, and on site difficulties encountered during contract performance, the court does not afford Max Wyeth's views as to whether or not Oasis submitted a fraudulent claim in the 2008 certified claim much weight.

Plaintiff also argues that "[t]he law does not require a contractor to hold a belief in the validity of its claim from the beginning of time," citing to Hernandez, Kroone & Associates, Inc. v. United States, 110 Fed. Cl. at 525, and noting that in Hernandez, Kroone & Associates the court found an element "of the Plaintiff's claim was not *valid*, [but] it also found that it was not *fraudulent*." (emphasis in original). Defendant takes issue with Oasis' characterization of Hernandez, Kroone & Associates: "Oasis cannot twist itself into the framework of *Hernandez, Kroone & Assocs., Inc. v. United States*, 110 Fed. Cl. 496, 525 (2013) to escape its fraud." (internal reference omitted).

---

[50] Plaintiff concedes that "Paul Morrell testified that during the Base Year, he operated the company as if the Contract was for the sale of water at $3.50 per case, but that over time, he became convinced that Phil Morrell's interpretation, which underlies the claim, was correct."

[51] Plaintiff also argues that:

the absurdity of the Defendant's position is highlighted by its reliance on the beliefs of Max Wyeth. Mr. Wyeth ceased to have any involvement in Oasis as of early 2006 at the latest; and in fact, was locked in a payment dispute with the Morrell brothers for much of that time. Yet Defendant would have the court believe that "Oasis" does not believe in its 2008 claim because Mr. Wyeth says it is wrong.

In <u>Hernandez, Kroone & Associates</u>, plaintiff entered into a contract with the United States Army Corps of Engineers (COE) to construct a modular building, as well as too deliver and install the building for use as a Border Patrol Station by the United States Department of Homeland Security, in Indio, California. Initially, the corporation General Modular Corporation (GMC) was to be the prime contractor and plaintiff would have been a subcontractor, however, "[i]nstead of proceeding further with GMC's proposal, the COE informed Mr. Bennett that it had been decided that the contract for the Indio Border Patrol project would be awarded to an 8(a) contractor," and the president and chief executive officer of GMC informed "the COE that in the process of developing GMC's proposal he learned that HKA [Hernandez, Kroone & Associates] was in the SBA 8(a) program; accordingly, Mr. Bennett proposed that HKA become the prime contractor for the Indio project and that GMC would endeavor to serve as a subcontractor to HKA for the modular building and site fencing portions." <u>Hernandez, Kroone & Assocs., Inc. v. United States</u>, 110 Fed. Cl. at 501. On January 28, 2005, COE commenced the process to initiate the award of a sole source [SBA] 8(a) contract for the Indio Border Patrol Station to plaintiff. Subsequently, the court noted that:

> On October 21, 2005, HKA (Anne Hernandez) addressed a letter to COE (Joseph Flynn) asserting, in part, that "I signed a contract on February 15, 2005. This contract did not include the statement of work from the January 25, 2005 proposal nor from the March 11, 2005 statement of work." The letter also asserted that with respect to on-site lighting and security cameras from their January 25, 2005 proposal that were included in the Schedule of Values for the first invoice HKA submitted to COE, "We were required to show these items on the schedule of values in order to get paid."

<u>Id.</u> at 511 (internal citations omitted). After a letter from plaintiff to "the local California office of the congressman representing the 41st District," "[t]he COE commenced internal discussions to organize a response to the congressional inquiries which resulted from HKA's request for assistance and to schedule a meeting with HKA to discuss the applicable contractual scope of work." <u>Id.</u> at 511-12. Subsequently, the COE and plaintiff met to reach an agreement, however, "[u]pon review, HKA notified the COE that they did not agree with items 1 and 2 in the proposed modification and would not sign it. The Modification No. R00003, dated November 14, 2005, was then issued on a unilateral basis." <u>Id.</u> at 513. Thereafter,

> [o]n December 13, 2005, HKA submitted a certified claim to Patricia Bonilla, contracting officer, regarding Unilateral Contract Modification No. R00003, dated November 14, 2005. The claim primarily addressed HKA's contention that the January 25, 2005 proposal cited in Modification No. R00003 was an additional scope of work added to the February 2nd solicitation and the estimated costs cited were for this future additional work.

<u>Id.</u> (internal citation omitted). "The HKA December 13, 2005 claim purports to detail the estimated cost of adding the January 25, 2005 proposal to the scope of work HKA was to perform together with the resulting time extension." <u>Id.</u> at 525.

After the plaintiff in Hernandez, Kroone & Associates filed a Contract Disputes Act claim in the United States Court of Federal Claims, defendant filed an answer, and an amended answer asserting fraud counterclaims for the Special Plea in Fraud statute, the False Claims Act, and the antifraud provision on the Contract Disputes Act. As bases for its counterclaims, the defendant in Hernandez, Kroone & Associates set forth a number of asserted "falsities" in the Contract Disputes Act claims Hernandez, Kroone & Associates "submitted to the contracting officer, predominantly in the December 13, 2005 claim for an equitable adjustment based on the assertion that Modification No. R00003 comprised a change in the contract scope of work by adding HKA's January 25, 2005 proposal." Id.

The Court of Federal Claims determined that:

Defendant asserts that [plaintiff] HKA's claim that Modification No. R00003 comprised a change in the contract scope of work was a "falsity." As discussed previously, the rejection of HKA's claim for an equitable adjustment based on Modification No. R00003 relies on the conduct of the parties before this dispute arose. However, the somewhat unorthodox manner in which the contract was negotiated initially with GMC and subsequently with HKA to satisfy an 8(a) award obligation, left ample room for argument as to the scope of work involved. The preponderant record evidence shows that after the review triggered by the COE's erroneous assertion that the modular building, as built, did not conform to the contract specifications, HKA evolved to the view that its January 25, 2005 proposal was not part of the awarded contract. This view was seriously researched by COE and debated at a COE–HKA meeting on November 9, 2005. A purported settlement then failed, and unilateral Modification No. R00003 was issued. Based upon full consideration of the record evidence, including the testimony of all witnesses, it is concluded there exists no viable evidence to support defendant's assertion that HKA did not, after October of 2005, believe that the contract, as awarded, did not include HKA's January 25, 2005 proposal. Rather the evidence supports HKA's sincerity in this regard, if not its validity, and HKA did not knowingly present a false or fraudulent claim on December 13, 2005 or thereafter by asserting that their January 25, 2005 proposal was not part of the scope of work in the awarded contract.

Id. at 525 (internal citations omitted).

The facts of the above captioned case are different from those in Hernandez, Kroone & Associates, as the contract at issue in the above captioned case went through numerous and structural changes from the time that it was awarded until the end of the base year. As catalogued above, as a result of modifications to the contract in the base year, the number of bottled water facilities was reduced and a not to exceed limitation on the quantity of water produced at each plant that did not require the government to

purchase any minimum number of cases produced by the contractor was added. Moreover, as a result of the contract being novated from American AquaSource to Oasis, and the deadline for the facilities and the period and obligations in the base period being altered in P00006, the nature of the base year contract was changed.  Perhaps most importantly, in P00011, the contract was fundamentally altered and P00011 established a payment structure moving forward in the option periods by which Oasis would be paid $9,333,333.33 per month, independent of the amount of water delivered. Even if the original intent of the contract was for the payment for cases of bottled water produced, as the government has alleged, P00011 dramatically reshaped the terms of the contract.  It cannot be a surprise to the government that plaintiff's views may have changed over the course of the base year regarding the contract as a whole. Plaintiff conceded that "Paul Morrell testified that during the Base Year, he operated the company as if the Contract was for the sale of water at $3.50 per case, but that over time, he became convinced that Phil Morrell's interpretation, which underlies the claim, was correct." As noted above, Paul Morrell offered an affidavit in support of his certified claim when he submitted it and also credibly testify at trial that he sincerely believed that the plaintiff was entitled to the monies it sought.  The court suggests that same principles that guided the court's decision in Hernandez, Kroone & Associates apply here as well. See id.

