# In the United States Court of Federal Claims

No. 10-707C
Filed: April 7, 2017
Reissued: December 1, 2017[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | | |
| **OASIS INTERNATIONAL WATERS, INC.,** | * * * | |
| Plaintiff, | * | **Trial; Contract Interpretation; Duress; Fraud; Special Plea in Fraud; False Claims Act; Anti-Fraud Provision of the Contract Disputes Act.** |
| v. | * * | |
| **UNITED STATES,** | * * | |
| Defendant. | * * | |
| * * * * * * * * * * * * * * * | | |

## O P I N I O N

**Laurence Schor**, Asmar, Schor & McKenna, PLLC, Washington, D.C., for plaintiff. With him were **Susan L. Schor, Dennis C. Ehlers, David A. Edelstein, Robert D. Pratt,** and **Allison G. Geewax**, Asmar, Schor & McKenna, PLLC, Washington, D.C.

**James P. Connor**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Tanya B. Koenig**, Trial Attorney, Commercial Litigation Branch, **Stephen C. Tosini**, Senior Trial Counsel, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler,** Acting Assistant Attorney General, Civil Division, Department of Justice.

## HORN, J.

Plaintiff, Oasis International Waters, Inc. (Oasis), is a contractor that performed a bottled water contract with the United States military in Iraq during the Iraq War. Oasis is a Nevada corporation for which the principal place of business is in Utah. After the end of contract performance, plaintiff filed a certified claim with the contracting officer, which was denied in its entirety. Plaintiff thereafter filed a complaint in the United States Court of Federal Claims, and, subsequently, defendant filed fraud counterclaims against plaintiff.

---

[1] The court issued a series of opinions in the above captioned case on August 31, 2016, April 7, 2017, and November 21, 2017. In response to the court's November 21, 2017 Order, the parties agreed that all three opinions could be issued without redactions. After reviewing the opinions, the court agrees with the parties and the original opinions are hereby unsealed and reissued without redaction.

A trial was held regarding plaintiff's breach of contract claims, as well as defendant's fraud counterclaims. As indicated below, in an earlier opinion in the case, the court, with the exception of one claim which the court deferred, and which is addressed below, denied defendant's counterclaims for the Special Plea in Fraud, False Claims Act, and the anti-fraud provision of the Contract Disputes Act.

## FINDINGS OF FACT

As stipulated by the parties, "[a]fter the start of the Iraq War but prior to the award of the contract at issue in this case, the Army procured all of its Iraq bottled water requirements from Turkey, Kuwait, and Jordan and shipped it by truck into Iraq and to the various U.S. military bases in Iraq." United States Air Force Colonel Renee M. Richardson, who served as one of the contracting officers on the contract at issue in this case from May 2006 until October 2006,[2] explained at trial that "[t]he previous approach was bringing bottled water in from Turkey, Jordan, and Kuwait, of course, which put soldiers on the road for the transportation." As noted in the Statement of Work for the solicitation at issue in this case, Solicitation No. W27P4A-05-R-0002 (the solicitation):

> Up to the present time bottled water has been purchased from sources outside of Iraq. This practice necessitates large numbers of convoys and escorts to transport the bottled water from Kuwait, Jordan, and Turkey. Producing bottled water locally would significantly reduce the number of convoys required to transport water as well as reduce the likelihood of battle related injuries.

> The parties also stipulated that:

> On or about March 2, 2005, Maj. Vazquez, a contracting officer with Joint Contracting Command-Iraq (JCC-I, later Joint Contracting Command-Iraq Afghanistan – JCC-I/A), serving at Camp Victory, issued a Request for Information (RFI) "to get information on contractors capable of providing the following capabilities for construction of re-locatable water purifying and bottling facilities for distribution at several locations in Iraq. Locations will be identified at a later date and time. These facilities are to produce clean drinkable bottled water per all USDA and FDA standards and requirements."

The RFI generated interest from 71 vendors, and, on April 3, 2005, the government posted Solicitation No. W27P4A-05-R-0002.[3] Proposals were due by May 3, 2005, and the government received 22 bids in response to the solicitation, and answered 145 questions. A sample of the questions and answers reveals that the bidders had questions about the pricing, capabilities, the land to be provided in Iraq and the obligations of the government. For example, one part of question 33 stated: "Is our offer to give the cost per

---

[2] In 2006, Colonel Richardson was a Lieutenant Colonel. When she testified at trial, she was a full Colonel. The court refers to her as Colonel Richardson in this opinion.

[3] The government issued 11 amendments to the solicitation.

liter with the personnel built in, seperate [sic] to the cost of the plant and equipment?" The government replied: "All Costs per liter are to be included." Likewise, question 40 asked: "Start up Cost: Since the bid is predicated upon the deliverables per litre bottle of water, can we assume that all costs(inc personnel and equipment deployment to site) incurred between contract award and water production will fall upon the successful bidder?" The government replied: "Yes. It is up to you how you determine the cost per litre taking into account all costs associated with this endeavor."

There were a number of questions regarding the obligations of the government. Question 2 asked, "[i]f projected demand falls short, what are the minimum volume requirements? Is there a required minimum quantity the Government will procure?" The government responded: "There are no minimums. The minimum is zero." Additionally, question 35, referring to question and answer 2, asked:

> The answer to Question #2 states that there are no minimum purchase quantities. This decision places an unreasonable amount of financial risk on the contractor, and will likely severely limit the competition for this RFP [Request for Proposals]. Request that the Government guarantee minimum purchase quantities base [sic] on the estimated quantities that appear in the RFP.

The government responded:

> The levels of liters required are in the range. This is roughly the production per day. You might have a day where your levels are lower, however, the Government contract is a Firm Fixed Price not Indefinite Delivery / Indefinite Quantity. The Government is entering into a one year contract with three option years. The only thing that could prevent the basic year from occurring is a Government decision to Terminate for Convenience or default of the contractor to perform to the requirements and the Government would then Terminate for Default.

One bidder questioned the potential for installment payments, asking: "Would the Government authorize progress or installment payments recognizing 1) the significant capital investment with establishing new capability and, 2) the ability to credit progress payments with actual deliveries?" to which the government responded that: "The first payment will be made once the contractor has the first plant operational and has had an approved first article test accepted without conditions."

In response to question 44, the government indicated "[t]he Government will provide as flat land as possible," and regarding site conditions, the government indicated in the answer to question 89, the government stated that "[s]ite prep should be minimal. The water source has been identified and deemed to have sufficient amounts by the government to support the operation." The government also noted in answer to question 89, however, "[i]t is up to you what you do in order to meet the Government's requirements and timeframe for delivery."

One of the 22 bids was submitted by American AquaSource, Inc. (American AquaSource), and signed by Max Wyeth, President of American AquaSource. Attached to the American AquaSource proposal was a spreadsheet showing the volumes of production and an estimate for when each site would begin water production. American AquaSource's bid assumed a price of $3.50 per case of water, or a total of $50,225,000.00, based on the production of 14,350,000 cases.[4] At trial, Max Wyeth explained that he calculated the $50.225 million figure "using our average forecast of demand, we came up with a case number that would be produced per year, and multiplied that by the case cost."[5]

Major Mauricio Vazquez, who issued the RFI and answered the questions posed by the potential offerors, contacted Max Wyeth to clarify the proposal and to submit a "total cost per year for all four years and the Grand total." Max Wyeth provided Major Vazquez with a base year price of $50,225,000.00 and three option year prices of $186,000,000.00, totaling $608,225,000.00. Max Wyeth confirmed in his correspondence "that the 3.50 price is the only price, regardless of the winter/summer/surge period, for all years within the contract." After negotiations between Max Wyeth and Major Vazquez, in which Major Vazquez asked Max Wyeth to reconsider the option year prices, on May 11, 2005, Max Wyeth submitted an amendment to the American AquaSource proposal, which included a revised "Summary of Pricing Schedule" with a proposed base year price of $50,225,000.00 and three option year prices of $112,000,000.00, for a total contract price of $386,225,000.00. The parties have stipulated that, "[o]ther than AquaSource's proposed price, all other offerors whose proposals were found technically acceptable offered prices in excess of $1 Billion."[6] Major Vazquez awarded contract no. W27P4A-

---

[4] The court notes, however, for the basis of the estimate in the American AquaSource proposal, American AquaSource assumed annual production of 384 million bottles or 32 million cases of water.

[5] Counsel for defendant confirmed during Max Wyeth's testimony:

> Q. So, just so the record is clear, the $50.225 [million] in your proposal is based upon $3.50 per case?
>
> A. Yes.

[6] The government's own Independent Government Cost Estimate, estimated a total base year cost of $149,145,842.23, or almost three times American AquaSource's proposal for the base year, to construct and operate the eight water bottling facilities in Iraq. Morrell International, Inc., a corporation, whose Chief Executive Officer was Phil Morrell, also submitted a separate proposal which provided for a base year price of $899,725,000.00, option year prices of $831,287,500.00 per year, for a contract total of $3,393,587,500.00. Phil Morrell, who later became the president of Oasis, the successor contractor to American AquaSource, testified at trial, however, that his bid was a "bad bid," and that he had intended to bid at $5.50 per case of bottled water. Phil Morrell indicated that the

05-C-0002 (the contract) to American AquaSource on May 25, 2005. The contract called for base year price of $50,225,000.00 and three option year prices of $112,000,000.00 each, for a total contract price of $386,225,000.00.[7] Major Vazquez signed the contract on behalf of the government and Max Wyeth signed on behalf of American AquaSource.

After the contract was awarded to American AquaSource, Paul Morrell contacted Max Wyeth, and subsequently, in June 2005, Max Wyeth exchanged several emails with Phil Morrell and Dan Petsche, then the Vice President for Contracts and Compliance for Al-Morrell Development discussing the bottled water project.[8] Paul Morrell testified that "[o]ur original intent with American AquaSource was to sell our assets to him, as it appeared that he didn't have the resources and the funding to acquire our assets, much less build the factories. It morphed or migrated into a partnership between Max and Phil and myself." Paul Morrell explained that, initially:

> Al-Morrell Development was essentially the performance arm of the operation. We built the facilities. We financed them. All the employees were employed by Al-Morrell Development. It was basically the part of the organizations that really did all the performance. . . . Max's responsibility was to provide water bottling expertise, because Phil and I were -- had never built a water bottling plant prior to this.

The original arrangement changed, because as Paul Morrell testified:

> Initially, Mr. Wyeth told us that he had the financing lined up, and he just needed time. He didn't have time, because the first facility had to be up -- we're talking July, and we had basically 90 days to get the first facility up. So, we really didn't have time. . . . So, our understanding was he would continue to try to bring his financing option to the table, get money in the bank. In the meantime, Phil and I would self-fund this first plant so that we could meet the contractual deadlines. Over the course of the fall, it became clear that Mr. Wyeth's options were not going to come to fruition, and AMD [Al-Morrell Development] -- initially it was a parallel track. We were trying to obtain financing on behalf of AMD while we were waiting for his financing to

request "needed to be right around $5.50 per case," for "somewhere around the 32 million cases per year."

[7] The cover page to the contract listed the estimated dollar amount as "$386,225,000.00." At trial, Major Vazquez testified that this amount was in error and that the amount should have been $50,225,000.00. Subsequently, on July 15, 2005, United States Air Force Major Marc A. Lopez, who served as the contracting officer on the contract from June 2005 until September 2005, executed modification P00002 on behalf of the government, which changed the dollar amount from "$386,225,000.00" to "50,225,000 (NTE)," because "[o]nly the base year award should have been documented in the contract."

[8] Max Wyeth testified that at the time he signed this contract he had no relationship with Al-Morrell Development, Paul Morrell, Phil Morrell, or Paul Jeffries.

come into place. Ultimately his financing failed, and the AMD financing did come into place late in the year or early the next year.

Therefore, in July 2005, Phil Morrell, Al-Morrell Development, Max Wyeth, and American AquaSource entered into a joint development and pre-incorporation agreement to form a new corporation to fulfill the contract, with the agreement reflecting that the purpose of American AquaSource's contract was to "build up to six (6)[9] water bottling plants in the country of Iraq." Initially, the corporation was called Iraqua, Inc., but later changed its name, on July 15, 2005, to Oasis.[10] Subsequently, in the fall of 2005, Phil Morrell, Al-Morrell Development, Max Wyeth, and American AquaSource signed an addendum to the joint development and pre-incorporation agreement, assigning American AquaSource's contract to Oasis. The addendum required Max Wyeth, of American AquaSource, to execute a novation agreement. The novation agreement was to be a modification to the contract, and ultimately was modification P00005, discussed below. On December 5, 2005,[11] "American Aqua Source, Inc.," "Oasis International Water, Inc.," and the "United States of America" "enter[ed] into this Novation Agreement. . . as of August 1, 2005." Max Wyeth, then-president of Oasis and American AquaSource, signed the modification on behalf of Oasis on December 2, 2005 and Colonel Brandon Montler signed for the military on December 5, 2005.[12] The modification stated that the "purpose of this modification" was to reflect the novation agreement transferring all rights and responsibilities of the bottled water contract from American AquaSource to Oasis. The modification also stated that, "[a]ll other terms and conditions of the contract remain unchanged."

Paul Morrell was the Chief Executive Officer of Al-Morrell Development from August 15, 2005 through January 2006, and, thereafter, he served as President of Al-Morrell Development. Paul Morrell also was the Chief Executive Officer of Oasis from

---

[9] As explained below, although the contract, as executed, required eight water bottling plants, the contract was modified by modification P00001 to require only six water bottling plants.

[10] Paul Morrell testified that "Oasis was originally called Iraqua. Everybody loved that name except the bankers. The bankers wouldn't allow us [to] own a bank account with that name Iraqua on it, literally, so we changed the name to Oasis." Paul Morrell testified that "Phil [Morrell] and Max [Wyeth] were owners in Oasis, and Phil and I were owners in Al-Morrell Development, but we made a very -- Phil and I made a very practical decision that if we were going to invest our funds into the business, that our company was going to own the assets."

[11] In 2005, Colonel Montler was a Major. When he testified at trial, he was a Colonel. The court refers to him as Colonel Montler in this opinion.

[12] At the time of the novation, Max Wyeth testified he was "out of the loop" and his interest in Oasis was eventually bought out by the Phil Morrell and Paul Morrell. Max Wyeth also was not involved in the completion of the bottled water plants. Oasis accepted Max Wyeth's resignation as president of Oasis on January 5, 2006.

August 15, 2005 through January 2006, and, thereafter, served as President of Oasis. Phil Morrell was Chairman of Oasis from July 2005 through December 2012. Paul Jeffries served as both the Chief Executive Officer and Chief Financial Officer of Al-Morrell Development and Oasis. Paul Jeffries served as Chief Financial Officer of Al-Morrell Development and Oasis from June 2005 through January 2006, and, subsequently, served as Chief Executive Officer of Al-Morrell Development and Oasis from January 2006 through 2010. Paul Jeffries was replaced as Chief Financial Officer of Al-Morrell Development and Oasis by Neil Vos, who served as Chief Financial Officer from February 16, 2006 until June 2011. As noted above, Dan Petsche was the Vice President for Contracts and Compliance for Al-Morrell Development during initial discussions about the contract with Max Wyeth, and he also was the Vice President for Contracts and Compliance for Oasis from 2005 through October 31, 2011. At all times, Paul Morrell and Phil Morrell[13] had a controlling interest in Oasis, and after Max Wyeth was bought out and resigned as president, Paul Morrell and Phil Morrell controlled 100% of Oasis.

<u>The Contract</u>

As noted above, Major Vazquez awarded contract no. W27P4A-05-C-0002 to American AquaSource on May 25, 2005. Item no. 0001 of the contract was "NON-PERSONAL SERVICS [sic]" (capitalization in original) and indicated:

> The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO). Period of Performance: 25 May 05 through 24 May 06.

The unit price was listed as "$3.50/case" for all amounts of water produced. Following the item no. 0001 were three items for the three option years, item no. 1001, item no. 2001, and item no. 3001, changing only the period of performance.[14] After item nos. 0001, 1001, 2001, and 3001, there was a summary of the pricing schedule which stated:

### SUMMARY OF PRICES FOR BASE YEAR AND THREE OPTION YEARS

| | |
|---|---|
| **TOTAL BASE YEAR** | $50,225,000.00 |
| **FIRST OPTION YEAR** | $112,000,000.00 |
| **SECOND OPTION YEAR** | $112,000,000.00 |
| **THIRD OPTION YEAR** | $112,000,000.00 |

---

[13] Phil Morrell and Paul Morrell are brothers.

[14] The similarity of the three options years after the base year is reflected in the typographic error of "NON-PERSONAL SERVICS" in each of the three option years. (capitalization in original).

**GRAND TOTAL (Base Year and Three Option Years)      $386,225,000.00**

(capitalization and emphasis in original). The period of performance was listed in the contract as:

|   |   |
|---|---|
| BASIC PERIOD | 25 May 2005 - 24 May 2006 |
| OPTION PERIOD I | 25 May 2006 - 24 May 2007 |
| OPTION PERIOD II | 25 May 2007 - 24 May 2008 |
| OPTION PERIOD III | 25 May 2008 - 24 May 2009 |

(capitalization in original). The statement of objectives for the "purified bottled water services" contract explained:

> The purpose of this contract is to provide re-locatable purified bottled water capabilities at various locations throughout Iraq Area of Operations (AO). Contractor shall produce the amounts of bottled water as outlined in Figure 1. Contractor shall ensure bottled water capability is able to relocate upon notification by the Contracting Officer (CO) due to military operational requirements. Bottled water capabilities shall be established in the order as listed in Figure 1. Actual locations will be given to the contractor that wins award. The contractor shall provide all the mechanical equipment required to produce and prepare for shipment the required amounts of bottled water. The first bottled water site shall be operational 120 days after the contract is awarded. This includes military inspection and acceptance. After contract award, additional bottled water sites shall be established within the remainder of days from contract award. A full 365 days from contract award, all sites will be fully operational.

Figure 1, referenced in the statement of objectives, identified the production requirements at each of the bottled water facilities at different points in the year.

| LOCATION | TOTAL PRODUCTION REQUIREMENT/DAY in 1K Liters (winter/summer/surge) |
|---|---|
| **Location 1** | 75-100K liters / 101-150K liters / 151-200K liters |
| **Location 2** | 65-100K liters / 101-135K liters / 136-170K liters |
| **Location 3** | 35-55K liters / 56-75K liters / 76-100K liters |
| **Location 4** | 60-110K liters / 111-160K liters / 161-210K liters |
| **Location 5** | 60-110K liters / 111-160K liters / 161-210K liters |
| **Location 6** | 200-300K liters / 301-400K liters / 401-450K liters |

| | |
|---|---|
| **Location 7** | 80-120K liters / 121-160K liters / 161-200K liters |
| **Location 8** | 75-110K liters / 111-150K liters / 151-190K liters |

(capitalization in original). Figure 1 contemplated three different quantity production requirements: winter, summer, and "surge." Colonel Richardson testified, explaining the different requirements, as follows:

> [D]uring the winter, the weather was a lot more reasonable in Iraq; the highs were around the eighties, nineties. In the summer, temperatures got up to 135 degrees, requiring soldiers to drink more just to stay cool and to stay hydrated. During surge, what that's really talking to is battle operations. Our soldiers wind up wearing 60, 70, 80 pounds' worth of gear and then going out into . . . tanks, which causes them to sweat and causes them to need more water.

The tasks section of the contract instructed, in part: "The contractor shall provide re-locatable purified water bottling capability for producing and packaging required amounts of one liter bottles of water per day as outlined in Figure 1," "Contractor shall provide, operate, maintain, and repair all the mechanical equipment required to accomplish the Government's objectives," "Contractor shall ensure bottled water meets or exceeds all US Government quality standards," and "Contractor shall operate the purified bottled water capabilities with enough personnel to meet the Government's requirements." Regarding payment to the contractor, the invoicing section of the contract stated:

> Invoicing shall occur monthly. The contractor shall invoice to the Contracting Officer Representative (COR), by the 5th of each month, for the total of all liters in [sic] produced, per location, for the entire previous month. The CORs will prepare the DD250s and will submit them with the contractor's invoice to the Contracting Officer (CO), no later than the 10th of each month.

Bottled Water Facilities

Although the contract, as awarded, required eight bottled water facilities, on May 26, 2005, as noted above, the day after contract award, United States Air Force Lieutenant Marion Knapp executed a no-cost modification P00001 on behalf of the government reducing the required number of water bottling facilities from eight to six. The six bottled water facilities were: LSA Anaconda (Anaconda), Camp Victory, Al Asad Airbase, Qayyarrah West (Q-West), Speicher, and Camp Taqaddum (TQ). On May 25, 2005, Major Vazquez indicated in an email to Lieutenant Knapp and Captain Patrick Sturgill, who served as a "liaison" between the contractor and the military, that land would be provided to the contractor no later than 30 days after contract award, "to ensure no delay is imposed by the Government to the Contractor." Although the answer to question

number 44 regarding the solicitation indicated that "[s]ite prep should be minimal," defendant had to provide site preparation at every location except Al Asad.[15]

Anaconda, the first bottled water facility, was contractually required to be operational by September 22, 2005. Major Lopez executed modification P00004 on September 18, 2005, on behalf of the government, granting a 12-day extension of the requirement for Anaconda's certification until October 4, 2005. Although Anaconda began producing water on October 10, 2005, Anaconda was not audited and certified operational until December 14, 2005, after producing almost 2 million liters of water.

Camp Victory, the second bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Camp Victory on September 4, 2005. Camp Victory was certified operational on April 7, 2006, and began producing bottled water on April 12, 2006. Al Asad, the third bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Al Asad on August 22, 2005. The contractual deadline to complete Al Asad was extended to June 30, 2006, and Al Asad was certified operational on July 24, 2006.

Q-West, the fourth bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Q-West on September 11, 2005, but on December 19, 2005, the military directed and authorized land at a different location for the Q-West plant. The contractual deadline to complete Q-West was extended to June 30, 2006, and Q-West was certified operational on July 9, 2006. Plaintiff indicated it encountered challenges with the water source at Q-West. Alan Morrell[16] testified that "we opened Q-West and started drawing from that irrigation line, we started getting turbid water, water so turbid that it was filled with mud and sand. And at that time, it was so significant that we couldn't purify it." As a result, "what it did is it . . . immediately fouled all of our [equipment] -- we didn't have an ultra filtration system there because it didn't call for one." Moreover, the "ROWPU [Reverse Osmosis Water Purification Unit] was immediately filled with mud, and fouled. And each set of those membranes is $26,000. And they were ruined. And we couldn't keep them clean and operational enough to operate and make water there as a result." In order to fix the problem, Alan Morrell testified that Oasis "purchased a Pall Aria from northern New York and we also took an

---

[15] In the case of Al Asad, plaintiff claims that: "Defendant refused to provide site prep at Al Asad, Oasis was forced in December 2005 to hire its own subcontractor to prep the site, which included filling borrow pits dug by the military, at a cost of $224,100," and further spent "$158,110 to abate the flooding and repair the damage caused to the site," as a result of the work done by another government contractor, Kellogg, Brown & Root, at an adjacent site.

[16] As noted above, Alan Morrell "was an Oasis consultant from late June 2005 through October 2005. Specifically, he was the Oasis Contract and Compliance Administrator from October 2005 through March 2007. He was Director of Contracts and Compliance from March 2007 through November 2008. He was Project Management Director from November 2008 through December 2009."

additional ROWPU system that we had used at Balad [Anaconda] and recommissioned it, repiped and replumbed the lines at Q-West and solved the problem."

Speicher, the fifth bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Speicher on August 13, 2005. The contractual deadline to complete Speicher was extended twice, finally to June 30, 2006, and Speicher was certified operational on June 20, 2006, and began producing bottled water on June 24, 2006. Initially, Oasis believed they would receive water provided by the government via a ROWPU. Alan Morrell testified, however, that "we opened the factory, we start producing, and within 48 hours, KBR [Kellogg Brown & Root] came in and just railed on us for consuming their ROWPU'd water. And they got -- they got their KBR COTR or contractor officer's representative for that site involved and they shut down our water." As a result, Alan Morrell testified that:

> They're [Oasis' contracting officer and COSCOM (United States Corps Support Command)] beating us up for delivering quantities, but they're refusing to give us the water they're required to provide us. So, we're dealing with that at Speicher, and we're dealing with a lack of water delivery at Q-West to a level we can produce there, too, and we're all running for a completed amount of or quantity of water, but we can't get to it.

As a solution, Oasis purchased from an American company a "BEV 9 reverse osmosis system, and in the spring of 2007, installed it, commissioned it, and began to draw well water."