Defendant also cites to Daewoo Engineering & Construction Co. v. United States, 557 F.3d at 1339, for the proposition that "the certified claim was simply a 'negotiating ploy,'" and Oasis "did not honestly believe that the Government owed it the various amounts stated when it certified the claim," because "Paul Morrell contemporaneously estimated the value of Oasis's $50 million certified claim to be well below that amount." The court believes the facts in Daewoo are sufficiently different from the facts in the above captioned case. In Daewoo, the United States Army Corps of Engineers solicited bids for the construction of a road in the Republic of Palau in 1998.  See Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 550. The contract was awarded to Daewoo Engineering and Construction Co., Ltd. (Daewoo), which submitted the lowest bid. Construction began in 2000 and was scheduled to be completed within 1,080 days, but was subject to delays. See id. at 550 n.31. Daewoo subsequently submitted a certified claim for an equitable adjustment, requesting $13,348,793.07 in "additional costs as of December 31, 2001" and listed $50,629,855.88 in "costs January 1, 2002 & Forward," for a total of approximately $64 million. Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1336. Daewoo also sought additional time to perform the contract, and alleged that the contract had used defective specifications, the government had breached its duties to cooperate and to disclose superior knowledge, and that it was impossible to complete the contract within the specified time period.  The contracting officer denied the claim.[52]  See id. at 1338. Daewoo then filed a complaint with the United States Court of Federal Claims, seeking an increase in "compensable and non-compensable contract performance time," damages in the amount of $13,348,793.07 for damages suffered through December 31, 2001, and $50,629,855.88 for damages suffered from January 1,

---

[52] In a footnote, the Court of Federal Claims also indicated that the revised claim amount that was discussed at trial in Daewoo was never certified and submitted to a contracting officer. Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 560 n.19; id. at 573.

2002 through contract completion, for a total of approximately $64 million. Id. at 1335-36. The government counterclaimed, alleging fraud and sought forfeiture of Daewoo's claims.[53] Finding that the government had demonstrated by "clear and convincing evidence" that Daewoo "knowingly presented a false claim with the intention of being paid for it," the Court of Federal Claims dismissed plaintiff's claims, assessed a penalty of $50.6 million under the antifraud provision of the Contract Disputes Act, $10,000.00 under the False Claims Act, and forfeited Daewoo's claims under the Special Plea in Fraud. Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584. The Court of Federal Claims also found that Daewoo's certified claim was simply a "negotiating ploy." Id. at 585. Moreover, the Court of Federal Claims noted that Daewoo had submitted an inflated claim to get the government to "pay attention." Id. The Court of Federal Claims stated:

> The Project Manager testified at one point that Daewoo filed at least $50 million of the claim to indicate "the seriousness of the situation" and to get the Government to "pay attention" so it would agree to a cheaper method of constructing embankments. If so, this is further evidence of bad faith. It means that Daewoo submitted a certified claim as a negotiating ploy; that is, for a reason other than an attempt to recover money for which Daewoo believed the Government is liable.

Id. (citations and footnote omitted).

Daewoo appealed to the United States Court of Appeals for the Federal Circuit. See, generally, Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332. Daewoo first argued that it had not made a claim for $64 million, but, rather, that its certified claim was for $13 million and the $50.6 million requested was in the nature of future costs offered as estimates to encourage the government to adjust the contract specifications. As noted by the Court of Federal Claims:

> We suspect that Daewoo's entire claim is fraudulent. However, plaintiff's apparent incompetence in putting together its claim, along with the unwillingness of its witnesses to explain the process, provides it an ironic benefit. That is, we found it difficult to locate the line between fraud and mere failure of proof in this case.
>
> It is theoretically possible that plaintiff's $13 million claim represents an amount that it could have incurred because of defective specifications, had such a theory been applicable, but plaintiff could not prove it because it employed the wrong legal theories and its witnesses were not credible. For these reasons, we limited findings of fraud to the $50 million claim that clearly is fraudulent

Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 595-96. Therefore, the Federal Circuit noted that the Court of Federal Claims had found no support for Daewoo's

---

[53] As in the above captioned case, defendant also sought penalties under the False Claims Act and under the antifraud provision of the Contract Disputes Act.

calculation of the $50.6 million in future costs, and that at trial Daewoo, had "made no real effort to justify the accuracy of the claim for future costs or even to explain how it was prepared." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1338. The Federal Circuit also noted that, even on appeal, Daewoo did not attempt to factually dispute the Court of Federal Claims' finding of fraud, but, rather, argued that the penalty should be set aside because it was only in the amount of $50.6 million, not $64 million. See id. at 1339. The Federal Circuit rejected this argument, and found the lower court's finding of fraud was not erroneous and that the assessment of a penalty in the amount of $50.6 million was proper. See id. at 1341.

As noted above, defendant has not demonstrated that Paul Morrell did not believe in the certified claim when he submitted it to the government, unlike the project manager in Daewoo. The court reiterates that Paul Morrell, both on direct examination, and cross-examination, steadfastly held to his view that the certified claim he signed was the one he believed in and that the government actually owed plaintiff what was claimed, both when he certified and submitted the certified claim, and, again, when he testified at trial in the above captioned case. Although not as significant as Paul Morrell, who was the signatory of the certified claim, the court notes that Phil Morrell consistently held the view that the contract was a capabilities contract, as noted by his August 2006 memorandum, reflecting his belief of a "**Capabilities for Time Period not Quantity**," and that "[f]unding was received for purchase of water, but it the contract was a capabilities contract." (emphasis in original).

Before the Federal Circuit, Daewoo also argued before the Federal Circuit that a claim can only be fraudulent it if rests upon false facts, not if it rests upon a baseless calculation, the Federal Circuit rejected Daewoo's argument, stating: "It is well established that a baseless certified claim is a fraudulent claim." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1339.  Although defendant repeatedly stresses that Oasis has submitted a "baseless" claim, the certified claim identifies and supports the capabilities theory of plaintiff's claims, with more than fifty pages of explanation and figures as well as the affidavits from a number of Oasis personnel including Paul Morrell. Simply because defendant vehemently disagrees with plaintiff's theory, does not make plaintiff's claim baseless.

Defendant also claims that:

The fraud in this case goes well beyond the scheme in *Commercial Contractors* because Oasis not only did not share its contract interpretation with the Government, but repeatedly told the Government that, contrary to the representations in the certified claim, the contract only allowed for one payment of $3.50 per case of water. Yet, despite invoicing and being paid the $3.50 per case, Oasis filed a certified claim asking to be paid another $3.50 per case based on an implausible contract interpretation never shared with the military until the certified claim. In sum, Oasis's implausible contract interpretation, in conjunction with a mountain of trial evidence defeating any "good faith belief of entitlement under the contract,"

> *Commercial Contractors*, 154 F.3d at 1364, compel only one conclusion:
> Oasis's claim was fraudulent and false.

(internal citation omitted). Defendant continues: "The overwhelming evidence of Oasis's singular understanding of the contract before, during, and after the certified claim demonstrates intent to defraud under the *Commercial Contractors* prohibition on advancing frivolous contract constructions and the prohibition on baseless claims and gamesmanship in the certified claim process reinforced by *Daewoo*."

In <u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d 1357, the United States Court of Appeals for the Federal Circuit considered the government's counterclaims for the Special Plea in Fraud Statute, the False Claims Act, and the anti-fraud provision of the Contract Disputes Act.[54] In <u>Commercial Contractors</u>, the Army Corps of Engineers awarded a contract to Commercial Contractors, Inc. (CCI)

> to construct several segments of the Telegraph Canyon Channel in Chula
> Vista, California, as part of a flood control project. The contract required CCI
> to excavate the areas in which the channel segments were to be built, to
> build the channel segments by setting up forms and pouring concrete into
> the forms, and to backfill the excavated areas surrounding the channel
> segments. The contract contained detailed specifications that governed all
> aspects of the work to be performed, including drawings indicating the lines
> to which CCI was required to excavate, quality control standards specifying
> the hardness that the poured concrete was required to achieve before the
> supporting forms could be removed, and miscellaneous other provisions
> specifying such factors as the proper composition and required compaction
> density of the backfill materials.

<u>Id.</u> at 1361-62. CCI was obligated under the contract to excavate the channel in accordance with the contract drawings. "CCI was to be compensated for the excavation portion of the project based on the volume of earth excavated." <u>Id.</u> at 1362-63. The contract also stated that "'[a]ll excavation outside of the excavation lines shown on the drawings will be considered as being for the convenience of Contractor and will not be included in the measurement for payment.'" <u>Id.</u> The Federal Circuit explained:

> The Court of Federal Claims found that CCI excavated less than the
> contract drawings required, but submitted cross-sections and quantity
> surveys indicating that it had excavated up to the contract lines. CCI does
> not dispute those findings. Furthermore, the court found that CCI billed the
> Corps for additional excavation which was not required by the contract, but
> which CCI did to accommodate a traveling metal form system that CCI used
> to speed up the project.