Camp Taqaddum, or TQ, the sixth bottled water facility, was initially required to be operational by May 24, 2006. Although the military initially authorized the land for TQ on August 24, 2005, the military directed Oasis to use land at different locations twice, the second time in March 2006. The contractual deadline to complete TQ was twice extended, to June 30, 2006, and then to October 15, 2006. The site preparation for TQ was completed by July 2, 2006, and on August 11, 2006, Colonel Richardson gave approval for Oasis to construct the plant at TQ. TQ was completed on October 23, 2006, and despite Oasis requesting 40.5 days of excusable delay on September 25, 2006, United States Air Force Lieutenant Colonel Joel R. Fortenberry, who served as the contracting officer on the contract from October 2006 until early 2007, executed modification P00013 on behalf of the government, granting plaintiff only eight days of excusable delay for TQ. TQ was certified operational on October 25, 2006.

<u>Relevant Modifications</u>

During contract performance there were a series of relevant modifications to the contract.[17] As noted above, after contract award, modification P00001 reduced the number of bottled water facilities from eight to six, and on July 15, 2005, Major Lopez executed modification P00002 on behalf of the government, which changed the dollar

---

[17] As the parties have stipulated, 13 relevant modification were issued after the contract was executed.

amount from "386,225,000 (estimated)" to "50,225,000 (NTE)." Subsequently, on August 9, 2005, Major Lopez and Max Wyeth executed modification P00003, which added a "NTE," or not to exceed limitation on the quantity of water produced at each plant, and did not require the government to purchase any minimum number of cases produced by the contractor. Pursuant to modification P00003, the not to exceed "case quantity was a total of 14,350,000 cases of water," and, as modified in modification P00002, the not to exceed price was $50,225,000.00. As explained above, modification P00004 granted a twelve day extension of the requirement for the certification of the Anaconda bottled water plant, and modification P00005 was the novation agreement.

*Modification P00006*

Prior to the execution of modification P00006, on March 27, 2006, United States Air Force Lieutenant Colonel James E. Davis,[18] who served as the contracting officer on the contract from September 2005 until January 2006, sent Oasis a letter titled "Preliminary Notice of Government Intent to Exercise Option CLINs 1001-5, Contract W27P4A-05-C-0002 for $112M," which stated: "The Government must withhold its intent to exercise the option," which meant the contract would come to an end. The letter informed Oasis that "[t]he contracting office does not have assurance of adequate funding."[19] On April 3, 2006, Paul Jefferies sent Lieutenant Colonel Davis a draft proposal, which would form the basis of modification P00006, and included a way to include a base year amount of 14,350,000 cases of bottled water at $3.50 per case for a total of $50,225,000.00.

Modification P00006, which was executed on April 14, 2006 by Lieutenant Colonel Davis and Phil Morrell, extended the base year of the contract from May 24, 2006 to August 15, 2006, and required that the bottled water capability be established at the six sites by June 30, 2006. Modification P00006 extended the contractual deadline for bottled water plants to be operational to June 30, 2006. According to modification P00006, the bottled water plants were to be operational in the following order: (1) Anaconda, (2) Camp Victory, (3) Speicher, (4) Q-West, (5) TQ, and (6) Al Asad.[20] Modification P00006 also required the production of 14.35 million cases of water during the base period of the contract, and removed the "not to exceed" requirements established in modification

---

[18] In 2005 and 2006, Lieutenant Colonel Davis was a Major. When he testified at trial, he was a Lieutenant Colonel. The court refers to him as Lieutenant Colonel Davis in this opinion, unless quoting from a document.

[19] Phil Morrell testified that "I told them [the government] that would be a really bad thing to get a letter like that, because that letter would put us in default with our banker. And that letter did put us in default with our banker, and it cost us $3 million to pull our -- our contract out of default." Phil Morrell also testified that Oasis had "already been told that by Colonel Hay, that they [the government] didn't have the funding to continue on this."

[20] At the time modification P00006 was executed, Anaconda and Camp Victory were already operational.

P00003. Finally, the option years were realigned to match the extension of the base year, so the first option period would run from August 16, 2006 until January 15, 2007, the second option period would run from January 16, 2007 until January 15, 2008, and the third option period would run from January 16, 2008 until January 15, 2009. Modification P00006 also added a fourth option period that would run from January 16, 2009 until August 16, 2009. The amount of water in the base period, the first option period, and the newly added fourth option period were different than the second and third option years. After modification P00006 to the contract, the periods of performance, quantities of water, and amounts due Oasis were:[21]

| ITEM NO. | SCHEDULE OF SUPPLIES/ SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Purified bottled water (12 / 1 Liter bottles per case) | | CASE | $3.50 | |
| 1001 | BASE Period 24 May 2005 to 15 August 2006 | 14,350,000 | | | $50,225,000.00 |
| 2001 | OPTION ONE 16 August 2006 to 15 January 2007 | 14,285,715 | | | $50,000,000.00 |
| 3001 | OPTION TWO 16 January 2007 to 15 January 2008 | 32,000,000 | | | $112,000,000.00 |
| 4001 | OPTION THREE 16 January 2008 to 15 January 2009 | 32,000,000 | | | $112,000,000.00 |
| 5001 | OPTION FOUR 16 January 2009 to 16 August 2009 | 17,714,286 | | | $62,000,000.00 |

(capitalization in original).

*Modification P00011*

As noted above, United States Air Force Colonel Richardson served as the contracting officer on the contract from May 2006 until October 2006. By June 2006, Oasis personnel, including Paul Morrell, Phil Morrell, Alan Morrell, Paul Jeffries and Dan Petsche had begun negotiations with Colonel Richardson to further modify the contract. Both parties had financial challenges, defendant obtaining the funding to exercise the first option, and plaintiff, which would be in default with its lenders if the contract was terminated for convenience.[22] Internally, Oasis considered the following proposal, as noted in an August 1, 2006 email from Paul Morrell:

I've tried a lot of complicated algorithms to try to make a solution that is equitable to both the Military and US. I've concluded that the most equitable approach for everyone is the following: We gat [sic] paid a flat $112,000,000/year just as the contract states or $9,333,333/month (5/6th of

---

[21] Colonel Richardson testified that the modifications "changed the end date of option four from 16 August 2009 to 16 July 2009. So, it actually decreased the period of performance for the contractor."

[22] According to plaintiff's post-trial brief, "[d]uring the P00011 discussions, Oasis had an outstanding debt of over $70 million."

that until TQ comes online). We agree to deliver up to 32,000,000 cases per year in aggregate with an annual reconciliation if the actual deliveries exceed that amount.

The parties discussed several options for how to proceed moving forward, and ultimately, on August 8, 2006, Oasis, at Colonel Richardson's request, provided her a draft proposal, which was consistent with the internal Oasis proposal.[23] The draft proposal[24] indicated two options:[25]

---

[23] Paul Jefferies testified at trial that "we were still being asked for significant concessions, beyond what was outlined that I've tried to outline here. . . . I mean to the tune of $30 million of concessions yet beyond what's on this page." Paul Jefferies also indicated that:

> We didn't really make an offer. The negotiations began with Paul [Morrell] and I sitting in a room with [Colonel] Renee [Richardson], and I believe her assistant was there, and they told us that they were being pushed a particular direction, that she would need concessions from us to pay out the balance of the funds owed or she would have to move in this other direction.

[24] Alan Morrell who earlier had testified about the water issues at the various plants indicated that regarding the lack of water at Speicher, "on modification P00011, because this was such a hot issue, again, part of the negotiation was a concession that we would sort this problem out," and Oasis "bought another BEV 9 reverse osmosis system." Alan Morrell also testified that "[p]art of the concessions that were demanded from us in P00011 were two site improvements to solve water issues. One was Speicher, and the other was Q-West."

[25] The first option contemplated modifying the contract to not build TQ, but the parties decided to build the TQ plant.

**Option II**.  Complete the construction of TQ in Oct 2006.

Close Base Period

| Item No. | Description | | PRICE | |
|---|---|---|---|---|
| 1001 | BASE Period of Performance from 24 May 2005 to 15 August 2006 | | $50,225,000 | |
| | Allocation for uncompleted Plant (TQ) 1/6th | .167 | ($ 8,370,833) | |
| | Allowance for capital purchases to complete TQ.  Allowed due to military delay of Land. | | $ 5,500,000 | Estimate |
| | Funds to Purchase Pall Aria to filter QW Water. | 1 | $    300,000 | |
| | Purchase RO's to improve SP water flow | 1 | $    300,000 | |
| | Creation and distribution of Water information campaign posters "its just water" | 100+ | 0 | |
| | conversion and support of Class 1 Water sites at each of its locations | 5 | 0 | |
| | Previous invoices through 8.5.06 | | (23,268,860) | |
| | **Net Due Oasis At Close of Clin 1001 08.15.06** | | **$24,685,307** | |

On August 12, 2006, Paul Morrell and Colonel Richardson executed modification P00011, which was generally consistent with the Option II in the draft proposal and established a payment structure by which Oasis would be paid $9,333,333.33 per month, independent of any amount of water, moving forward in the option periods. Modification P00011 also modified the fourth option period, ending on July 16, 2009.

The modification explained:

The purpose of this modification is to do the following:

1. Provide a revised CLIN structure to reflect monthly pricing based upon water production capability.

2. Replace the Contract Statement of Objectives, with Performance Work Statement, dated 12 August 2006, provided as Attachment 1 to this modification.

3. Incorporate the contractor's Quality Assurance Plan into the contract provided as Attachment 2 to this modification.

4. Incorporate the List of Critical Equipment into the contract, provided as Attachment 3 to this modification.

5. Insert Special Clause, titled "Equipment Leased by the Government", into the Contract.

6. Insert clause DFARS 252.232-7007, "Limitation of Government's Obligation" (May 2006) into the Contract.

7. Replace Contract Section J, List of Documents, Exhibits and Other Attachments.

8. Decrease the contract amount by $11,604,166.45 from $386,225,000.00 to $374,620,833.55.

9. Decrease the contract funded amount by $5,604,166.35 from $100,225,000.00 to $94,620,833.65.

10. Change the end date of Option 4 from 16 August 2009 to 16 July 2009.

On August 15, 2006, as part of modification P00011, Oasis submitted a final invoice to close out the base year in the amount of $24,542,387.00. The total amount of water produced in the base year was 8,705,992 cases, which translated to $30,470,972.00 at $3.50 per case. In addition, from the time the contract was awarded to the end of the base year, Oasis submitted nine invoices for payment at $3.50 per case, totaling approximately $23 million, which the government paid.[26]

---

[26] As reflected in the joint stipulations, and as agreed to by the parties regarding invoices for the base year of the contract: On December 31, 2005, Oasis submitted an invoice to the Government for 293,160 cases of water from Anaconda at 3.50 per case, for a total of $1,026,060.00. On January 31, 2006, Oasis submitted an invoice for 356,400 cases of water from Anaconda at $3.50 per case for a total of $1,247,400.00, and on February 28, 2006, Oasis submitted an invoice for 508,680 cases of water from Anaconda at $3.50 a case, for a total of $1,780,380.00. On March 31, 2006, Oasis submitted an invoice for 664,320 cases of water from Anaconda at $3.50 per case, for a total of $2,325,120.00. One month later, on April 30, 2006, Oasis submitted an invoice for 910,020 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $3,185,070.00. On May 31, 2006, Oasis submitted an invoice for 1,126,920 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $3,944,220.00. On June 15, 2006, Oasis submitted an invoice for 1,381,140 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $4,833,990.00. On July 1, 2006, Oasis submitted an invoice for 297,540 cases of water from Anaconda and Speicher at $3.50 a case, for a total of $1,041,390.00. Finally, on July 31, 2006, Oasis submitted an invoice for 1,150,900 cases

The contract ended on July 16, 2009, and Oasis performed on the contract until that date. Subsequently, Oasis and the government entered into a separate, follow-on contract regarding bottled water in Iraq. The issues in this opinion relate solely to the base year of the original contract.

Certified Claim

Prior to the filing of the certified claim, Phil Morrell sent an email to Paul Morrell and Paul Jeffries on August 4, 2006, with his thoughts on the contract, as follows:

**Capabilities for Time Period not Quantity**

- Funding was received for purchase of water, but it [sic] the contract was a capabilities contract
- Should have 2 Contracts
  - Capabilities Contract
  - Product Procurement Contract
- Funding was received for Contact# _____
- Contract#____ is a capabilities contract not a procurement contract
- $50 million on the table is for capability not water procurement

The general assumption from everybody is that the price of water in the CLIN is somehow associated with the price of capabilities.

(emphasis in original). At trial, Phil Morrell explained his view of the contract:

When I studied the contract, including when I talked to -- told Max [Wyeth] that he could get a progress payment, which I did tell Max, way back in the early days, probably a week into the -- two weeks into the contract, that he could get a progress payment. Based on all the historic contracting that I had done, and the way that I submitted my bid, the anticipation that was there would be, you know, progress payment capabilities, or -- in the contract. So, looking at Max's bid, he had put $58 million in for what appeared to be the construction capabilities, and then out of the $58 million, based on -- and I read this somewhere, I think it was in the FAR firm fixed price area -- it says that you -- if it's for equipment, then you have to deduct the salvage value of the equipment, and then you could bill for whatever that was. So, that -- I didn't actually sit down and do the numbers because that's just not what I do, but I – I suggested that we bill against the $52.25 million or $50.225 million as capabilities.

---

of water from Anaconda, Q-West, Speicher, and Camp Victory, for a total of $4,028,150.00.

Paul Morrell stated at trial that he agreed with Phil Morrell about the contract being a capabilities contract after executing modification P00011. Regarding Colonel Richardson's correspondence, he testified

> she's commenting on the proposal . . . specifically, the 9.33 million per month for capabilities going forward, and she's saying she thinks that a reasonable approach, but this is one of the first times where I hear a contract officer say the same thing that Phil has been saying for most of the year, that this is a water production capability contract. And Colonel Richardson goes on, through the -- post-P00011, and she's very clear that it's a water production capability contract and it has been all along. They've just been administering it as if it weren't.

On June 20, 2008, Paul Morrell signed the certified claim, and on July 4, 2008, Oasis submitted its certified claim to the government. At the beginning of the certified claim, Paul Morrell, as President of Oasis, stated: "I certify that the claims stated herein are made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the Contract adjustment for which the contractor believes the Government is liable." Paul Morrell also submitted a sworn affidavit[27] in support of Oasis' certified claim at the time he submitted the certified claim, in which he stated:

> During the period May 2005 to the present, I was responsible for the day-to-day management of Contract W27P4A-05-C-0002 (the "Contract") and had responsibility for all aspects of Oasis' performance of the Contract I also had overall responsibility for the cost and accounting issues involving Oasis' performance of the Contract. This Affidavit is based on my first-hand knowledge, the collective corporate knowledge of Oasis and the corporate records of Oasis maintained in the ordinary course of business.

The certified claim identified eight claims for which plaintiff sought payment: Claim 1 was a "Claim for all bottled water supplied in the Contract base year, as extended to August 15, 2006, excluding bottled water supplied from Camp Anaconda through May, 2006 (5,605,020 cases of bottled water)," for which plaintiff sought $19,617,570.00. Claim 2 was a "Claim for penalty wrongfully assessed for failure to open Camp TQ on time," which plaintiff ascribed "solely as a result of Government-caused delays and disruptions," for which plaintiff sought $2,270,833.00. The certified claim indicated that Claim 3 was a "Claim for reduction in Contract consideration for first option period (August 15, 2006 through January 15, 2007) resulting from P00011," for which plaintiff sought $3,333,333.00. Claim 4 was a "Claim for water bottling capabilities services provided through extension of Contract base year," and plaintiff valued Claim 4 at $11,175,063.00. Claim 5 sought $808,423.00 as a "Claim for cost of site improvements required," specifically at Anaconda, Camp Victory, Al Asad, and TQ. Claim 6 was a "Claim for cost

---

[27] In addition to Paul Morrell, Neil Vos, the then-Chief Financial Officer of Oasis, Lawrence Schwartz, a certified public accountant, and Alan Morrell also submitted sworn affidavits in support of the certified claim.

of water supply improvements at Camp Speicher and Camp Qwest," for which plaintiff sought $600,000.00. Claim 7 was a "Claim for other penalties assessed re: Government delays of TQ opening," related to the "44 days of TQ AQL[28] penalties erroneously assessed to Oasis due to Government-caused delays in establishing TQ in the first Option Period" and was valued by plaintiff at $2,053,333.00. The plaintiff's certified claim reflected a total amount claimed for the first seven claims of "$39,858,555." Below the total for the first seven claims, plaintiff's certified claim indicated: "Alternative additional claim for water supplied from Camp Anaconda during initial Contract base year ending May 2006, 3,100,972 cases of bottled water: $10,853,402." The certified claim indicated the plaintiff's view that:

> The Contract is not a model of clarity. The amount payable in the Contract base year is a firm, fixed-price amount of $50,225,000. . . . However, the Contract, as written, does not require delivery of any bottled water in the Contract base year. In the Contract base year, Oasis was entitled to a firm, fixed-fee payment of $50,225,000. The Contract provides that the entire payment is for water purification and water-bottling capabilities. Under the Contract, bottled water was a separately priced commodity to be paid for by the Government at the price of $3.50 per case under a separate CLN.

(internal citations omitted).

The certified claim was passed between, and considered by, a number of contracting officers and personnel, including United States Navy Lieutenant Commander Klingenberg, who was the contracting officer when Oasis submitted its certified claim on July 4, 2008, United States Air Force Major Jamie Rhone, who served as the contracting officer from July 2008 until January 2009, and Dean Carsello, a Joint Contracting Command Iraq Afghanistan (JCC-I/A) policy analyst, who was involved in reviewing the claim in 2008 and 2009. United States Air Force Lieutenant Colonel Kevin Hobbs[29] denied Oasis' certified claim in its entirety when he issued the Contracting Officer's Final Decision on October 18, 2009.

On October 18, 2010, plaintiff filed its complaint in the United States Court of Federal Claims. Plaintiff's complaint alleged eight counts, and the complaint mostly tracks the claims raised in the certified claim, with the same dollar amounts, albeit framed as breaches of contract in the complaint. The first count, "**Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for water TakenFrom [sic] Sites other than LSA Anaconda**" seeks damages in the amount of $19,617,570.00, plus interest. (emphasis in original). The second count, "**Breach of Contract For Improper Assessment of a Liquidated Damages Penalty Against Oasis for Failing to Have All Six Facilities Open by the End of the Base Year, or Alternatively, for Reducing the Base Year Contract Price Without Consideration**,"

---

[28] The parties have stipulated that "AQL" is an acronym for Acceptable Quality Level.

[29] In 2009, Lieutenant Colonel Hobbs was a Major. When he testified at trial, he was a Lieutenant Colonel. The court refers to him as Lieutenant Colonel Hobbs in this opinion.

seeks damages in the amount of $2,270,833.00, plus interest. (emphasis in original). The third count, "**Breach of Contract For Improper Reduction of the Option Period One Price Without Consideration**" seeks damages in the amount of $3,333,333.00, plus interest. (emphasis in original). The fourth count of the complaint, "**Breach of Contract Resulting from Government Acts and Omissions Impacting and Damaging Oasis During the Base Year, as Extended**" seeks damages in the amount of $11,175,063.00, plus interest. (emphasis in original). The fifth count, "**Breach of Contract Resulting From Government Failure to Provide Suitable Construction Sites**," seeks damages in the amount of $808,423.00, plus interest. (emphasis in original). Oasis' sixth count, "**Breach of Contract and/or Constructive Change for Failure to Provide Suitable Water at the Purification Facilities as Required by the Contract**" seeks $600,000.00, plus interest. (emphasis in original). The seventh count of the complaint, "**Breach of Contract For Unjustified Imposition of Penalties for Late Opening of TQ and/or Wrongful Reduction in Contract Price**," seeks $2,053,333.20 plus interest. (emphasis in original). Finally, the eighth count of the complaint, "**Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for Water TakenFrom [sic] Site LSA Anaconda**," seeks damages in the amount of $10,853,402.00, plus interest. (emphasis in original).

Defendant filed an answer to Oasis' complaint on February 15, 2011, and, more than a year later, on April 12, 2012, filed a motion to amend the pleadings to include fraud counterclaims. Oasis responded to the amended answer and counterclaims on May 10, 2012, however, on June 6, 2014, defendant moved to, again, amend its pleadings and filed a second amended answer and counterclaim. In the interim, during highly contested, and at times uncooperative, discovery the parties filed numerous motions related to discovery, the production of documents, how documents were maintained, how documents were to be produced, and in what format, and who would bear the costs, spoliation, whether or not various privileges applied to various documents, as well as motions to compel, motions to strike, and motions to quash. The court held numerous status conferences and hearings to try and resolve the various disputes between the parties, issued numerous orders, including publishing one substantive, lengthy opinion on attorney-client privilege and work product prior to trial. See Oasis Int'l Waters, Inc. v. United States, 110 Fed. Cl. 87 (2013).

The parties also filed motions for summary judgment and motions in limine in advance of the trial, and after trial, filed a series of lengthy post-trial briefing materials. The effect of the discovery disputes, and difficult relationships, resulted in discovery deadlines being repeatedly pushed back, and trial dates repeatedly postponed. Ultimately, a six week trial was held. Initially, the court issued an opinion regarding the fraud counterclaims raised by defendant. The court determined that, Paul Morrell, as signatory to the certified claim, did not have the intent to commit fraud and genuinely believed in his interpretation of the contract regarding what payments Oasis was entitled to recover under the contract. The court also found that neither Paul Morrell, nor plaintiff, acted recklessly when submitting plaintiff's claims. Therefore, with the exception of Claim 2, which the court deferred, and addresses below, the court denied defendant's counterclaims for the Special Plea in Fraud, False Claims Act, and the anti-fraud provision

of the Contract Disputes Act. This opinion addresses the issues of contract interpretation, duress, and defendant's remaining fraud counterclaim. The court will separately address plaintiff's allegation of spoliation and damages, if any.

## DISCUSSION

Contract Interpretation

Initially, plaintiff argues that "[t]he Contract was a firm-fixed-price (FFP) services contract for water bottling 'capability,' pursuant to which Oasis was entitled to $50,225,000 in the Base Year in exchange for 12 months of performance, irrespective of the amount of water produced by Oasis and/or purchased by Defendant." Plaintiff also contends that "[u]nder the Contract, Oasis was to be paid $3.50 per case of extracontractual water." By contrast, defendant claims that "[t]he contract's payment terms of $3.50 per case are clear and unambiguous." Defendant argues that the Court should enforce those terms and rule that the contract does not require the Government to pay Oasis separately for the cost to build the bottled-water facilities," and pay only $3.50 a case for the water produced.

"Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)) ("The starting point for any contract interpretation is the plain language of the agreement."); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483–84 (2013).

"'"In contract interpretation, the plain and unambiguous meaning of a written agreement controls.'"" Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380–81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015) (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Canpro Investments Ltd. v. United States, 130 Fed. Cl. 320, 347 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually

intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'"

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435, reh'g denied and en banc suggestion declined (Fed. Cir. 1996); (internal citations omitted)); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435 and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467; see also Coast Professional, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014) (noting that a contract must be interpreted in context, giving meaning to the document as a whole) (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 752 (Fed. Cir. 1999)); McHugh v. DLT Solutions, Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. Dep't of Transp., 230 F.3d 1333, 1340–41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." Air–Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Group, Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015); see also Marquardt Co. v. United States, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

The Federal Circuit also has indicated that "'[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380–81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002)); see also LAI Servs., Inc. v. Gates, 573 F.3d at 1314; Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); Hunt Constr. Grp., Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract . . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." (citations omitted)); Beard v. United States, 125 Fed. Cl. at 158 (quoting Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1288 (Fed. Cir. 2008)) ("In construing the meaning of a contractual provision, the court does not interpret the disputed term or phrase in isolation, but "construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.").

It has been "'a fundamental precept of common law that the intention of the parties to a contract controls its interpretation.'" Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (quoting Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971))); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer. . . ."); see also Canpro Investments Ltd. v. United States, 130 Fed. Cl. at 347 ("Contract interpretation requires determining the intention of the parties.").

The contract, as awarded, indicated:

The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8[30] separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO). Period of Performance: 25 May 05 through 24 May 06.