---

[54] In <u>Commercial Contractors</u>, the Federal Circuit refers to the Special Plea in Fraud as the "the Forfeiture of Fraudulent Claims Act." <u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d at 1362.

> At trial, CCI argued that its excavation claims were not false because it interpreted the contract as providing for payment based on the volume of earth computed from the contract drawings, regardless of whether CCI actually excavated up to the lines specified in those drawings. The court rejected CCI's contract interpretation, principally because that interpretation directly contradicted the express terms of the contract, which provided that CCI was required to excavate "accurately to the lines, grades, and elevations shown" in the drawings.

Id. at 1363. The court noted that Mr. Pallamary, CCI's own subcontractor, repeatedly warned CCI's project manager that "he did not believe that the contract permitted CCI to excavate less than the contract drawings called for, or to submit cross-sections that did not reflect the actual amounts excavated." Id. The Federal Circuit determined that the testimony of CCI's project manager, who supervised the project for CCI,

> was uncorroborated and was contradicted by testimony from the Corps' contracting officials, whom the court found to be credible witnesses. Based on those credibility determinations, we uphold the court's rejection of CCI's contention that Mr. Barron [the Corps' original project engineer] interpreted and modified the contract so as to permit CCI to ignore the minimum excavation specifications for all but payment purposes. In light of the clear and unambiguous contract language, we also uphold the court's ruling that CCI's interpretation of the contract was so unreasonable as to defeat CCI's assertion that it pressed its claims based on a good faith belief of entitlement under the contract.

Id. Moreover, the Federal Circuit reasoned that:

> when a contractor adopts a contract interpretation that is implausible in light of the unambiguous terms of the contract and other evidence (such as repeated warnings from a subcontractor or the fact that the interpretation is contrary to well-established industry practice), the contractor may be liable under the FCA [False Claims Act] or the CDA even in the absence of any deliberate concealment or misstatement of facts. Under such circumstances, when the contractor's purported interpretation of the contract borders on the frivolous, the contractor must either raise the interpretation issue with the government contracting officials or risk liability under the FCA or the CDA.

Commercial Contractors, Inc. v. United States, 154 F.3d at 1367.

Although defendant believes the above captioned case fits the parameters of Commercial Contractors perfectly, the court disagrees. Even if Oasis has an incorrect interpretation of the contract, this alone does not demonstrate fraud by Oasis. Nor would the wrong interpretation rise to the level of frivolous. Given the shifting nature of the contract, indeed a contract that was performed and was compensated and managed

completely differently midway through the base year of the contract, it was possible and reasonable for Oasis to recalibrate its views of the contract. It certainly would have been preferable if there had been better communication between the government and the contractor, however, because plaintiff's interpretation is not frivolous, it does not risk liability under the fraud counterclaims pursuant to Commercial Contractors. Although the government witnesses did not share his recollection, Phil Morrell testified that he explained his view of the contract to multiple Army officials. He was most specific about his communications, including with a government officer, Colonel Hay, who did not testify and was not called to testify by either party at trial.[55]  Phil Morrell testified that the Army "understood [my] position on getting paid the $50 million, that that didn't require a production to do that, didn't require product to get paid the $50 million," a statement which remained uncontroverted after trial.

Although the court does not agree with plaintiff that "Oasis did everything correctly," the court concludes that defendant has failed to prove the requisite intent to establish fraud for Claims 1, 4, 6, and 8. Therefore, Oasis is not found to have practiced, or attempted to practice, a fraud against the United States with respect to the Special Plea in Fraud statute for Claims 1, 4, 6, and 8. Plaintiff's claims for Claims 1, 4, 6, and 8, are not forfeited as a result.[56] As noted above, Claim 2 regarding the Special Plea in Fraud counterclaim is deferred.

### b. False Claims Act

In defendant's second amended answer and counterclaim, defendant argues that "Oasis's 2008 certified claim to the contracting officer violated the False Claims Act by claiming $44,516,868, pursuant to a fraudulent contractual construction that it was entitled to a 'mobilization' payment of $50,225,000, plus $3.50 per case for bottled water delivered during the base period, as well as for claiming $600,000 in costs that the Government had already reimbursed."  Defendant argues that "Oasis had actual knowledge of the falsity of the claim or it acted in deliberate ignorance or reckless disregard of the truth or falsity of the claim," and, therefore, plaintiff "is liable pursuant to the False Claims Act, 31 U.S.C. §3729 et seq., for at least one false claim, which carries a civil penalty of not less than $5,500 and not more than $11,000 for each claim presented." In its post-trial brief, defendant reiterates that "Oasis also violated the False Claims Act and is liable for an

---

[55] Oasis states that "[d]efendant did not call Col. Hay for his understanding of the Contract, despite the fact that he was a COR [contracting officer representative] and the customer (COSCOM), and was heavily involved in the Base Year."

[56] The court, however, agrees with defendant, that Oasis' argument that it "is improper for the Government to file a fraud counterclaim if contracting officers – who did not have access to any of Oasis's internal documents – did not report the claim as fraudulent" is incorrect. Defendant correctly notes that the "Department of Justice possesses sole authority to assert fraud counterclaims" in this court (citing 28 U.S.C. §§ 516, 2508; 31 U.S.C. § 3730(a) and Hernandez, Kroone, & Assocs. v. United States, 110 Fed. Cl. at 528).

$11,000 penalty plus the Government's costs," and "Oasis is liable under the False Claims Act for the same reasons that its claim must be rejected under the Special Plea in Fraud." In response, Oasis contends that "the Government must prove that Oasis' claim is actually false. But the Government has not – and cannot – prove this, because Oasis' claim is not false. The Court should reach this conclusion even if it ultimately disagrees with Oasis's claim, since there is a wide gap between 'incorrect' and 'fraudulent.'"

As indicated by the United States Supreme Court, "'[t]he False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts.'" Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 135 S. Ct. 1970, 1973 (2015) (quoting S. Rep. No. 99–345, at 8 (1986), 1986 U.S.C.C.A.N. 5266, 5273). The False Claims Act, 31 U.S.C. § 3729,[57] provides:

**(a) Liability for certain acts.--**

**(1) In general.**--Subject to paragraph (2), any person who--

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

**(E)** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

---

[57] The False Claims Act was amended in 2009.  See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4(a), 123 Stat. 1617, 1621. The amendments are treated "as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date."  § 4(f), 123 Stat. at 1625. See AEY, Inc. v. United States, 114 Fed. Cl. at 633 ("The amended provision, 31 U.S.C. § 3729(a)(1)(B), took effect as if enacted on June 7, 2008 and applies to all claims under the False Claims Act that were pending on or after that date."). As noted above, Oasis submitted its certified claim on July 4, 2008, and Lieutenant Colonel Hobbs denied Oasis' certified claim in its entirety on October 18, 2009.

**(F)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000,[58] as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

. . .

**(b) Definitions.**--For purposes of this section--

**(1)** the terms "knowing" and "knowingly" --

---

[58] The Department of Justice, by regulation, has increased the penalties for FCA [False Claims Act] violations to a minimum of $5,500.00 and a maximum of $11,000.00." Alcatec, LLC v. United States, 100 Fed. Cl. at 526 n.13 (citing 28 C.F.R. § 85.3(a)(9)); see also Veridyne Corp. v. United States, 105 Fed. Cl. at 808 n.30; Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890; Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47,099–01, 47,104 (Aug. 30, 1999). The regulation at 28 C.F.R. § 85.3 states:

The civil monetary penalties provided by law within the jurisdiction of the respective components of the Department, as set forth in paragraphs (a) through (d) of this section, are adjusted in accordance with the inflation adjustment procedures prescribed in section 5 of the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, Pub. L. 101–410, effective on or after September 29, 1999, as follows:

(a) Civil Division.

…

(9) 31 U.S.C. 3729(a), False Claims Act, violations: minimum from $5,000 to $5,500; maximum from $10,000 to $11,000.

28 C.F.R. § 85.3 (2016). The court has the discretion to impose penalties within the statutory range. See Morse Diesel Int'l, Inc. v. United States, 79 Fed. Cl. 116, 125 (2007), recons. denied, 81 Fed. Cl. 311 (2008).

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

**(2)** the term "claim"--

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729 (2012) (emphasis in original); see also Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 135 S. Ct. at 1973;[59] U.S. ex rel. Heath v. AT & T, Inc., 791 F.3d 112, 115 (D.C. Cir. 2015) ("The False Claims Act, 31 U.S.C. §§ 3729 et seq., broadly proscribes the knowing or reckless submission of false claims for payment to the federal government or within a federally funded program.").