The statement of objectives for the "purified bottled water services" contract explained: "Bottled water capabilities shall be established in the order as listed in Figure 1. Actual locations will be given to the contractor that wins award. The contractor shall provide all the mechanical equipment required to produce and prepare for shipment the required amounts of bottled water." Figure 1, referenced in the statement of objectives, identified

[30] As noted above, modification P00001, issued on May 26, 2005, reduced the required number of water bottling facilities from eight to six.

the production requirements at each of the bottled water facilities at different points in the year, ranging from requiring a minimum of 75,000 liters of water a day during winter at location 3, to the maximum requirement of 210,000 liters of water during surge at locations 5 and 6. The summary of prices for the base year and the three options years stated that total base year price was $50,225,000.00, and the unit price was listed as "$3.50/case" for all amounts of water produced. As awarded, the base year of the contract was May 25, 2005 to May 24, 2006. Regarding payment, the contract provided that "[i]nvoicing shall occur monthly. The contractor shall invoice to the Contracting Officer Representative (COR), by the 5th of each month, for the total of all liters in [sic] produced, per location, for the entire previous month."

The parties view the contract differently, although both parties assert that the contract is unambiguous. Plaintiff claims that "Oasis' reading is supported by the plain meaning of the contract, which must control if the contract is unambiguous," and the defendant argues that "[t]he Contract's payment terms of $3.50 per case are clear and unambiguous." As noted above, plaintiff argues that "[t]he Contract was a firm-fixed-price (FFP) services contract for water bottling 'capability,' pursuant to which Oasis was entitled to $50,225,000 in the Base Year in exchange for 12 months of performance, irrespective of the amount of water produced by Defendant." Plaintiff also argues that the contract permitted "the Government to take – at no additional cost – bottled water from Oasis within specified quantity ranges and time periods. All water taken outside those ranges or periods ('extra-contractual water') was to be paid for separately at $3.50 per case." Defendant, however, contends that "the contract is clear and unambiguous that the Government's only payment obligation under the bottled-water contract was to pay $3.50 per case for up to 14,350,000 cases of water."

The court agrees with plaintiff that the contract is a firm fixed price contract. As indicated by plaintiff, included in the list of clauses incorporated into the contract is FAR 52.216-1, and the text of the bottled water contract states: "52.216-1 Type of Contract. (Apr 1984) The Government contemplates award of a <u>Firm Fixed Priced</u> contract resulting from this solicitation." (emphasis in original). Moreover, as noted below, in the questions and answers related to the solicitation, which were subsequently incorporated into the contract, the government explained that "the Government contract is a Firm Fixed Price not Indefinite Delivery / Indefinite Quantity." At trial, Major Vazquez testified that he wrote the answer to this question, and had the following exchange with plaintiff's counsel:

[Q.] And you wrote that the contract was a firm fixed price, right?

A. Yes.

Q. Did you believe that to be correct at the time?

A. Yes.

Q. Do you believe that to be correct now?

A. Yes.

The FAR addresses "Firm-Fixed-Price Contracts" at 48 C.F.R. § 16.202-1, and provides:

> A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties. The contracting officer may use a firm-fixed-price contract in conjunction with an award-fee incentive (see 16.404) and performance or delivery incentives (see 16.402–2 and 16.402–3) when the award fee or incentive is based solely on factors other than cost. The contract type remains firm-fixed-price when used with these incentives.

48 C.F.R. 16.202-1 (2017);[31] see also Zafer Taahhut Insaat ve Ticaret A.S. v. United States, 833 F.3d 1356, 1361 (Fed. Cir. 2016) (quoting 48 C.F.R. § 16.202-1) ("'A firm-fixed price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing,' 48 C.F.R. § 16.202–1, and generally sets forth a fixed scope of work."). As indicated by the Federal Circuit, "[t]he essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs." Lakeshore Eng'g Servs., Inc. v. United States, 748 F.3d 1341, 1347 (Fed. Cir. 2014). Defendant points to two exchanges of trial testimony demonstrating the knowing risk that plaintiff was taking, first, defendant's counsel had the following exchange with Phil Morrell regarding setting up Oasis to perform the contract:

> Q. So, it was a big risk you were taking, right?
>
> A. Yes.
>
> Q. And you're a big risk-taker, aren't you?
>
> A. Yes.

Likewise, defendant's counsel had the following exchange with Paul Jeffries about the inherent risk in the contract:

> Q. So, essentially Oasis was taking a risk of taking a loss in the first year with the opportunity to make significant profits in the following two years, correct?
>
> A. That's correct.

---

[31] Although the court cites to the 2017 version of the Code of Federal Regulations, this provision is consistent with the provision in effect during the contract award and performance.

Q. That was the bargain that Oasis entered into, right?

A. That's correct. Substantial risk for substantial gain.

It is noteworthy that throughout the first year of the contract, plaintiff submitted nine invoices for various quantities of cases of water, which were paid.

Turning to the terms of the contract, defendant contends that "the Government's only payment obligation under the bottled-water contract was to pay $3.50 per case for up to 14,350,000 cases of water." Plaintiff argues that "Defendant's interpretation of the Contract – which was enforced on Oasis during the Base Year – required Oasis to spend $70 million to establish the capability to bottle water in the middle of a warzone, with no guarantee that Defendant would pay Oasis even one (1) dollar." Plaintiff contends that "Defendant received the benefit of being able to purchase water locally at a fraction of the cost it had been paying previously, and Oasis received the benefit of . . . maybe selling water to Defendant if Defendant wanted to buy water. Such an interpretation offers no consideration to Oasis, and is illegal." The plaintiff also claims that "Defendant is arguing, without actually saying it, that the Contract was an IDIQ, with no minimum, something that the FAR specifically prohibits." The court disagrees with plaintiff's characterization. As defendant noted, the military provided the land, the fuel, the water, and plaintiff received the benefit of ownership of the bottled water facilities. Plaintiff also was compensated for water produced, which is consistent with the contract. Furthermore, defendant has not argued that the contract was an indefinite delivery/indefinite quantity contract. Regarding contract development, Major Vazquez testified on cross-examination that "[t]he way we developed this contract was we wanted to have fixed prices throughout the life of the contract, whether it be the base year or any option years. And we looked at it at, as awarded, 0.292 cents per bottle that we requested." Plaintiff's counsel followed up this statement by Major Vazquez by asking "[s]o, the fixed price was the per liter price," to which Major Vazquez answered: "The unit price, yes, sir." Defendant points out that "Oasis ignores the contract's plain terms and the testimony of both contract signatories. In doing so, Oasis concludes that the contract's plain terms and the testimony of both contract signatories do not matter because 'this Contract [is] a 'firm-fixed-price' contract.'"

Moreover, Major Vazquez statement of the cost under the contract as 0.292 cents per bottle is consistent with the four CLINs of the contract representing the base year and the three options years. As noted above, each of four CLINs (0001, 1001, 2001, 3001), provided that "[t]he Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO). Period of Performance. . . ." Each CLIN representing a contract year had subCLINs for each of the bottle water plants, with quantity, unit, and unit prices. For example, the base year of the contract provides:

 

Contract No. W27P4A-05-C-0002

| | CONTINUATION SHEET | | | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGES |
|---|---|---|---|---|---|
| | | | | W27P4A-05-C-0002 | |

NAME OF OFFEROR OR CONTRACTOR

| ITEM NO. | SCHEDULE OF SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | SITE 1<br>NON-PERSONAL SERVICS: The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO). Period of Performance: 25 May 05 through 24 May 06 | | | | |
| 0001AA | Purified bottled water IAW SOO = 0-50K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AB | Purified bottled water IAW SOO = 51-100K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AC | Purified bottled water IAW SOO = 101-150K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AD | Purified bottled water IAW SOO = 151-200K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0002 | SITE 2 | | | | |
| 0002AA | Purified bottled water IAW SOO = 0-50K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0002AB | Purified bottled water IAW SOO = 51-100K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0002AC | Purified bottled water IAW SOO = 101-150K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0002AD | Purified bottled water IAW SOO = 151-200K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0003 | SITE 3 | | | | |
| 0001AA | Purified bottled water IAW SOO = 0-25K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AB | Purified bottled water IAW SOO = 26-50K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AC | Purified bottled water IAW SOO = 52-75K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AD | Purified bottled water IAW SOO = 76-100K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0004 | SITE 4 | | | | |
| 0001AA | Purified bottled water IAW SOO = 0-50K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AB | Purified bottled water IAW SOO = 51-100K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AC | Purified bottled water IAW SOO = 101-150K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AD | Purified bottled water IAW SOO = 151-200K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0005 | SITE 5 | | | | |
| 0001AA | Purified bottled water IAW SOO = 0-50K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AB | Purified bottled water IAW SOO = 51-100K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AC | Purified bottled water IAW SOO = 101-150K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AD | Purified bottled water IAW SOO = 151-200K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0006 | SITE 6 | | | | |
| 0001AA | Purified bottled water IAW SOO = 0-125K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AB | Purified bottled water IAW SOO = 126-250K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AC | Purified bottled water IAW SOO = 251-325K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AD | Purified bottled water IAW SOO = 326-450K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0007 | SITE 7 | | | | |
| 0001AA | Purified bottled water IAW SOO = 0-50K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AB | Purified bottled water IAW SOO = 51-100K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AC | Purified bottled water IAW SOO = 101-150K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AD | Purified bottled water IAW SOO = 151-200K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0008 | SITE 8 | | | | |
| 0001AA | Purified bottled water IAW SOO = 0-50K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AB | Purified bottled water IAW SOO = 51-100K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AC | Purified bottled water IAW SOO = 101-150K liters | 12/case | Liter | $3.50/case (.292 ea) | |
| 0001AD | Purified bottled water IAW SOO = 151-200K liters | 12/case | Liter | $3.50/case (.292 ea) | |

27

Each subCLIN refers to the "SOO" or the statement of objectives for the "purified bottled water services" contract, which explained:

> The purpose of this contract is to provide re-locatable purified bottled water capabilities at various locations throughout Iraq Area of Operations (AO). Contractor shall produce the amounts of bottled water as outlined in Figure 1. Contractor shall ensure bottled water capability is able to relocate upon notification by the Contracting Officer (CO) due to military operational requirements. Bottled water capabilities shall be established in the order as listed in Figure 1. Actual locations will be given to the contractor that wins award. The contractor shall provide all the mechanical equipment required to produce and prepare for shipment the required amounts of bottled water. The first bottled water site shall be operational 120 days after the contract is awarded. This includes military inspection and acceptance. After contract award, additional bottled water sites shall be established within the remainder of days from contract award. A full 365 days from contract award, all sites will be fully operational.

Figure 1, referenced in the statement of objectives, identified the production requirements at each of the bottled water facilities at different points in the year.

| LOCATION | TOTAL PRODUCTION REQUIREMENT/DAY in 1K Liters (winter/summer/surge) |
|---|---|
| Location 1 | 75-100K liters / 101-150K liters / 151-200K liters |
| Location 2 | 65-100K liters / 101-135K liters / 136-170K liters |
| Location 3 | 35-55K liters / 56-75K liters / 76-100K liters |
| Location 4 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 5 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 6 | 200-300K liters / 301-400K liters / 401-450K liters |
| Location 7 | 80-120K liters / 121-160K liters / 161-200K liters |
| Location 8 | 75-110K liters / 111-150K liters / 151-190K liters |

(capitalization in original).

Although the amount of water requested by the government would vary by the time of the year and the bottled water facility, pursuant to each of the CLINs, the unit, and the

unit price was always consistent, "12/case" "Liter" "$3.50/case (.292 ea)," the contractor would be paid same way. The contract provided that "[t]he contractor shall invoice to the Contracting Officer Representative (COR), by the 5th of each month, for the total of all liters in [sic] produced, per location, for the entire previous month."

Reading the CLINs, statement of objectives, and Figure 1 together, the contractor was obligated to produce the bottled water as outlined in Figure 1, and, after invoicing the government for the water produced in each location, would be compensated at the rate of $3.50 per case. Although plaintiff argues that "Oasis' reading is supported by the plain meaning of the contract, which must control if the contract is unambiguous," plaintiff also argues that that defendant's argument for Oasis to be paid $3.50 a case is wrong given that the pages of the contract with the CLIN "are obviously incomplete" because "[t]he entire right column ('Amount') on every page is blank. Second, most of the parts of pages 3-6 that are filled out are filled out incoherently." (internal citations omitted). Plaintiff contends that:

> Assuming Defendant's theory is correct, the "QTY" column would list a number, the "UNIT" column would say "cases" or "liters," the "UNIT PRICE" column would be "$3.50/case" or ".292/liter" (but not both), and the "AMOUNT" column would list the product of multiplying the number in the "QTY" column by the price in the "UNIT PRICE" column. That did not occur.

(capitalization in original). The court does not share plaintiff's concern about the organization of the CLIN structure. The unit price of "$3.50/case" or ".292/liter" is not confusing, as the unit is identified as a liter of water, and the unit price is consistent – either $.292 per liter or $3.50 per case - and as the CLINs also identify the quantity as 12/case. Multiplying 12 times .292, results in $3.50. The court finds the contract as drafted and executed obligates the government to pay under the contract for the bottled water at a rate of $3.50/case.

Furthermore, the plaintiff's contention that the CLIN structure is "obviously incomplete" because the amount is left blank on every page, is not persuasive. As noted above, in interpreting the contract, the court considers the CLINs, Statement of Objectives, and Figure 1 together. The amount is left blank because the amount required by the government varied during the year. As indicated in the findings of fact Figure 1 contemplated three different production requirements: winter, summer, and "surge." Colonel Richardson testified, explaining the different requirements, as follows:

> [D]uring the winter, the weather was a lot more reasonable in Iraq; the highs were around the eighties, nineties. In the summer, temperatures got up to 135 degrees, requiring soldiers to drink more just to stay cool and to stay hydrated. During surge, what that's really talking to is battle operations. Our soldiers wind up wearing 60, 70, 80 pounds' worth of gear and then going out into . . . tanks, which causes them to sweat and causes them to need more water.

As there was not a consistent, specific amount of bottled water for delivery required under the contract, it was not only logical to leave the amount blank on the CLIN structure, but proper.

Plaintiff also argues that, regardless of any amounts of water to be paid at $3.50 per case, Oasis was entitled to the "$50,225,000 firm-fixed-price Base Year Contract price for establishing the capability to produce water in Iraq regardless of how much water it produced." Plaintiff further contends that "[t]he Contract was a firm fixed price (FFP) services contract for water bottling 'capability,' pursuant to which Oasis was entitled to $50,225,000 in the Base Year in exchange for 12 months of performance, irrespective of the amount of water produced by Oasis and/or purchased by the Government." Plaintiff points to the statement of objectives, which as indicated above, begins: "The purpose of this contract is to provide re-locatable purified bottled water capabilities at various locations throughout Iraq Area of Operations (AO)." Plaintiff argues that "[t]he text of the Contract also shows that Oasis was being paid for a service (the establishment and maintaining of purified bottled water capability in Iraq), not a commodity (the water itself)." Plaintiff also cites to the language of the contract which states: "The contractor shall ensure **purified bottled water capability** is able to relocate upon notification by the CO" and "[t]he contractor shall provide own [*sic*] power generation to operate the **bottled water capability**." (emphasis added by plaintiff). It is apparent to the court that the language of the contract refers to capability in order to enable the production of water to be sold to the government. The sentence immediately following "[t]he purpose of this contract is to provide re-locatable purified bottled water capabilities at various locations throughout Iraq Area of Operations (AO)," is "Contractor shall produce the amounts of bottled water as outlined in Figure 1." As explained above, Figure 1 identified the production requirements at each of the bottled water facilities at different points in the year. The CLIN structure also was based on production of water, with each of the subCLINs identifying the quantity, unit, and unit prices for the production.

Moreover, the statement of objectives required the "first bottled water site shall be operational 120 days after the contract is awarded." Defendant argues Oasis "cannot explain why a contractor would not produce water in the base year when the first bottled-water plant was required to be completed no later than September 2005, mid-way through the base year." Plaintiff argues that "[t]here is no discernable reason for why the Contract Period for Anaconda (CLIN 0001) would end on day 120 if there was any expectation that bottled water would be produced there during the base year," and "[b]ecause Oasis' performance period at the first site ended on day 120, the Contract had no requirement for Oasis to actually operate Anaconda during the Base Year and produce bottled water." Plaintiff contends that the contract was designed to bring the first plant "on line on day 120, stop work there, and focus on establishing the capability at the remaining five (5) locations." Plaintiff overlooks the requirements of the CLINs, and even for the first plant with the 120 day operational requirement, there still is listed a range of production with the amounts listed in terms of cases of water and the rate of payment. The statement of objectives first referencing the 120 day operational requirement also points to Figure 1 which as repeatedly referenced above, listed the "TOTAL PRODUCTION REQUIREMENT/DAY" for each plant for the various time frames (winter/summer/surge), including for the first bottled water plant. (capitalization in original). Moreover, plaintiff's

reference to the 120 day period of performance refers to the "Deliveries or Performance" section of the contract, but as defendant argues, this "section does not relate to delivery of plants (as Oasis suggests), but to delivery of water." The schedule for delivery information includes the heading "SHIP TO ADDRESS," which only makes sense for the delivery of water, and not the bottled water plants themselves. (capitalization in original). Moreover, the quantity is listed as "N/A," and if plaintiff was correct that the delivery would simply be the capability, the court questions why the number would not simply be one. Finally, both the CLINs and the "Deliveries or Performance" make no changes from year to year of the contract, between the base year and the option years,[32] and if the nature of the contract was intended to be so different, capability in the base year, and production of water in the remaining years, the court cannot understand why the structure, pricing, and quantities would be consistent from year to year. The court agrees with defendant that the "Deliveries or Performance" refers to delivery of water.[33]

The parties further disagree about the purpose of the contract. Plaintiff argues that

prior to the Oasis Contract, Defendant was able to fulfill its water needs, but there was significant risk due to the need to bring the water into Iraq via truck convoy. Defendant's actions leading up to this Contract make clear that the primary purpose of the Contract was to develop the capability to produce purified bottled water at U.S.-controlled locations in Iraq to avoid these risks.

(internal citation and footnote omitted). Defendant responds that plaintiff is taking an "illogical position" to argue that establishing the capability would reduce the number of convoys. The court notes that Statement of Work for the solicitation stated that:

Up to the present time bottled water has been purchased from sources outside of Iraq. This practice necessitates large numbers of convoys and escorts to transport the bottled water from Kuwait, Jordan, and Turkey. Producing bottled water locally would significantly reduce the number of convoys required to transport water as well as reduce the likelihood of battle related injuries.

The court interprets the purpose of the contract as "[p]roducing bottled water," which not only requires the capability to produce, but also the production of, the required bottled water. Only by producing water, would the demand for water from neighboring counties be diminished.

The court also notes that the payment terms of the contract required an invoice "each month, for the total of all liters in [sic] produced, per location, for the entire previous

---

[32] The only exception is the contract period for the first bottled water facility is 120 days for the base year and 365 days for each of the option years.

[33]  As discussed below, modification P00003 changed the "SHIP TO ADDRESS" location for the "Deliveries or Performance" from destination to origin. (capitalization in original).

month," which is inconsistent with a payment of $50,225,000 for producing only the water production capability. The mechanism for payment to the plaintiff was to invoice the government for the bottled water actually produced in each given month is also inconsistent with plaintiff's articulated understanding of completing the first bottled water plant, because plaintiff argued above, there was no "expectation that bottled water would be produced there during the base year."

Finally, the court turns to the questions and answers during the solicitation process. As the questions and answers during the solicitation process were subsequently incorporated into the contract, the court considers the questions and answers to reach a determination on contract interpretation. Both parties cite to the questions and answers during the solicitation process as further evidence for their respective contract interpretation position. Plaintiff contends that "[t]he answers to solicitation questions, incorporated into the Contract, further support Oasis' contention that payment was not contingent on the production of any water." As it relates to the payment terms of the contract, plaintiff first cites to question 9 from the questions and answers in response to the request for information from potential offerors, which asked, "[w]hat would be your proposed payment terms?" with the government answering: "Monthly. Firm Fixed Price Contract."[34] Defendant argues that:

> This response does not support Oasis's contract interpretation for a number of reasons, First, Oasis itself understood that the firm-fixed-price in the contract was the unit price, $3.50 per case. Oasis's contract interpretation makes even less sense when one considers the response stated that the contractor would be paid "monthly." Oasis never explains how a contractor could be paid for a water production capability on a "monthly" basis, when Oasis argues that it was entitled to a one-time $50.225 million "for the capability alone."

As explained immediately above, the contract provided regarding payment terms that "[i]nvoicing shall occur monthly," which would have allowed for monthly payment for water produced. There is no payment mechanism in the contract for a flat $50,225,000.00 amount for establishing capability, or any indication in the contract of a payment mechanism for how plaintiff was to be compensated if, on the final day of the base year, plaintiff only had established the capability for all of the bottled-water facilities, and had not produced any water. As the defendant argues, "Oasis also never explains how it could be entitled to progress payments for the facilities themselves, when (1) the contract never mentions progress payments of any kind, (2) the military provided the land, (3) the military provided the fuel, (4) the military provided the water, and Oasis owned the facilities." Absent a reference in the contract for an alternative method to compensate plaintiff, and consistent with the questions and answers regarding monthly invoicing, question 9 from

---

[34] The court notes that the plaintiff cites to question 9 from the questions and answers in response to the request for information for support for its view of the contract as firm fixed price contract, but, as indicated above, the court already has concluded that the contract was a firm fixed price contract.

the questions and answers relating to the monthly payment for water supports defendant's interpretation of the contract.

Plaintiff also cites to the questions and answers in response to Solicitation No. W27P4A-05-R-0002, and plaintiff argues, regarding question 11b, "the Military told offerors that they would receive payment 'once the contractor has the first plant operational and has an approved first article test accepted without conditions.' There was no condition that any amount of water be delivered prior to payment." As defendant, correctly notes, however, "[t]he question-and-answer cited by Oasis [question 11b] says that '*first* payment' will be made when the military 'accept[s]' water 'without conditions.' In other words, the military would pay the per-liter price for that water, not $50.225 million simply because the contractor produced one case of water." (emphasis added by defendant, internal citations omitted). Additionally, the court notes, the original question asked in question 11b was regarding installment payments, as one bidder questioned the potential for installment payments: "Would the Government authorize progress or installment payments recognizing 1) the significant capital investment with establishing new capability and, 2) the ability to credit progress payments with actual deliveries?" to which the government responded that: "The first payment will be made once the contractor has the first plant operational and has had an approved first article test accepted without conditions."

Regarding support for its capability argument, plaintiff also points to question and answer 4. Question 4 states: "RFP requires 1st production capability 120 days ARO. Is it correct to interpret this to mean the capability for the entire 1st base requirements, including surge potential?" which the government answers: "120 days after contract award, the plant must be capable of producing up to that capacity." The court notes that defendant does not challenge that 120 days after award the first plant had to be operational, or that under the contract the remaining bottled water facilities were to be established "within the remainder of days from contract award," but cites to the requirement of capability at 120 days to undermine plaintiff's theory of the contract, arguing that Oasis "cannot explain why a contractor would not produce water in the base year when the first bottled-water plant was required to be completed no later than September 2005, mid-way through the base year." Indeed, nothing about the government's answer indicates that plaintiff was only to establish the capability, nor would it explain why the base year of the contract would be for a calendar year, but only require the first bottled water facility to operational within 120 days and then not require any water produced, especially because, as explained above, Figure 1 sets out a range of production requirements for each of the bottled water facilities at different times of the year, spanning more than 120 days. The reason plaintiff appears to have cited the question and answer 4 would be that it uses the word "capability."

Plaintiff also focuses on the related questions 2 and 35 to demonstrate that the government was not required to purchase any water, as well as "that the contractor was still guaranteed payment after completing the first plant without a requirement for producing water." Question 2 asked, "[i]f projected demand falls short, what are the minimum volume requirements? Is there a required minimum quantity the Government

33

will procure?" The government responded: "There are no minimums. The minimum is zero." Additionally, question 35, referring to question and answer 2, asked:

> The answer to Question #2 states that there are no minimum purchase quantities. This decision places an unreasonable amount of financial risk on the contractor, and will likely severely limit the competition for this RFP [Request for Proposals]. Request that the Government guarantee minimum purchase quantities base [sic] on the estimated quantities that appear in the RFP.

The government responded:

> The levels of liters required are in the range. This is roughly the production per day. You might have a day where your levels are lower, however, the Government contract is a Firm Fixed Price not Indefinite Delivery / Indefinite Quantity. The Government is entering into a one year contract with three option years. The only thing that could prevent the basic year from occurring is a Government decision to Terminate for Convenience or default of the contractor to perform to the requirements and the Government would then Terminate for Default.