---

[59] Although the United States Supreme Court in Kellogg Brown & Root addressed the False Claims Act, because the case was brought as a civil qui tam action, "filed by private parties, called relators, 'in the name of the Government,'" Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 135 S. Ct. at 1973, the holding by the Supreme Court does not impact this case.  In addition, the Supreme Court also addressed the Wartime Suspension of Limitations Act, which is not at issue in the above captioned case.

The term "claim" is defined in the False Claims Act as:

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

**(B)** does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

31 U.S.C. § 3729(c) (2012).[60] The False Claims Act also states:

---

[60] The prior version of the False Claims Act was substantively similar to the current version, but is organized slightly differently, and stated:

> **(1)** knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> **(2)** knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> **(3)** conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> **(4)** has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

**(1)** the terms "knowing" and "knowingly" --

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

31 U.S.C. § 3729(b) (2012).

───────────────

> **(5)** authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> **(6)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or
>
> **(7)** knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729 (2006).  The term "claim" was previously defined in the False Claims Act as:

> Includ[ing] any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (2006).

Congress rejected requiring a specific intent to defraud under the False Claims Act.  See 31 U.S.C. § 3729(b).  Instead, Congress adopted a knowing standard, defined as "actual knowledge" of the falsity, acting in "deliberate ignorance of the truth or falsity," or acting in "reckless disregard of the truth or falsity." Id.; see also Ulysses, Inc. v. United States, 110 Fed. Cl. at 642. The standard was designed to address "the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know." See S. Rep. No. 99-345, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5286.  Thus, the False Claims Act covers not just those who set out to defraud the government, but also those who ignore obvious deficiencies in a claim.

Therefore, the critical issue in the case currently before the court is whether plaintiff had "knowledge," as defined by the False Claims Act, to include reckless disregard, that the claims plaintiff submitted to the government were false or fraudulent.  To prove a violation of the False Claims Act, the government can, but need not, prove that a party intended to deceive the government. See United States v. TDC Mgmt. Corp., 24 F.3d 292, 298 (D.C. Cir. 1994); see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1340 ("no proof of specific intent to defraud is required." (quoting 31 U.S.C. § 3729(b))); Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 524. The False Claims Act requires only that the government prove that a party knowingly, as defined under the False Claims Act, submitted a claim with reckless disregard to the truth or falsity of the information. See 31 U.S.C. § 3729(b); United States v. TDC Mgmt. Corp., 24 F.3d at 298; see also Ulysses Inc. v. United States, 117 Fed. Cl. 772, 781 (2014); Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. at 379 (quoting 31 U.S.C. § 3729(b)) ("while the FCA does not require proof of specific intent to defraud, it does require that the person or entity acted with knowledge. The statute defines 'knowing' or 'knowingly' to 'mean that a person' 'with actual knowledge of the information' either 'acts in deliberate ignorance of the truth or falsity of the information' or 'acts in reckless disregard of the truth or falsity of the information.'"); Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 n.2 (2008) ("Section 3729(b) provides that the terms 'knowing' and 'knowingly' 'mean that a person, with respect to information-1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.'"), superseded in unrelated part by statute, Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4, 123 Stat. 1617, 1621. The United States Court of Appeals for the Federal Circuit has noted that, "[f]or purposes of the FCA [False Claims Act], a contractor is deemed to have known that a claim it submitted was false if it had actual knowledge of the falsity of the claim or if it acted in deliberate ignorance or reckless disregard of the truth or falsity of the claim." Commercial Contractors, Inc. v. United States, 154 F.3d at 1362. As indicated in Ulysses, Inc. v. United States, 110 Fed. Cl. 618, "'[t]he False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government . . . .  It was not intended to impose liability for every false statement made to the government.'" Id. at 641 (quoting Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir. 2001) (omission in original).

Reckless disregard has been characterized as "'an extreme version of ordinary negligence,'" United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 530 F.3d 980, 983 (D.C. Cir.) (quoting United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997)), reh'g en banc denied (D.C. Cir. 2008), or "aggravated gross negligence" such as when the party "deliberately avoided learning the truth." United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1274-75 (D.C. Cir. 2010); see also United States ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 945 n.12 (10th Cir. 2008); Trafalgar House Constr., Inc. v. United States, 77 Fed. Cl. 48, 53 (2007) ("'Reckless disregard' has been defined as an "'aggravated form of gross negligence.'" (quoting UMC Elecs. Co. v. United States, 43 Fed. Cl. at 792 n.15 (quoting United States ex rel. Aakhus v. Dyncorp, Inc., 136 F.3d 676, 682 (10th Cir. 1998)))), aff'd, 274 F. App'x 898 (Fed. Cir. 2008); Riley Constr. Co. v. United States, 65 Fed. Cl. 264, 270 (2005) ("The legal standard that may apply is 'reckless disregard.' This has been defined in the case law as something more than gross negligence, or 'gross negligence plus.'").[61]

A failure to make a minimal examination of records can constitute deliberate ignorance or reckless disregard, and a contractor that deliberately ignores false information submitted as part of a claim can be found liable under the False Claims Act. See United States v. TDC Mgmt. Corp., 24 F.3d at 298; see also Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23 (An applicant who submitted estimates of the quantities of the materials billed to the government prepared by his workmen, but substantially overbilled due to misrepresentation, resulted in a finding of "extreme negligence" for which he was found liable under the False Claims Act.). The court in Miller v. United States noted that a contractor cannot be saved by relying on local government officials in preparing its claims. See Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23. The court found the applicant in Miller had the responsibility to ensure the claims were accurate, and the contractor had in fact signed the claims, "evidencing his agreement to the figures it contained." Id.; see also Riley Constr. Co. v. United States, 65 Fed. Cl. at

---

[61] Black's Law Dictionary defines gross negligence as:

> A lack of even slight diligence or care. The difference between *gross negligence* and *ordinary negligence* is traditionally said to be the omission of even such diligence as habitually careless and inattentive people do actually exercise in avoiding danger to their own person or property. . . . A conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages. — Also termed *reckless negligence; wanton negligence; willful negligence; willful and wanton negligence; hazardous negligence; magna neglegentia*. . . . . "Negligence is gross if the precautions to be taken against harm are very simple, such as persons who are but poorly endowed with physical and mental capacities can easily take. . . . As it originally appeared, this was very great negligence, or the want of even slight or scant care. It has been described as a failure to exercise even that care which a careless person would use."

Black's Law Dictionary 1197 (10th ed. 2014) (emphasis in original) (citations omitted).

268-69 (The Senate Committee Report on the False Claims Act states that "'those doing business with the Government have an obligation to make a limited inquiry to ensure that the claims they submit are accurate.'" (citation omitted)).  When the claims are prepared in a "sloppy or unsupervised fashion" and it results in overcharging the government, there is reckless disregard. See 132 Cong. Rec. H9, 382-03 (1986) (statement of Rep. Berman, as sponsor of the 1986 amendment to the False Claims Act). Although a person must make at least a minimal examination of the records, the examination need be only "reasonable and prudent under the circumstances." United States v. Bourseau, 531 F.3d 1159, 1168 (9th Cir. 2008) (quoting S. Rep. No. 99-345, at 21), cert. denied, 555 U.S. 1212 (2009).  Courts have found reckless disregard when a plaintiff failed to review claims that either he or another person prepared before submitting them. See Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23; United States v. Krizek, 111 F.3d at 942. In Krizek, the United States Court of Appeals for the D.C. Circuit upheld the district court's conclusion that plaintiff acted with reckless disregard in failing "utterly" to review the false submissions made on his behalf in violation of the False Claims Act when, plaintiff doctor let his wife complete the submission of claims to the local Medicare carrier; the wife did not attempt to establish how much time was actually spent with each patient; and the doctor did not review the submission. See United States v. Krizek, 111 F.3d at 942. Indeed, a person generally cannot escape liability by claiming to have relied on others in preparing the claim. See id.; see also Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23. But see Riley Constr. Co. v. United States, 65 Fed. Cl. at 270 ("Mr. Riley would have had reason to rely on Douglas, the former Navy ROIC, as an expert in submitting claims. Such reliance, if it exists, may be relevant in considering the various counterclaims.").