It is notable that the government did not respond that the government was guaranteeing the contractor a payment upon completion of any, or all, of the bottled water facilities, and then, in addition, payment for production of water. Such a statement would be inconsistent with the government's stated position during contract performance and in litigation that the government was only paying for the production of bottled water. Indeed, this is defendant's view of the questions and answers, as defendant claims, "[t]he military's answers to bidder questions, for which the contract awardee acknowledged receipt and which Oasis's chairman maintained a well-annotated copy, further confirms the clear and unambiguous terms of the contract."[35]

Defendant cites to question 33 to claim "[t]he military's responses to bidder questions stated that all bidders were required to propose a per-liter price inclusive of all costs, including the cost to construct and operate the bottled-water facilities." Indeed, one potential offeror asked in one part of question 33: "Is our offer to give the cost per liter with the personnel built in, seperate [sic] to the cost of the plant and equipment?" The government replied: "All Costs per liter are to be included." Likewise, question 40 asked: "Start up Cost: Since the bid is predicated upon the deliverables per litre bottle of water, can we assume that all costs(inc personnel and equipment deployment to site) incurred between contract award and water production will fall upon the successful bidder?" The

---

[35] Regarding question 35, specifically, defendant argues that, "this question-and-answer does not remotely support Oasis's position that it was entitled to $50.225 million without producing any water," and the import of the government's answer is that "the military may order no water on one particular day, but the military would generally order (and pay for) water within the water production ranges set forth in Figure 1 of the solicitation (and ultimately the contract)."

government replied: "Yes. It is up to you how you determine the cost per litre taking into account all costs associated with this endeavor." The government could have indicated that a stand-alone payment demonstrating capability should be taken into account for pricing purposes, but the government's answer points to the contractor only being paid for delivery of water. The defendant also points to the government's answer to question 47, which explained after completion, "the bottled-water plants would be the property of the contractor, not the Government," to argue that the government would not receive the benefit of the facilities if it paid $50,225,000.00 to Oasis to demonstrate the capability to produce bottled water, and then, to additionally compensate Oasis for actually producing the bottles of water.

In sum, the court believes that the answers provided by the government during the solicitation process, which were incorporated into the contract, demonstrate the correctness of the defendant's position that the government's obligation under the contract was solely to pay for water produced and delivered and does not demonstrate that the intent of the base year of the contract was to compensate Oasis $50,225,000.00 for demonstrating the capability to produce bottled water, and then, to additionally compensate the contractor for producing the requested bottles of water. Therefore, the court believes that the terms of the contract are unambiguous that the contract only obligated the government to pay plaintiff for cases of water. See Arko Exec. Servs. v. United Sates, 553 F.3d at 1379.

Although the court believes the terms are not ambiguous, and, as noted above, the parties both assert that the terms of the contract are clear, out of an abundance of caution the court examines the intentions of the parties when they executed the contract. Defendant argues that "[e]ven if the Court concludes that the contract is ambiguous, there is a mountain of extrinsic evidence confirming that the contract permitted a base year payment of $3.50 per case only, and not $50.225 million, plus $3.50 per case, as Oasis now contends." Plaintiff argues that "[i]n the event that the Court finds the contract to be ambiguous on these basic terms, the extrinsic evidence also supports Oasis' understanding."

As explained by the United States Court of Appeals for the Federal Circuit, "[w]hen the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." TEG–Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d at 824. In TEG–Paradigm, the Federal Circuit also noted that "[a]lthough extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning." TEG–Paradigm Envtl., Inc. v. United States, 465 F.3d at 1338; see also Shell Oil Co. v. United States, 751 F.3d at 1296. By contrast, "[w]hen a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may then resort to extrinsic evidence to resolve the ambiguity. We utilize extrinsic evidence to derive a construction that effectuates the parties' intent at the

time they executed the contract." <u>TEG–Paradigm Envtl., Inc. v. United States</u>, 465 F.3d at 1338 (citations omitted).

"Generally, the plain language of a contract controls; however, language that is reasonably susceptible to more than one interpretation, where 'each [interpretation] . . . is found to be consistent with the contract language,' may be considered ambiguous." <u>Marquardt Co. v. United States</u>, 101 Fed. Cl. at 268 (quoting <u>Cmty. Heating & Plumbing Co. v. Kelso</u>, 987 F.2d 1575, 1579 (Fed. Cir. 1993)); <u>see also</u> <u>Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.</u>, 169 F.3d at 751 ("When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity."). The United States Court of Appeals for the Federal Circuit has stated that, "[t]o show an ambiguity [in contract language,] it is not enough that the parties differ in their respective interpretations of a contract term." <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004); <u>see also</u> <u>Bell/Heery v. United States</u>, 106 Fed. Cl. 300, 309 (2012), <u>aff'd</u>, 739 F.3d 1324, <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2014). In order to demonstrate ambiguity, the interpretations offered by both parties "must fall within a 'zone of reasonableness.'" <u>Id.</u> (quoting <u>Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.</u>, 169 F.3d at 751). The Federal Circuit elaborated: "To incorporate extrinsic material, a contract must use language that leaves no relevant 'ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract.'" <u>Lakeshore Eng'g Servs., Inc. v. United States</u>, 748 F.3d at 1347 (quoting <u>Northrop Grumman Info. Tech., Inc. v. United States</u>, 535 F.3d 1339, 1344 (Fed. Cir. 2008)).

Because an ambiguous or uncertain writing sometimes only can be understood upon consideration of the surrounding circumstances, courts may rely on extrinsic evidence to interpret an ambiguous contract clause. <u>See</u> <u>Cruz-Martinez v. Dep't of Homeland Sec.</u>, 410 F.3d 1366, 1371 (Fed. Cir. 2005) ("'[M]eaning can almost never be plain except in a context.'" (quoting Restatement (Second) of Contracts § 212, cmt. b (1981))); <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d at 1375 (holding that extrinsic evidence is permissible to interpret an ambiguous contract); <u>Sylvania Elec. Prods., Inc. v. United States</u>, 126, 458 F.2d 994, 1005, 198 Ct. Cl. 106 (1972); <u>Mata v. United States</u>, 114 Fed. Cl. 736, 746 (2014) ("If a contract is ambiguous, the court may rely on extrinsic evidence to discern the parties' intent."); <u>Commonwealth Edison Co. v. United States</u>, 56 Fed. Cl. 652, 662 (2003). "Courts may not resort to extrinsic evidence 'to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting.'" <u>Shell Oil Co. v. United States</u>, 751 F.3d at 1304 (quoting <u>Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.</u>, 169 F.3d at 752). There are limitations, however, on the use of extrinsic evidence. Extrinsic evidence "may not be used 'to justify reading a term into an agreement that is not found there.'" <u>Warren v. Office of Pers. Mgmt.</u>, 407 F.3d 1309, 1314 (Fed. Cir. 2005) (quoting <u>Fox v. Office of Pers. Mgmt.</u>, 100 F.3d 141, 145 (Fed. Cir. 1996)); <u>see also</u> <u>Holland v. United States</u>, 621 F.3d 1366, 1378 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir.), <u>cert. denied</u>, 565 U.S. 928 (2011). "Only in the event of an ambiguity may [the court] examine extrinsic or parol evidence." <u>Bell BCI Co. v. United States</u>, 570 F.3d 1337, 1341 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2009); <u>McAbee Constr., Inc. v. United States</u>, 97 F.3d at 1434 ("[E]xtrinsic evidence . . . should not be used to introduce an ambiguity where none

exists." (quoting <u>Interwest Constr. v. Brown</u>, 29 F.3d 611, 615 (Fed. Cir. 1994)); <u>K-Con Bldg. Sys., Inc. v. United States</u>, 107 Fed. Cl. 571, 600 (2012). "The parol evidence rule provides a further limitation on the use of extrinsic evidence in interpreting contracts. Under the parol evidence rule, extrinsic evidence pre-dating a written agreement may not be used 'to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding.'" <u>TEG-Paradigm Envtl., Inc. v. United States</u>, 465 F.3d at 1338-39 (quoting <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d at 1375). The court, therefore, first must ascertain whether the language at issue was ambiguous. <u>See</u> <u>NVT Techs., Inc. v. United States</u>, 54 Fed. Cl. 330, 335 (2002) (finding that the threshold question is whether the document in question contains ambiguous language), <u>aff'd</u>, 370 F.3d 1153 (Fed. Cir. 2004); <u>Bell BCI Co. v. United States</u>, 570 F.3d at 1341. As noted by the Federal Circuit, "[w]hen faced with an ambiguous contract, we 'construe its language to effect the parties' intent at the time they executed the [contract].'" <u>Metropolitan Area Transit, Inc. v. Nicholson</u>, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (quoting <u>Dureiko v. United States</u>, 209 F.3d 1345, 1358 (Fed. Cir. 2000)).

The court first turns to the testimony of the signatories to the contract to examine the parties' intentions of the payment terms of the contract. Max Wyeth, the president of American AquaSource when it was awarded the original contract and the original signatory to the contract, testified that he based the $50,225,000.00 figure in the base year by "using our average forecast of demand, we came up with a case number that would be produced per year, and multiplied that by the case cost," which was "[t]he number of cases times $3.50." Max Wyeth further testified that the $50,225,000.00 was a "gross revenue figure," calculated on the cases to be produced and sold at $3.50 per case. The American AquaSource proposal included spreadsheets showing the volumes of production and an estimate for when each site would begin water production, the bid assumed a price of $3.50 per case of water, or a total of $50,225,000.00, based on the production of 14,350,000 cases.[36] At trial, Max Wyeth explained how he understood the contractor was to be compensated under the contract:

Q. And when you signed the contract, what was your understanding as to how the contractor would be paid under this contract?

A. On a monthly basis for the amount of water delivered.

Q. At what price?

A. $3.50 a case.

Q. Did you believe under this contract that the Government was required to pay for the costs to construct facilities and $3.50 per case?

---

[36] The court notes the original basis of estimate in the American AquaSource proposal assumed annual production of 384 million bottles or 32 million cases of water.

A. No.

Counsel for defendant emphasized during Max Wyeth's testimony: "So, just so the record is clear, the $50.225 million in your proposal is based upon $3.50 per case?" to which Max Wyeth replied: "Yes." Again, during his testimony, Max Wyeth had the following exchange with defendant's counsel:

[Q.] [W]hat was the contractual unit price under the agreement?

A. The unit price was 0.292 per liter or $3.50 a case of 12.

Q. And was that consistent with your understanding of how you would be paid under the contract as the contractor?

A. Yes.

Q. And was that the totality of what you would be paid under the contract was $3.50 per case?

A. Yes.

Q. Do you believe you had a meeting of the minds with Major Vazquez regarding the payment terms of the contract?

A. Yes.

Q. What do you believe that meeting of the minds was with respect to the payment terms?

A. Simply that the water produced and delivered would be paid for in the following month.

Q. And what is the per case price for all of the base year and all of the option years?

A. $3.50 a case.

Major Vazquez, the signatory on behalf of the government, in response to the question: "What was your understanding of the contract price per case for the base year?" testified that "[i]t was $3.50 per case." Major Vazquez also responded to defendant's counsel's question: "Based on your understanding, would the Government pay $50.225 million for the facilities and then an additional $3.50 a case for every case of water produced?" "No." Regarding the pricing schedule, defendant's counsel and Major Vazquez had the following exchange:

[Q.] The total base year is how much?

A. $50,225,000.

Q. And I know I've kind of asked you before, but who came up with that number?

A. Mr. Wyeth.

Q. And how was the Government going to pay AquaSource in the base year of the contract if AquaSource were to win the award?

A. We would pay them like any other of the vendors that proposed. Once the first article passed and production began, we would pay based off the invoice, the number of liters that were requested and were received by the Government in that previous month.

Q. Would the Government pay $50.225 million to the successful awardee just to make the facilities operational?

A. No, they would not.

Major Vazquez also answered defendant's counsel's question: "Do you believe you had a meeting of the minds with Mr. Wyeth on this contract?" "Yes, I do."[37] The court notes

---

[37] Despite both of their sworn testimony at trial, plaintiff argues that Major Vazquez and Max Wyeth "did not have a meeting of the minds," contending that "[w]hile Maj. Vazquez and Max Wyeth may have both espoused the same contractual interpretation at trial, their testimony was inconsistent with their contemporaneous actions and was unreliable at best." For example, plaintiff, citing to the trial transcript, states:

Maj. Vazquez's testimony at trial also was evasive when he was questioned regarding the actions he took that were inconsistent with his testimony:

Q. So, this contract, as awarded, was it a *firm fixed* price contract?

A. It was a *fixed* price contract.

Q. Was it a *firm fixed* price contract?

A. I believe I just answered that. It was a *fixed* price contract.

This is the sort of testimony individuals offer when they are trying to be tricky and avoid being completely forthright. Moreover, his testimony was wrong, as a "fixed price" contract is not the same as a "firm fixed price" contract.

(emphasis in trial transcript added by plaintiff; citation omitted). The court believes plaintiff is parsing words and reading far too much into Major Vazquez's answers at trial. Furthermore, the court has agreed with plaintiff that the contract was firm fixed price

Case 1:10-cv-00707-MBH   Document 540   Filed 12/01/17   Page 40 of 88

that in its previous decision on the fraud counterclaims, the court indicated regarding Max Wyeth's testimony that:

> Oasis did not exist as a corporation when Mr. Wyeth was awarded the contract on behalf of American AquaSource. Mr. Wyeth testified that when he signed the American AquaSource contract he had no relationship with Al-Morrell Development or with Paul Morrell or Phil Morrell. Given the evolution of the contract, including fundamental changes to the contract, especially after modifications P00006 and P00011, the reduction from the number of bottled water plants from eight to six, and on site difficulties encountered during contract performance, the court does not afford Max Wyeth's views as to whether or not Oasis submitted a fraudulent claim in the 2008 certified claim much weight

Max Wyeth's testimony, however, is relevant to the contract, as awarded, when reaching a determination on contract interpretation. Max Wyeth was the architect of the proposed and accepted pricing schedule, the $50,225,000.00 base year amount and how the contract would be paid. Although he left Oasis in 2005, and did not have much awareness of the certified claim process, or even modification P00006 and modification P00011, he was involved in and aware of the formation of the contract and the documents he signed. Max Wyeth's testimony, and the contemporaneous documentation, therefore, are relevant and court affords his views on the contract formation due consideration. As indicated by a Judge of the United States Court of Federal Claims, looking to the purpose of contract interpretation is "to determine the intent of the parties at the time that the contract was made; this controls the contract's interpretation." Ahrens v. United States, 62 Fed. Cl. 664, 669 (2004) (citing Safeco Credit v. United States, 44 Fed. Cl. 406, 419 (1999)). Given Max Wyeth's and Major Vazquez's testimony, the court believes the above discussion supports the court's conclusion that the contract obligated the government to pay plaintiff $3.50 for each case of water, and not $50,225,000.00 to establish the capability to produce water, as well as $3.50 a case of water.

Much of the documentation the parties point to as extrinsic evidence occurred later in time than the date of the execution of the contract.[38] Indeed, numerous exhibits cited to by the parties relate to events after the execution of modification P00006 and modification P00011, which as the court noted in the earlier opinion, "dramatically reshaped the terms of the contract." Although plaintiff claims that "P00011 and the Contracting Officer's Memorandum for Record completely support Oasis' contract position," information on the conduct of the parties after the execution of the modifications offers the court less guidance as to the intent of the parties at the time the contract was executed and, in fact, could give a misleading impression. Likewise, the plaintiff's

---

contract. Plaintiff also asserts, without support, that "Max Wyeth's lack of basic government contracts knowledge is a fatal flaw to Defendant's argument."
[38] Of note is Phil Morrell's August 4, 2006 email to Paul Morrell and Paul Jeffries regarding his view of the contact, referenced above, which stated in part, "Funding was received for purchase of water, but it [sic] the contract was a capabilities contract," and "Contract#____ is a capabilities contract not a procurement contract."

40

argument that "[t]he Final Decision on Oasis' claim, signed by then-Contracting Officer Maj. Kevin Hobbs, fully supports Oasis' position," is similarly unhelpful, as it was issued on October 18, 2009, more than four years after the contract was executed, and more than three years after modification P00011 was executed.[39]

The court, however, does briefly address two documents from July 2005, first, plaintiff's July 2005 memorandum to investors. Defendant argues that "[s]tarting in July 2005 and continuing throughout the base year of the contract, Oasis routinely projected its revenues from the bottled-water contract," and "[i]n each such case, Oasis projected revenue at $3.50 per case only, and never projected any revenue for the cost to build the facilities or to make the facilities operational." In response, plaintiff claims that "Oasis' revenue projections were almost exclusively a representation of what it was told the Contract entitled it to receive in payment. The early AAS [American AquaSource] and Iraqua spreadsheets, which were created by Max Wyeth, were widely inaccurate and were inconsistent with Defendant's theory of the Contract."

The court notes that in July 2005 memorandum, under the heading "revenue projections" "[t]he company projects revenues to be $50 million in the total base year, $112 million in the first option year, and $112 million a year in the subsequent 2nd and 3rd option years, for a total of $386 million in sales revenues over 4 years." Unless the plaintiff anticipated delivering zero water to the government in the base year, it appears the plaintiff communicated to its investors it would be paid for cases of water produced totaling $50 million. Likewise, the "project costs & details" states:

> The engagement calls for the supply of all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of

---

[39] Moreover, the court finds many of the later in time arguments red herrings, and in some cases, misrepresentations. For example, plaintiff contends that, regarding the contracting officer's final decision, "Lt. Col. Hobbs rejected Defendant's fabricated interpretation of the Contract, as demonstrated by the fact that the term '$3.50' is not mentioned once in the final decision." The court notes, however, that the contracting officer's final decision denied plaintiff's claims in full, and regarding the contracting officer's final decision's view of the contract, the decision states, in part:

> One can only conclude that while the Government was not obligated to purchase any water during the base year, the intent was clearly to purchase at least some water from any of the sites if it was available. It must also be assumed, because the Government did not create a separate CLIN for the construction of the bottled water facilities itself, that it was the Governments [sic] intent for the $50,225,000 to cover the cost of constructing all of the bottled water facilities and the water itself.

Objectives (SOO) at a price of $3.50 per liter bottle, with a period of performance from May 2005 through May 2009.

No mention is made of a $50,225,000.00 payment to plaintiff in addition to the $3.50 figure. Additionally, a July 2005 email from Phil Morel to Max Wyeth, with copies to, among others, Paul Morrell, included a spreadsheet which was a four year projection, and included a projection for case per year and the gross revenues, and each case assumed 12 liters of water at $3.50 per case. For the first year, the projections assume 14,500,000 cases of water, the projected revenue was $50,750,000.00, and for the remaining years, the projections assume 32,500,000 cases of water and projected revenues of $113,750,000.00 [40] The "cost of goods" for the first year assumes a total of 174,000,000 bottles, or 12 bottles per case, times 32,500,000 cases, and total costs of goods of $12,118,520.00. The projections, subtract the total costs of goods of $12,118,520.00 from the projected revenue of $50,750,000.00 for a gross profit of $38,631,480.00. Although plaintiff argues that "[t]hese statements are descriptive of how the company was operating, which is the primary driving purpose of an investment document," and posits, "[m]oreover, the early statements were done at a time when Oasis had not really gotten into the Contract in detail and seen the myriad of issues the Contract had," nowhere in the detailed projections is a there a line item for an additional $50,225,000.00 payment to the contractor, lending further support for the court's conclusion that the contract was structured for the government to pay plaintiff $3.50 a case of water, and not $50,225,000.00 to establish the capability to produce water as well as $3.50 a case of water.

The court also takes note of modification P00003, executed by Major Lopez and Max Wyeth on August 9, 2005, close in time to the July 2005 documents discussed immediately above. Modification P00003, added a "not to exceed" limitation on the quantity of water produced at each plant, and did not require the government to purchase any minimum number of cases produced by the contractor. Pursuant to modification P00003, the "not to exceed" "case quantity was a total of 14,350,000 cases of water," and, as modified in modification P00002, the "not to exceed" price was $50,225,000.00.[41] The court notes that dividing the "50,225,000 (NTE)," added in modification P00002 by the not to exceed 14,350,000 cases of water added to contract by modification P00003, reflects $3.50 a case, consistent with the defendant's view of contract interpretation. This

---

[40] As the projections assumed 14,500,000 cases of water for the first year and 32,500,000 cases of water for the remaining years, the projected revenues are slightly higher than the amounts listed in the contract which assumed production of 14,350,000 cases of water in the base year and 32,000,000 cases of water for the remaining years after modification P00003 was executed.

[41] As indicated above, the cover page to the contract stated the dollar amount as "386,225,000 (estimated)." At trial, Major Vazquez testified that this was amount was in error and that the amount should have been $50,225,000.00, and, on July 15, 2005, Major Lopez executed modification P00002 on behalf of the government, which changed the dollar amount from "$386,225,000 (estimated)" to "50,225,000 (NTE)," because "[o]nly the base year award should have been documented in the contract."

is also consistent with the projections referenced above, and nowhere is there support of plaintiff view that plaintiff could receive the "50,225,000 (NTE)" for creating the capability and then be paid for additional, "extracontractual water." The testimony of the signatories to the contract, as well as the documents produced near in time to the execution of the contract support the defendant's view of the contract, and that the parties' intended for the contract to compensate plaintiff only for the bottled water produced, and that plaintiff derived its revenue projections based on that same assumption.

As the court refers to the change to the contract as a result of modification P00003, the court addresses plaintiff's contention that modification P00003 was not a valid modification, as it lacked consideration and, even if it was a valid modification, Oasis was never bound by modification P00003. Plaintiff first argues that "P00003 is invalid for lack of consideration" because "P00003 introduced into the Contract for the first time a requirement for Oasis to produce up to 14,350,000 case [sic] of water in exchange for the $50,225,000 Base Year value of the Contract. Defendant, on the other hand, still committed to purchasing zero (0) cases of water under the Contract, eliminating any guaranteed payment sum to Oasis." Defendant, on the other hand, contends that the "contractor received consideration for modification P00003 and it is valid."

As noted above, on August 9, 2005, Major Lopez and Max Wyeth executed modification P00003 which added a "not to exceed" limitation on the quantity of water produced at each plant, and the "not to exceed" total was 14,350,000 cases of water. As noted by defendant, "Oasis was not even involved in the P00003 negotiation, as the modification was signed by Mr. Wyeth on behalf of AquaSource." As indicated at trial, Max Wyeth, in response to the question, "this is modification number 3. You willingly signed this modification?" testified: "Yes." Moreover, defendant argues that "the consideration for P00003 is plain on its face: it placed a 'not to exceed' at each bottled-water location." Although modification P00003 did not require the government to purchase any minimum number of cases produced by the contractor, the court agrees with defendant that the contractor received consideration in the form of not being required to produce more than the identified maximum amount for each bottled water facility, offering the contractor certainty for each plant, and allowing the contractor to plan accordingly. After modification P00003 was executed, the base year of the contract reflected the total amount each plant was obligated to produce:

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | | PAGES |
|---|---|---|---|
| | W27P4A-05-C-0002 (P00003) | | 3 OF 18 |

NAME OF OFFEROR OR CONTRACTOR

American AquaSource, Inc.

| ITEM NO. | SCHEDULE OF SUPPLIES / SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | NON-PERSONAL SERVICES: The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 6 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO).  Period of Performance: 25 May 05 through 24 May 06. | | | | |
| 0001 0001AA | SITE 1 – LSA Anaconda Purified bottled water (12 / 1-Liter bottles per case) | 2,356,549 (NTE) | Case | $ 3.50 | $ 8,247,921.00 (NTE) |
| 0002 0002AA | SITE 2 – Taqqadum (TQ) Purified bottled water (12 / 1-Liter bottles per case) | 1,928,729 (NTE) | Case | $ 3.50 | $ 6,750,552.00 (NTE) |
| 0003 0003AA | SITE 3 – Al Asad Purified bottled water (12 / 1-Liter bottles per case) | 1,077,472 (NTE) | Case | $ 3.50 | $ 3,771,153.00 (NTE) |
| 0004 0004AA | SITE 4 – Qayyarrah West (Q-West) Purified bottled water (12 / 1-Liter bottles per case) | 1,987,053 (NTE) | Case | $ 3.50 | $ 6,954,684.00 (NTE) |
| 0005 0005AA | SITE 5 – FOB Speicher Purified bottled water (12 / 1-Liter bottles per case) | 1,987,053 (NTE) | Case | $ 3.50 | $ 6,954,684.00 (NTE) |
| 0006 0006AA | SITE 6 – Camp Victory Purified bottled water (12 / 1-Liter bottles per case) | 5,013,145 (NTE) | Case | $ 3.50 | $ 17,546,006.00 (NTE) |
| | | | | **TOTAL** | |
| | | | | $ 50,225,000.00 (NTE) | |

In addition, modification P00003 changed the SHIP TO ADDRESS location for the information schedule for the "Deliveries or Performance" referenced above. Modification P00003 changed the SHIP TO ADDRESS from destination to origin. (capitalization in original). Regarding this change, Dan Petsche explained:

A. We did want it to be origin instead of destination, because we didn't want it to be destination. I – you're correct.

Q. Okay. So, in JX 103,[42] you state that the contractor wants it to be origin?

A. Right, right, right.

Q. And this change was implemented in P00003, correct?

A. Yes, it was.

The court does not weigh how valuable the consideration was to the contractor, only if the contractor received any consideration, as explained by a Judge of the United States Court of Federal Claims in Axion Corp.:

> In determining whether there was consideration, courts look to the language of the contract modifications. McLain Plumbing & Elec. Serv., Inc. v. United States, 30 Fed. Cl. 70, 81 (1993) ("[T]he contract modification represents the best source of evidence regarding intent."). Courts do not evaluate the adequacy of consideration, only the existence of consideration.