In Daewoo, the Federal Circuit rejected the plaintiff's argument that a claim can only be fraudulent if it rests upon false facts, not if it rests upon a baseless calculation, stating: "It is well established that a baseless certified claim is a fraudulent claim." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1339. "'[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the "claim for payment."'" See Ulysses, Inc. v. United States, 110 Fed. Cl. at 642 (quoting United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995)) (alteration in original). "[I]n deciding whether a given false statement is a claim or demand for payment, a court should look to see if, within the payment scheme, the statement has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." United States v. Rivera, 55 F.3d at 709.  In order to determine the number of false claims a contractor submitted to the government, the United States Supreme Court has stated: "A correct application of the statutory language requires . . . that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." United States v. Bornstein, 423 U.S. 303, 312 (1976).[62] The Supreme Court's guidance in United States v. Bornstein has been interpreted to require courts to ask: "'With what act did the defendant submit his demand or request and how many such acts were

---

[62] United States v. Bornstein analyzed an earlier version of the False Claims Act, but the guidance of the United State Supreme Court remains relevant to the court's interpretation of amended versions of the False Claims Act. See United States v. Krizek, 111 F.3d at 939 n.1.

there?'" United States v. Krizek, 111 F.3d at 939. When a fraudulent claim consists of multiple components, the submission of an aggregate claim, rather than its individual components, is the act that creates liability under the False Claims Act. See Miller v. United States, 213 Ct. Cl. at 71–72, 550 F.2d at 23–24 (rejecting an argument that a contractor had asserted sixteen false claims under an earlier version of the False Claims Act, "eleven based on invoices used in calculating the monthly billings plus five, one for each of the monthly consolidated billings," because "the invoices are like tally sheets used in calculating a final figure to present to the Government; they are not the claim itself"); see also United States v. Woodbury, 359 F.2d 370, 378 (9th Cir. 1966) (rejecting the argument that a penalty could be assessed under an earlier version of the False Claims Act for each document that was attached to fraudulent applications for payment).

An innocent mistake or mere negligence, such as a math error or flawed reasoning, may be excused. See United States v. Sci. Applications Int'l Corp., 626 F.3d at 1274 (citing S. Rep. No. 99-345, at 7); United States ex rel. Fowler v. Caremark RX, L.L.C., 496 F.3d 730, 742 (7th Cir.) (citations omitted), reh'g and suggestion for reh'g en banc denied (7th Cir. 2007), cert. denied, 552 U.S. 1183 (2008), overruled on other grounds by Glaser v. Wound Care Consultants, Inc., 570 F.3d 907 (7th Cir. 2009); Riley Constr. Co. v. United States, 65 Fed. Cl. at 269 (noting that the False Claims Act was not intended to punish honest mistakes and mere negligence (citing S. Rep. No. 99-345 at 7)); see also United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999).

Thus, under the False Claims Act, there must be a showing of more than an innocent mistake or mere negligence. See Ulysses, Inc. v. United States, 117 Fed. Cl. at 780 (quoting UMC Elec. Co. v. United States, 43 Fed. Cl. at 795 ("'Under the False Claims Act there must be a showing by the government of more than innocent mistake or mere negligence.'")); Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. at 379; Riley Constr. Co. v. United States, 65 Fed. Cl. at 269. The government is required to show the knowing presentation by the contractor of information known to be "false or fraudulent." See Young-Montenay, Inc. v. United States, 15 F.3d at 1043. The government has "the burden to allege and prove that the statements were false under any reasonable interpretation." United States v. Adler, 623 F.2d 1287, 1289 (8th Cir. 1980). The burden of proof on the government in this regard is by a preponderance of the evidence. See Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d. at 1340 (citing 31 U.S.C. § 3731(c); Commercial Contractors, Inc. v. United States, 154 F.3d at 1362).

As indicated in Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States:

> To establish [plaintiff's] liability under the FCA, the government must prove by a preponderance of the evidence, Daewoo, 557 F.3d at 1340, that "(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; [and] (3) the contractor knew the claim was false or fraudulent." Young–Montenay, Inc. v. United States, 15 F.3d 1040, 1043 (Fed. Cir. 1994). The

government has "the burden to allege and prove that the statements were false under any reasonable interpretation." <u>United States v. Adler</u>, 623 F.2d 1287, 1289 (8th Cir. 1980).

<u>Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States</u>, 116 Fed. Cl. at 379 (footnote omitted); <u>see</u> <u>also</u> <u>Ulysses, Inc. v. United States</u>, 110 Fed. Cl. at 641 ("The Government must prove the elements of an FCA claim by a preponderance of the evidence.").

      "To bring [a] FCA [False Claims Act] claim, the Government is not tasked to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages." <u>Veridyne Corp. v. United States</u>, 105 Fed. Cl. at 808; <u>see</u> <u>also</u> <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1341 ("The Court of Federal Claims did not err in concluding that Daewoo violated the False Claims Act. Because the court did not find that the government incurred damages from Daewoo's false claim, the court properly assessed only the statutory penalty."); <u>see</u> <u>also</u> <u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d at 1371-72 ("[A] contractor can be held liable for submitting a false claim even if the goods it delivered are of the same quality as the goods specified in the contract, provided that the contractor acted with the requisite knowledge that the corresponding claim was false.  But while the contractor may be liable in that situation, it is liable only for FCA penalties, not damages. . . .  In order to recover FCA damages, the government must prove that it sustained an actual loss as a result of the contractor's false or fraudulent claim." (citations omitted)); <u>Alcatec, LLC v. United States</u>, 100 Fed. Cl. at 526 ("To bring an FCA claim, the Government does not have to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages." (citing <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1341; <u>Young–Montenay, Inc. v. United States</u>, 15 F.3d at 1043 (absent proof of harm, the government can recover penalties, but not damages))); <u>AEY, Inc. v. United States</u>, 114 Fed. Cl. at 633 n.17 ("In essence, Section 3729 imposes a penalty on a person who knowingly presents a false claim wholly apart from proof of any specific damages.").

      In <u>Rex Trailer Co. v. United States</u>, the United States Supreme Court stated, "there is no requirement, statutory or judicial, that specific damages be shown, and this was recognized by the Court in <u>Marcus</u>." <u>Rex Trailer Co. v. United States</u>, 350 U.S. 148, 152-53 (1956). In <u>Rex Trailer</u>, the United States Supreme Court summarized <u>United States ex. rel. Marcus v. Hess</u>, 41 F. Supp. 197, 218 (W.D. Pa. 1941), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 127 F.2d 233 (3d Cir.), <u>cert.</u> <u>granted</u>, 317 U.S. 613 (1942), <u>and</u> <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 317 U.S. 537, <u>and</u> <u>reh'g</u> <u>denied</u>, 318 U.S. 799 (1943), <u>superseded</u> <u>by</u> <u>statute</u> <u>on</u> <u>other</u> <u>grounds</u> <u>as</u> <u>recognized</u> <u>in</u> <u>Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson</u>, 559 U.S. 280, <u>reh'g</u> <u>denied</u>, 560 U.S. 936 (2010), by noting that, in the 1940s, the United States District Court for the Western District of Pennsylvania concluded that plaintiff was liable for the statutory penalty for submission of a false claim, but not damages, as damages were not proven.  <u>See</u> <u>Rex Trailer Co. v. United States</u>, 350 U.S. at 152-53.  Although the Supreme Court's discussion in <u>Rex Trailer</u> focused on the Surplus Property Act, the Supreme Court referred to <u>Marcus</u>, which involved the False

Claims Act, in determining that proof of damages was not necessarily required in the assessment of a civil remedy or statutory penalty. See id. at 153 n.5 ("On several of the projects involved in the Marcus case, fraud was discovered by the Government in time for payments to be withheld. At trial [on the False Claims Act] in the District Court defendants urged that there could be no recovery of a penalty or forfeiture in these instances in which no actual damages could be shown. The District Court held that failure to show actual damages in these instances would not preclude recovery under the statute. United States ex rel. Marcus v. Hess, 41 F. Supp. 197, 218. The judgment of the District Court [in Marcus] was affirmed here. See United States v. Rohleder, 157 F.2d 126, 129 [(3d Cir. 1946)].").