Axion Corp. v. United States, 68 Fed. Cl. 468, 476 (2005); see also La Gloria Oil and Gas Co. v. United States, 72 Fed. Cl. 544, 573 (2006), aff'd in part, rev'd in part, ConocoPhillips v. United States, 501 F.3d 1374 (Fed. Cir. 2007). The court concludes that the plaintiff was provided consideration for executing modification P00003, in the form of a definite "NTE" for each location and the change of location of delivery, and, therefore, modification P00003 was a valid modification.

Second, plaintiff argues that "P00003 was invalidated by P00005," because "[u]nder the plain language of the novation agreement (signed by Defendant and incorporated by P00005) Oasis was never bound by P00003." Defendant argues that "[t]he novation agreement did not void bilateral modification P00003." As noted above, in July 2005, Phil Morrell, Al-Morrell Development, Max Wyeth, and American AquaSource entered into a joint development and pre-incorporation agreement to form a new corporation to fulfill the contract, which became Oasis. Subsequently, in the fall of 2005, Phil Morrell, Al-Morrell Development, Max Wyeth, and American AquaSource signed an addendum to the joint development and pre-incorporation agreement, assigning American AquaSource's contract to Oasis. The addendum required Max Wyeth, of

---

[42] Joint exhibit 103 states, in part:

> Dan brought up the fact the there was not FOB [Freight on Board] designation within the contract (Destination or Origin). It is in our best interests liability wise and payment wise for it to be Origin as if KBR [Kellogg, Brown & Root] or whomever is delegated to pick the water up from our facility did not pick it up on a daily basis, it would sit and no payment would be made. With an origin designation, we would basically get paid as it came off the line and it is palleted.

American AquaSource, to execute a novation agreement. The novation agreement was to be a modification to American AquaSource's contract with the government. The novation agreement became modification P00005. On December 2, 2005, Max Wyeth, then-president of Oasis and American AquaSource, signed the modification on behalf of Oasis, and on December 5, 2005, Colonel Montler signed for the military. Modification P00005 stated that the "purpose of this modification" was to "reflect the novation agreement transferring all rights and responsibilities of contract W27P4A-05-C-0002 from American Aqua Source Inc to Oasis International Water Inc in accordance with the attached novation agreement dated August 1, 2005." The modification also stated that, "[a]ll other terms and conditions of the contract remain unchanged."

Plaintiff contends that because the effective date of the novation agreement was August 1, 2005, and modification P00003 was executed on August 9, 2005, Oasis only agreed to ratify "all previous actions" taken by American AquaSource prior to August 1, 2005. Plaintiff points to the language of the novation agreement that defines contracts, and states in part:

> The term **"the Contracts,"** as used in this Agreement, means the above Contracts and purchase orders and all other contract and purchase orders, including all modifications, made between the Government and the Transferor before the effective date of this Agreement (whether or not performance and payment have been completed and releases executed of the Government or the Transferor has any remaining rights, duties, or obligations under the Contracts and purchase orders).

(emphasis in original). The novation agreement also provides that the "Transferee has assumed all obligations and liabilities of the Transferor under the Contracts by virtue of the above transfer," and that the "Transferee ratifies all previous actions taken by the Transferor with respect to the Contracts, with the same force and effect as if the action had been taken by the Transferee."[43]

As discussed at trial, and based on the record before the court, the signatories to the modification appear to have intended that Oasis be bound by modification P00003. Colonel Montler, who signed on behalf of the government, had the following exchange with defendant's counsel at trial:

[Q.] [W]hat was the purpose of Modification P00005?

A. This modification -- it's just affecting the transfer of all the rights and responsibilities of the contractor from American AquaSource to Oasis. Nothing else got changed, and I don't see that I added Section -- the novation agreement wasn't added to Section J, so it's not even an attachment to the contract at this point.

---

[43] The "Transferor" was American AquaSource and the "Transferee" was Oasis.

Q. Did the modification have any other purpose, other than to novate the contract?

A. No. All other terms and conditions of the contract remain unchanged.

Max Wyeth, who signed on behalf of American AquaSource and Oasis, similarly explained to defendant's counsel:

Q. Why is it dated August 1, 2005, do you know?

A. Probably when it was created.

Q. And was the intent of this modification to invalidate any previous modifications?

A. No, it was a continuation of our intent . . . when we started our partnership.

Q. What was the purpose of the novation agreement?

A. To transfer the contract.

Q. Transfer the contract from who to who?

A. From American AquaSource to Oasis.[44]

Furthermore, as noted by defendant, "both Oasis and the military operated as if modification P00003 was a valid modification throughout performance of the contract," as explained at trial, including Alan Morrell's exchange with defendant's counsel:

Q. And at this time [December 2005], Oasis believed that modification number 3 was valid, right?

A. At this time, it was the only CLIN structure we had, and yes, we believed that that was what we had access to, yes.

Q. And just so we're clear, you believe -- Oasis believed that modification 3 was valid at that time, correct?

A. At that time we did.

At trial Phil Morrell also responded to defendant's counsel's question on cross-examination, "Oasis appropriately relied on Modifications P00001, P00003, and P00006 in setting up the plants, right?" by answering: "Yes." The clearest evidence that Oasis

---

[44] Max Wyeth also explained, in response to the question: "Why is it dated August 1, 2005, do you know?" "Probably when it was created."

operated as though modification P00003 was a valid modification, might be the December 6, 2005 letter Oasis sent to the military, the day after the Max Wyeth signed modification P00005, which stated in part:

> The JCC-I Contract requires the Contractor to make very substantial up-front investments, in the estimated amount of some $46 million, to set-up six re-locatable water purification and bottling plants at sites on military bases in Iraq, and contemplates that the Contractor will recoup such investment through the firm fixed unit prices for produced purified bottle water in accordance with SOO Figure 1 and the Contract Schedule (Contr. Section B), both as revised by Mod P00003.[45]

In addition to referring to the changes in modification P00003, the letter reflects the defendant's view of the interpretation of the contract. The court, therefore, believes that the novation agreement, as part of modification P00005 intended to include modification P00003, and did not exclude it. The court agrees with defendant that P00003 was a valid modification to the original contract, and modification P00005 did not invalid modification P00003.

Duress

In addition to asserting that modification P00003 is invalid, plaintiff argues that modification P00006 and modification P00011 are invalid due to duress by the government. Regarding duress, plaintiff argues that "[d]uring the Base Year, Oasis' principles [sic] repeatedly found themselves on the brink of bankruptcy. Defendant knowingly pushed Oasis to the brink of bankruptcy by deliberately misinterpreting the Contract and withholding or threatening to withhold payments Oasis was due." Plaintiff claims that the Army used "the leverage created by its maladministration of the Contract to coerce valuable concessions from Oasis that Oasis did not want to concede and should not have been forced to concede." In response, defendant states that "Oasis resorts to accusations that two different military contracting officers, United States Air Force Colonels Renee Richardson and James Davis, took advantage of Oasis' alleged 'economic duress' to force Oasis into bilateral modifications," and argues that "[t]here is not a shred of evidence supporting Oasis's economic duress claim and a mountain of evidence contradicting it, not the least of which is the $100 million profit enjoyed by Oasis under the contract."[46]

---

[45] The December 6, 2005 letter also stated:

> [T]he Contract, as issued, requires the Contractor, once first article approval by the Government has been obtained at each site, to produce, and the Government to pay for, purified bottle water in quantities within the minimum and maximum daily quantities specified for the respective Winter or Summer season at the respective sites in SOO Figure 1, as amended by Mod P00003. . . .

[46] Defendant also argues that plaintiff "wants to retain the benefits that it received in

The United States Court of Appeals for the Federal Circuit has indicated that "[t]o render a contract unenforceable for duress, a party must establish (1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts." N. Star Steel Co. v. United States, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (citing Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003)); see also Dureiko v. United States, 209 F.3d at 1358; Employers Ins. of Wausau v. United States, 764 F.2d 1572, 1576 (Fed. Cir. 1985) (quoting Fruhauf Southwest Garment Co. v. United States, 111 F. Supp. 945, 126 Ct. Cl. 51, 62 (1953) ("[T]he requirements to establish duress are exacting. Three elements must be found: '(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.'")); Starr Int'l Co. v. United States, 106 Fed. Cl. 50, 77, recons. denied (2012); IMS Engineers-Architects, P.C. v. United States, 92 Fed. Cl. 52, 66 (2010); Aboo v. United States, 86 Fed. Cl. 618, 632, aff'd, 347 F. App'x 581 (Fed. Cir. 2009). "Duress occurs when a party involuntarily accepts another party's terms because the circumstances permitted no alternative and such circumstances were the result of the other party's coercive acts." Pew Forest Prods. v. United States, 105 Fed. Cl. 59, 67 (2012) (citing N. Star Steel Co. v. United States, 477 F.3d at 1334). As noted by a Judge of the United States Court of Federal Claims, "[t]his Court's jurisprudence has shown that the bar for establishing duress is a high one." Starr Int'l Co. v. United States, 106 Fed. Cl. at 77.

Plaintiff claims that "Oasis has demonstrated each of the three requirements for duress," defendant, by contrast, argues that "plaintiff's duress claims should be roundly rejected because there is not a shred of evidence supporting Oasis's attempts to walk away from its contractual commitments," and that "Oasis falls far short of establishing a single element of economic duress, let alone all three."

   a.  Involuntary Acceptance

As indicated above, for a duress claim to be successful, a plaintiff must first establish that "it involuntarily accepted the other party's terms . . . ." N. Star Steel Co. v. United States, 477 F.3d at 1334. Regarding the first element, involuntary acceptance, defendant argues, plaintiff "never explains why it did not sign the modification[s] under protest." At trial, Phil Morrell in response to the question, "you did not indicate anywhere on Modification P00006 that you were signing the agreement under pro -- under protest, right?" testified: "I didn't indicate it, no." Oasis concedes that "[w]hile Defendant is correct

---

P00011, but undo the portions that it now contends are not in its best interest," noting that

   Oasis does not claim that it should have been paid $3.50 per case for all water delivered after August 2006; rather, Oasis was satisfied to receive the $9.3 million a month. Nor does Oasis offer to return the more than $24 million check it received as part of the P00011 negotiations. Rather, as Paul Morrell testified, Oasis wants to keep the benefits of P00011, but invalidate the portions with which it now disagrees.

that neither P00006 nor P00011 contains a provision saying that the modification was under duress, there is no requirement to include such a statement in order for a contractor to later seek to invalidate the modification." Plaintiff contends that "the logical fallacy in Defendant's argument is that it assumes a contractor could be coerced into signing a modification under duress, but would then have the negotiating power to insist that the modification include language saying it was under duress. That ignores human nature." Instead, plaintiff argues "the only way to determine whether Oasis involuntarily accepted P00006 and P00011 is to consider the underlying facts surrounding them, and those facts demonstrate that Oasis did not want either modification."

First, the court notes that in a situation in which a party indicates that it may not want a modification, another form of a contract change, or is facing financial difficulties, those facts alone are not necessarily an indication that, if a modification is executed, duress must have been involved. Moreover, as numerous cases demonstrate, a plaintiff which believes it is signing a contract or modification under duress can, in fact, sign under protest to indicate it is executing the agreement unwillingly. In North Star Steel Co. v. United States, the North Star Steel Company had alleged a breach of contract between the Arizona Electric Power Cooperative Inc. (AEPCO) and the United States Department of Energy's Western Area Power Administration (WAPA), with "North Star being an acknowledged third party beneficiary of the contract." N. Star Steel Co. v. United States, 477 F.3d at 1325. The Consolidated Arrangements Contract (CAC) was entered into on August 17, 1994, between WAPA and AEPCO for the benefit of North Star. As explained by the Federal Circuit,

> WAPA, however, had technical concerns about being able to provide regulating services to meet North Star's load requirements. For this reason, WAPA negotiated for a provision in the CAC that the regulating services to be provided to North Star would be made and paid for pursuant to an ad hoc methodology utilizing an in-kind energy payment, which would be in addition to the FERC-approved transmission rate schedule.

Id. at 1327-28 (footnote omitted). The CAC provided that the parties "shall jointly establish an appropriate cost-based methodology to review, evaluate, and periodically, if necessary, adjust the percentage associated with the In–Kind Energy payment." Id. at 1328. "In spite of their inability to reach agreement within the first year of normal operations, WAPA, North Star, and AEPCO continued to negotiate with respect to a new methodology. On June 3, 1999, a meeting took place to discuss WAPA's proposal to add Amendment No. 3 to the CAC . . . entitled 'Modification of Section 14 of the Original Contract (Control Area and Regulating Services'))." Id. at 1329. As noted by the Federal Circuit, "[o]n July 29, 1999, North Star authorized AEPCO to accept Amendment No. 3 and to amend the CAC under protest." Id. In its analysis, the Federal Circuit stated: "Turning to the issue of duress, the government recognizes that North Star agreed to Amendment No. 3 under protest, thereby apparently involuntarily accepting WAPA's terms," id. at 1333, and explained that "it is undisputed that AEPCO signed Amendment No. 3 under protest, which satisfies the first prong of the duress test. . . ." Id. at 1334. This is especially notable, since as discussed below, the Federal Circuit ultimately determined

that "the court's findings of fact do not support a determination of duress. The reason is that the third prong of the test—that the circumstances which North Star faced were the result of WAPA's coercive acts—was not met." Id. (footnote omitted).

The North Star case is not alone. In Systems Technology Associates, Inc. v. United States, 699 F.2d 1383 (Fed. Cir. 1983), the plaintiff, Systems Technology Associates, Inc. (STA) entered into a contract with the Environmental Protection Agency on August 15, 1974, which was subsequently terminated for default. See id. at 1384. The termination for default was converted to a termination for convenience by the United States Department of the Interior Board of Contract Appeals which required the government to equitably adjust the Systems Technology plaintiff's contract. As explained by the Federal Circuit:

> On February 14, 1978, the parties met and STA suggested that the settlement be on a "total cost" basis. STA submitted a termination settlement proposal. In evaluating that proposal, a Government auditor requested and was denied access to STA's books on June 5, 1978. The parties met and discussed their disagreements over the use of the total cost basis methodology, favored by the Government, and over Government access to STA's books. Subsequently, STA resubmitted its claim, protesting the Government's insistence on a total cost basis settlement and agreeing under protest to make cost records available to Government auditors. The auditors, however, insisted on using STA's job cost ledgers. STA again protested. The auditors finally concluded that, because of STA's failure to make the job cost ledgers available, the field audit office could not render an opinion on STA's settlement proposal. This dispute over methodology and access to the job cost ledgers continued until October 4, 1978, when STA submitted under protest a settlement proposal prepared on a total cost basis and allowed the auditors access to its job cost ledgers.

Id. at 1384-85 (footnotes omitted). Even though the plaintiff in Systems Technology did contemporaneously protest the government action, like in North Star, the Federal Circuit ultimately concluded that "[t]he contractor has failed to establish facts constituting duress under the applicable standards of duress." Id. at 1390. Therefore, contrary to Oasis' contention, it is possible to protest the government's action, and later raise a claim of duress. Moreover, these cases demonstrate that in addition to a plaintiff having to timely protest, depending on the facts presented, the party must be able to demonstrate duress, in fact, occurred.

The only precedential case on this issue that plaintiff addresses is the Court of Claims case of Louisiana-Pac. Corp. v. United States, 656 F.2d 650, 228 Ct. Cl. 363 (1981). In Louisiana-Pac. Corp., the plaintiff had a third party agreement with the Northern Timber Company in which plaintiff assumed the benefits and responsibilities of Northern Timber Company's timber sale contract with the Forest Service of the United States Department of Agriculture. See id. at 651. The Court of Claims noted that "before plaintiff had cut any trees, the Forest Service mailed plaintiff a proposed bilateral modification of

the contract which reduced the volume established in the original contract," to which plaintiff submitted a counterproposal to the Assistant Regional Forester. Id. The Forest Service responded that the counteroffer was "not acceptable" and "the Forest Service stated its refusal 'to accept any modification by Louisiana-Pacific signed under protest or with qualification,'" and finally that "unless the Forest Service's modification of the contract was signed 'as presented,' it would 'cancel the sale' and terminate the contract. Id. at 651-52. On April 25, 1974, without written protest or reservation of any rights, plaintiff signed and returned the Forest Service's Agreement to Modify Contract." Id. at 652. Plaintiff argues this case is not relevant because it was based on "a motion for summary judgment that did not actually decide the issue of duress, let alone reject the duress claim." The court agrees that the Court of Claims did not specifically reach the issue in Louisiana-Pac. Corp., noting instead that "plaintiff says duress upon it renders the modification void. If so, there was no accord and satisfaction or waiver which defendant relies upon. Thus, there is presented a disputed question of fact we cannot resolve on the pending motions." Id. Nonetheless, the court's discussion of duress is instructive:

> Plaintiff tells us that it needed lumber, which was getting scarce, so it agreed to the modification although it did not want to do so. This does not necessarily demonstrate duress. There may have been alternatives. Plaintiff perhaps could have sought other timber sources or it could have stood its ground and sued for breach in 1974 instead of in 1979. See Murphy v. United States, 209 Ct. Cl. 352 (1976) (plaintiff held not to have resigned his position under duress where threatened with an investigation he could have contested). We do not intimate that suit would be a reasonable alternative in every case. However, by signing the modification without protest at the time, defendant argues that plaintiff waived its rights and by accord and satisfaction made a considered business judgment that it would rather proceed under a modified contract than to sue for breach. Plaintiff appears to want it both ways the benefits of the modified contract and damages for breach as well. If plaintiff is correct in its approach to this problem, it is hard to imagine how a contract modification could ever stand where it was accepted with reluctance. Years afterward, as here, a party could come in claiming duress and great uncertainty would thus attend contract law. We have no doubt but that plaintiff did not like the modified contract to which the Forest Service asked it to agree, but agree it did.

Louisiana-Pac. Corp. v. United States, 656 F.2d at 652-53, 228 Ct. Cl. at 367-68. Although the posture of the above captioned case and the Louisiana-Pac. Corp. are very different, the dicta in Louisiana-Pac. Corp. is logical and convincing. Although plaintiff argues that the assumption that a contractor could be coerced into signing a modification under duress, but would then have the negotiating power to insist that the modification include language saying it was under duress" "ignores human nature," it can just as easily be argued that it would be human nature for a contractor who was unhappy with the outcome of a contract modification to later cry duress to undo the bargained result. The failure of plaintiff in the above captioned case to contemporaneously protest either modification, moreover, makes the court initially skeptical of plaintiff's claims that the modifications

were involuntarily accepted by plaintiff. What most undermines plaintiff's argument regarding its claim that a contractor under duress would not have the power to insist on protest language, is plaintiff's own behavior during contract performance in response to the government's request for a waiver of plaintiff's claims. At trial, Paul Jeffries had the following exchanges on direct examination:

> Q. Did the Government ask for waivers of claims regularly from Oasis?

> A. Yes, they did.

> Q. To the best of your knowledge, starting at P00006, did Oasis ever sign a waiver of claims?

> A. To the best of my knowledge, no.

> . . .

> Q. Do you recall if Oasis signed a waiver of additional claims at the time of P00011?

> A. We were requested to and we did not.

> Q. And why didn't you sign that waiver of additional claims?

> A. Because we believed that there would be claims arising from this transaction and potentially previous ones.

Regarding the defendant's request for a waiver of claims, plaintiff apparently had the ability to resist the government's request, but plaintiff claims it lacked all ability to indicate it was protesting the modifications as executed.

Defendant also contends "Oasis *proposed* both modifications to the military that it now claims were the result of economic duress," (emphasis in original), noting that "Oasis proposed P00006 to the military," and "[a]s with P00006, Oasis suggested major portions of modification P000011 [sic]." Oasis counters that "[w]hat Oasis labeled a 'proposal' was in reality a 'counter proposal.' However, even if it were a proposal, the mistake Defendant makes is assuming that because something was a 'proposal,' the idea was both generated by Oasis and something Oasis objectively wanted." Oasis contends that "[a] party under duress may very well make a proposal in order to avoid a much worse outcome. That does not mean the initial proposal was not coerced . . . . Simply proposing a modification does not demonstrate that the party actually wanted the modification." Although the court notes that a Judge of the Court of Federal Claims has indicated, "[a]s for the first element [of duress], the plaintiff presents no evidence to support the involuntary acceptance of the terms of the modification. In fact, the evidence demonstrates the opposite because the plaintiff, not the defendant, sought and then proposed a recovery schedule." McLain Plumbing & Elec. Serv., Inc. v. United States, 30

Fed. Cl. 70, 83 (1993). Therefore, the court agrees that, even if Oasis proposed the modification, that does not evidence per se that plaintiff signed the modifications without duress. Therefore, the court examines the circumstances of both modification P00006 and modification P00011 to determine if either was signed under duress.

Modification P00006

As noted above, the base year of the contract was scheduled to end on May 24, 2006. On March 8, 2006, contract specialist William Moxham sent Oasis an email which said in part:

> It was apparent at the last meeting that OIWI [Oasis] had a copy of the modification that I had prepared in draft for the previous Contracting Officer (Brandon Montier). I understand you [sic] company's misgiving about extending the contract but the fact is that without some sort of extension the FY 05 funding amount will go away and your contract value will drop from $386,225,000 to in the neighborhood of $341,000,000. As we approach mid March it is also looking like OIWI is going to be far from the mark with regard to the 24 May 2006 completion. So far OIWI has only delivered 1,158,240 bottles of water out of 14,350,000 for the base period.
>
> . . .
>
> Right at the moment you owe us dates when your plants are estimated to be on line and a rough approximation of how much water you will have delivered or available for delivery before 24 May 2005. We hope if you don't agree with the modification that at some point in the near future you are going to have a counter proposal that we can reach some arrangement on.

Paul Morrell sent an internal email to Oasis personnel on March 10, 2006, in which he indicated:

> Attached are the dates to give Moxham - they are slightly different than the ones I circulated yesterday based upon where the commitments coming out of Italy. They are conservative and certainly NOT the dates we will be driving to internally. We'll need to take the bullet now to move the dates but we should (we damn well better!!) exceed the expectations we are setting now so we don't do this same battle day after day. I've also suggested moving the completion date to 8/15/06 to consume the entire $50mm. I agree with Moxham that we should remove the line item clins to allow money to flow between locations. Get a draft amendment together with Moxham and distribute it for consideration.

The same date, March 10, 2006, Oasis sent the military a proposal, with the subject "Response and counter to JCC-I/A P00006" which indicated:

Following up to referenced draft P00006, and per our conversations regarding "actual" projected operational dates, first product delivery dates, as well as Montier 13JAN06 proposed draft CLIN restructuring for maximizing Base Year Period funding allocation, we are responding to and countering same prior to our scheduled meeting regarding same on Saturday 11MAR06 at 1000 in the JCC-I/A PARC Forces offices located on Camp Victory.

The proposal stated:

We have been very forthcoming with JCC-I about these delays and have in the past discussed several resolutions and methods of recovering from this and restructuring the Schedule of Supplies/Services, part of which is included within referenced P00006 draft and extending the Base Year Period to 31AUG06 (see P00006, CLIN 0001AA) that would allow both Oasis and the Government the leverage of maximizing deliveries and utilization of allocated funding within the Base Year Period.