As indicated above, defendant initially argues: "Oasis is liable under the False Claims Act for the same reasons that its claim must be rejected under the Special Plea in Fraud."[63] As determined above, Oasis did not violate the Special Plea in Fraud statute. Defendant also asserts that, "[a]t a minimum, Oasis's own documents, witness testimony, and representations to third parties demonstrate that it acted with reckless disregard to the falsity of its certified claim, which is sufficient for liability under the False Claims Act." In response, plaintiff agrees with defendant only insofar as "[w]ith respect to the False Claims Act only, knowledge may be demonstrated by proof of reckless disregard for the truth." The court also agrees that regarding the False Claims Act counterclaim alleged by defendant in this case, the False Claims Act, unlike the Special Plea in Fraud, does not require specific intent to defraud, merely "actual knowledge" of the falsity, acting "in deliberate ignorance of the truth or falsity," or acting "in reckless disregard of the truth or falsity," are sufficient to trigger liability. See 31 U.S.C. § 3729(b). Furthermore, as noted above, the preponderance of the evidence standard which applies to proof under the False Claims Act is a less rigorous standard than the clear and convincing standard of proof applied under the Special Plea in Fraud statute. See UMC Elecs. Co. v. United States, 249 F.3d at 1338-39.

As indicated in Ulysses, Inc. v. United States, 110 Fed. Cl. 618, "[i]n the classic FCA [False Claims Act] scenario, a contractor asks the Government for a payment which it is not entitled to receive." Ulysses, Inc. v. United States, 110 Fed. Cl. at 642. As determined above, the court concluded that Oasis did not violate the Special Plea in Fraud statute, because the plaintiff did not have the requisite intent to "double-bill" the government or seek payment for services it did not provide. The crux of the court's conclusion for why the certified claim was not a violation of the Special Plea in Fraud was, even if Oasis had an incorrect view of the contract, which the court has not yet determined, Oasis' interpretation of the contract was sincere and was reasonable given the multiple

---

[63] As noted above, both plaintiff and defendant combined many of their fraud arguments together. Both parties seem to believe that if fraud was proven, or disproven, it would apply equally to each of the counterclaims, and merely give lip service to the differing standard of proof for the False Claims Act and the antifraud provision of the Contract Disputes Act. In its principal post-trial brief, plaintiff posits "[a]lthough these statutes differ in wording and remedy, each has two primary requirements that are relevant to this action: (1) the Government must demonstrate that the claim is actually false, and (2) the Government must demonstrate that the contractor acted knowingly."

modifications, and, therefore, the changing nature of the terms of the contract. Consequently, the court has already determined that the statements were not false "under any reasonable interpretation."  Nor does the lower standard of proof for the False Claims Act, a preponderance of the evidence, change the court's conclusion.

In a previous decision regarding the False Claims Act, the undersigned discussed at length a plaintiff's view that its certified claim represented a series of legal theories, and, therefore, could not be a false claim.  The undersigned noted that:

> Plaintiff is correct that statements of legal theories do not constitute "false claims." As noted by the court in Tyger Construction Co. v. United States, 28 Fed. Cl. 34 [sic], 56 (1993), "[a]ttaching FCA liability to expressions of legal opinion would have an impermissibly stifling effect on the legitimate presentation of claims. Indication is absent that Congress intended to penalize good faith disputes over contract liability." Id. Moreover, as the Court of Federal Claims noted in Ulysses, Inc. v. United States, 110 Fed. Cl. 618, the government's False Claims Act counterclaim failed because the defendant failed to prove that plaintiff's underlying CDA claim was factually false. See id. at 645. The Ulysses court explained: "Rather, Plaintiff asserted a different interpretation of the requirements of the First Purchase Order than the Government. So too, Ulysses argued in its claim that by accepting its 112 Parts as components of its 100 Parts, the Government had waived the approved source requirement in the past—a legal position not a factual representation," with the Ulysses court determining that "Plaintiff's interpretation was in essence a legal call about what would meet the requirements of the Purchase Orders Plaintiff informed the Government of its legal position in writing several times." Id.

Despite the foregoing, and even though the undersigned stated in UMC Electronics Co. v. United States, 43 Fed. Cl. at 794, "[a] contractor, upon submission of a claim, who is aware of and takes advantage of a disputed legal issue does not knowingly commit fraud," the undersigned recognized in UMC Electronics that "'[c]ontractors in a False Claims Act case, such as UMC in the instant action, not infrequently contend that their claims were not false because an interpretation of relevant regulations permits their claims," and it "is a matter of law for the court to interpret a relevant statutory or regulatory requirement." Id. Therefore, it is insufficient for plaintiff merely to suggest that its entire claim is a legal theory and, therefore, impossible to be a false claim. Indeed, although as noted above, plaintiff believes that the "Government's FCA counterclaims are an attempt to expand dangerously the FCA from its regular and intended context to apply also to good-faith statements of legal theories by parties aggrieved by the Government's breach of its contractual obligations," it would be a dangerous precedent to allow a contractor to present its certified claim under the guise of a "legal theory," and, thereafter, not to be subject to a False Claims Act counterclaim by the government in all circumstances. It would have been

absurd, for example, for the project manager in <u>Daewoo</u>, Mr. Kim, who had specifically disavowed the truth of the claim during his trial testimony to have been able to argue that the baseless claim was, instead, a legal theory his company was pursing. <u>See</u> <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 73 Fed. Cl. at 585. Therefore, although recognizing plaintiff's argument that the claim was a legal theory, the court looks to the substance of plaintiff's certified claim to see if plaintiff violated the False Claims Act.

<u>Horn & Assocs., Inc. v. United States</u>, 123 Fed. Cl. 728, 769-770 (2015). Although the undersigned concluded that there was no <u>per</u> <u>se</u> rule that would bar legal theories from being false claims, neither this court, nor any other court with binding authority on this court, has concluded that a reasonable interpretation or legal theory could not be a defense to a counterclaim under the False Claims Act. Just as the court determined Oasis' theory was a reasonable one, even if a potentially incorrect one, and, therefore, that Oasis' interpretation of the contract did not violate the Special Plea in Fraud statute, the court similarly concludes plaintiff's differing interpretation of the contract from that of the defendant, was not evidence that Oasis acted with reckless disregard to the truth of its certified claim and did not violate the False Claims Act. Nor can the court determine that the decision to submit the certified claim as filed was reckless, as the court agrees with the plaintiff that "Phil and Paul Morrell believed in the contract theory of the claim from well before it was ever submitted." As discussed above, listening to and observing both Phil Morrell and Paul Morrell during the trial as they offered in person testimony, the court found the evidence they offered creditable on the issues of their understanding and intent when they developed plaintiff's theory of the certified claim, and, specifically, Paul Morrell's testimony regarding the certification of the claim.[64]

The government has not demonstrated that the plaintiff's interpretation should be considered "false statements," nor has the government demonstrated that Oasis had "actual knowledge" of the falsity, was acting "in deliberate ignorance of the truth or falsity,"

---

[64] The court notes that in plaintiff's post-trial briefs plaintiff also argues that for False Claims Act purposes, "in the context of an open legal question (<i>i.e.</i> the initial interpretation of a law or contract), the subjective intent of a party who adopts a reasonable interpretation is irrelevant, and the Court should not even consider it." As the court has determined that there is no violation of the False Claims Act, the court does not reach a distinction between an objective and subjective interpretation of the contract. The court, however, notes plaintiff only cites to a footnote in a non-precedential decision for support. <u>See</u> <u>U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.</u>, 657 F. Supp. 2d 1039, 1057 (S.D. Iowa 2009), <u>aff'd</u>, 613 F.3d 1186 (8th Cir. 2010). The court further notes that the plaintiff and the United States District Court for the Southern District of Iowa both also cite to the United States Supreme Court decision of <u>Safeco Insurance Co. of America v. Burr</u> for the proposition that "[t]o the extent that they argue that evidence of subjective bad faith can support a willfulness finding even when the company's reading of the statute is objectively reasonable, their argument is unsound." <u>Safeco Ins. Co. of Am. v. Burr</u>, 551 U.S. 47, 70 (2007). The statute at issue in <u>Safeco</u> addressed the Fair Credit Reporting Act, and, therefore, was not in the context of the False Claims Act, and, moreover, did not address interpretation of a contract.

or was acting "in reckless disregard of the truth or falsity." See 31 U.S.C. § 3729(b). Because the court finds that defendant has not demonstrated that plaintiff had knowledge that its claims were false or fraudulent, and had no intention to induce "wrongful payment," United States v. Rivera, 55 F.3d at 709, Oasis is not liable under the False Claims Act. As indicated above, the court believes that the testimony of the Paul Morrell and Phil Morrell was sincere. There was no indication in their testimony at trial of any intention or steps taken to defraud the government. As the parties do not raise stand-alone arguments related solely to the False Claims Act, the court determines, for the reasons articulated above, the government has not proven a violation of the False Claims Act, even under the preponderance of the evidence standard. The court has determined, based on plaintiff's articulation of its theory in its certified claim, that plaintiff did not attempt to "double bill" the government for allegedly $30,000,000.00 in Claims 1 and 8, nor did plaintiff attempt to be paid a second time the $600,000.00 for the water fixes in Claim 6. Furthermore, plaintiff did not seek costs they believed had not been incurred in Claim 4. As indicated above, the court has deferred Claim 2 for Special Plea in Fraud purposes, and does the same for Claim 2 as it relates to the False Claims Act. Defendant offers no new arguments specific to the False Claims Act that have not been addressed above. Therefore, with the exception of the counterclaim for Claim 2, based on defendant's theory of contract interpretation and economic duress, defendant's False Claims Act counterclaims are dismissed.