In a March 14, 2006 email, Paul Morrell explained to Alan Morrell, Paul Jefferies, Phil Morrell and Dan Petsche that regarding any modification to the base year contract, "[j]ust to emphasize – the extension is for their benefit – not ours. I'm not interested in giving them anything for it beyond what we have already committed." Plaintiff also cites as evidence that Oasis did not want the modifications a March 9, 2006 email from Dan Petsche to Lieutenant Colonel Davis which noted that "[w]e understand and appreciate the Governments [sic] desire to maximize and leverage the base period and subsequent option period funding appropriated and we firmly believe that there is a way to that end that would be a win-win for both the Government and Oasis." After discussions with the government, Oasis sent a counterproposal on April 3, 2006. The counterproposal stated:

Major Davis,

Oasis International Waters, Inc. acknowledges and we are in receipt of modification P00006 of referenced. Further we understand the Military's challenge with funding Option Period One as originally proposed in our contact. [sic]

Our goal is to accommodate the Military's 2006 fiscal year funding challenges without significantly changing the risk & cost recovery profile of the contract and impacting the unit price of water to the military, and as such we summit [sic] this proposal with no cost changes pending the approval of our financing partner, we believe a positive response from the military will assist with this approval. Therefore we are responding as follows:

1. Please change Standard Form 30 (REV 10-83), Block 8 to reflect correct company name, **Oasis International Waters, Inc.**

55

2. With respect to the period of performances to schedule(s) reflected per P00006 Continuation Sheet, herein referred to as **Item 1**:

> (a) we **DISAGREE** with proposed and counter per the schedule that follows:

> (b) In addition with both the base year and CLIN 2001 OPTION ONE is hereby exercised upon approval of P00006,

### *[OASIS' PROPOSED SCHEDULE REMOVED]*

3. **Item 2**, Removal of Summary of Pricing Schedule Page 7 of 18, - **AGREED**.

4. **Item 3**, Section C, Page 9 of 18, Statement of Objectives, Paragraph 3.1 (NOTE) Remove note and add "The Contractor shall operate the plant in accordance with the management SOP provided as attachment 01 to this statement of objectives". - **Although we agree with removal of current Paragraph 3.1, we did not receive Attachment 01 SOP in. Please forward for our review of cost, technical, and/or schedule impact**.

5. **Item 4**, Section C, Page 9 of 18, Statement of Objectives, Paragraph 3.1 (Figure 1) - **AGREED**.

6. **Item 5**, Section C, Page 10 of 18, Statement of Objectives, Paragraph 4.5.3 & 4.5.4 deletion - **AGREED**.

7. **Item 6**, Section C, Page 10of18, Statement of Objectives, Paragraph 4.6 revision **Oasis is able to provide a single side access pallet measuring 45" x 37 after current pallets and pallet raw material inventories are depleted.**

8. **Item 7**, Section C, Page 9 of 18, Statement of Objectives, Paragraph 6.3 revision - **AGREED, excluding TQ which is dependent upon military assistance to finish preparing the land. Date to be determined**.

9. **Item 8**, Section C, Page 9 of 18, Statement of Objectives, Paragraph 8, - **AGREED upon the condition of Government acceptance of Item 1, Continuation Sheet**.

10. **Item 9**, Section F, Page 17 of 18, Deliveries or Performance. - **AGREED, upon the condition that the delivery point for the water remains at origin or FOB Oasis Water plant**.

11. **Item 10**, Section G, Page 18 of 18, Contract Administration Data. -

**AGREED**.

12. **Item 11**, Modification of FAR 52.217-9 Option to Extend the Term of the Contract, as prescribed in 17.208(g), insert a clause substantially the same as the following:

Option to Extend the Term of the Contract (MAR 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of intent to extend at least 90 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 54 (months).

**Due to lead-times for raw materials required and logistical challenges from open ports to the operational sites, we DISAGREE with the leadtimes reflected within paragraph (a) and counter propose with the Government providing a 90 day written notice to extend and at least 120 days written notice of intent to extend.**

Alternatively the Military may agree to reimburse Oasis for excess raw materials needed to ensure steady supply of water.

We remain available to conclude these negotiations promptly.

(capitalization and emphasis in original).

As noted above, the April 3, 2006 proposal from Paul Jeffries formed the basis of modification P00006, and contained a way to include a base year amount of 14,350,000 cases of bottled water at $3.50 per case for a total of $50,225,000.00. Modification P00006, which was executed on April 14, 2006 by Lieutenant Colonel Davis and Phil Morrell, extended the base year of the contract from May 24, 2006 to August 15, 2006, and required that the bottled water capability be established at all six sites by June 30, 2006. Therefore, modification P00006 extended the contractual deadline for bottled water plants to be operational to June 30, 2006. According to modification P00006, the bottled water plants were to be operational in the following order: (1) Anaconda, (2) Camp Victory, (3) Speicher, (4) Q-West, (5) TQ, and (6) Al Asad.[47] Modification P00006 also required

---

[47] At the time modification P00006 was executed, Anaconda and Camp Victory were already operational.

the production of 14.35 million cases of water during the base period of the contract, and removed the "not to exceed" requirements established in modification P00003. Finally, the option years were realigned to match the extension of the base year, so the first option period would run from August 16, 2006 until January 15, 2007, the second option period would run from January 16, 2007 until January 15, 2008, and the third option period would run from January 16, 2008 until January 15, 2009. Modification P00006 also added a fourth option period that would run from January 16, 2009 until August 16, 2009. The amount of water in the base period, the first option period, and the newly added fourth option period were different than the second and third option years.

At trial, Paul Jeffries, testified that Oasis had agreed to modification P00006 and in response to the question "you as CEO believe that Oasis was bound by the terms of modification number 6, right?" he answered: "Yes, we intended to execute accordingly." Paul Jeffries indicated that he did not protest or indicate that the P00006 was signed under duress. Paul Jeffries also indicated that "from the time it [P00006] was signed, I operated as though it was valid, going forward." During his trial testimony, Phil Morrell, also admitting he did not lodge a protest regarding modification 00006 after he signed the modification, and stated: "Well, I knew I was being coerced into signing it, no question about it."

<u>Modification P00011</u>

Although modification P00006 was executed in April of 2006, by June of 2006, Oasis and Colonel Richardson, then the contracting officer, began negotiations to modify the contract further. Paul Jeffries testified that:

> The negotiations began with Paul and I sitting in a room with Renee, and I believe her assistant was there, and they told us that they were being pushed a particular direction, that she would need concessions from us to pay out the balance of the funds owed or she would have to move in this other direction. Paul quickly and generously made an offer that I thought he thought would solve this, put it to bed quickly. So, he said, look, I'll just give you an extra million cases of water as a concession and let's move forward, and the response that we got was, that's great, thank you, now what else do you have?

Oasis considered a number of proposals, as noted in an internal August 1, 2006 email from Paul Morrell:

> I've tried a lot of complicated algorithms to try to make a solution that is equitable to both the Military and US. I've concluded that the most equitable approach for everyone is the following: We gat [sic] paid a flat $112,000,000/year just as the contract states or $9,333,333/month (5/6th of that until TQ comes online). We agree to deliver up to 32,000,000 cases per year in aggregate with an annual reconciliation if the actual deliveries exceed that amount.

After further discussions and consideration of several options for how to proceed moving forward, ultimately, on August 8, 2006, Oasis, at Colonel Richardson's request, provided her a draft proposal, which was consistent with the internal Oasis proposal. The draft proposal indicated two options:[48]

**Option II**.  Complete the construction of TQ in Oct 2006.

Close Base Period

| Item No. | Description | | PRICE | |
|---|---|---|---|---|
| 1001 | BASE Period of Performance from 24 May 2005 to 15 August 2006 | | $50,225,000 | |
| | Allocation for uncompleted Plant (TQ) 1/6th | .167 | ($ 8,370,833) | |
| | Allowance for capital purchases to complete TQ.  Allowed due to military delay of Land. | | $ 5,500,000 | Estimate |
| | Funds to Purchase Pall Aria to filter QW Water. | 1 | $   300,000 | |
| | Purchase RO's to improve SP water flow | 1 | $   300,000 | |
| | Creation and distribution of Water information campaign posters "its just water" | 100+ | 0 | |
| | conversion and support of Class 1 Water sites at each of its locations | 5 | 0 | |
| | Previous invoices through 8.5.06 | | (23,268,860) | |
| | **Net Due Oasis At Close of Clin 1001 08.15.06** | | **$24,685,307** | |

Regarding the proposed deal, option II, that formed the basis of modification P00011, Paul Jeffries, in an August 9, 2006 email to Paul Morrell and Phil Morrell stated: "Im [sic] having a little indigestion over the increase in requested water, but overall I feel we are at 99% of everything we hoped for and with clarity and cash flow to make it manageable." At trial, Paul Jeffries, in response to the question, "[t]hat was what you thought at the time?" answered: "Yes. Well, that's what I wrote here. Keeping in mind that the goal was to get a $24 million check and a renewal. That is the 99 percent of what we're talking about." Paul Jeffries also testified that "we were still being asked for

---

[48] The first option contemplated modifying the contract to not build TQ, but the parties decided to build the TQ plant.

significant concessions, beyond what was outlined that I've tried to outline here. . . . I mean to the tune of $30 million of concessions yet beyond what's on this page."

On August 12, 2006, Paul Morrell and Colonel Richardson executed modification P00011, which was generally consistent with the draft proposal and established a payment structure by which Oasis would be paid $9,333,333.33 per month, independent of any amount of water, moving forward in the option periods. The day modification P00011 was executed, Paul Jeffries sent an email to a representative of Oasis' financier and indicated "I believe this modification is a significant win for us. [sic] clarifies our service status, improves cash flow and many military deliverables." At trial, Paul Jeffries, in response to the question, "[t]hat's what you believed at the time, right?" answered: "I did. Significant in that we're still in business, yeah. And that it did make good modifications to the contract going forward." Also at trial, in response to the government's question, "And you, as CEO, operated with the assumption that modification 11 was a valid modification, correct?" Paul Jeffries testified, "[w]e lived by the conditions of P00011, yes."

The day modification P00011 was executed, Phil Morrell emailed Colonel Richardson, and copied numerous individuals at Oasis and the Army, indicating:

> I would like to express my personal appreciation to all, for the hard work you have done to bring clarity to this contract. I believe it now better represents what we all had in mind when we undertook the project. Once again, within our corporate culture, we have looked for and found the solution which brings about the ethical win-win attitude we continuously try to drive.[49]

---

[49] Defendant takes note of Phil Morrell's email to Dan Petsche on July 15, 2005, regarding the general approach to the contract:

> There are 2 requirements in my philosophy which makes me successful in getting the contract closed in the way that is most beneficial for all involved. 1. "the one who cares the least wins". I would like to win this, but a half win is not good enough. in lew of the fact that we have experience in country and with this type of contract, we have learned that we can do the best job possible and still be robed of our future through political channels. This will not end up in a win scenario. in reality I can only say we have a win if the first years contract is a win. If we loose the contract after the first year then you need to understand WE LOOSE IT ALL based on the contract that is currently in position. That means it would have been better for us as a company to have lost it today in negotiation than lost in a year after we are $10-$15,000,000 upside down. As my friend you I don't want to be having a conversation 1 year from now saying we just couldn't figure out how to make this a win-win contract. We are not asking for a win-loose contract we are asking for a win-win contract. We know the solution for a win-win contract and noone should be offended or upset in any way by asking them to write the win-win contract. which leads me to #2

At trial, Phil Morrell testified regarding his email, "this was a very stressful time for everybody involved. This email was an attempt by me to prop everybody back up and get everybody feeling okay about things again. This was not some email that -- some legal email that I'm saying that everything worked out perfectly." Phil Morrell did, however, testify in response to the question: "And you believed at the time that P00011 was a win-win deal?" "Yes, absolutely."

Ultimately, the court agrees with defendant, which in its reply brief states, "it does not matter which party first proposed the modification. Both parties submitted proposals, counter-proposals, and negotiated each aspect of the modification before coming to an agreement and signing a bilateral modification." The back and forth process between the parties resulted in modifications which did not achieve everything either side wanted. The fact that plaintiff did not receive their desired result from the modifications does not prove that either modification P00006 or modification P00011 were executed under duress. The court fails to find the evidence in the record that the plaintiff involuntarily signed the modifications. Although the failure to demonstrate involuntary acceptance is fatal to plaintiff's duress claim, the court, nonetheless, examines the other two elements of the duress framework.

### b. No Other Alternative

Related to the concept of involuntarily acceptance, is the second prong of the duress analysis, that circumstances permitted plaintiff no other alternative than accepting the two modifications, when executing modification P00006 and modification P00011. Defendant argues that "Oasis also produced no evidence regarding the second prong necessary for economic duress, that it had no other alternatives than to sign P00006 and P00011." Indeed, the government argues that Oasis had alternatives to signing the modifications, stating "[o]f the many alternatives, Oasis was free to: (1) not propose P00006 and P00011; (2) not sign P00006 or P00011; (3) propose alternative terms to modify the contract other than those it agreed to in P00006 and P00011; or (4) stop performance under the contract and accept the contractual consequences." In response, Oasis contends that "[d]efendant's argument that Oasis had alternative options is superficial and ignores the facts of the case. Instead of actually addressing the plausibility of the 'alternatives' it proposes, Defendant simply cuts and pastes generic case law of where other courts have held that other contractors had other options."

Plaintiff contends that "Oasis did not want either proposal, but was forced to propose something in order to avoid financial ruin." Plaintiff also states, regarding the argument it could have proposed alternative terms, "[t]he final modifications that were

---

2. The definition of diplomacy: this is when you tell someone to go to hell and they truly enjoy the trip and appreciate your suggestion for them to take the trip. I trust your ability to fix this contract. . . . If we loose the contract in a year from now the military will also loose so lets protect them from themselves. Lets change the loose-loose contract to a win-win contract.

(capitalization in original; spelling in original).

agreed to were the only option on the table, and Defendant has no argument that anything substantively better existed." Plaintiff argues that "[d]efendant makes no attempt to suggest that there were alternative modification terms that would have been acceptable to Defendant – let alone that those terms would have been substantively better and presented no evidence to supports [sic] its assertions," but that alone does not support Oasis' position that there were no available alternatives. Most notably, plaintiff concedes that "[d]efendant is correct that sometimes it is a viable alternative to stop performance and pursue legal remedies," but argues that "[i]f Oasis had stopped performance and accepted the contractual consequences, the company would have gone out of business and the Morrells would have lost everything." Defendant notes "[t]he crux of Oasis's economic duress claim is that it may have been 'bankrupt[ed]' had it not entered into P00006 and P00011." (trial citations omitted). At trial, Phil Morrell testified that "P00006 was the only way I could pull it out of default, and it was the only thing that Montler would offer us to -- to move on to the next level of this contract. So, this pulled me out of default with my banker. I didn't have a choice. I had to pull the contract out of default." In its briefs, plaintiff contends that "Oasis was underwater at the time of P00006 and P00011 and was on the verge of bankruptcy from March-August 15, 2006."

The court notes that the joint exhibits introduced at trial demonstrate that Oasis' audited financial statements reflected a profit for 2006, the year both modification P00006 and modification P00011 were executed, as the combined net earnings listed a profit of $19,284,023.00 for 2006.[50] The combined statements of owners' equity also demonstrates that "Al-Morrell Development, LLC Members' Equity" net earnings for 2006 were $19,284,023.00, the same as the combined net earnings for Al-Morrell Development, LLC and Oasis. Plaintiff addresses the consolidated statements, by stating, "[f]irst, looking at Oasis' 2006 financial report ignores $12-15 million financial outlay Oasis made in 2005 to build Anaconda, mobilize, and order equipment for the other plants. Due to the fact that Defendant only paid Oasis approximately $1 million in 2005, Oasis already entered 2006 heavily in the red." Plaintiff also contends that "[s]econd, Oasis' financial situation was substantially different in December 2006 than it was in April 2006 (P00006) and August 2006 (P00011). Year to date, Defendant had only paid Oasis around $11 million through March 2006, and around $23 million through August 2006," and argues that $90,000,000.00 in revenue for 2006 came from after modification P00011 was

---

[50] The court notes that Oasis' audited financial statements also reflected a profit for 2007 and 2008, the two years after the modifications were executed. The 2007 Oasis' audited financial statements indicated a net profit of $14,674,848.00 and the 2008 Oasis' audited financial statements indicated a net profit of $26,129,285.00. Although defendant points to the profitability of the later years of the contract, indicating Oasis made $100 million in profit under the bottled-water contract, which represents more than 25 percent of the $381,081,443 million paid to Oasis over the four-year contract," and argues "Oasis also concedes that the contract was profitable," to prove that Oasis did not execute the modification under duress, the court only considers the financial status of Oasis as it existed when modification P00006 and modification P00011 were executed.

executed.[51] Oasis also contends that "the 'net earnings' is akin to operating profit (gross revenue minus operating costs) and does not account for the $70 million investment Oasis made in the plants or the debt payments due. As such, Oasis still owed tens of millions to its financial lenders at the end of 2006." Therefore, plaintiff alleges that "Oasis was underwater at the time of P00006 and P00011 and was on the verge of bankruptcy from March-August 15, 2006." Even if plaintiff is correct, none of the above proves that Oasis was on the "verge of bankruptcy," or that plaintiff was coerced into signing modification P00006 and modification P00011 or had no alternative but to do so. Defendant also points to the testimony of Paul Jeffries regarding the risk Oasis took on initially in order to potentially be profitable in the latter years of the contract:

> Q. So, essentially Oasis was taking a risk of taking a loss in the first year with the opportunity to make significant profits in the following two years, correct?
>
> A. That's correct.
>
> Q. That was the bargain that Oasis entered into, right?
>
> A. That's correct. Substantial risk for substantial gain.

Paul Jeffries, prior to the above quoted testimony, testified that Oasis was motivated to continue the contract

> [b]ecause we still -- we had all debt and no revenue, right? We were just starting to produce revenue at a couple of the sites. We were building. We had committed the better portion of $60 million in capital expenses that were moving -- either were in-country or were moving toward country, and if they didn't renew the contract, we would have no opportunity to recover a large portion of those dollars. It would bankrupt the company first, Paul and Phil second, and it would be devastating financially for us.

Alan Morrell testified that modification P00011 was executed "under duress, but I'll tell you what, when you get a check for $47 million and you're a company that's on the verge of bankruptcy, you're going to be relieved." Phil Morrell testified regarding modification P00011, it was accomplished "on threat of shutting the contract down, not funding the next period, the personal bankruptcy I had talked about." Defendant argues that "Oasis proffered no evidence that it suffered *any* financial loss, much less financial loss that could justify an economic duress claim. For example, Oasis did not introduce any evidence that it was on the verge of bankruptcy, nor did it introduce any evidence regarding the financial condition of its owners, Paul Morrell and Phil Morrell." (emphasis in original). The court finds the testimony of plaintiff's witnesses on this subject to be conclusory and only about

---

[51] The court notes that, if plaintiff was millions of dollars in debt before modification P00006 and modification P00011 were executed, and if plaintiff earned $90,000,000.00 in revenue in 2006 after modification P00011 was executed, it does not appear that plaintiff suffered as a result of the modifications, or was forced to accept an unfair bargain.

the probability of, or even the possibility of, bankruptcy. Defendant notes that:

> Oasis introduced no evidence regarding the (1) value of the "homes" Oasis
> claims Paul Morrell and Phil Morrell were "on the edge of losing,"[52] (2) the
> amount of money in the Morrells' various bank accounts, (3) the value of
> their investments, including stocks, bonds, and real estate investments, and
> (4) the value of the other companies owned by the Morrells, including Al-
> Morrell Development and Diatect, a company owned by Phil Morrell.

In fact, only in the trial testimony of the principals of Oasis did they allege the precarious
state of their financial status, but their testimony did not include supporting documentation
for the record.

In IMS Engineers, a Judge of the United States Court of Federal Claims also
considered a duress claim when the support for the duress claim was not fully
documented. The duress allegation in IMS Engineers arose from a settlement agreement
between the plaintiff and the Army Corps of Engineers. The plaintiff had been awarded a
contact in 1991 as a subcontractor to the United States Small Business Administration,
but in 1996, the Corps "moved to terminate plaintiff's contract with a March 25, 1996
notice to the SBA." IMS Engineers-Architects, P.C. v. United States, 92 Fed. Cl. at 61.
The IMS Engineers court noted that:

> In October 1996 the parties held in-person settlement negotiations, during
> which the Corps continued to question plaintiff's claims. Plaintiff had lost its
> records and provided no documentation of its expenses. . . . The Corps's
> records of the parties' settlement negotiations document the Corps's tough
> negotiating position. Contracting Officer Ryals and Contracting Specialist
> Jean Petty, negotiating for the Corps, disputed Mr. Singh's calculations of
> employee salaries and accumulated interest. Ms. Petty also indicated that
> any work that plaintiff performed without first having received a notice to
> proceed or a Corps-approved work plan had been at plaintiff's risk.

Id. at 62. "Ultimately, after Mr. Ryals reiterated to Mr. Singh that 'without financial records,
a settlement was very difficult,' Mr. Singh and the Corps agreed on October 30, 1996, to
settle for $499,999.00. Mr. Ryals later recorded his conclusion that '[t]he settlement
represents a fair and reasonable conclusion to this contract and all parties are satisfied
with its outcome.'" Id. at 63 (footnote and internal references omitted). Plaintiff
subsequently filed suit in the United States Court of Federal Claims seeking to set aside
the release. See id. at 56. In discussing the plaintiff's duress allegations, the IMS
Engineers court acknowledged that:

> The Corps's contract administration was irregular, and the Corps officials
> knew that was the case. However, the credible testimony of the Corps's fact

---

[52] Plaintiff's counsel argued in its initial post-trial brief that had Oasis suffered a 45 million
dollar loss, "Paul and Phil are operating with no safety net, knowing that they are on the
edge of losing their homes."

witnesses overcomes Mr. Singh's charge of economic duress. As was revealed at trial, plaintiff's evidence of financial distress was weak. Letters from Mr. Singh dated November 28, 1994, and December 8, 1994, amount to no more than unsubstantiated pleas for relief. The Corps understood that the transfer of Contract 0004 from plaintiff would occasion a loss of work. Nevertheless, plaintiff never has been able to document its claimed losses.

Id. at 66-67 (footnote and internal references omitted). The IMS Engineers court concluded that:

The Corps's administration and transfer of Contract 0004 may have resulted in financial loss, and these circumstances led to plaintiff's dissatisfaction with both the Corps and the parties' settlement. Nevertheless, the court cannot disregard plaintiff's release on the basis that the Corps was aware that plaintiff had suffered a loss due to the transfer of work under Contract 0004 and the subsequent termination of Contract 0004. The release was received by the Corps pursuant to the parties' settlement, which was negotiated at arms-length and was economically reasonable. Plaintiff did not produce evidence to document its loss, to approximate a reasonable calculation of loss absent records, or to show that the Corps coerced a settlement that only partially compensated plaintiff for plaintiff's December 23, 1996 release.

Id. at 69. Likewise, the plaintiff in the above captioned case alleges that it was on the "verge of bankruptcy" and that the Oasis' principals "could have lost everything including their lives." Plaintiff did not introduce any supporting evidence to that effect, nor was the testimony elicited by plaintiff's counsel during the trial adequate to support such a claim. Moreover, plaintiff has not documented its financial condition or the economic condition of Paul Morrell or Phil Morrell that would have resulted in their personal bankruptcy, making it difficult for plaintiff to prove that it had no alternative but to sign the modifications. Nor has the plaintiff demonstrated that the discussions and negotiations between plaintiff and the government did not allow for choices on the part of plaintiff.

   c.  *Wrongful Act*

Regarding the third element of duress, a coercive, wrongful act by the government, Oasis claims that "Defendant created, contributed to, and otherwise exacerbated the financial condition of Oasis, which ultimately required Oasis to sign P00006 and P00011." The defendant responds that "Oasis produced no evidence – none – to support its accusations that the military officers, all of whom were serving this country in a war zone at the time, acted wrongfully." As noted by a Judge of the United States Court of Federal Claims in Starr International,

[t]o substantiate a claim of duress, a plaintiff "must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced

these two factors." <u>Fruhauf [Sw. Garment Co. v. United States]</u>, 126 Ct. Cl. [51,] 52, 111 F. Supp. 945 [1953)]. In other words, "[t]he assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities." <u>Id.</u>

<u>Starr Int'l Co. v. United States</u>, 106 Fed. Cl. at 77. As indicated by the United States Court of Appeals for the Federal Circuit in <u>North Star</u>, "'coercion requires a showing that the Government's action was wrongful, *i.e.,* "(1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing."'" <u>N. Star Steel Co. v. United States</u>, 477 F.3d at 1334 (quoting <u>N. Star Steel Co. v. United States</u>, 69 Fed. Cl. 672, 721 (2005) (quoting <u>Rumsfeld v. Freedom NY, Inc.</u>, 329 F.3d at 1330));[53] <u>see also IMS Engineers-Architects, P.C. v. United States</u>, 92 Fed. Cl. at 66; <u>Aboo v. United States</u>, 86 Fed. Cl. at 632. A Judge of the United States Court of Federal Claims has explained that "[t]o invalidate contract modifications on the ground of economic duress, the contractor must show that government coercion was the cause of the contractor's financial distress and that the Government employed extra-contractual means to effect this distress." <u>Vicari v. United States</u>, 47 Fed. Cl. 353, 360 (2000); <u>see also Henderson Cnty. Drainage Dist. No. 3 v. United States</u>, 53 Fed. Cl. 48, 56 (2007) (quoting <u>Vicari v. United States</u>, 47 Fed. Cl. at 360) ("Plaintiff 'must show that government coercion was the cause of the . . . financial distress. . . .' Economic conditions and financial concerns alone are not enough."). As noted by the Federal Circuit in <u>Rumsfeld</u>, "an act can be coercive without being illegal. Government coercion may be supported by a finding that the government engaged in wrongful acts by violating the contract without a good-faith belief that its actions were justified or by violating the covenant of good faith and fair dealing implicit in every contract." <u>Rumsfeld v. Freedom NY, Inc.</u>, 329 F.3d at 1330; <u>Starr Int'l Co. v. United States</u>, 106 Fed. Cl. at 77 ("A coercive act is one that is 'wrongful,' but need not be illegal."). As explained in <u>Systems Technology Associates, Inc. v. United States</u>, "[a]n act the Government is empowered to take under law, regulation, or contract may nonetheless support a claim of duress if the act violates notions of fair dealing by virtue of its coercive effect." <u>Sys. Tech. Assocs., Inc. v. United States</u>, 699 F.2d at 1387-88.