### a. Contract Disputes Act

Finally, as recently often has been the case in fraud counterclaims urged by the United States in contract cases, defendant includes fraud counterclaims under all three statutes.  Here too,  defendant argues in its second amended answer and counterclaim, regarding the anti-fraud provision of the Contract Disputes Act, that Oasis "is liable to the United States pursuant to the Contract Disputes Act, 41 U.S.C. § 7103, for the amount of such unsupported claims, $44,516,868, plus the Government's costs attributable to reviewing such claims," because

> Oasis's claims for payment of both a "mobilization" payment of $50,225,000, plus $3.50 per case for bottled water sold during the contract's base period, as well as its claim for $600,000 for which the Government had already reimbursed it, were knowingly baseless. In particular, Oasis submitted at least one certified claim in an attempt to obtain payment from the Government by means of a false statement of fact concerning its right to payment of $44,516,868.

As it argued above, plaintiff contends that, "[a]t an absolute minimum, the frank and open nature of the claim alone negates the Government's arguments under the Special Plea in Fraud and CDA fraudulent claims provision, both of which require an *intent* to deceive the Government." (emphasis in original).

The anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 604 (now 41 U.S.C. § 7103(c)(2) (2012)) provides:

71

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

41 U.S.C. § 604.[65] The Contract Disputes Act at 41 U.S.C. § 605(c)(1) (2006) (now 41 U.S.C. § 7103(b)(1) (2012)), requires for a certification of a claim in excess of $100,000.00,

> the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

---

[65] The language of the anti-fraud provision of the Contract Disputes Act was slightly altered when it was recodified in 2011 at 41 U.S.C. § 7103(c)(2). See Veridyne Corp. v. United States, 758 F.3d at 1380. The current language of the provision now states:

> If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim.

41 U.S.C. § 7103(c)(2); see also Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 525 ("By the Act of January 4, 2011, Pub. L. No. 111–350, 124 Stat. 3677, the CDA [Contract Disputes Act] was amended and enacted into positive law. The CDA provisions were relocated from 41 U.S.C. §§ 601–13 (2006) to 41 U.S.C. §§ 7101–09. Comparing 41 U.S.C. § 7103(c)(2) with its source, 41 U.S.C. § 604 (2006), confirms the absence of any substantive change."). Although the minor differences in the revisions to the current versions do not change the court's analysis, the court refers to the anti-fraud provision of the Contract Disputes Act in effect at the time of the events in the above-captioned case. The court notes that in AEY, Inc. v. United States, the plaintiff argued that under the current version of the anti-fraud provision of the Contract Disputes Act, "the antifraud provisions of the CDA supersede the Forfeiture Statute [28 U.S.C. § 2514]," AEY, Inc. v. United States, 114 Fed. Cl. at 627. Plaintiff has not raised a similar argument in the above captioned case.  In AEY, Inc. v. United States, the court declined to address the AEY plaintiff's contention that the 28 U.S.C. § 2514 is superseded by the anti-fraud provision of the Contract Disputes Act, because the court concluded the government had waived its rights under 28 U.S.C. § 2514. See AEY, Inc. v. United States, 114 Fed. Cl. at 632.

41 U.S.C. § 605(c)(1); see Trafalgar House Constr., Inc. v. United States, 73 Fed. Cl. 675, 693 (2006) ("The primary purpose of this certification is to prevent the submission of fraudulent claims."), aff'd, 274 F. App'x 898 (Fed. Cir. 2008).  The Contract Disputes Act at 41 U.S.C. § 605(c)(7), requires that "[t]he certification required by paragraph (1) may be executed by any person duly authorized to bind the contractor with respect to the claim." 41 U.S.C. § 605(c)(7) (now 41 U.S.C. § 7103(b)(2) (2012)).

As noted by the United States Court of Appeals for the Federal Circuit, "[t]he Contract Disputes Act requires that an authorized corporate official certify that 'the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, [and] that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.'" Veridyne Corp. v. United States, 758 F.3d at 1380 (quoting 41 U.S.C. § 605(c)(1) (recodified at 41 U.S.C. § 7103(b)(1)(A)-(D) (2012)). As noted by the trial court in Veridyne, "[a]lthough the anti-fraud provision contains no express requirement that the costs must be 'reasonable,' it presumes that defendant actually has incurred the claimed costs of review." Veridyne Corp. v. United States, 107 Fed. Cl. at 767 (citing 41 U.S.C. § 7103(c)(2)).

"Congress enacted the fraud provision of the CDA 'out of concern that the submission of baseless claims contributes to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic.'" Veridyne Corp. v. United States, 758 F.3d at 1381 (quoting Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1340); see also Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584 (quoting Sen. Report No. 95–1118, 1978 U.S.C.C.A.N. 5235, 5254) ("This subsection [41 U.S.C. § 604] is included out of concern that the submission of baseless claims contribute to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic. Hence, payment of such a claim by the Government would constitute a windfall to the contractor."). As the trial court in Daewoo indicated, "[u]sing a claim to gain leverage against the United States violates the principle on which Congress enacted the Contract Disputes Act, including its effort to prevent contractors from using the claims process to obtain higher profits. Congress called it 'horse trading.'" Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 570.

"A contractor is liable under the antifraud provision of the CDA when the "'contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor. . . .'"" Ulysses, Inc. v. United States, 110 Fed. Cl. at 647 (quoting Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1335 (quoting 41 U.S.C. § 604)).  A "misrepresentation of fact" is defined as "'a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.'"  Veridyne Corp. v. United States, 758 F.3d at 1381; see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1335 (quoting 41 U.S.C. § 601(9) (now 41 U.S.C. § 7101(9) (2012))); Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 524.

"The government must establish this falsity and intent by a preponderance of the evidence." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1335; see also Veridyne Corp. v. United States, 758 F.3d at 1381; UMC Elecs. Co. v. United States, 249 F.3d at 1338 (citing Commercial Contractors, Inc. v. United States, 154 F.3d at 1362) ("The government must prove a violation of the Contract Disputes Act and False Claims Act by a preponderance of the evidence."); Ulysses, Inc. v. United States, 110 Fed. Cl. at 647 (citing Commercial Contractors, Inc. v. United States, 154 F.3d at 1362) ("While the CDA does not provide a standard of proof, the Federal Circuit has applied the 'preponderance of the evidence' standard to claims brought under the CDA's fraud provision."); Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 524 ("The government must establish this falsity and intent by a preponderance of the evidence.").[66]

"To recover under the CDA, the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with an intent to deceive or mislead the government." Commercial Contractors, Inc. v. United States, 154 F.3d at 1362 (citing 41 U.S.C. § 601(7) (now 41 U.S.C. § 7101(7) (2012))); see also Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584; Chemray Coatings Corp. v. United States, 29 Fed. Cl. 278, 285 (1993) ("In order to obtain reimbursement for a paid claim, defendant must prove that a part of plaintiff's claim is unsupported and that this lack of support is due to fraud or misrepresentation intended by plaintiff to deceive the government." (citing Tyger Constr. Co. v. United States, 28 Fed. Cl. at 58)).