A Judge of the United States Court of Federal Claims also has observed that "[a]bsent wrongful conduct, economic pressure and the threat of considerable financial loss do not constitute duress." <u>IMS Engineers-Architects, P.C. v. United States</u>, 92 Fed. Cl. at 66 (citing <u>Sys. Tech. Assocs., Inc. v. United States</u>, 699 F.2d at 1387–88). As

---

[53] Oasis quotes the earlier decision of <u>Systems Technology Associates, Inc. v. United States</u>, for the proposition that the cases of Court of Claims "have done away with the requirement of an illegal act, focusing instead on the coercive nature of the act as dispositive of its 'wrongfulness,'" <u>Sys. Tech. Assocs., Inc. v. United States</u>, 699 F.2d at 1387, and argues "[t]his approach has focused more on the extent to which the will of the contractor has been overridden, rather than on the lawfulness of the coercive act." The court notes that <u>North Star</u>, decided after <u>System Technology</u>, still provides that one way to prove a wrongful act is demonstrate the government's conduct was illegal. <u>See N. Star Steel Co. v. United States</u>, 477 F.3d at 1334.

explained in a decision from the United States Court of Claims:

> "Economic duress may not be implied merely from the making of a hard bargain." Aircraft Associates & Mfg. Co., Inc. v. United States, 357 F.2d 373, 378, 174 Ct. Cl. 886, 896 (1966). The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions. Fruhauf Southwest Garment Co. v. United States, 111 F. Supp. at 951, 126 Ct. Cl. at 62. "Some wrongful conduct must be shown, to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity." La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 1382, 193 Ct. Cl. 168, 177 (1970). It is not duress to threaten to make good faith use of the remedies prescribed under a contract. "A party is always entitled to say that if his offer is not accepted, he will avail himself of his legal rights; it is only the threat of a wrongful or unlawful act that may constitute duress. Such a threat will amount to duress only if it is sufficient to overpower the will of the other party and prevent the free exercise of his will."

Johnson, Drake & Piper, Inc. v. United States, 531 F.2d 1037, 1042-43, 209 Ct. Cl. 313 (1976) (quoting Beatty v. United States, 168 F. Supp. 204, 206-07, 144 Ct. Cl. 203, 206 (1958)); see also Metcalf Constr. Co., Inc. v. United States, 102 Fed. Cl. 334, 347 (2011) (quoting Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1330 (quoting Johnson, Drake & Piper, Inc. v. United States, 531 F.2d at 1042, 209 Ct. Cl. 313 (""'[E]conomic pressure and even the threat of considerable financial loss are not duress."'"))); IMS Engineers-Architects, P.C. v. United States, 92 Fed. Cl. at 66.

Initially, the court notes, as discussed above, without much, if any, support, Oasis claims that "Oasis was underwater at the time of P00006 and P00011 and was on the verge of bankruptcy from March-August 15, 2006." Defendant, regarding the wrongful act prong of the duress analysis, argues that "[e]ven if Oasis could substantiate its claim that it was in a difficult financial condition when it signed P00006 and P00011, Oasis's economic duress claim still fails." As noted above, "[a]bsent wrongful conduct, economic pressure and the threat of considerable financial loss do not constitute duress." IMS Engineers-Architects, P.C. v. United States, 92 Fed. Cl. at 66; see also Metcalf Constr. Co., Inc. v. United States, 102 Fed. Cl. at 347 (quoting Rumsfeld v. Freedom NY, Inc., 329 F.3d at 1330 (quoting Johnson, Drake & Piper, Inc. v. United States, 531 F.2d at 1042, 209 Ct. Cl. 313 (""'[E]conomic pressure and even the threat of considerable financial loss are not duress."'")).

Moreover, defendant argues that the source of economic peril, if it existed at all, was plaintiff's lender, and not the government. Defendant notes that "Oasis is attempting to invalidate agreements it made with the *Government* because of financial pressure placed upon it by *MSD* [Michael S. Dell]. But Oasis's disagreements with MSD have nothing to do with the Government." (emphasis in original). As the court indicated above, "[t]o invalidate contract modifications on the ground of economic duress, the contractor must show that government coercion was the cause of the contractor's financial distress

and that the Government employed extra-contractual means to effect this distress." Vicari v. United States, 47 Fed. Cl. at 360; see also Henderson Cnty. Drainage Dist. No. 3 v. United States, 53 Fed. Cl. at 56. As explained during the trial, it was plaintiff's decision to use MSD as a lender, and the government did not require Oasis to use MSD as a condition of the modifications. In response to the government's question: "But that was Oasis's choice to enter into that agreement with MSD, right?" Paul Jeffries answered "[i]t was." Similarly, Alan Morrell had the following exchange on cross-examination:

> [Q.] The Government didn't force Oasis to enter into that agreement, right, with MSD?
>
> A. No, they did not.
>
> Q. So, it was Oasis willingly undertook that contractual obligation, right?
>
> A. Yes, we did.

In response, plaintiff claims that "Oasis acknowledges that financial peril is a necessary but not sole condition of economic duress." Instead, "Oasis is arguing that Defendant's wrongful conduct combined with the possibility of financial ruin, constitutes duress." As discussed above, Phil Morrell testified that he had no choice but to accept modification P00006. Plaintiff argues, "[i]n fact, P00006 was the only way he could get Oasis out of default on its loan agreement and was the only option the Government offered to continue the Contract." Although defendant agrees that plaintiff's witnesses testified that Oasis would be in default of their financing agreement if the Government did not execute the option years under the contract,[54] defendant notes that "Oasis knew full well that the Government was not required to execute the option periods." In response to the question: "And you understood the Government in its sole discretion can either exercise an option or not exercise an option, correct?" Paul Jeffries answered "Yes."[55] Moreover, when asked on cross-examination: "It was Oasis' decision to agree to financial terms that included a provision for default if the Government were not to exercise an option," Paul Morrell testified "That's correct." Therefore it was a provision in Oasis' contract with its financial backer that was the source of Oasis' economic pressure. In the court's view, the government was not the cause of Oasis' distress. Even if the government used that leverage to gain a more favorable agreement for the modifications, that alone

---

[54] In fact, defendant's counsel had the following exchange with Alan Morrell:

> Q. So, assuming that that is in the agreement, Oasis willingly entered into a contract with an investor that it would go into default if the Government didn't exercise its first option period, true?
>
> A. It's risky, isn't it? Yes, it's true.

[55] Separately, when asked on cross-examination: "Oasis was not assured that the Government would exercise that option when it entered into agreement with MSD, right?" Paul Jeffries answered: "No, we were not."

does not prove duress or coercive wrongdoing. In affirming the trial court's decision in Peters v. United States, the Federal Circuit reasoned:

> The trial judge discussed in adequate detail the reasons why the facts of this case did not establish economic distress or coercion, and there is no need to repeat that discussion. In brief, he correctly concluded that the government did not act improperly in insisting upon a formal modification of the contract that required Peters to pay more for the timber; that the "serious financial and time pressures" that Peters then faced "as a result of the contract requirements . . . was not due to wrongful or improper conduct by the Government [but] was pressure generated from the contract situation" . . . Peters had not shown that in the circumstances of this case his signing of the modification agreement was the result of economic duress or coercion.

Peters v. United States, 694 F.2d 687, 694 (Fed. Cir. 1982) (first omission in original); see also Asberry v. Postal Serv., 692 F.2d 1378, 1381 (Fed. Cir. 1982); McLain Plumbing & Elec. Serv., Inc. v. United States, 30 Fed. Cl. at 82.

In Systems Technology, discussed above, the court noted that the Systems Technology plaintiff argued that "the Government was aware of, had caused, and had used the contractor's precarious financial condition to coerce a settlement," and the court noted that "STA's precarious financial condition is well documented in the record and was recognized by the Government." Sys. Tech. Assocs., Inc. v. United States, 699 F.2d at 1389. Nonetheless, the Federal Circuit determined "STA, however, does no more than assert causation and the Government's coercive use of the circumstances to secure a settlement. The record is totally devoid of proof of either count." Id. Even if the government in the above captioned case was aware of the difficult position Oasis was in as a result of its lender, this alone does not demonstrate that Oasis was coerced by the government to execute the modifications.

Plaintiff also claims that "Oasis' economic duress claims largely stem from a pattern of contractual breaches by Defendant that began shortly after Contract award and continued up to and throughout the entire Base Year. Defendant had no good faith basis to breach the contract in these ways. . . ." Specifically, plaintiff claims that "Defendant forced on Oasis a contractual interpretation it knew or should have known was incorrect," and alleges that "Defendant's knowingly baseless interpretation of the Contract and failure to award contractually sufficient land on time had crippled Oasis financially." As determined above, the defendant, not the plaintiff, understood the correct interpretation of the contract, therefore, the court disagrees with plaintiff that "Defendant forced on Oasis a contractual interpretation it knew or should have known was incorrect." Nor does the court conclude that pattern of contractual breaches by defendant resulted in the wrongful conduct that plaintiff alleges gave rise to the duress, because the "pattern of contractual breaches" plaintiff believes occurred stem from plaintiff's view of the contract. Plaintiff claims that defendant

knowingly putting Oasis into default by sending the notice of intent not to renew. While standing alone, and despite its not being required by the Contract, such an action might not constitute duress, in this case it does because Defendant's action (sending the letter) had more drastic results due to Defendant's prior wrongful pattern of withholding and threatening to withhold money. Here, Oasis' situation would not have been as bad if the Government had paid the entire Base Year firm fixed price; but because it was threatening to simply end the contract having paid Oasis only 10% of that amount, the entire personal assets of the Morrell brothers were on the line.

Holding aside that plaintiff has not demonstrated that "the entire personal assets of the Morrell brothers were on the line," as plaintiff admits, the notice not to renew in and of itself would not constitute duress. As explained above, on March 27, 2006, the contracting officer, sent Oasis a letter titled "Preliminary Notice of Government Intent to Exercise Option CLINs 1001-5, Contract W27P4A-05-C-0002 for $112M," which stated: "The Government must withhold its intent to exercise the option," and informed Oasis that "[t]he contracting office does not have assurance of adequate funding." As determined above, Oasis knew that the military was not obligated to exercise an option period. Regarding the remainder of plaintiff's argument, that Oasis would not have been in financial distress if had paid the entire Base Year firm fixed price; because the government's obligation under the contract was only to pay for bottled water produced, it was never obligated to make a $50,225,000.00 payment at the time the March 27, 2006 letter was sent.

Plaintiff also views the "wrongful conduct" of the contracting officers through the prism of its own interpretation of the contract, arguing that government "repeatedly threatened to withhold money it knew Oasis was due." At trial, however, Lieutenant Colonel Davis indicated that his understanding of the contract while he was the contracting officer was the one that the government has taken during this case. In response to the question, "Lieutenant Colonel Davis, what did you understand the unit price in this CLIN structure to be?" he answered, "$3.50 a case." Plaintiff claims that

Col. Richardson similarly threatened to withhold money she knew Oasis was already owed," arguing that "Oasis asked Col. Richardson how it should go about invoicing at the end of the year for the balance of the $50,225,000 Base Year price. Oasis had previously discussed with Col. Richardson Phil Morrell's interpretation that Oasis was entitled to be paid both for the capability and the water, and Col. Richardson told Oasis that was a non-starter.

(internal reference removed). Plaintiff's argument, however, is again premised on plaintiff's interpretation of the payment obligations of the contract. On cross-examination, Colonel Richardson indicated that "the CLIN structure clearly says I give you a case of water, you give me a $3.50."[56]

---

[56] The court notes, regarding plaintiff's assertion that Oasis had discussed Phil Morrell's interpretation, Colonel Richardson testified she was not informed of plaintiff's

Plaintiff also contends that the defendant's failure to adequately provide plaintiff land for the construction of the bottled water facilities was an example of the wrongful conduct of the defendant. Even this argument, however, is related to plaintiff's interpretation of the contract. Oasis explains:

> The Government's late delivery of land and assignment of non-Compliant land was a problem, but it would not have been an insurmountable problem but for Defendant's insistence on only paying for water. But, in the context of the Defendant's position that it would only pay for water and that any unused portion of the base year funds would disappear at the end of the Base Year, Defendant's delay in assigning usable land was a dire threat to Oasis' continued viability, since Oasis would need all the time it could get to produce enough water to "earn" its Base Year Payment.[57]

(footnote omitted). The court determined above, that the defendant was correct about the interpretation of the contract, then the late delivery of land was not an "insurmountable problem," and therefore, would not have been, in and of itself, the basis of wrongful conduct that would rise to coercion. The plaintiff's argument that "Defendant's position that it would only pay for water," is, as has been repeatedly stated in this opinion, the correct interpretation of the contract in the court's view. Moreover, one of the purpose of modification P00006 was to extend the deadlines for the plants to be operational, and addressed the defendant's delays in providing the land for the locations of the plants.

In addition, plaintiff argues that:

> A central part of the dispute in this case is whether Oasis was entitled to be paid for establishing the capability to produce water, actually producing water, or both. However, **at a minimum**, Oasis had to be paid for either water or capability. As a result of Defendant's contractual interpretation and maladministration of the Contract, for a substantial portion of the Base Year, Defendant was denying Oasis payment for either. Defendant refused to take all of the water Oasis produced and directed Oasis to slow production to a level below those in Figure 1 of the Contract.

(emphasis in original). Citing to plaintiff's trial exhibit 1166, the defendant argues that "the military did not 'shut down' Oasis's water production; it merely directed that water

---

interpretation of the contract. In response to the question from defendant's counsel: "Just so the record's clear, did anyone at Oasis ever tell you that they believed they were to get $50.225 million plus $3.50 a case?" Colonel Richardson testified: "Absolutely not, sir."

[57] Plaintiff, in a footnote, notes that "[o]f Oasis's entire claim, only Count 5 ($808,423) is *directly* related to issues with the land provided by the Defendant. The Defendant's land delays are also relevant to count 7, which seeks reimbursement of a delay penalty imposed by the Defendant." (emphasis in original).

production rates at one of Oasis's six plants be reduced from surge production rates to winter production rates." Indeed, the email which is plaintiff's exhibit 1166, from Lieutenant Colonel Davis requested that Oasis "align production of bottled water at Bottled Water Facility #6, Camp Victory to be in accordance with winter production of 250,000 liters of water per day as stated in Fig 1 of the contract."[58] Nonetheless, Oasis contends that "Oasis was producing and Defendant was not paying," noting that prior to executing modification P00011, "Oasis had approximately two (2) million cases of water sitting at its plants that Defendant would not allow Oasis to deliver," and "[s]uch a withholding had a crippling effect on Oasis, as it represented approximately one-third (1/3) of Oasis' entire revenue stream in the entire Base Year to that point."[59] The court notes, however, that the military did accept all cases of water produced by Oasis, as indicated in the parties joint stipulations, and as acknowledged by Phil Morrell at trial, as he responded to the government's question on cross-examination: "Oasis did submit

---

[58] As indicated above, the statement of objectives for the contract included production requirements for the bottled water facilities, which was labeled Figure 1:

| LOCATION | TOTAL PRODUCTION REQUIREMENT/DAY in 1K Liters (winter/summer/surge) |
|---|---|
| Location 1 | 75-100K liters / 101-150K liters / 151-200K liters |
| Location 2 | 65-100K liters / 101-135K liters / 136-170K liters |
| Location 3 | 35-55K liters / 56-75K liters / 76-100K liters |
| Location 4 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 5 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 6 | 200-300K liters / 301-400K liters / 401-450K liters |
| Location 7 | 80-120K liters / 121-160K liters / 161-200K liters |
| Location 8 | 75-110K liters / 111-150K liters / 151-190K liters |

(capitalization in original).

[59] Defendant points out that plaintiff failed "to mention that, in June 2006, it invoiced (and was paid) for $2,962,050 for 846,300 cases of water 'on hand' at Plant Victory that Oasis had produced but the Government had not yet accepted."

invoices for bottled water during the base period and the Government paid every single one of them, right?" by answering: "Correct."[60]

In <u>North Star</u>, the Federal Circuit reasoned that "[f]or the third prong of economic duress to have been met in this case, the circumstances which North Star confronted must have resulted from WAPA's coercive acts," and "[t]he third prong is not met because there was no wrongful action by the government." <u>N. Star Steel Co. v. United States</u>, 477 F.3d at 1334. The same applies to the plaintiff's case before this court, there is no coercive, wrongful act by the military that Oasis can credibly point to during the negotiations for the modifications that forced Oasis to execute the modifications under duress. Although Oasis has asserted that a number of the actions taken by the military during the negotiations for the two modifications, and during contract performance, many of plaintiff's claims stem from plaintiff's interpretation of the contract, which the court has concluded is not correct. As plaintiff has acknowledged in its arguments above, absent an incorrect interpretation of the contract by the defendant, the remaining issues identified by plaintiff do not rise to the level of coercion that would justify a finding of economic duress, and, therefore, invalidate modification P00006 and modification P00011. Plaintiff, therefore, has not proven that the government committed a wrongful act.[61]

---

[60] On cross-examination, Paul Morrell had the following exchange with defendant's counsel:

> [A.] My recollection is that we had 3 or 4 million cases of water that we had produced during the base year that were still sitting on our yards that had not been taken delivery of, so -- and we could only invoice after they had been delivered. Now, I may be wrong in that assumption, but that's my recollection.
>
> Q. The Government paid the invoices, though, right?
>
> A. They paid the invoices that we submitted to them with the exception of that July 31st. I don't recall for sure if they did.

[61] The court notes that the plaintiff spent considerable time in its post-trial briefs arguing that the burden of proof to be applied to duress is not a clear and convincing evidence standard, but rather the preponderance of the evidence standard. For example plaintiff argues that "Defendant asserts without any legal support that the clear and convincing evidence standard applies to all duress cases." Plaintiff argues that:

> The burden of proof here is the 'preponderance of the evidence' standard. Courts sometimes use the words 'exacting' when describing the *elements* of duress, but not when describing the *burden* of proving duress. Thus, cases stating that 'the requirements to establish duress are exacting' merely denote the specificity with which a contractor must prove the three elements of duress by a preponderance of the evidence.

In addition, defendant notes that the "[b]ilateral modifications P00006 and P00011 were executed in April and August 2006, respectively, yet Oasis did not raise its economic duress claims until it submitted its claim in July 2008, more than two years after P00006 and just less than two years after P00011." Therefore, defendant argues that "[b]ecause Oasis: (1) operated as if P00006 and P00011 were valid contractual modifications; and (2) waited approximately two years to challenge the validity of those modifications, Oasis has forfeited the right to invalidate those bilateral agreements." (citing VKK Corp. v. Nat'l Football League, 244 F.3d 114, 123 (2d Cir. 2001) and Loral Corp. v. United States, 193 Ct. Cl. 473, 481-82 (1970)). Plaintiff argues that "[d]efendant makes no effort to explain why one year (or even two years) was too long. The fact that Oasis waited a year in and of itself means nothing," especially because "[t]hroughout 2007, Oasis was still heavily underwater and highly dependent on Defendant for its financial solvency." Plaintiff also argues that "[t]he fact that Oasis operated as if the modifications were valid is similarly irrelevant, as that is the case anytime a party waits to allege duress." The plaintiff continues, "[i]f the Court believes that Oasis was coerced into signing P00006 and P00011, then Oasis was justified in waiting a year to raise the issue of duress." The court, however, has determined that Oasis did not execute modification P00006 and modification P00011 under economic duress. Moreover, regarding the delay, plaintiff seemingly offers no argument, other than the amount of time Oasis waited is irrelevant. As indicated by the United States Court of Claims "a telling indication that no duress was practiced is [a] long delay before plaintiff spoke out and claimed duress." Johnson, Drake & Piper, Inc. v. United States, 531 F.2d at 1042, 209 Ct. Cl. 313; see also IMS Engineers-Architects, P.C. v. United States, 92 Fed. Cl. at 68-69.

In McLain Plumbing & Electrical Service, Inc. v. United States, a Judge of the United States Court of Federal Claims determined that "plaintiff demonstrates no Government conduct representing coercion, the plaintiff further fails the basic requirement of proving economic duress." McLain Plumbing & Elec. Serv., Inc. v. United States, 30 Fed. Cl. at 83. The McLain plaintiff had argued that by virtue of the Veterans Administration demand to terminate plaintiff's original subcontractor in favor of another subcontractor, or face default termination "the contractor had no choice but to accept the terms of reinstatement (post default) in order to avoid a disastrous default termination which would serve to cripple any government contractor. Secondly, there was no alternative for McLain, simply stated, McLain could default its subcontractor or be defaulted." Id. The McLain court furthermore, agreed with the McLain defendant that "the fourteen month delay in asserting coercion certainly detracts from the plaintiff's assertions of economic duress." Id. Likewise, as explained by the court in IMS Engineers-Architects, P.C. v. United States, "plaintiff first complained of duress in its June 21, 2000 REA, which was submitted approximately three-and-one-half years after the Corps allegedly coerced the parties' settlement and plaintiff's release. Plaintiff's delay in claiming duress gives credence to Mr. Ryals's testimony regarding the parties' good-faith negotiations and Mr.

(emphasis in original). As the plaintiff has failed to prove any of the elements of economic duress, either under the preponderance of the evidence standard or the clear and convincing evidence standard, it does not matter which standard applies in order to reach a decision in the above captioned case.

Singh's satisfaction with the $499,999.00 settlement." <u>IMS Engineers-Architects, P.C. v. United States</u>, 92 Fed. Cl. at 69 (internal citation omitted). In the above captioned case, Colonel Richardson testified at trial:

> [Q.] Did anyone at Oasis ever tell you that they believed Modification Number 6 was invalid?
>
> A. No, sir.
>
> Q. Did anyone at Oasis ever tell you that they were coerced into signing this document?
>
> A. No, sir.
>
> Q. Did anyone at Oasis ever tell you that they only signed this contract because of duress?
>
> A. No, sir.
>
> Q. Did anyone at Oasis ever tell you that they believed any modification was invalid for any reason?
>
> A. No, sir.

This was corroborated by Paul Jeffries' testimony on cross-examination:

> Q. You never communicated to any Government representative that this modification is invalid because of coercion, you never said that to anyone on the Government side?
>
> A. Not in -- I'm sure we didn't communicate that until -- until we filed a claim. We did tell them -- there was no ambiguity about our dissatisfaction with them extending the base year, or with chopping up our annual renewals, because they couldn't fund a contract they had let. It's the U.S. Government.

Although the court does not assert the length of time plaintiff waited to raise its duress claim is dispositive, it certainly does not provide support for plaintiff's view that it executed the modifications under duress. In sum, plaintiff cannot meet the established high bar for establishing duress. <u>See</u> <u>Starr Int'l Co. v. United States</u>, 106 Fed. Cl. at 77; <u>see</u> <u>also</u> <u>Employers Ins. of Wausau v. United States</u>, 764 F.2d at 1576. Therefore, plaintiff has not demonstrated that it executed modification P00006 or modification P00011 under economic duress. The modifications are valid.