Defendant argues that "[i]n addition to forfeiting its claim under the Special Plea in Fraud, because Oasis submitted a fraudulent certified claim under the Contract Disputes Act, it owes the United States damages equal to the unsupported amount of its claim." Defendant claims that "Oasis has selected its own penalty, as Contract Disputes Act fraud damages are self-defining. Oasis itself selected the magnitude of its fraud and must reap the consequences." As noted above, defendant argues in its second amended answer and counterclaim, regarding the anti-fraud provision of the Contract Disputes Act, Oasis "is liable to the United States pursuant to the Contract Disputes Act, 41 U.S.C. § 7103, for the amount of such unsupported claims, $44,516,868, plus the Government's costs attributable to reviewing such claims." In its post-trial briefs, defendant submits the following chart for the amount of penalties allegedly owed by plaintiff under the Contract Disputes Act:

| Count | Description | Amount |
|-------|-------------|--------|
|       |             |        |

---

[66] As discussed above in the False Claims Act analysis, the preponderance of the evidence standard applied to proof under the Contract Disputes Act and the False Claims Act is a less rigorous standard than the clear and convincing standard of proof applied under the Special Plea in Fraud statute. See UMC Elecs. Co. v. United States, 249 F.3d at 1338-39 ("Under the Special Plea in Fraud, the government must prove its allegations by clear and convincing evidence." (citing Commercial Contractors, Inc. v. United States, 154 F.3d at 1362)).

| 1 | Bottled water already paid for during base period from sites other than Anaconda (5,605,020 cases) | $19,617,570 |
| 2 | TQ allegedly unpaid mobilization fee | $2,270,833 |
| 4 | Extrapolated monthly "mobilization fee" based on alleged firm fixed base year "mobilization fee" of $50.225 million | $11,175,063 |
| 6 | Camp Speicher and Q-West improvements already reimbursed by military as part of modification P00011 | $600,000 |
| 8 | Bottled water already paid for through May 24, 2006, from Anaconda (3,100,972 cases) | $10,853,402 |
|  | Total Amount of False and Fraudulent Claim | $44,516,868 |

For support, defendant claims that:

> As demonstrated above, counts one, two, four, six, and eight, are unsupported in their entirety. Counts one and eight attempt to compel payment of more than $30 million dollars for bottled water for which the military had already paid. Count six also seeks payment of the same $600,000 a second time. Counts [sic] four seeks costs never incurred, and count two stems from Oasis's baseless economic duress claim and its frivolous contract interpretation.

As discussed above, the court has found that Claims 1, 4, 6, and 8 were not unsupported in the certified claim, and not fraudulent, both in the context of the Special Plea in Fraud Statute and the False Claims Act. As indicated above, the court deferred Claim 2 for Special Plea in Fraud and False Claims Act purposes, and does the same for Claim 2 as it relates to the antifraud provision of the Contract Disputes Act. Defendant offers no new arguments specific to the antifraud provision of the Contract Disputes Act that have not been addressed above, except for the chart for the amount of penalties.

Although addressed in part in the Special Plea in Fraud analysis, plaintiff correctly notes that "[t]he Contract Disputes Act requires certification of claims by 'an individual authorized to bind the contractor with respect to the claim,'" and that "[d]efendant has cited *no* cases in which the individual who certified the claim believed in it, all corporate owners believed in it, but the claim was still found to be fraudulent because some *other* employees did not." (emphasis in original). As noted above, Mr. Jeffries, Mr. Vos, and Max Wyeth held differing views on the contract from those of Phil Morrell and Paul Morrell at trial. Mr. Jeffries, however, testified that "ultimately it was what Paul [Morrell] and Phil [Morrell] and legal counsel believed were the appropriate things to include in the claim," while Mr. Vos testified that it was his "understanding" for "the contract to allow only payments of $3.50 per case." As discussed above, Max Wyeth, the original signatory to the contract, who exited from the contract long before the certified claim was submitted, testified he based the $50,225,000.00 figure in the base year by "using our average forecast of demand, we came up with a case number that would be produced per year, and multiplied that by the case cost," which was "[t]he number of cases times $3.50." The individual, however, who was authorized to bind Oasis with respect to the claim was Paul Morrell. Paul Morrell signed the certified claim and plaintiff's position that "[d]efendant

provides nothing to contradict Paul Morrell's sworn testimony that his opinion and understanding evolved and he changed his mind, and that the right amount was claimed" remains true. Just as the differing views among officers of a corporation alone, cannot be proof of fraud, nor can differing views alone demonstrate a violation of the antifraud provision of the Contract Disputes Act.

Although discussed at length above, the court notes that the basis of the counterclaims in <u>Commercial Contractors, Inc. v. United States</u> were the False Claims Act and the Contract Disputes Act. As noted by the Federal Circuit:

> [W]hen a contractor adopts a contract interpretation that is implausible in light of the unambiguous terms of the contract and other evidence (such as repeated warnings from a subcontractor or the fact that the interpretation is contrary to well-established industry practice), the contractor may be liable under the FCA or the CDA even in the absence of any deliberate concealment or misstatement of facts. Under such circumstances, when the contractor's purported interpretation of the contract borders on the frivolous, the contractor must either raise the interpretation issue with the government contracting officials or risk liability under the FCA or the CDA.

<u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d at 1367. The court reiterates its analysis from above, which does not change in the context of the Contract Disputes Act fraud counterclaim, that even a potentially incorrect interpretation by Oasis does not demonstrate fraud and does not make its claim frivolous. The fundamental changes in manner in which plaintiff performed the contract for the government in the base year, including how it was compensated for the water produced, and continued to perform after the base year was complete, allows for plaintiff's certified claim to be a bona fide one, and not fraudulent either under the plaintiff's or defendant's interpretation of the contract. Defendant has failed to prove fraud. As demonstrated above, plaintiff's intent was not to make a claim that was intended to deceive or mislead the government. Therefore, the court concludes that defendant has failed to demonstrate a violation of the anti-fraud provision of the Contract Disputes Act.

As noted above, "Congress enacted the fraud provision of the CDA 'out of concern that the submission of baseless claims contributes to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic.'" <u>Veridyne Corp. v. United States</u>, 758 F.3d at 1381 (quoting <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1340). Defendant claims that Oasis overstated its claim pointing to an email from Paul Morrell to Phil Morrell in June 2008, in which he stated only days before certifying Oasis's claim, stating: "I'm expecting between 10m [million]-20m but it could be as high as $35m," regarding the certified claim. Defendant argues that it is fraud to "submit an inflated claim in the hope that the contracting officer will award some lesser amount to which the contractor feels entitled."[67]

---

[67] Plaintiff argues that "[e]xpecting to recover less than 100 cents on the dollar on a certified claim is simply a wise business practice," however, the court does not see how

Defendant's allegation, however, does not demonstrate that plaintiff filed the claim in the hopes of negotiating a settlement of the $50,225,000.00 claim, it merely proves that plaintiff was not confident that the government would agree with its theory of the confusing contract which had undergone numerous changes from the time the contract was executed.  Paul Morrell's skepticism was well founded.  The government denied the claim in full.  Moreover, as plaintiff notes, defendant bears the burden of proof for its counterclaims and did not ask Paul Morrell about the email, despite the multiple days he testified in this case.

Defendant also cites to both the Court of Federal Claims decision and the Federal Circuit decision in <u>Daewoo</u> for support that plaintiff's certified claim was a negotiating tactic (citing <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1341; <u>Daewoo Eng'g & Constr. Co. v. United States</u>,73 Fed. Cl. at 570). As the trial court in <u>Daewoo</u> indicated, however, "[u]sing a claim to gain leverage against the United States violates the principle on which Congress enacted the Contract Disputes Act, including its effort to prevent contractors from using the claims process to obtain higher profits." <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 73 Fed. Cl. at 570.  As demonstrated throughout this opinion, the court does not believe the intention of Oasis, and particularly of Paul Morrell when filing the certified claim, was to gain leverage over the United States or to simply obtain higher profits. Plaintiff appears to have held a valid belief that it was entitled to the money claimed.  Whether plaintiff firmly believed it would recover all of the money it felt entitled to, does not change that plaintiff, and Paul Morrell, as the signatory, believed in the merits of the certified claim. The court, therefore, concludes that defendant has failed to prove that Oasis knowingly submitted a baseless claim for Claims 1, 4, 6, or 8. Therefore, Oasis is not liable under the antifraud provision of the Contract Disputes Act for Claims 1, 4, 6, and 8.  As noted above, Claim 2 is deferred.

## CONCLUSION

For the reasons explained above, even if plaintiff's interpretation of the contract turns out to be incorrect, it does not follow that plaintiffs intended to perpetrate a fraud on the government when it submitted its certified claims.  Rather, as established above, Paul Morrell, as signatory to the certified claim, did not have the intention to commit fraud and genuinely believed in his interpretation of the contract regarding what payments Oasis was entitled to recover under the contract. Nor did plaintiff act recklessly when submitting its claims. Defendant's counterclaims, with the exception of counterclaims regarding Claim 2, which are deferred, are **DENIED**.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**

_____

that argument can establish that the claim which was certified and submitted necessarily was properly submitted and certified by Paul Morrell.