<u>Fraud Counterclaim for Claim 2</u>

In an earlier opinion in the above captioned case, and as noted above, the court, with the exception of one fraud counterclaim, which the court deferred, denied defendant's counterclaims for the Special Plea in Fraud, False Claims Act, and the anti-fraud provision of the Contract Disputes Act. As explained in the conclusion of the court's earlier opinion, "as established above, Paul Morrell, as signatory to the certified claim, did not have the intention to commit fraud and genuinely believed in his interpretation of the contract regarding what payments Oasis was entitled to recover under the contract. Nor did plaintiff act recklessly when submitting its claims." The court, however, deferred the counterclaims for Claim 2. As explained in the Special Plea in Fraud portion of the earlier opinion: "Because the court has deferred the issues of contract interpretation and economic duress, the court likewise, at this time, defers the resolution of the counterclaim pursuant to the Special Plea in Fraud for Claim 2." The court did the same with the counterclaim for Claim 2 for the False Claims Act, stating "[a]s indicated above, the court has deferred Claim 2 for Special Plea in Fraud purposes, and does the same for Claim 2 as it relates to the False Claims Act," as well as with the counterclaim for the anti-fraud provision of the Contract Disputes Act, stating "[a]s indicated above, the court deferred Claim 2 for Special Plea in Fraud and False Claims Act purposes, and does the same for Claim 2 as it relates to the anti-fraud provision of the Contract Disputes Act." As the court has now found in favor of defendant's interpretation of the contract, and has not found economic duress, the court now addresses Claim 2 of the defendant's counterclaims for the Special Plea in Fraud, False Claims Act, and the anti-fraud provision of the Contract Disputes Act.

As indicated above, on June 20, 2008, Paul Morrell, on behalf of Oasis signed the certified claim, and on July 4, 2008, Oasis submitted its certified claim to the government. Claim 2 in the certified claim was a "Claim for penalty wrongfully assessed for failure to open Camp TQ [Camp Taqaddum] on time," which plaintiff states was "solely as a result of Government-caused delays and disruptions," and for which plaintiff sought $2,270,833.00. Defendant contends that:

> Count two, which seeks $2.2 million relating to TQ, stems entirely from Oasis's attempts to invalidate P00011 through a claim of economic duress. As part of P00011, the Government paid Oasis $24 million, which included $5.5 million for TQ, a plant that Oasis still had not yet completed by August 2006. The claimed $2.2 million corresponds to one-sixth of the $50.225 million, minus the $5.5 million that the Government paid to Oasis for TQ as part of the P00011 negotiations. Even though Oasis voluntarily agreed to P00011, which closed out the base year, Oasis seeks an additional $2.2 million for TQ in its certified claim.

(internal citations omitted). Plaintiff argues that "the Court should disregard Defendant's 'fraudulent duress' interpretation," arguing that "[w]ith regard to Defendant's new 'fraudulent duress' argument related to Count 2, Defendant argues that fraudulent duress is not a new theory, but instead additional evidence to support its claim that Oasis' contractual interpretation is frivolous." Oasis also argues that "Defendant's argument essentially boils down to the fact that it really likes its duress defense," and plaintiff states

that "the Court should disregard Defendant's 'fraudulent duress' interpretation."[62] Defendant argues that "because Oasis's contract interpretation is implausible in light of the unambiguous terms of the contract and all extrinsic evidence, count two constitutes fraud."

As the court explained in the court's earlier opinion, for the majority of the parties' briefing, the parties do not differentiate between the various fraud statutes and generally only discuss "fraud." The same is true for the counterclaim for Claim 2. Nonetheless, the court briefly reiterates the standard for each fraud statute and analyzes each counterclaim for Claim 2 separately.

*Special Plea in Fraud*

The defendant's second amended answer and counterclaim asserts that:

Oasis attempted to practice fraud against the United States in the proof, statement, establishment, or allowance of the portions of the claim identified in the paragraphs above [in the defendant's second amended answer and counterclaim]. In particular, Oasis submitted at least one certified claim with the intent to cause the Government to pay Oasis amounts to which it knows it is not entitled.

As more fully explained in the court's earlier opinion, the Special Plea in Fraud statute provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

---

[62] Plaintiff also argues that "Defendant's fraudulent duress argument is particularly pernicious, given that Defendant admittedly destroyed the email accounts of the very witnesses Oasis is claiming coerced the company." For support, plaintiff cites to the joint stipulation that "[o]ther than the .pst file of Major Vazquez (which he personally retained), the Government did not find (and therefore could not search for responsive documents), the Iraq.centcom.mil domain email accounts of any potential witnesses in this case." As indicated above, the court has deferred spoliation until after the court considered the fraud counterclaims and contract interpretation. As the court determines below that there was no fraud committed by Paul Morrell or Oasis, the court does not need to consider if any potential spoliation occurred regarding the fraud counterclaim for Claim 2. Furthermore, the court does not accept plaintiff's characterization of the joint stipulation as defendant having "destroyed the email accounts," nor that the defendant admitted doing so.

28 U.S.C. § 2514 (2006); see also Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d 1348, 1365 (Fed. Cir. 2013), reh'g denied, 563 F. App'x 769 (Fed. Cir.), cert. denied, 135 S. Ct. 167 (2014). In Kellogg Brown & Root, the United States Court of Appeals for the Federal Circuit unequivocally held that "[o]n its face, the statute is limited to those circumstances where the Government proves fraud 'in the proof, statement, establishment or allowance' of a claim not in the execution of a contract." Id. at 1366 (footnote omitted).

Defendant alleges that "count two is premised upon Oasis's claim that it was entitled to be paid $50.225 million just to make the facilities 'capable' of producing water." Oasis stated in the certified claim that, "[w]hile Oasis delivered some bottled water during the Contract base year, Oasis invoiced the Government for that water and the Government paid those invoices. The primary deliverable item in the Contract base year is water purification and water-bottling *capabilities*." (emphasis in original). The certified claim made plain plaintiff's view that:

> Oasis provided water-bottling capability services for an additional 2.67 months when the Contract base year was extended to August 15, 2006, due to Government delays and breaches of contract. As explained in 6.0 paragraph 33, Oasis is entitled to a payment of $11,175,063 for the water-bottling capability services provided during the extended Contract base-year performance.

> In discussing modification P00011, the certified claim stated:

> Through P00011, Oasis was paid $23,411,780 for the 6,689,080 cases of bottled water delivered through July 2006 and $24,542,387 for delivery of water-bottling capabilities in the Contract base year. Accordingly, Oasis submitted an invoice in the amount of $24,542,387 for delivering water-bottling capabilities to the Government on August 15, 2006, and the invoice was paid. The net effect of P00011 was: 1) to reduce the Contract consideration for delivering purified water-bottling capability by $25,682,613 from $50,225,000 to $24,542,387; 2) to provide the Government all water produced, on hold and deliverable as of August 15, 2006, without paying Oasis any consideration, thereby damaging Oasis in the amount of $7,059,192 (2,016,912 cases x $3.50); and 3) to pay nothing for water-bottling capabilities for the period May 26, 2006, through August 15, 2006, which cost Oasis $11,170,061.

(internal citations omitted).

As explained above, the court noted plaintiff's view that "[t]he Contract was a firm-fixed-price (FFP) services contract for water bottling 'capability,' pursuant to which Oasis was entitled to $50,225,000 in the Base Year in exchange for 12 months of performance, irrespective of the amount of water produced by Oasis and/or purchased by Defendant." Likewise, the court noted the defendant's view that "the Court should enforce those terms

and rule that the contract does not require the Government to pay Oasis separately for the cost to build the bottled-water facilities." The court agreed with defendant's position that the government's obligation under the contract was solely to pay for water produced and does not demonstrate that the intent of the base year of the contract was to compensate plaintiff $50,225,000.00 to establish the capability to produce bottled water, and then, to additionally compensate the contractor for bottled water produced. Therefore, finding the defendant's interpretation of the contract was correct, the court determined that the terms of the contract are unambiguous that the contract obligated the government to pay plaintiff $3.50 a case of water, up to 14,350,000 cases of water for a total potential obligation of $50,225,000.00.

After concluding that the contract was unambiguous, out of an abundance of caution, the court examined the intentions of the parties when they executed the contract, and determined that the testimony of the signatories to the contract, as well as the documents produced near to the execution of the contract, supports the defendant's view of the contract, and that the parties intended for the contract to compensate plaintiff only for the bottled water produced. As noted above, defendant argues regarding Claim 2, "because Oasis's contract interpretation is implausible in light of the unambiguous terms of the contract and all extrinsic evidence, count two constitutes fraud." As explained in the court's previous opinion:

> In sum, the Oasis certified claim, and the affidavits of the Oasis personnel, including Paul Morrell, articulate a clear theory of plaintiff's claims. The certified claim alone is over fifty pages and provides specific calculations and details of how Oasis formed its views of the contract. This is significant, because as demonstrated at the trial and in the record before this court, defendant's witnesses and even some of plaintiff's witnesses, did not all share plaintiff's contractual view included in the certified claim. It was, therefore, incumbent upon Oasis to clearly articulate its theory of recovery in its certified claim. The court agrees with plaintiff that "Oasis' claim clearly and openly stated the basis for the claim, including the contractual interpretation that the Government now alleges to be fraudulent."

As it relates to Claim 2, although the court has determined that it was the defendant, and not the plaintiff, who had the proper interpretation of the contract, as the court explained in the court's prior opinion:

> Even if the rationale behind the plaintiff's theory is incorrect, the court agrees that, within the framework articulated by plaintiff in the certified claim, and as testified to at trial by Phil Morrell, and especially, Paul Morrell, who signed the certified claim, the certified claim was not an attempt to double bill the government; the certified claim was an attempt to recover on plaintiff's capabilities theory of the contract. The court had considerable opportunity to hear testimony, and observe, Paul Morrell, in particular, during the trial. Although there are two differing theories of contract interpretation before the court . . . the court is convinced, after sitting through

the trial and reviewing the evidence in the record, that the certified claim was presented in good faith and without the requisite intent to defraud.

Much like the court's conclusion that the certified claim was submitted in good faith, the court believes that the plaintiff offered a good faith position regarding contract interpretation in the certified claim.[63] Although the court found against plaintiff's contract interpretation position, that determination does not demonstrate that the plaintiff's interpretation was implausible or submitted without merit. Moreover, nothing about the court's analysis of the contract interpretation undermines the court's previous observations about Paul Morrell or that the certified claim was presented in good faith and without the requisite intent to defraud.

Furthermore, it is understandable that Paul Morell, the signatory of the certified claim, evolved his views on the meaning of the contract over time. Paul Morrell, in fact, testified his view of the contract changed over time and that he eventually concluded that interactions with the government made "it more clear to me that Phil had been correct all along. This is not about water. This is about capabilities, which is what Phil's been maintaining all along." The court notes that, as documented above with regard to the extrinsic evidence, Max Wyeth, and not Phil Morrell or Paul Morrell, was the architect of the pricing schedule in the contract, as, moreover, was the signatory of the contract. Paul Morrell's understanding of the contract was informed by events after the contract had been signed and performance of the contract had began when Oasis first became involved with American AquaSource and Max Wyeth. Likewise, in the previous opinion the court concluded that "Paul Morrell signed the certified claim and plaintiff's position that '[d]efendant provides nothing to contradict Paul Morrell's sworn testimony that his opinion and understanding evolved and he changed his mind, and that the right amount was claimed' remains true." The same is true for the Claim 2.

Turning to duress, the court believes that the defendant goes too far to suggest:

Oasis fabricated accusations of duress against military personnel who were serving in Iraq in its attempt to invalidate bilateral modifications P00006 and P00011. Oasis formulated its baseless coercion claims to support its efforts to obtain double payment from the military. Oasis's proposal, acceptance, and performance under P00006 and P00011 demonstrate that its double-

---

[63] As explained in the court's earlier opinion, plaintiff has a convoluted, alternative explanation of its claims, and indicated at closing argument that "Counts 1, 2 and 8 seek the difference between capability and water and what the government actually paid us in the base year, which is $47,954,167. We tried to allocate the difference, which is $32 million and change, amongst counts 1, 2 and 8, which are the things that we believe were taken from us." Plaintiff's counsel continued: "Counts 1 and 8 seek water payments. Count 2 seeks the difference between $50 million and $47 million. We thought the $47 million was capability, which is why count 2 is $2 million and counts 1 and 8 are $30 million." As the court previously indicated that it did not believe that plaintiff committed fraud for Claim 1 or Claim 8, the court does not need to address plaintiff's allocation theory for Claim 2.

billing claims are false and unsupported. While the military's contracting officers were focused on ensuring a safe and reliable water supply for the troops, Oasis accused those same officers of coercion solely to justify its baseless certified claim.

In its reply brief, defendant reiterates: "Accordingly, our argument that Oasis fabricated its economic duress is not a 'new theory' of fraud for count two, but simply more evidence that Oasis's contract interpretation is frivolous – which is the basis for our assertion of fraud on count two." As explained above, the plaintiff claimed that "Oasis has demonstrated each of the three requirements for duress," and defendant, by contrast, argued that "plaintiff's duress claims should be roundly rejected because there is not a shred of evidence supporting Oasis's attempts to walk away from its contractual commitments," and that "Oasis falls far short of establishing a single element of economic duress, let alone all three." As concluded above, plaintiff did not demonstrate that Oasis executed either modification P00006 or modification P00011 under duress, and plaintiff was unable to demonstrate that Oasis involuntarily accepted the modifications, had no alternative but to accept the modifications, or that the government committed a coercive, wrongful act that resulted in Oasis signing modification P00006 or modification P00011.

Despite these determinations, the court did not, and does not, conclude that the failure to prove duress would provide the basis of a fraud claim under the Special Plea in Fraud statute. Defendant's argument for fraud is based on its view that plaintiff put forth a "baseless economic duress claim." The court, however, does not believe the economic duress arguments were entirely baseless. Nor did the court conclude that plaintiff "fabricated" its claims, and, thereby, committed fraud. The court, after carefully considering the evidence in the case, as well as the parties' legal arguments, agreed with the defendant that the modifications were not executed under duress. This finding, however, is insufficient to meet the requirements of the Special Plea in Fraud statute, especially considering the court's earlier determinations regarding the sincerity of Paul Morrell's testimony or that the certified claim was presented in good faith and without the requisite intent to defraud. The defendant's Special Plea in Fraud counterclaim for Claim 2, therefore, is dismissed.

*False Claims Act*

As the court wrote in the earlier opinion, the False Claims Act, 31 U.S.C. § 3729 (2012),[64] provides:

---

[64] The False Claims Act was amended in 2009. See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4(a), 123 Stat. 1617, 1621. The amendments are treated "as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date." Id. § 4(f), 123 Stat. at 1625; see also AEY, Inc. v. United States, 114 Fed. Cl. 619, 633 (2014) ("The amended provision, 31 U.S.C. § 3729(a)(1)(B), took effect as if enacted on June 7, 2008 and applies to all claims under the False Claims Act that were pending on or after that date."). As explained in August 31, 2016 opinion, Oasis submitted its certified claim on July 4, 2008,

**(a) Liability for certain acts.--**

**(1) In general.**--Subject to paragraph (2), any person who--

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

**(E)** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

**(F)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

. . .

**(b) Definitions.**--For purposes of this section--

**(1)** the terms "knowing" and "knowingly" --

---

and Lieutenant Colonel Hobbs denied Oasis' certified claim in its entirety on October 18, 2009.

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

**(2)** the term "claim"--

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729. The term "claim" is defined in the False Claims Act as:

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

**(B)** does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

31 U.S.C. § 3729(c). The False Claims Act also states:

**(1)** the terms "knowing" and "knowingly" --

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

31 U.S.C. § 3729(b) (2012). Congress rejected requiring a specific intent to defraud under the False Claims Act. <u>See</u> 31 U.S.C. § 3729(b). Instead, Congress adopted a knowing standard, defined as "actual knowledge" of the falsity, acting in "deliberate ignorance of the truth or falsity," or acting in "reckless disregard of the truth or falsity." <u>Id.</u>

In the court's earlier opinion, the court concluded that:

The government has not demonstrated that the plaintiff's interpretation should be considered "false statements," nor has the government demonstrated that Oasis had "actual knowledge" of the falsity, was acting "in deliberate ignorance of the truth or falsity," or was acting "in reckless disregard of the truth or falsity." <u>See</u> 31 U.S.C. § 3729(b). Because the court finds that defendant has not demonstrated that plaintiff had knowledge that its claims were false or fraudulent, and had no intention to induce "wrongful payment," <u>United States v. Rivera</u>, 55 F.3d at 709, Oasis is not liable under the False Claims Act. As indicated above, the court believes that the testimony of the Paul Morrell and Phil Morrell was sincere. There was no indication in their testimony at trial of any intention or steps taken to defraud the government. As the parties do not raise stand-alone arguments related solely to the False Claims Act, the court determines, for the reasons articulated above, the government has not proven a violation of the False Claims Act, even under the preponderance of the evidence standard.

The court concludes that same applies to the counterclaim for Claim 2. The government did not raise any separate arguments for the False Claims Act regarding Claim 2. In its briefs, defendant only states that "Oasis is liable under the False Claims Act for the same

reasons that its claim must be rejected under the Special Plea in Fraud." As the court has concluded that defendant has not demonstrated fraud under the Special Plea in Fraud statute, defendant's False Claims Act counterclaim for Claim 2, therefore, also is dismissed.[65]

*Contract Disputes Act*

Defendant argues that "[i]n addition to forfeiting its claim under the Special Plea in Fraud, because Oasis submitted a fraudulent certified claim under the Contract Disputes Act, it owes the United States damages equal to the unsupported amount of its claim." Defendant claims that "Oasis has selected its own penalty, as Contract Disputes Act fraud damages are self-defining. Oasis itself selected the magnitude of its fraud and must reap the consequences. "

The court's previous opinion explained that the anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 604 (now 41 U.S.C. § 7103(c)(2) (2012)) provides:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

41 U.S.C. § 604.[66] The Contract Disputes Act, at 41 U.S.C. § 605(c)(1) (2006) (now 41

---

[65] The court notes that the preponderance of the evidence standard of proof is applicable to the False Claims Act, as well as to the Contract Disputes Act, as compared to the "clear and convincing" standard that applies to proof under the Special Plea in Fraud statute. See UMC Elecs. Co. v. United States, 249 F.3d 1337, 1338-39 (Fed. Cir. 2001) ("The government must prove a violation of the Contract Disputes Act and False Claims Act by a preponderance of the evidence. Under the Special Plea in Fraud, the government must prove its allegations by clear and convincing evidence." (citing Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir.), reh'g denied (Fed. Cir. 1998))). The court believes that defendant has not met its burden to prove its fraud claims for Claim 2 under either standard of proof.

[66] The language of the anti-fraud provision of the Contract Disputes Act was slightly altered when it was recodified in 2011 at 41 U.S.C. § 7103(c)(2). See Veridyne Corp. v. United States, 758 F.3d 1371, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014). The current language of the provision now states:

> If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus

U.S.C. § 7103(b)(1)), requires for a certification of a claim in excess of $100,000.00,

> the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c)(1); see Trafalgar House Constr., Inc. v. United States, 73 Fed. Cl. 675, 693 (2006) ("The primary purpose of this certification is to prevent the submission of fraudulent claims."), aff'd, 274 F. App'x 898 (Fed. Cir. 2008). The Contract Disputes Act at 41 U.S.C. § 605(c)(7), requires that "[t]he certification required by paragraph (1) may be executed by any person duly authorized to bind the contractor with respect to the claim." 41 U.S.C. § 605(c)(7) (now 41 U.S.C. § 7103(b)(2)).

The United States Court of Appeals for the Federal Circuit indicated "[t]he Contract Disputes Act requires that an authorized corporate official certify that 'the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, [and] that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.'" Veridyne Corp. v. United States, 758 F.3d at 1380 (quoting 41 U.S.C. § 605(c)(1) (recodified at 41 U.S.C. § 7103(b)(1)(A)-(D)). As noted by the trial court in Veridyne, citing to 41 U.S.C. § 7103(c)(2), "[a]lthough the anti-fraud provision contains no express requirement that the costs must be 'reasonable,' it presumes that defendant actually has incurred the claimed costs of review." Veridyne Corp. v. United States, 107 Fed. Cl. 752, 767 (2012), aff'd in part, rev'd in part, 758 F.3d 1371 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014).

As noted in the court's earlier opinion, defendant argues in its second amended answer and counterclaim, regarding the anti-fraud provision of the Contract Disputes Act, Oasis "is liable to the United States pursuant to the Contract Disputes Act, 41 U.S.C. § 7103, for the amount of such unsupported claims, $44,516,868, plus the Government's costs attributable to reviewing such claims." In its post-trial briefs, defendant submitted the following chart for the amount of penalties it alleges are owed by plaintiff under the Contract Disputes Act:

| Count | Description | Amount |
|---|---|---|
| 1 | Bottled water already paid for during base period from sites other than Anaconda (5,605,020 cases) | $19,617,570 |
| 2 | TQ allegedly unpaid mobilization fee | $2,270,833 |

---

all of the Federal Government's costs attributable to reviewing the unsupported part of the claim.

41 U.S.C. § 7103(c)(2).

| 4 | Extrapolated monthly "mobilization fee" based on alleged firm fixed base year "mobilization fee" of $50.225 million | $11,175,063 |
|---|---|---|
| 6 | Camp Speicher and Q-West improvements already reimbursed by military as part of modification P00011 | $600,000 |
| 8 | Bottled water already paid for through May 24, 2006, from Anaconda (3,100,972 cases) | $10,853,402 |
| | Total Amount of False and Fraudulent Claim | $44,516,868 |

For support, defendant claims that:

> As demonstrated above, counts one, two, four, six, and eight, are unsupported in their entirety. Counts one and eight attempt to compel payment of more than $30 million dollars for bottled water for which the military had already paid. Count six also seeks payment of the same $600,000 a second time. Counts four seeks costs never incurred, and count two stems from Oasis's baseless economic duress claim and its frivolous contract interpretation.

As explained in the court's earlier decision, "[d]efendant offers no new arguments specific to the antifraud provision of the Contract Disputes Act that have not been addressed above, except for the chart for the amount of penalties." The same is true for the Claim 2. Regarding Claim 2, the defendant merely relies on its belief that Oasis has a "frivolous contract interpretation" and, therefore, put forth a "baseless economic duress claim." As explained above, although the court found against the plaintiff regarding its interpretation of the contract and with respect to its duress claims. As evidenced by the court's lengthy discussion above addressing both contract interpretation and economic duress, however, the court does not believe plaintiff's theories as certified in the claim rise to the level of frivolous, and, are instead based on a possible, albeit incorrect theory of the case. Furthermore, the court, in the prior opinion, determined that:

> The fundamental changes in manner in which plaintiff performed the contract for the government in the base year, including how it was compensated for the water produced, and continued to perform after the base year was complete, allows for plaintiff's certified claim to be a bona fide one, and not fraudulent either under the plaintiff's or defendant's interpretation of the contract. Defendant has failed to prove fraud. As demonstrated above, plaintiff's intent was not to make a claim that was intended to deceive or mislead the government. Therefore, the court concludes that defendant has failed to demonstrate a violation of the anti-fraud provision of the Contract Disputes Act.

Again, the same logic applies to the fraud counterclaim for Claim 2. As with the prior counterclaims, Paul Morrell, as the signatory of Oasis' certified claim, believed in the theory and merits of the certified claim submitted. Likewise, the court's earlier opinion the court concluded that "Paul Morrell signed the certified claim and plaintiff's position that '[d]efendant provides nothing to contradict Paul Morrell's sworn testimony that his opinion

and understanding evolved and changed his mind, and that the right amount was claimed' remains true." The same is true for the Claim 2, and, as explained above, Paul Morrell inherited the contract from American AquaSource and Max Wyeth. As he was not the signatory to the contract, it is understandable that his views on the contract may have changed over time. Therefore, defendant has failed to prove that Oasis knowingly submitted a fraudulent claim for Claim 2, and Oasis is not liable under the anti-fraud provision of the Contract Disputes Act for Claim 2.

## CONCLUSION

For the reasons explained above, the court concludes that defendant's interpretation of the contract, requiring the government to pay only for bottled water produced, is correct. In addition, plaintiff has not demonstrated that Oasis executed either modification P00006 or modification P00011 under duress. Moreover, even though plaintiff's interpretation of the contract was incorrect, and the claims of economic duress have been found to be unsupported, plaintiff did not intend to perpetrate a fraud on the government when Oasis submitted its certified claim. Rather Paul Morrell, as signatory to the certified claim, did not have the intention to commit fraud and genuinely believed in his interpretation of the contract when he submitted the certified claim. Defendant's counterclaim regarding Claim 2 is **DENIED**.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**