# In the United States Court of Federal Claims

### No. 10-707C
### Filed: November 21, 2017
### Reissued: December 1, 2017[1]

* * * * * * * * * * * * * * * *
                          *

| | |
|---|---|
| **OASIS INTERNATIONAL WATERS, INC.,**                                               **Plaintiff,** <br><br> v. <br><br> **UNITED STATES,** <br><br>                **Defendant.** | **Trial; Contract Interpretation; Site Conditions; Law of the Case; Quantum; Delay.** |

* * * * * * * * * * * * * * * *

## O P I N I O N

**Laurence Schor**, Asmar, Schor & McKenna, PLLC, Washington, D.C., for plaintiff. With him were **Susan L. Schor, Dennis C. Ehlers, David A. Edelstein, Robert D. Pratt,** and **Allison G. Geewax**, Asmar, Schor & McKenna, PLLC, Washington, D.C.

**James P. Connor**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Tanya B. Koenig**, Trial Attorney, Commercial Litigation Branch, **Stephen C. Tosini**, Senior Trial Counsel, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler,** Acting Assistant Attorney General, Civil Division, Department of Justice.

## HORN, J.

Plaintiff, Oasis International Waters, Inc. (Oasis), is a contractor that performed a bottled water contract with the United States military in Iraq during the Iraq War. Oasis is a Nevada corporation for which the principal place of business is in Utah. After the end of contract performance, plaintiff filed a certified claim with the contracting officer, which was denied in its entirety. Plaintiff thereafter filed a complaint in the United States Court of Federal Claims on October 18, 2010, and, subsequently, on April 12, 2012, defendant filed fraud counterclaims against plaintiff.

---

[1] The court issued a series of opinions in the above captioned case on August 31, 2016, April 7, 2017, and November 21, 2017.  In response to the court's November 21, 2017 Order, the parties agreed that all three opinions could be issued without redactions.  After reviewing the opinions, the court agrees with the parties and the original opinions are hereby unsealed and reissued without redaction.

**FINDINGS OF FACT**

As stipulated to by the parties, "[a]fter the start of the Iraq War but prior to the award of the contract at issue in this case, the Army procured all of its Iraq bottled water requirements from Turkey, Kuwait, and Jordan and shipped it by truck into Iraq and to the various U.S. military bases in Iraq." United States Air Force Colonel Renee M. Richardson, who served as one of the contracting officers on the contract at issue in this case from May 2006 until October 2006,[2] explained at trial that "[t]he previous approach was bringing bottled water in from Turkey, Jordan, and Kuwait, of course, which put soldiers on the road for the transportation." As noted in the Statement of Work for the solicitation at issue in this case, Solicitation No. W27P4A-05-R-0002 (the solicitation):

> Up to the present time bottled water has been purchased from sources outside of Iraq. This practice necessitates large numbers of convoys and escorts to transport the bottled water from Kuwait, Jordan, and Turkey. Producing bottled water locally would significantly reduce the number of convoys required to transport water as well as reduce the likelihood of battle related injuries.

The parties also stipulated that:

> On or about March 2, 2005, Maj. Vazquez, a contracting officer with Joint Contracting Command-Iraq (JCC-I, later Joint Contracting Command-Iraq Afghanistan – JCC-I/A), serving at Camp Victory, issued a Request for Information (RFI) "to get information on contractors capable of providing the following capabilities for construction of re-locatable water purifying and bottling facilities for distribution at several locations in Iraq. Locations will be identified at a later date and time. These facilities are to produce clean drinkable bottled water per all USDA and FDA standards and requirements."

The RFI generated interest from 71 vendors, and, on April 3, 2005, the government posted Solicitation No. W27P4A-05-R-0002.[3] Proposals were due by May 3, 2005, and the government received 22 bids in response to the solicitation, and answered 145 questions. A sample of the questions and answers reveals that the bidders had questions about the pricing, capabilities, the land to be provided in Iraq and the obligations of the government. For example, one part of question 33 stated: "Is our offer to give the cost per liter with the personnel built in, seperate [sic] to the cost of the plant and equipment?" The government replied: "All Costs per liter are to be included." Likewise, question 40 asked: "Start up Cost: Since the bid is predicated upon the deliverables per litre bottle of water, can we assume that all costs(inc personnel and equipment deployment to site) incurred between contract award and water production will fall upon the successful bidder?" The

---

[2] In 2006, Colonel Richardson was a Lieutenant Colonel. When she testified at trial, she was a full Colonel. The court refers to her as Colonel Richardson in this opinion.

[3] The government issued 11 amendments to the solicitation.

government replied: "Yes. It is up to you how you determine the cost per litre taking into account all costs associated with this endeavor."

There were a number of questions regarding the obligations of the government. Question 2 asked, "[i]f projected demand falls short, what are the minimum volume requirements? Is there a required minimum quantity the Government will procure?" The government responded: "There are no minimums. The minimum is zero." Additionally, question 35, referring to question and answer 2, asked:

> The answer to Question #2 states that there are no minimum purchase quantities. This decision places an unreasonable amount of financial risk on the contractor, and will likely severely limit the competition for this RFP [Request for Proposals]. Request that the Government guarantee minimum purchase quantities base [sic] on the estimated quantities that appear in the RFP.

The government responded:

> The levels of liters required are in the range. This is roughly the production per day. You might have a day where your levels are lower, however, the Government contract is a Firm Fixed Price not Indefinite Delivery / Indefinite Quantity. The Government is entering into a one year contract with three option years. The only thing that could prevent the basic year from occurring is a Government decision to Terminate for Convenience or default of the contractor to perform to the requirements and the Government would then Terminate for Default.

One bidder questioned the potential for installment payments, asking: "Would the Government authorize progress or installment payments recognizing 1) the significant capital investment with establishing new capability and, 2) the ability to credit progress payments with actual deliveries?" to which the government responded that: "The first payment will be made once the contractor has the first plant operational and has had an approved first article test accepted without conditions."

In response to question 44, the government indicated "[t]he Government will provide as flat land as possible," and regarding site conditions, the government indicated in the answer to question 89, stated that "[s]ite prep should be minimal. The water source has been identified and deemed to have sufficient amounts by the government to support the operation." The government also noted in answer to question 89, however, "[i]t is up to you what you do in order to meet the Government's requirements and timeframe for delivery."

In response to the question: "Start up Cost: Since the bid is predicated upon the deliverables per litre bottle of water, can we assume that all costs(inc personnel and equipment deployment to site) incurred between contract award and water production will fall upon the successful bidder?" the government indicated: "Yes. It is up to you how you determine the cost per litre taking into account all costs associated with this endeavor."

One of the 22 bids was submitted by American AquaSource, Inc. (American AquaSource), and signed by Max Wyeth, President of American AquaSource. Attached to the American AquaSource proposal was a spreadsheet showing the volumes of production and an estimate for when each site would begin water production. American AquaSource's bid assumed a price of $3.50 per case of water, or a total of $50,225,000.00, based on the production of 14,350,000 cases.[4] At trial, Max Wyeth explained that he calculated the $50.225 million figure "using our average forecast of demand, we came up with a case number that would be produced per year, and multiplied that by the case cost."[5]

Major Mauricio Vazquez, who issued the RFI and answered the questions posed by the potential offerors, contacted Max Wyeth to clarify the proposal and to submit a "total cost per year for all four years and the Grand total." Max Wyeth provided Major Vazquez with a base year price of $50,225,000.00 and three option year prices of $186,000,000.00, totaling $608,225,000.00. Max Wyeth confirmed in his correspondence "that the 3.50 price is the only price, regardless of the winter/summer/surge period, for all years within the contract." After negotiations between Max Wyeth and Major Vazquez, in which Major Vazquez asked Max Wyeth to reconsider the option year prices, on May 11, 2005, Max Wyeth submitted an amendment to the American AquaSource proposal, which included a revised "Summary of Pricing Schedule" with a proposed base year price of $50,225,000.00 and three option year prices of $112,000,000.00, for a total contract price of $386,225,000.00. The parties have stipulated that, "[o]ther than AquaSource's proposed price, all other offerors whose proposals were found technically acceptable offered prices in excess of $1 Billion."[6] Major Vazquez awarded contract no. W27P4A-

---

[4] The court notes, however, for the basis of the estimate in the American AquaSource proposal, American AquaSource assumed annual production of 384 million bottles or 32 million cases of water.

[5] Counsel for defendant confirmed during Max Wyeth's testimony:

> Q. So, just so the record is clear, the $50.225 [million] in your proposal is based upon $3.50 per case?

> A. Yes.

[6] The government's own Independent Government Cost Estimate, estimated a total base year cost of $149,145,842.23, or almost three times American AquaSource's proposal for the base year, to construct and operate the eight water bottling facilities in Iraq. Morrell International, Inc., a corporation, whose Chief Executive Officer was Phil Morrell, also submitted a separate proposal which provided for a base year price of $899,725,000.00, option year prices of $831,287,500.00 per year, for a contract total of $3,393,587,500.00. Phil Morrell, who later became the president of Oasis, the successor contractor to American AquaSource, testified at trial, however, that his bid was a "bad bid," and that he had intended to bid at $5.50 per case of bottled water. Phil Morrell indicated that the

05-C-0002 (the contract) to American AquaSource on May 25, 2005. The contract called for base year price of $50,225,000.00 and three option year prices of $112,000,000.00 each, for a total contract price of $386,225,000.00.[7] Major Vazquez signed the contract on behalf of the government and Max Wyeth signed on behalf of American AquaSource.

After the contract was awarded to American AquaSource, Paul Morrell contacted Max Wyeth, and subsequently, in June 2005, Max Wyeth exchanged several emails with Phil Morrell and Dan Petsche, then the Vice President for Contracts and Compliance for Al-Morrell Development discussing the bottled water project.[8] Paul Morrell testified that "[o]ur original intent with American AquaSource was to sell our assets to him, as it appeared that he didn't have the resources and the funding to acquire our assets, much less build the factories. It morphed or migrated into a partnership between Max and Phil and myself."[9] Paul Morrell explained that, initially:

> Al-Morrell Development was essentially the performance arm of the operation. We built the facilities. We financed them. All the employees were employed by Al-Morrell Development. It was basically the part of the organizations that really did all the performance. . . . Max's responsibility was to provide water bottling expertise, because Phil and I were -- had never built a water bottling plant prior to this.

The original arrangement changed, because as Paul Morrell testified:

> Initially, Mr. Wyeth told us that he had the financing lined up, and he just needed time. He didn't have time, because the first facility had to be up -- we're talking July, and we had basically 90 days to get the first facility up. So, we really didn't have time. . . . So, our understanding was he would continue to try to bring his financing option to the table, get money in the bank. In the meantime, Phil and I would self-fund this first plant so that we could meet the contractual deadlines. Over the course of the fall, it became clear that Mr. Wyeth's options were not going to come to fruition, and AMD [Al-Morrell Development] -- initially it was a parallel track. We were trying to

---

request "needed to be right around $5.50 per case," for "somewhere around the 32 million cases per year."

[7] The cover page to the contract listed the estimated dollar amount as "$386,225,000.00." At trial, Major Vazquez testified that this amount was in error and that the amount should have been $50,225,000.00. Subsequently, on July 15, 2005, United States Air Force Major Marc A. Lopez, who served as the contracting officer on the contract from June 2005 until September 2005, executed modification P00002 on behalf of the government, which changed the dollar amount from "$386,225,000.00" to "50,225,000 (NTE)," because "[o]nly the base year award should have been documented in the contract."

[8] Max Wyeth testified that at the time he signed this contract he had no relationship with Al-Morrell Development, Paul Morrell, Phil Morrell, or Paul Jeffries.

[9] Phil Morrell and Paul Morrell are brothers.

obtain financing on behalf of AMD while we were waiting for his financing to
come into place. Ultimately his financing failed, and the AMD financing did
come into place late in the year or early the next year.

Therefore, in July 2005, Phil Morrell, Al-Morrell Development, Max Wyeth, and American
AquaSource entered into a joint development and pre-incorporation agreement to form a
new corporation to fulfill the contract, with the agreement reflecting that the purpose of
American AquaSource's contract was to "build up to six (6)[10] water bottling plants in the
country of Iraq." Initially, the corporation was called Iraqua, Inc., but later changed its
name, on July 15, 2005, to Oasis. Subsequently, in the fall of 2005, Phil Morrell, Al-Morrell
Development, Max Wyeth, and American AquaSource signed an addendum to the joint
development and pre-incorporation agreement, assigning American AquaSource's
contract to Oasis. The addendum required Max Wyeth, of American AquaSource, to
execute a novation agreement. The novation agreement was to be a modification to the
contract, and ultimately was modification P00005, discussed below. On December 5,
2005,[11] "American Aqua Source, Inc.," "Oasis International Water, Inc.," and the "United
States of America" "enter[ed] into this Novation Agreement. . . as of August 1, 2005." Max
Wyeth, then-president of Oasis and American AquaSource, signed the modification on
behalf of Oasis on December 2, 2005 and Colonel Brandon Montler signed for the military
on December 5, 2005.[12] The modification stated that the "purpose of this modification"
was to reflect the novation agreement transferring all rights and responsibilities of the
bottled water contract from American AquaSource to Oasis. The modification also stated
that, "[a]ll other terms and conditions of the contract remain unchanged."

Paul Morrell was the Chief Executive Officer of Al-Morrell Development from
August 15, 2005 through January 2006, and, thereafter, he served as President of Al-
Morrell Development. Paul Morrell also was the Chief Executive Officer of Oasis from
August 15, 2005 through January 2006, and, thereafter, served as President of Oasis.
Phil Morrell was Chairman of Oasis from July 2005 through December 2012. Paul Jeffries
served as both the Chief Executive Officer and Chief Financial Officer of Al-Morrell
Development and Oasis. Paul Jeffries served as Chief Financial Officer of Al-Morrell
Development and Oasis from June 2005 through January 2006, and, subsequently,
served as Chief Executive Officer of Al-Morrell Development and Oasis from January
2006 through 2010. Paul Jeffries was replaced as Chief Financial Officer of Al-Morrell
Development and Oasis by Neil Vos, who served as Chief Financial Officer from February

---

[10] As explained below, although the contract, as executed, required eight water bottling
plants, the contract was modified by modification P00001 to require only six water bottling
plants.

[11] In 2005, Colonel Montler was a Major. When he testified at trial, he was a Colonel. The
court refers to him as Colonel Montler in this opinion.

[12] At the time of the novation, Max Wyeth testified he was "out of the loop" and his interest
in Oasis was eventually bought out by the Phil Morrell and Paul Morrell. Max Wyeth also
was not involved in the completion of the bottled water plants. Oasis accepted Max
Wyeth's resignation as president of Oasis on January 5, 2006.

16, 2006 until June 2011. As noted above, Dan Petsche was the Vice President for Contracts and Compliance for Al-Morrell Development during initial discussions about the contract with Max Wyeth, and he also was the Vice President for Contracts and Compliance for Oasis from 2005 through October 31, 2011. At all times, Paul Morrell and Phil Morrell had a controlling interest in Oasis, and after Max Wyeth was bought out and resigned as president, Paul Morrell and Phil Morrell controlled 100% of Oasis.

<u>The Contract</u>

As noted above, Major Vazquez awarded contract no. W27P4A-05-C-0002 to American AquaSource on May 25, 2005. Item no. 0001 of the contract was "NON-PERSONAL SERVICES [sic]" (capitalization in original) and indicated:

> The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO). Period of Performance: 25 May 05 through 24 May 06.

The unit price was listed as "$3.50/case" for all amounts of water produced. Following the item no. 0001 were three items for the three option years, item no. 1001, item no. 2001, and item no. 3001, changing only the period of performance.[13] After item nos. 0001, 1001, 2001, and 3001, there was a summary of the pricing schedule which stated:

**SUMMARY OF PRICES FOR BASE YEAR AND THREE OPTION YEARS**

**TOTAL BASE YEAR**            $50,225,000.00

**FIRST OPTION YEAR**          $112,000,000.00

**SECOND OPTION YEAR**         $112,000,000.00

**THIRD OPTION YEAR**          $112,000,000.00

**GRAND TOTAL (Base Year and Three Option Years)**      $386,225,000.00

(capitalization and emphasis in original). The period of performance was listed in the contract as:

BASIC PERIOD          25 May 2005 - 24 May 2006
OPTION PERIOD I       25 May 2006 - 24 May 2007
OPTION PERIOD II      25 May 2007 - 24 May 2008
OPTION PERIOD III     25 May 2008 - 24 May 2009

---

[13] The similarity of the three options years after the base year is reflected in the typographic error of "NON-PERSONAL SERVICES" in each of the three option years. (capitalization in original).

(capitalization in original). The statement of objectives for the "purified bottled water services" contract explained:

> The purpose of this contract is to provide re-locatable purified bottled water capabilities at various locations throughout Iraq Area of Operations (AO). Contractor shall produce the amounts of bottled water as outlined in Figure 1. Contractor shall ensure bottled water capability is able to relocate upon notification by the Contracting Officer (CO) due to military operational requirements. Bottled water capabilities shall be established in the order as listed in Figure 1. Actual locations will be given to the contractor that wins award. The contractor shall provide all the mechanical equipment required to produce and prepare for shipment the required amounts of bottled water. The first bottled water site shall be operational 120 days after the contract is awarded. This includes military inspection and acceptance. After contract award, additional bottled water sites shall be established within the remainder of days from contract award. A full 365 days from contract award, all sites will be fully operational.

Figure 1, referenced in the statement of objectives, identified the production requirements at each of the bottled water facilities at different points in the year.

| LOCATION | TOTAL PRODUCTION REQUIREMENT/DAY in 1K Liters (winter/summer/surge) |
|---|---|
| Location 1 | 75-100K liters / 101-150K liters / 151-200K liters |
| Location 2 | 65-100K liters / 101-135K liters / 136-170K liters |
| Location 3 | 35-55K liters / 56-75K liters / 76-100K liters |
| Location 4 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 5 | 60-110K liters / 111-160K liters / 161-210K liters |
| Location 6 | 200-300K liters / 301-400K liters / 401-450K liters |
| Location 7 | 80-120K liters / 121-160K liters / 161-200K liters |
| Location 8 | 75-110K liters / 111-150K liters / 151-190K liters |

(capitalization in original). Figure 1 contemplated three different quantity production requirements: winter, summer, and "surge." Colonel Richardson testified, explaining the different requirements, as follows:

[D]uring the winter, the weather was a lot more reasonable in Iraq; the highs were around the eighties, nineties. In the summer, temperatures got up to 135 degrees, requiring soldiers to drink more just to stay cool and to stay hydrated. During surge, what that's really talking to is battle operations. Our soldiers wind up wearing 60, 70, 80 pounds' worth of gear and then going out into . . . tanks, which causes them to sweat and causes them to need more water.

The tasks section of the contract instructed, in part: "The contractor shall provide re-locatable purified water bottling capability for producing and packaging required amounts of one liter bottles of water per day as outlined in Figure 1," "Contractor shall provide, operate, maintain, and repair all the mechanical equipment required to accomplish the Government's objectives," "Contractor shall ensure bottled water meets or exceeds all US Government quality standards," and "Contractor shall operate the purified bottled water capabilities with enough personnel to meet the Government's requirements." Regarding payment to the contractor, the invoicing section of the contract stated:

Invoicing shall occur monthly. The contractor shall invoice to the Contracting Officer Representative (COR), by the 5th of each month, for the total of all liters in [sic] produced, per location, for the entire previous month. The CORs will prepare the DD250s and will submit them with the contractor's invoice to the Contracting Officer (CO), no later than the 10th of each month.

<u>Bottled Water Facilities</u>

Although the contract, as awarded, required eight bottled water facilities, on May 26, 2005, as noted above, the day after contract award, United States Air Force Lieutenant Marion Knapp executed a no-cost modification P00001 on behalf of the government reducing the required number of water bottling facilities from eight to six. The six bottled water facilities were: LSA Anaconda (Anaconda), Camp Victory, Al Asad Airbase, Qayyarrah West (Q-West), Speicher, and Camp Taqaddum (TQ). On May 25, 2005, Major Vazquez indicated in an email to Lieutenant Knapp and Captain Patrick Sturgill, who served as a "liaison" between the contractor and the military, that land would be provided to the contractor no later than 30 days after contract award, "to ensure no delay is imposed by the Government to the Contractor." Although the answer to question number 44 regarding the solicitation indicated that "[s]ite prep should be minimal," defendant had to provide site preparation at every location except Al Asad.[14]

---

[14] In the case of Al Asad, plaintiff claims that: "Defendant refused to provide site prep at Al Asad, Oasis was forced in December 2005 to hire its own subcontractor to prep the site, which included filling borrow pits dug by the military, at a cost of $224,100," and further spent "$158,110 to abate the flooding and repair the damage caused to the site," as a result of the work done by another government contractor, Kellogg, Brown & Root, at an adjacent site.

Anaconda, the first bottled water facility, was contractually required to be operational by September 22, 2005. Major Lopez executed modification P00004 on September 18, 2005, on behalf of the government, granting a 12-day extension of the requirement for Anaconda's certification until October 4, 2005. Although Anaconda began producing water on October 10, 2005, Anaconda was not audited and certified operational until December 14, 2005, after producing almost 2 million liters of water.

Camp Victory, the second bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Camp Victory on September 4, 2005. Camp Victory was certified operational on April 7, 2006, and began producing bottled water on April 12, 2006. Al Asad, the third bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Al Asad on August 22, 2005. The contractual deadline to complete Al Asad was extended to June 30, 2006, and Al Asad was certified operational on July 24, 2006.

Q-West, the fourth bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Q-West on September 11, 2005, but on December 19, 2005, the military directed and authorized land at a different location for the Q-West plant. The contractual deadline to complete Q-West was extended to June 30, 2006, and Q-West was certified operational on July 9, 2006. Plaintiff indicated it encountered challenges with the water source at Q-West. Alan Morrell[15] testified that "we opened Q-West and started drawing from that irrigation line, we started getting turbid water, water so turbid that it was filled with mud and sand. And at that time, it was so significant that we couldn't purify it." As a result, "what it did is it . . . immediately fouled all of our [equipment] -- we didn't have an ultra filtration system there because it didn't call for one." Moreover, the "ROWPU [Reverse Osmosis Water Purification Unit] was immediately filled with mud, and fouled. And each set of those membranes is $26,000. And they were ruined. And we couldn't keep them clean and operational enough to operate and make water there as a result." In order to fix the problem, Alan Morrell testified that Oasis "purchased a Pall Aria from northern New York and we also took an additional ROWPU system that we had used at Balad [Anaconda] and recommissioned it, repiped and replumbed the lines at Q-West and solved the problem."

Speicher, the fifth bottled water facility, was initially required to be operational by May 24, 2006. The military authorized land for Speicher on August 13, 2005. The contractual deadline to complete Speicher was extended twice, finally to June 30, 2006, and Speicher was certified operational on June 20, 2006, and began producing bottled water on June 24, 2006. Initially, Oasis believed they would receive water provided by the government via a ROWPU. Alan Morrell testified, however, that "we opened the factory, we start producing, and within 48 hours, KBR [Kellogg Brown & Root] came in and just railed on us for consuming their ROWPU'd water. And they got -- they got their KBR

_____

[15] As noted above, Alan Morrell "was an Oasis consultant from late June 2005 through October 2005. Specifically, he was the Oasis Contract and Compliance Administrator from October 2005 through March 2007. He was Director of Contracts and Compliance from March 2007 through November 2008. He was Project Management Director from November 2008 through December 2009."

COTR or contractor officer's representative for that site involved and they shut down our water." As a result, Alan Morrell testified that:

> They're [Oasis' contracting officer and COSCOM (United States Corps Support Command)] beating us up for delivering quantities, but they're refusing to give us the water they're required to provide us. So, we're dealing with that at Speicher, and we're dealing with a lack of water delivery at Q-West to a level we can produce there, too, and we're all running for a completed amount of or quantity of water, but we can't get to it.

As a solution, Oasis purchased from an American company a "BEV 9 reverse osmosis system, and in the spring of 2007, installed it, commissioned it, and began to draw well water."

Camp Taqaddum, or TQ, the sixth bottled water facility, was initially required to be operational by May 24, 2006. Although the military initially authorized the land for TQ on August 24, 2005, the military directed Oasis to use land at different locations twice, the second time in March 2006. The contractual deadline to complete TQ was twice extended, to June 30, 2006, and then to October 15, 2006. The site preparation for TQ was completed by July 2, 2006, and on August 11, 2006, Colonel Richardson gave approval for Oasis to construct the TQ plant. TQ was completed on October 23, 2006. Although Oasis requested 40.5 days of excusable delay on September 25, 2006, United States Air Force Lieutenant Colonel Joel R. Fortenberry, who served as the contracting officer on the contract from October 2006 until early 2007, executed modification P00013 on October 24, 2006 on behalf of the government, granting plaintiff only eight days of excusable delay for TQ. TQ was certified operational on October 25, 2006.

Relevant Modifications

During contract performance there were a series of relevant modifications to the contract.[16] As noted above, after contract award, modification P00001 reduced the number of bottled water facilities from eight to six, and on July 15, 2005, Major Lopez executed modification P00002 on behalf of the government, which changed the dollar amount from "386,225,000 (estimated)" to "50,225,000 (NTE)." Subsequently, on August 9, 2005, Major Lopez and Max Wyeth executed modification P00003, which added a "NTE," or not to exceed limitation, on the quantity of water produced at each plant, and did not require the government to purchase any minimum number of cases produced by the contractor. Pursuant to modification P00003, the not to exceed "case quantity was a total of 14,350,000 cases of water," and, as modified in modification P00002, the not to exceed price was $50,225,000.00. As explained above, modification P00004 granted a twelve day extension of the requirement for the certification of the Anaconda bottled water plant, and modification P00005 was the novation agreement.

---

[16] As the parties have stipulated, 13 relevant modification were issued after the contract was executed.

*Modification P00006*

Prior to the execution of modification P00006, on March 27, 2006, United States Air Force Lieutenant Colonel James E. Davis,[17] who served as the contracting officer on the contract from September 2005 until January 2006, sent Oasis a letter titled "Preliminary Notice of Government Intent to Exercise Option CLINs 1001-5, Contract W27P4A-05-C-0002 for $112M," which stated: "The Government must withhold its intent to exercise the option," which meant the contract would come to an end. The letter informed Oasis that "[t]he contracting office does not have assurance of adequate funding."[18] On April 3, 2006, Paul Jefferies sent Lieutenant Colonel Davis a draft proposal, which would form the basis of modification P00006, and included a way to include a base year amount of 14,350,000 cases of bottled water at $3.50 per case for a total of $50,225,000.00.

Modification P00006, which was executed on April 14, 2006 by Lieutenant Colonel Davis and Phil Morrell, extended the base year of the contract from May 24, 2006 to August 15, 2006, and required that the bottled water capability be established at the six sites by June 30, 2006. Modification P00006 extended the contractual deadline for bottled water plants to be operational to June 30, 2006. According to modification P00006, the bottled water plants were to be operational in the following order: (1) Anaconda, (2) Camp Victory, (3) Speicher, (4) Q-West, (5) TQ, and (6) Al Asad.[19] Modification P00006 also required the production of 14.35 million cases of water during the base period of the contract, and removed the "not to exceed" requirements established in modification P00003. Finally, the option years were realigned to match the extension of the base year, so the first option period would run from August 16, 2006 until January 15, 2007, the second option period would run from January 16, 2007 until January 15, 2008, and the third option period would run from January 16, 2008 until January 15, 2009. Modification P00006 also added a fourth option period that would run from January 16, 2009 until August 16, 2009. The amount of water in the base period, the first option period, and the newly added fourth option period were different than the second and third option years.

---

[17] In 2005 and 2006, Lieutenant Colonel Davis was a Major. When he testified at trial, he was a Lieutenant Colonel. The court refers to him as Lieutenant Colonel Davis in this opinion, unless quoting from a document.

[18] Phil Morrell testified that "I told them [the government] that would be a really bad thing to get a letter like that, because that letter would put us in default with our banker. And that letter did put us in default with our banker, and it cost us $3 million to pull our -- our contract out of default." Phil Morrell also testified that Oasis had "already been told that by Colonel Hay, that they [the government] didn't have the funding to continue on this."

[19] At the time modification P00006 was executed, Anaconda and Camp Victory were already operational.

After modification P00006 to the contract, the periods of performance, quantities of water, and amounts due Oasis were:[20]

| ITEM NO. | SCHEDULE OF SUPPLIES/ SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Purified bottled water (12 / 1 Liter bottles per case) | | CASE | $3.50 | |
| 1001 | BASE Period 24 May 2005 to 15 August 2006 | 14,350,000 | | | $50,225,000.00 |
| 2001 | OPTION ONE 16 August 2006 to 15 January 2007 | 14,285,715 | | | $50,000,000.00 |
| 3001 | OPTION TWO 16 January 2007 to 15 January 2008 | 32,000,000 | | | $112,000,000.00 |
| 4001 | OPTION THREE 16 January 2008 to 15 January 2009 | 32,000,000 | | | $112,000,000.00 |
| 5001 | OPTION FOUR 16 January 2009 to 16 August 2009 | 17,714,286 | | | $62,000,000.00 |

(capitalization in original).

*Modification P00011*

As noted above, United States Air Force Colonel Richardson served as the contracting officer on the contract from May 2006 until October 2006. By June 2006, Oasis personnel, including Paul Morrell, Phil Morrell, Alan Morrell, Paul Jeffries and Dan Petsche had begun negotiations with Colonel Richardson to further modify the contract. Both parties had financial challenges, defendant obtaining the funding to exercise the first option, and plaintiff, which would be in default with its lenders if the contract was terminated for convenience.[21] Internally, Oasis considered the following proposal, as noted in an August 1, 2006 email from Paul Morrell:

> I've tried a lot of complicated algorithms to try to make a solution that is equitable to both the Military and US. I've concluded that the most equitable approach for everyone is the following: We gat [sic] paid a flat $112,000,000/year just as the contract states or $9,333,333/month (5/6th of that until TQ comes online). We agree to deliver up to 32,000,000 cases per year in aggregate with an annual reconciliation if the actual deliveries exceed that amount.

The parties discussed several options for how to proceed moving forward, and ultimately, on August 8, 2006, Oasis, at Colonel Richardson's request, provided her a

---

[20] Colonel Richardson testified that the modifications "changed the end date of option four from 16 August 2009 to 16 July 2009. So, it actually decreased the period of performance for the contractor."

[21] According to plaintiff's post-trial brief, "[d]uring the P00011 discussions, Oasis had an outstanding debt of over $70 million."

draft proposal, which was consistent with the internal Oasis proposal.[22] The draft proposal[23] indicated two options:[24]

> **Option II**.  Complete the construction of TQ in Oct 2006.
>
> Close Base Period

| Item No. | Description | | PRICE | |
|---|---|---|---|---|
| 1001 | BASE Period of Performance from 24 May 2005 to 15 August 2006 | | $50,225,000 | |
| | Allocation for uncompleted Plant (TQ) 1/6th | .167 | ($ 8,370,833) | |
| | Allowance for capital purchases to complete TQ.  Allowed due to military delay of Land. | | $ 5,500,000 | Estimate |

---

[22] Paul Jefferies testified at trial that "we were still being asked for significant concessions, beyond what was outlined that I've tried to outline here. . . . I mean to the tune of $30 million of concessions yet beyond what's on this page." Paul Jefferies also indicated that:

> We didn't really make an offer. The negotiations began with Paul [Morrell] and I sitting in a room with [Colonel] Renee [Richardson], and I believe her assistant was there, and they told us that they were being pushed a particular direction, that she would need concessions from us to pay out the balance of the funds owed or she would have to move in this other direction.

[23] Alan Morrell who earlier had testified about the water issues at the various plants indicated that regarding the lack of water at Speicher, "on modification P00011, because this was such a hot issue, again, part of the negotiation was a concession that we would sort this problem out," and Oasis "bought another BEV 9 reverse osmosis system." Alan Morrell also testified that "[p]art of the concessions that were demanded from us in P00011 were two site improvements to solve water issues. One was Speicher, and the other was Q-West."

[24] The first option contemplated modifying the contract to not build TQ, but the parties decided to build the TQ plant.

| | | | | |
|---|---|---|---|---|
| | Funds to Purchase Pall Aria to filter QW Water. | 1 | $   300,000 | |
| | Purchase RO's to improve SP water flow | 1 | $   300,000 | |
| | Creation and distribution of Water information campaign posters "its just water" | 100+ | 0 | |
| | conversion and support of Class 1 Water sites at each of its locations | 5 | 0 | |
| | Previous invoices through 8.5.06 | | (23,268,860) | |
| | **Net Due Oasis At Close of Clin 1001 08.15.06** | | **$24,685,307** | |

On August 12, 2006, Paul Morrell and Colonel Richardson executed modification P00011, which was generally consistent with the Option II in the draft proposal and established a payment structure by which Oasis would be paid $9,333,333.33 per month, independent of any amount of water, moving forward in the option periods. Modification P00011 also modified the fourth option period, ending on July 16, 2009.

The modification explained:

The purpose of this modification is to do the following:

1. Provide a revised CLIN structure to reflect monthly pricing based upon water production capability.

2. Replace the Contract Statement of Objectives, with Performance Work Statement, dated 12 August 2006, provided as Attachment 1 to this modification.

3. Incorporate the contractor's Quality Assurance Plan into the contract provided as Attachment 2 to this modification.

4. Incorporate the List of Critical Equipment into the contract, provided as Attachment 3 to this modification.

5. Insert Special Clause, titled "Equipment Leased by the Government", into the Contract.

6. Insert clause DFARS 252.232-7007, "Limitation of Government's Obligation" (May 2006) into the Contract.

7. Replace Contract Section J, List of Documents, Exhibits and Other Attachments.

8. Decrease the contract amount by $11,604,166.45 from $386,225,000.00 to $374,620,833.55.

9. Decrease the contract funded amount by $5,604,166.35 from $100,225,000.00 to $94,620,833.65.

10. Change the end date of Option 4 from 16 August 2009 to 16 July 2009.

On August 15, 2006, as part of modification P00011, Oasis submitted a final invoice to close out the base year in the amount of $24,542,387.00. The total amount of water produced in the base year was 8,705,992 cases, which translated to $30,470,972.00 at $3.50 per case. In addition, from the time the contract was awarded to the end of the base year, Oasis submitted nine invoices for payment at $3.50 per case, totaling approximately $23 million, which the government paid.[25]

*Modification P00013*

After modification P00011 was executed, on September 25, 2006, Oasis requested 40.5 days of excusable delay for completing TQ. After TQ was completed 8 days after the agreed to October 15, 2006 date in modification P00011, the parties executed modification P00013 on October 24, 2006, with Lieutenant Colonel Fortenberry signing on behalf of the government, and Paul Jeffries signing on behalf of Oasis. Modification P00013 stated:

> The purpose of this modification is to administratively establish an agreement between the Government and Oasis International Waters, Inc. that eight days of delay, with regards to the establishment of Bottled Water Production Capability at Taqqadum, Iraq, is excusable. Oasis International Waters, Inc. shall apply the excusable delay to their invoice submitted for

---

[25] As reflected in the joint stipulations, and as agreed to by the parties regarding invoices for the base year of the contract: On December 31, 2005, Oasis submitted an invoice to the Government for 293,160 cases of water from Anaconda at 3.50 per case, for a total of $1,026,060.00. On January 31, 2006, Oasis submitted an invoice for 356,400 cases of water from Anaconda at $3.50 per case for a total of $1,247,400.00, and on February 28, 2006, Oasis submitted an invoice for 508,680 cases of water from Anaconda at $3.50 a case, for a total of $1,780,380.00. On March 31, 2006, Oasis submitted an invoice for 664,320 cases of water from Anaconda at $3.50 per case, for a total of $2,325,120.00. One month later, on April 30, 2006, Oasis submitted an invoice for 910,020 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $3,185,070.00. On May 31, 2006, Oasis submitted an invoice for 1,126,920 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $3,944,220.00. On June 15, 2006, Oasis submitted an invoice for 1,381,140 cases of water from Anaconda and Camp Victory at $3.50 a case, for a total of $4,833,990.00. On July 1, 2006, Oasis submitted an invoice for 297,540 cases of water from Anaconda and Speicher at $3.50 a case, for a total of $1,041,390.00. Finally, on July 31, 2006, Oasis submitted an invoice for 1,150,900 cases of water from Anaconda, Q-West, Speicher, and Camp Victory, for a total of $4,028,150.00.

the period of performance of 01 - 31 October 2006. All other contract terms and conditions remain unchanged.

The contract ended on July 16, 2009, and Oasis performed on the contract until that date. Subsequently, Oasis and the government entered into a separate, follow-on contract regarding bottled water in Iraq.

Certified Claim

Prior to the filing of the certified claim, Phil Morrell sent an email to Paul Morrell and Paul Jeffries on August 4, 2006, with his thoughts on the contract, as follows:

**Capabilities for Time Period not Quantity**

- Funding was received for purchase of water, but it [sic] the contract was a capabilities contract
- Should have 2 Contracts
  - Capabilities Contract
  - Product Procurement Contract
- Funding was received for Contact# _____
- Contract#____ is a capabilities contract not a procurement contract
- $50 million on the table is for capability not water procurement

The general assumption from everybody is that the price of water in the CLIN is somehow associated with the price of capabilities.

(emphasis in original). At trial, Phil Morrell explained his view of the contract:

When I studied the contract, including when I talked to -- told Max [Wyeth] that he could get a progress payment, which I did tell Max, way back in the early days, probably a week into the -- two weeks into the contract, that he could get a progress payment. Based on all the historic contracting that I had done, and the way that I submitted my bid, the anticipation that was there would be, you know, progress payment capabilities, or -- in the contract. So, looking at Max's bid, he had put $58 million in for what appeared to be the construction capabilities, and then out of the $58 million, based on -- and I read this somewhere, I think it was in the FAR firm fixed price area -- it says that you -- if it's for equipment, then you have to deduct the salvage value of the equipment, and then you could bill for whatever that was. So, that -- I didn't actually sit down and do the numbers because that's just not what I do, but I – I suggested that we bill against the $52.25 million or $50.225 million as capabilities.

Paul Morrell stated at trial that he agreed with Phil Morrell about the contract being a capabilities contract after executing modification P00011. Regarding Colonel Richardson's correspondence, he testified

she's commenting on the proposal . . . specifically, the 9.33 million per month for capabilities going forward, and she's saying she thinks that's a reasonable approach, but this is one of the first times where I hear a contract officer say the same thing that Phil has been saying for most of the year, that this is a water production capability contract. And Colonel Richardson goes on, through the -- post-P00011, and she's very clear that it's a water production capability contract and it has been all along. They've just been administering it as if it weren't.

On June 20, 2008, Paul Morrell signed the certified claim, and on July 4, 2008, Oasis submitted its certified claim to the government. At the beginning of the certified claim, Paul Morrell, as President of Oasis, stated: "I certify that the claims stated herein are made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the Contract adjustment for which the contractor believes the Government is liable." Paul Morrell also submitted a sworn affidavit[26] in support of Oasis' certified claim at the time he submitted the certified claim, in which he stated:

> During the period May 2005 to the present, I was responsible for the day-to-day management of Contract W27P4A-05-C-0002 (the "Contract") and had responsibility for all aspects of Oasis' performance of the Contract I also had overall responsibility for the cost and accounting issues involving Oasis' performance of the Contract. This Affidavit is based on my first-hand knowledge, the collective corporate knowledge of Oasis and the corporate records of Oasis maintained in the ordinary course of business.

The certified claim identified eight claims for which plaintiff sought payment: Claim 1 was a "Claim for all bottled water supplied in the Contract base year, as extended to August 15, 2006, excluding bottled water supplied from Camp Anaconda through May, 2006 (5,605,020 cases of bottled water)," for which plaintiff sought $19,617,570.00. Claim 2 was a "Claim for penalty wrongfully assessed for failure to open Camp TQ on time," which plaintiff ascribed "solely as a result of Government-caused delays and disruptions," for which plaintiff sought $2,270,833.00. The certified claim indicated that Claim 3 was a "Claim for reduction in Contract consideration for first option period (August 15, 2006 through January 15, 2007) resulting from P00011," for which plaintiff sought $3,333,333.00. Claim 4 was a "Claim for water bottling capabilities services provided through extension of Contract base year," and plaintiff valued Claim 4 at $11,175,063.00. Claim 5 sought $808,423.00 as a "Claim for cost of site improvements required," specifically at Anaconda, Camp Victory, Al Asad, and TQ. Claim 6 was a "Claim for cost of water supply improvements at Camp Speicher and Camp Qwest," for which plaintiff sought $600,000.00. Claim 7 was a "Claim for other penalties assessed re: Government

---

[26] In addition to Paul Morrell, Neil Vos, the then-Chief Financial Officer of Oasis, Lawrence Schwartz, a certified public accountant, and Alan Morrell also submitted sworn affidavits in support of the certified claim.

delays of TQ opening," related to the "44 days of TQ AQL[27] penalties erroneously assessed to Oasis due to Government-caused delays in establishing TQ in the first Option Period" and was valued by plaintiff at $2,053,333.00. The plaintiff's certified claim reflected a total amount claimed for the first seven claims of "$39,858,555." Below the total for the first seven claims, plaintiff's certified claim indicated: "Alternative additional claim for water supplied from Camp Anaconda during initial Contract base year ending May 2006, 3,100,972 cases of bottled water: $10,853,402." The certified claim indicated the plaintiff's view that:

> The Contract is not a model of clarity. The amount payable in the Contract base year is a firm, fixed-price amount of $50,225,000. . . . However, the Contract, as written, does not require delivery of any bottled water in the Contract base year. In the Contract base year, Oasis was entitled to a firm, fixed-fee payment of $50,225,000. The Contract provides that the entire payment is for water purification and water-bottling capabilities. Under the Contract, bottled water was a separately priced commodity to be paid for by the Government at the price of $3.50 per case under a separate CLN.

(internal citations omitted).

The certified claim was passed between, and considered by, a number of contracting officers and personnel, including United States Navy Lieutenant Commander Klingenberg, who was the contracting officer when Oasis submitted its certified claim on July 4, 2008, United States Air Force Major Jamie Rhone, who served as the contracting officer from July 2008 until January 2009, and Dean Carsello, a Joint Contracting Command Iraq Afghanistan (JCC-I/A) policy analyst, who was involved in reviewing the claim in 2008 and 2009. United States Air Force Lieutenant Colonel Kevin Hobbs[28] denied Oasis' certified claim in its entirety when he issued the Contracting Officer's Final Decision on October 18, 2009.

On October 18, 2010, plaintiff filed its complaint in the United States Court of Federal Claims. Plaintiff's complaint alleged eight counts, and the complaint mostly tracks the claims raised in the certified claim, with the same dollar amounts, albeit framed as breaches of contract in the complaint. The first count, "**Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for water TakenFrom [sic] Sites other than LSA Anaconda**" seeks damages in the amount of $19,617,570.00, plus interest. (emphasis in original). The second count, "**Breach of Contract For Improper Assessment of a Liquidated Damages Penalty Against Oasis for Failing to Have All Six Facilities Open by the End of the Base Year, or Alternatively, for Reducing the Base Year Contract Price Without Consideration**," seeks damages in the amount of $2,270,833.00, plus interest. (emphasis in original). The third count, "**Breach of Contract For Improper Reduction of the Option Period One**

---

[27] The parties have stipulated that "AQL" is an acronym for Acceptable Quality Level.

[28] In 2009, Lieutenant Colonel Hobbs was a Major. When he testified at trial, he was a Lieutenant Colonel. The court refers to him as Lieutenant Colonel Hobbs in this opinion.

**Price Without Consideration**" seeks damages in the amount of $3,333,333.00, plus interest. (emphasis in original). The fourth count of the complaint, "**Breach of Contract Resulting from Government Acts and Omissions Impacting and Damaging Oasis During the Base Year, as Extended**" seeks damages in the amount of $11,175,063.00, plus interest. (emphasis in original). The fifth count, "**Breach of Contract Resulting From Government Failure to Provide Suitable Construction Sites**," seeks damages in the amount of $808,423.00, plus interest. (emphasis in original). Oasis' sixth count, "**Breach of Contract and/or Constructive Change for Failure to Provide Suitable Water at the Purification Facilities as Required by the Contract**" seeks $600,000.00, plus interest. (emphasis in original). The seventh count of the complaint, "**Breach of Contract For Unjustified Imposition of Penalties for Late Opening of TQ and/or Wrongful Reduction in Contract Price**," seeks $2,053,333.20 plus interest. (emphasis in original). Finally, the eighth count of the complaint, "**Breach of Contract, and Breach of the Duty of Good Faith and Fair Dealing, for Failure to Pay for Water TakenFrom [sic] Site LSA Anaconda**," seeks damages in the amount of $10,853,402.00, plus interest. (emphasis in original).

Defendant filed an answer to Oasis' complaint on February 15, 2011, and, more than a year later, on April 12, 2012, filed a motion to amend the pleadings to include fraud counterclaims. Oasis responded to the amended answer and counterclaims on May 10, 2012, however, on June 6, 2014, defendant moved to, again, amend its pleadings and filed a second amended answer and counterclaim. In the interim, during highly contested, and at times uncooperative, discovery the parties filed numerous motions related to discovery, the production of documents, how documents were maintained, how documents were to be produced, and in what format, and who would bear the costs, spoliation, whether or not various privileges applied to various documents, as well as motions to compel, motions to strike, and motions to quash. The court held numerous status conferences and hearings to try and resolve the various disputes between the parties, issued numerous orders, including publishing one substantive, lengthy opinion on attorney-client privilege and work product prior to trial. See Oasis Int'l Waters, Inc. v. United States, 110 Fed. Cl. 87 (2013).

The parties also filed motions for summary judgment and motions in limine in advance of the trial, and after trial, filed a series of lengthy post-trial briefing materials. The effect of the discovery disputes, and difficult relationships, resulted in discovery deadlines being repeatedly pushed back, and trial dates repeatedly postponed. Ultimately, a six week trial was held. Initially, the court issued an opinion regarding the fraud counterclaims raised by defendant. The court determined that, Paul Morrell, as signatory to the certified claim, did not have the intent to commit fraud and genuinely believed in his interpretation of the contract regarding what payments Oasis was entitled to recover under the contract. The court also found that neither Paul Morrell, nor plaintiff, acted recklessly when submitting plaintiff's claims and the court denied defendant's counterclaims for the Special Plea in Fraud, False Claims Act, and the anti-fraud provision of the Contract Disputes Act.

Subsequently, the court issued an opinion regarding contract interpretation and duress, concluding that the government's obligation under the contract solely was to pay for water produced and delivered and does not demonstrate that the intent of the base year of the contract was to compensate Oasis $50,225,000.00 for demonstrating the capability to produce bottled water, and then, to additionally compensate the contractor for producing the requested bottles of water. Additionally, the court determined that both modification P00006 and modification P00011 were valid because plaintiff did not demonstrate that it executed either modification under economic duress.  At a status conference after the court issued the contract interpretation opinion, plaintiff indicated that the two remaining counts to be resolved are Count 5 and Count 7.[29] This opinion addresses the two remaining counts.

## DISCUSSION

Count 5

The fifth count of plaintiff's complaint, "**Breach of Contract Resulting From Government Failure to Provide Suitable Construction Sites**," seeks damages in the amount of $808,423.00, plus interest.[30] (emphasis in original). Count 5 sought damages for site improvements at TQ as well as at Anaconda, Camp Victory, and Al Asad. In plaintiff's certified claim, Oasis argued to the contracting officer that "[t]he only reasonable interpretation of the Government's promise to deliver 'level' land requiring 'minimal' site preparation is that the Government agreed to deliver flat, graded land reasonably prepared for installation of production bottled-water facilities. Thus, the Government assumed all risks of site conditions being as warranted by the Government." In the contracting officer's final decision, the contracting officer concluded:

> T]he USG [United States Government] clearly stated that it would provide as level a ground as possible to simplify structural evenness issues. In no way did the USG promise to provide exactly level land, the USG later stated in the same question and answer session that it was Oasis' responsibility for all site improvements. This claim element is denied.

---

[29] As indicated in the parties' April 28, 2017 joint status report: "Oasis submits that two of the counts of Oasis' Claim remain unresolved by the previous decisions: Count 5 and Count 7." Defendant contended in the joint status report that "[t]he Court should enter judgment in favor of the Government on all of Oasis's claims," and reiterates in its September 14, 2017 submission, "[t]he Court's contract interpretation decision defeats all of Oasis's claims."

[30] The count notes that in plaintiff's May 30, 2017 submission to the court, plaintiff refers to the amount for Count 5 as $808,473.00.  For example, in the conclusion, plaintiff states: "Oasis respectfully requests the Court award it damages in the amount of $808,473 for differing site conditions pursuant to Count 5."

The court concluded in its contract interpretation opinion that the language of the contract and the questions and answers incorporated into the contract "demonstrate the correctness of the defendant's position that the government's obligation under the contract was solely to pay for water produced and delivered." Therefore, defendant argues: "Given that the Court has decided the Government's only contractual payment obligation [was to pay $3.50 per case for the production and delivery of water], Oasis's request that the Court rule that the contract also required the Government to pay for Oasis's site improvements is barred by the law-of-the-case doctrine. Accordingly, the Court should deny Oasis's claim for site improvement costs." (citation omitted).

The United States Supreme Court has stated that "the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (citation and footnote omitted), reh'g denied, 462 U.S. 1146 (1983), supplemented by 466 U.S. 144 (1984); see also Agostini v. Felton, 521 U.S. 203, 236 (1997). Law of the case is a judicially created doctrine, under which "a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation." Suel v. Sec'y, Health & Human Servs., 192 F.3d 981, 985 (Fed. Cir. 1999) (citation omitted), reh'g denied (2000). Nevertheless, "law of the case doctrine is limited to issues that were actually decided, either explicitly or by necessary implication, in the earlier litigation." Toro Co. v. White Consol. Indus., Inc., 383 F.3d 1326, 1335 (Fed. Cir. 2004) (citation omitted), reh'g en banc denied (2004), cert. denied, 544 U.S. 948 (2005); see also Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 657 (Fed. Cir.), cert. denied, 474 U.S. 902 (1985). Law of the case doctrine applies to a court's own decisions as well as decisions of other courts in the same case. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988); see also Gindes v. United States, 740 F.2d 947, 950 (Fed. Cir.) ("law of the case [i]s a rule that 'A decision by the court on a point in a case becomes the law of the case unless or until it is reversed or modified by a higher court.'" (quoting Raylaine Worsteds, Inc. v. United States, 137 Ct. Cl. 54, 146 F. Supp. 723, 726 (1956))), cert. denied, 469 U.S. 1074 (1984); McGuire v. United States, 97 Fed. Cl. 425, 433 (2011). Law of the case is a doctrine that exists to promote judicial economy and fairness. See, e.g., Mendenhall v. Barber-Greene Co., 26 F.3d 1573, 1582 (Fed. Cir.) (noting that law of the case doctrine rests on the need for judicially economy), cert. denied, 513 U.S. 1018, and cert. denied sub nom. D.G. v. T.M.N., 513 U.S. 1018 (1994); Suel v. Sec'y, Health & Human Servs., 192 F.3d at 984 (noting that law of the case aims to "protect the settled expectations of the parties and promote orderly development of the case.") (citations omitted).

The United States Court of Appeals for the Federal Circuit has further explained the fairness theory behind the law of the case doctrine, stating: "Its elementary logic is matched by elementary fairness-a litigant given one good bite at the apple should not have a second." Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 900 (Fed. Cir.) cert. denied, 469 U.S. 857 (1984); see also Athey v. United States, 123 Fed. Cl. 42, 49 (2015). In other words, "'no litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time.'" Gindes v. United States, 740 F.2d

at 949 (quoting <u>United States v. Turtle Mountain Band of Chippewa Indians</u>, 222 Ct. Cl. 1, 612 F.2d 517, 520 (1979)). Furthermore, "a reassignment to another judge should not be viewed as declaring open season on relitigating any prior rulings with which a party disagrees." <u>Applegate v. United States</u>, 52 Fed. Cl. 751, 765 (2002), <u>appeal dismissed</u>, 57 F. App'x 426 (Fed. Cir.), <u>aff'd</u>, 70 F. App'x 582 (Fed. Cir. 2003), <u>cert. denied</u>, 540 U.S. 1149 (2004) (citation omitted).

Law of the case is a discretionary doctrine that, "[i]n the absence of statute the phrase, 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." <u>Messinger v. Anderson</u>, 225 U.S. 436, 444 (1912) (citations omitted).  Although courts have the power to revisit their own prior decisions, the United States Supreme Court has cautioned that "as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"  <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. at 816 (quoting <u>Arizona v. California</u>, 460 U.S. at 618 n.8).  More specifically, the United States Court of Appeals for the Federal Circuit has identified only three exceptional circumstances that justify a departure from the law of the case doctrine.   The circumstances are essentially the same as those that justify granting a motion for reconsideration:

> Reasons that may warrant departure from the law of the case, thus providing an exception to the more rigorous requirements of <u>res judicata</u>, include the discovery of new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice.

<u>Intergraph Corp. v. Intel Corp.</u>, 253 F.3d 695, 698 (Fed. Cir. 2001) (citation omitted); <u>see also Gould, Inc. v. United States</u>, 67 F.3d 925, 930 (Fed. Cir. 1995) (citing <u>Gindes v. United States</u>, 740 F.2d at 950); <u>Perkin-Elmer Corp. v. Computervision Corp.</u>, 732 F.2d at 900 (citing <u>Central Soya Co. v. Geo. A. Hormel & Co.</u>, 723 F.2d 1573, 1580 (Fed. Cir. 1983)).  The standard to determine whether a court's previous decision was clearly erroneous and constitutes a manifest injustice "'is a stringent one. . . .  A mere suspicion of error, no matter how well supported, does not warrant reopening an already decided point.'"  <u>Gindes v. United States</u>, 740 F.2d at 950 (quoting <u>N. Helex Co. v. United States</u>, 225 Ct. Cl. 194, 634 F.2d 557, 561-62 (1980) (citation omitted)).  The United States Court of Appeals for the Federal Circuit has noted that a "'strong showing of clear error . . . is required before a court should reexamine its decision in the prior appeal.'"  <u>Gindes v. United States</u>, 740 F.2d at 950 (quoting <u>United States v. Turtle Mountain Band of Chippewa Indians</u>, 222 Ct. Cl. at 8, 612 F.2d at 521).

Oasis does not attempt to argue that the court's conclusion that "the government's obligation under the contract was solely to pay for water produced and delivered" is not law of the case, nor does plaintiff claim that the court's conclusion was manifest injustice.

Absent any argument from the plaintiff, the court agrees with defendant that the sole government obligation under the contract, as executed, was the payment for water delivered. Therefore, Oasis' site improvement claim is barred by the law of the case.

Instead of addressing the law of the case for the government's obligation under the contract as a result of the court's contract interpretation and duress opinion, the plaintiff initially argues that Oasis' claim for site improvements was not resolved by modification P00011. Defendant responds that: "P00011 precludes Oasis' site preparation claim because the parties agreed upon a final price ($47 million) for the first year of the contract, and Oasis did not reserve site preparation claims from the final contract price." In the court's opinion regarding contract interpretation and duress, the court determined that modification P00011 was valid, as plaintiff did not demonstrate that it executed modification P00011 under duress. The court also noted in the same opinion that "[o]n August 15, 2006, as part of modification P00011, Oasis submitted a final invoice to close out the base year in the amount of $24,542,387.00."

Plaintiff argues that "[a]bsent waiver or release language in P00011, Count 5 must survive," (footnote omitted), and argues that

[t]he fact that Defendant requested that Oasis sign a waiver related to P00011 and that Oasis refused to do so shows that the parties knew that P00011 did not resolve all outstanding issues – otherwise Defendant would not have needed to request such a waiver and Oasis would have no reason not to sign such a waiver.

The court does not follow plaintiff's logic. As plaintiff's counsel of record indicated regarding releases to the court during a discussion with the court at the close of the plaintiff's case in chief, "[t]he ones [the modifications] that the Government considers to be specifically important to include them do. It happened on this particular contract. So, there is a course of dealing on this contract." Plaintiff's counsel of record also indicated that "[t]here's testimony that there were requests with regard to the remainder of the modifications for the inclusion of that particular language, which was denied by the Oasis people, who did not do it." If the government's requests for releases happened as a matter of course during contract performance in the above captioned case, the fact that the government requested a release for modification P00011 does not demonstrate that the government believed all outstanding issues were not resolved.

Defendant also points to the language of <u>Fraass Surgical Manufacturing Co. v. United States</u>, which states that "a supplemental agreement entered into between a contractor and the government operates as a bar to all claims not specifically reserved," and points to site conditions not being reserved as a part of the subsequent agreement in the form of modification P00011. <u>See</u> <u>Fraass Surgical Mfg. Co. v. United States</u>, 202 Ct. Cl. 585, 594, 505 F.2d 707, 712 (1974). Plaintiff, citing to Board of Contract Appeals decisions, albeit not decisions regarding site conditions, argues that subsequent claims may be allowed when the parties "had not discussed such costs in negotiations leading up to the modification." (citing <u>Chantilly Constr. Corp.</u>, ASBCA, 81-1 BCA ¶ 14,863 (Feb.

24, 1992) and <u>Crawford Tech. Servs., Inc.</u>, ASBCA, 93-3 BCA ¶ 26,136 (May 28, 1993)). As noted above, the plaintiff, as part of modification P00011, agreed to submit an invoice to close out the base year, which was ultimately $24,542,387.00. The final invoice, in order to close out the base year, would necessarily have included all amounts owed in the base year. The absence of a specific mention of the site conditions in modification P00011 does not prove that the parties intended the issue to survive after the execution of modification P00011.[31]

Defendant further states that "the vast majority of Oasis's $808,473 in alleged site preparation costs were incurred in the contract's first year." In fact, plaintiff's submission regarding Count 5 states that "Oasis incurred $115,920.00 in site improvement costs related to the laydown yard at TQ in October 2006, several months after P00011 was signed." Holding aside the impact of law of the case and the impact of modification P00011, regarding any site preparation costs that may have been incurred after modification P00011, defendant argues that "the contract does not require the Government to pay for Oasis's site preparation costs." Defendant further contends that "Oasis cannot point to a single provision to support its position that these costs were the Government's responsibility."   As noted above, Major Vazquez awarded contract no. W27P4A-05-C-0002 to American AquaSource on May 25, 2005. Item no. 0001 of the contract was "NON-PERSONAL SERVICES [sic]" (capitalization in original), which indicated:

> The Contractor shall provide all labor, tools, supervision, personnel, equipment, transportation, materials, facilities, and other essentials necessary to perform and sustain 8 separate and independent purified bottle water plants according to the 20 Mar 05 Statement of Objectives (SOO). Period of Performance: 25 May 05 through 24 May 06.

Following item no. 0001 were three items for the three option years, item no. 1001, item no. 2001, and item no. 3001, changing only the period of performance.[32]   Defendant, therefore, contends that "[t]he contract never states, as Oasis suggests, that the Government was required to provide land that required no site preparation, nor does it obligate the Government to pay for Oasis's site preparation costs. Rather, the Government was only required to provide 'production facility real estate within a secure military base' in conditions that would be 'austere and totally unimproved.'"

---

[31] Plaintiff also points to the language of modification P00011 itself and the Memorandum for Record for modification P00011, neither of which discussed site conditions as evidence that the site conditions were not part of the modification.

[32] As noted above, the similarity of the three options years after the base year is reflected in the typographic error of "NON-PERSONAL SERVICES" in each of the three option years. (capitalization in original).

The contract at section 4.3 states:

> Contractor shall provide living quarters, inside the base compound, to all of their employees employed in the operation, maintenance, and repair of the mechanical equipment required to accomplish the Government's objectives. **NOTE**: Even though these locations are on military installations, the offeror's must take into account this is a desert with high temperatures during the day, low temperatures at night, wind and sand blowing, low sanitization, limited resources, to include supplies and materials, with austere and totally unimproved conditions in and around the military installations where these plants will be residing. Also it is a combat zone.

(emphasis in original). Plaintiff argues that "[d]efendant's basis for disputing Oasis' claimed entitlement that the Contract says that the environment will be 'austere and totally unimproved,' is based on a patent mischaracterization of the text of the Contract." Plaintiff further argues that "[t]he reference to 'austere and totally unimproved' conditions is within the context of the living quarters of the contractor's employees. It has nothing to do with the condition of the land on which the plant would be built." The court notes, however, that modification P00001, in addition to having the same section 4.3 clause, also has a clause for "Place of Performance," at section 7.3.1, which states in full:

> The Contractor shall perform services required in the SOO at six (6) separate locations, fully independent of each other throughout the Iraqi AO. **NOTE:** Specific locations will be identified to the award winner.
> **NOTE:** Even though these locations are on military installations, the offeror's must take into account this is a desert with high temperatures during the day, low temperatures at night, wind and sand blowing, low sanitization, limited resources, to include supplies and materials, with austere and totally unimproved conditions in and around the military installations where these plants will be residing. Also it is a combat zone.

(emphasis in original).  This section refers to the six bottled water facilities to be built, but uses identical language to the section 4.3 clause. It appears to the court that the government intended that all of the land provided to Oasis would be "austere and totally unimproved conditions." The court disagrees with plaintiff's claim that defendant's reference to the austere and totally unimproved conditions is a "patent mischaracterization." The more correct reading appears to be that the government intended that the land provided to plaintiff would be "austere and totally unimproved."

Plaintiff also argues that "[p]otential offerors, because they were not allowed to visit the sites prior to award, submitted several questions regarding the condition of the sites. Defendant's answers to the questions, which were incorporated into the Contract, clarified that the land would be essentially build-ready." As noted above, a number of question and answers addressed site conditions. Question 44 asked the government: "If it is necessary to lay concrete pads, on which to position hardware, bury pipes etc, will that work fall to the contractor (under supervision of the client), or is this an action delivered

by the client?" The government responded that: "Contractor Responsible. The Government will provide as flat land as possible to simplify any structural evenness issues." Question 89 asked the government: "Will some land-surveying, geodesy[33] data be available from Government/Army engineers to reduce risk of sending geodesy engineers with site-surveying teams? The government responded that: "Site prep should be minimal.[34] The water source has been identified and deemed to have sufficient amounts by the government to support the operation. It is up to you what you do in order to meet the Government's requirements and timeframe for delivery." Oasis argues that these answers were the government "guaranteeing land that was as 'flat' as possible and which would require 'minimal' site prep," but neither answer comes close to a "guarantee" by the government, that would create a contractual obligation on the government's part.

In addition, as noted by defendant, another question and answer, question 48 noted that the Army had indicated that the "[p]roduction facility Real Estate within a secure military base shall be provided to the contractor," and asked: "What is it?" to which the government responded: "Just Land, you must provide us how much land you will need." Finally, in response to question 40: "Start up Cost: Since the bid is predicated upon the deliverables per litre bottle of water, can we assume that all costs(inc personnel and equipment deployment to site) incurred between contract award and water production will fall upon the successful bidder?" the government indicated: "Yes. It is up to you how you determine the cost per litre taking into account all costs associated with this endeavor." The court believes that these answers, rather than supporting plaintiff's view, are consistent with the government's view that the site preparation costs were to be borne by Oasis, and, therefore, were not the government's responsibility, as the contract placed

---

[33] The National Ocean Service, an office within the National Oceanic and Atmospheric Administration, and therefore, part of the United States Department of Commerce, defines geodesy as "the science of accurately measuring and understanding three fundamental properties of the Earth: its geometric shape, its orientation in space, and its gravity field— as        well        as        the        changes        of        these        properties        with        time." http://oceanservice.noaa.gov/facts/geodesy.html

[34] The government also argues that "Oasis is not just seeking costs above 'minimal' site preparation; Oasis is seeking *all* of its site preparation costs," (emphasis in original), and

> Oasis cites no evidence showing that its site preparation costs were more than minimal and the trial evidence shows the opposite: Oasis's $808,473 in site preparation costs were (a) less than two percent of the costs of the $60 million costs of the project; (b) less than one percent of the $100 million in profit that Oasis made on the bottled-water contract; (c) and less than one quarter of one percent of the $381 million that the Government paid Oasis under the bottled-water contract.

(internal citations omitted).  As the court concludes Oasis is not entitled to site preparation costs, the court does not have resolve the semantic differences between the parties for what minimal means.

the cost of establishing bottled water plants and producing the bottled water on the contractor.

Nor do the plaintiff's statements that the government made some site improvement of the bottled water sites change the court's conclusion. Plaintiff contends that Alan Morrell's affidavit and testimony, discussed further below, demonstrates that the Army "repeatedly admitted responsibility for making the land build-ready," and that "[d]efendant never denied responsibility for site improvements or attempted to charge Oasis for these costs or otherwise seek reimbursement." Defendant correctly points out that even if government performed some site preparation work, that did not obligate the government to perform all the site preparation work, nor did it create a contractual obligation to do so.[35]

The defendant also notes that "[a]lthough Oasis repeatedly characterizes its site improvement claim as one for 'differing site conditions,' the Federal Acquisition Regulation (FAR) differing site condition clause, FAR § 52.236–2, was not included in the contract." Review of the contract supports defendant's contention that the differing site conditions clause is not present in plaintiff's contract. Moreover, although the plaintiff characterizes its claims as one of differing site conditions, including its conclusion in its Count 5 submission, "[f]or the above reasons, Oasis respectfully requests the Court award it damages in the amount of $808,473 for differing site conditions pursuant to Count 5," the plaintiff, however, also states that "[t]he $808,473 in site improvements identified by Oasis was necessary to make the land compliant with the contractual requirement of build-ready land, and are properly recoverable under the Contract's changes clause." (citing FAR § 52.243-1).

The contract did include a changes clause, which stated in full:

52.243-1 Changes-Fixed-Price. (Aug 1987)
(a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
(1) Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.
(2) Method of shipment or packing.
(3) Place of delivery.

---

[35] The defendant notes that, regarding the two cases plaintiff cites to prove that if defendant made the site improvements at no additional cost it would have been illegal, Vulcanite Portland Cement Co. v. United States, 74 Ct. Cl. 692, 705 (1931) and Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1573 (Fed. Cir. 1991) both cases explain that "the necessary contractual element of consideration is missing when the Government agrees to perform work outside of its contractual requirements. As a result, any Government assistance to Oasis for site preparation work did not create a contractual obligation for the Government to perform all of Oasis's site preparation work."

(b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

(c) The Contractor must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.

(d) If the Contractor's proposal includes the cost of property made obsolete or excess by the change, the Contracting Officer shall have the right to prescribe the manner of the disposition of the property.

(e) Failure to agree to any adjustment shall be a dispute under the Disputes clause. However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

The record does not reflect, nor was there evidence introduced at trial, that there was a written order regarding the differing site conditions or a response from Oasis within 30 days.  The government also argues, "Oasis has failed to comply with the contractual provision on which it relies," and that "[t]here was also no reason for the Government to authorize changes because site preparation costs were already Oasis's contractual responsibility." The court does not see how plaintiff could recover for differing site conditions by relying on the changes clause at FAR § 52.243-1.

Plaintiff also argues that "Oasis has proven quantum," perhaps as an acknowledgment that there is no contract provision for differing site condition claims. "*Quantum meruit* is '[a] claim or right of action for the reasonable value of services rendered.'" United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1329 (Fed. Cir. 2006) (quoting Black's Law Dictionary 1276 (8th ed. 2004)).  The United States Court of Appeals for the Federal Circuit distinguishes two types of *quantum meruit* claims: implied-in-law and implied-in-fact.  See Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007).  An implied-in-law contract is

a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice. The Court of Federal Claims, however, lacks jurisdiction over contracts implied in law. 28 U.S.C. § 1491(a)(1) (2000). On the other hand, "[w]here a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity.  The contractor is not compensated under the contract but rather under an implied-in-fact contract." United Pac. Ins. Co. v. United States, 464 F.3d at 1329-30.

Int'l Data Prods. Corp. v. United States, 492 F.3d at 1325-26; see also Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003) ("Recovery in *quantum meruit*, however, is based upon a contract implied in law." (citing Fincke v. United States, 230 Ct. Cl. 233, 246, 675 F.2d 289, 296 (1982)); Sanders v. United States, 252 F.3d 1329, 1334 (Fed. Cir. 2001); Steinberg v. United States, 90 Fed. Cl. 435, 443 (2009). Thus, the Court of Federal Claims does not have jurisdiction over implied-in-law contract claims, but does have jurisdiction over express and implied-in-fact contracts.

An implied-in-fact contract cannot exist, however, when there is an express, written contract. See Hercules Inc. v. United States, 516 U.S. 417, 423-24 (1996) (stating that the Tucker Act only extends to express or implied-in-fact contracts, based on a meeting of the minds, and not implied-in-law contracts, and that implied-in-fact contracts are agreements "not embodied in an express contract"); Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997) ("Further, an implied-in-fact contract cannot exist if an express contract already covers the same subject matter.") (citing Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir.), cert. denied, 498 U.S. 811 (1990) and Reforestacion de Sarapiqui v. United States, 26 Cl. Ct. 177, 190, aff'd, 985 F.2d 583 (Fed. Cir. 1992))).

In Enron Federal Solutions, Inc. v. United States, 80 Fed. Cl. 382 (2008), the United States Court of Federal Claims addressed the court's jurisdiction over equitable claims, id. at 409 (citing Trauma Serv. Grp., Ltd. v. United States, 33 Fed. Cl. 426, 432 (1995), aff'd, 104 F.3d 1321 (Fed. Cir. 1997) and Perri v. United States, 340 F.3d at 1343-44), and noted the narrow circumstances under which the Court of Appeals for the Federal Circuit have permitted *quantum meruit* recovery, namely when a plaintiff "provides services or goods to the government pursuant to an *attempted* express contract, but . . . the government simply refuses to pay." Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 409 (citing Perri v. United States, 340 F.3d at 1343-44) (emphasis in original); footnote omitted). In the above captioned case, however, there is only an express contract, and at no point does plaintiff allege that an implied-in-fact contract exists. More specifically, plaintiff's complaint at Count 5 is identified as a breach of contract claim, and never indicates that an implied-in-fact contract could result from the bottled water sites provided by the government. Moreover, as noted above, an implied-in-fact contract cannot be found when an express contract between the two parties on the same subject matter already exists. See Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 410 (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1326 and Atlas Corp. v. United States, 895 F.2d at 754-55). Even if plaintiff's Count 5 survived, there does not appear to a basis for recovery in quantum.

Finally, although the court does not reach the issue, the court shares the defendant's concerns about whether that the affidavit submitted by Alan Morrell is "unreliable and contradicted by the trial evidence."  As plaintiff states in its Count 5 submission, "Oasis submitted the sworn affidavit of Alan Morrell. The affidavit describes in detail the basis for the $808,473 in costs incurred by Oasis to correct the deficient sites." (internal citation omitted).

As an example of the affidavit's potential unreliability is the section on site preparations for Anaconda.  Alan Morrell's affidavit states:

> With normal rainfall it became clear that the Camp Anaconda site required substantial grading, earth compaction, and gravel fill for ongoing site access and for flood abatement. Oasis spent another $88,610 between September 12 and November 19, 2005, for those improvements. The additional site work performed by Oasis was necessary to make the Camp Anaconda site usable for a purified water-bottling facility. Without these improvements, it would have been impossible to open a production facility at Camp Anaconda. The additional amount expended for the minimal site preparation at Camp Anaconda, excluding accrued interest, was $98,760.

He testified to the same at trial, as indicated in this exchange with plaintiff's counsel about the site conditions for Anaconda:

> [A.] [T]he total amount was $98,760.
>
> Q. And in your affidavit, you mention 52 days of delay based on your research. That, again, included all aspects of giving you the site as well as the time to prep, correct?
>
> A. Correct.
>
> Q. And did it include any others that you can recall, any other aspects or delaying events?
>
> A. No, it would have been related to -- primarily it would have been related to site improvements.

An Oasis memorandum, dated February 19, 2008, regarding "Anaconda Land Issuance and Site Prep," however, stated that: "Minimal site prep required. Only required minor grading," and contented: "Land prep was completed and ready for building **16JUL05** (Newell 18JUL05 field report). Actual mobilization and construction began within days." (emphasis in original). Given that plaintiff's support for its site preparation costs is solely derived from Alan Morrell's testimony and his affidavit and backup material, it is not clear to the court that Oasis would be awarded site preparation cost damages.

<u>Count 7</u>

The seventh count of plaintiff's complaint, "**Breach of Contract For Unjustified Imposition of Penalties for Late Opening of TQ [Camp Taqaddum] and/or Wrongful Reduction in Contract Price**," seeks $2,053,333.20, plus interest. (emphasis in original). Plaintiff's certified claim explained that Claim 7 was a "Claim for other penalties assessed re: Government delays of TQ opening," which plaintiff characterizes as related to the "44 days of TQ AQL [Acceptable Quality Level] penalties erroneously assessed to Oasis due to Government-caused delays in establishing TQ in the first Option Period" and was

valued by plaintiff at $2,053,333.00." In the September 14, 2017 submission to the court addressing Count 7, plaintiff states that "Count 7 has not been resolved by either P00011 or P00013." By contrast, defendant argues that "Count 7 is premised upon the invalidation of P00011, a valid modification," and that "bilateral modification P00013 is an accord and satisfaction that defeats Count 7 as a matter of law."

As reflected above, Camp Taqaddum, or TQ, the sixth bottled water facility, was initially required to be operational by May 24, 2006. Although the military initially authorized the land for TQ on August 24, 2005, the military directed Oasis to use land at different locations twice, the second time in March 2006. The contractual deadline to complete TQ was twice extended, first, by modification P00006 to June 30, 2006, and then, by modification P00011 to October 15, 2006. The site preparation for TQ was completed by July 2, 2006, and on August 11, 2006, Colonel Richardson gave approval for Oasis to construct the plant at TQ. Modification P00011, although it was signed on August 12, 2006, provided that, beginning September 1, 2006, for each day that TQ was not meeting Acceptable Quality Level requirements for the bottled water, Oasis would have to pay a $46,666.66 penalty.[36] TQ was completed on October 23, 2006, eight days after it was required to be operational and fifty two days after the AQL deductions began on September 1, 2006. TQ was certified operational on October 25, 2006.

Oasis requested 40.5 days of excusable delay on September 25, 2006, Lieutenant Colonel Fortenberry executed modification P00013 on behalf of the government, granting plaintiff only eight days of excusable delay for TQ. Modification P00013 also stated:

> The purpose of this modification is to administratively establish an agreement between the Government and Oasis International Waters, Inc. that eight days of delay, with regards to the establishment of Bottled Water Production Capability at Taqqadum, Iraq, is excusable. Oasis International Waters, Inc. shall apply the excusable delay to their invoice submitted for the period of performance of 01 - 31 October 2006. All other contract terms and conditions remain unchanged.

As a result of the penalties, Oasis reduced its invoices by $2,053,000.00. In plaintiff's certified claim, Oasis argued to the contracting officer that

> P00011, was signed on August 12, 2006, *three days* before the end of the Contract base year, P00011 retroactively reduced the base Contract year payment from $50,225,000 to $47,954,167, a $2,270,833 "penalty" that the Government demanded because Oasis had not opened the water-bottling facility at TQ on time. . . . P00011 also imposed "penalties" for the delayed

---

[36] The language of modification P00011 provided for each bottled water facility that the "Monthly Deduction for performance below AQL" was ".5% of the total monthly price for each day the AQL is not met or surpassed." As explained above, the payment structure of the contract after modification P00011 was that Oasis would be paid $9,333,333.33 per month, independent of any amount of water, moving forward. TQ was only the bottled water facility also to contain the phrase "Effective beginning 1 Sep 06 for this facility."

opening of TQ, if it did not meet an expedited construction schedules to have TQ operational by October 15, 2006. The penalties, ultimately assessed amounted to $2,053,333.

(emphasis in original; internal citations omitted). As noted above, Count 7 of plaintiff's complaint sought $2,053,333.20, plus interest, however, in plaintiff's September 14, 2017 submission to the court addressing Count 7, plaintiff states: "For every day of excusable delay that the Court finds, Oasis is entitled to receive $46,666.66 from Defendant. If the Court finds that Oasis is entitled to 32.5 days of excusable delay, Oasis should receive $1,516,666.45."

During plaintiff's opening statement at trial, plaintiff's counsel indicated, regarding Count 7:

> Count 7, for the so-called AQL penalties.[37] She [Colonel Richardson] assessed penalties because a site that had not yet even been provided was not providing water. She assessed penalties as liquidated damages, because even into the first option period she said I'm assessing damages for 45 days for not having this plant online, even though -- even though the evidence will show, even when the site was made available to them, there was a slow-down and a directed suspension simply because the Government had not yet decided they even wanted the plant.

As explained at length in the court's contract interpretation and duress decision, modification P00006 and modification P00011 were valid, as plaintiff did not demonstrate that it executed modification P00006 and modification P00011 under economic duress. As explained above, modification P00006, which was executed on April 14, 2006 by Lieutenant Colonel Davis and Phil Morrell, extended the base year of the contract from May 24, 2006 to August 15, 2006, and required that the bottled water capability be established at the six sites by June 30, 2006, thereby extending the contractual deadline for bottled water plants to be operational to June 30, 2006. In modification P00011, the parties jointly agreed that the "[a]ll water capabilities shall be fully established prior to 15 October 2006." The parties agreed to this, even though Colonel Richardson gave approval for Oasis to construct the plant at TQ on August 11, 2006, one day before modification P00011 was executed.

---

[37] Plaintiff's counsel previously explained in his opening statement:

> P00011 reduced the price of the Option one period, which had already been exercised, by more than $3 million. P00011 forced Oasis to essentially agree to a form of liquidated damages called AQL, a quality of water which didn't even exist in the contract until it was introduced by P00011. P00011 also purports to resolve some water quality issues . . . at no cost to the Government.

In plaintiff's September 14, 2017 submission to the court addressing Count 7, plaintiff argues that in the court's contract interpretation opinion, "[t]he Court has found that P00011 was valid. As such, the Court has also found that the AQL penalty **structure** was also valid (*i.e.* $46,666.66 per day absent excusable delay). However, the fact that the AQL penalty structure was valid does not mean that all of the **assessed** penalties were valid."[38] (citation omitted; emphasis in original). Plaintiff, therefore, argues that "Oasis was entitled to (and did) make a claim for excusable delay under the Contract as modified by P00011." Plaintiff then claims that, "[t]he 40.5 days of excusable delay requested by Oasis all occurred between August 15, 2006 and September 25, 2006. P00011 could not have resolved and/or waived these delays because P00011 was signed on August 12, 2006, three days before the first excusable delays identified by Oasis occurred." (internal references omitted). In response, defendant argues that "Count 7 is premised upon the invalidation of P00011, a valid modification." The court notes that although plaintiff argues that Oasis could not have accounted for all the excusable delay that occurred after modification P00011 was signed, the court believes the purpose of P00011 was to anticipate any delays that would occur in the future and put a penalty on those delays. The language of modification P00011 makes this clear as the penalty for TQ was a "Monthly Deduction for performance below AQL" of ".5% of the total monthly price for each day the AQL is not met or surpassed. Effective beginning 1 Sep 06 for this facility."

As explained above, the payment structure of the contract after modification P00011 was that Oasis was paid $9,333,333.33 per month, independent of any amount of water, moving forward. Oasis' actions after modification P00011 was executed are consistent with modification P00011 and the penalty language, as demonstrated on its invoices for September 2006. The September 15, 2006 invoice lists an amount of $9,333,333.33, "For The Balance Due on Purified Bottled Water Capacity Sevices [sic] Base Period 16 August thru 15 September 2006," and a "Deduction for Performance below AQL- Taqqadum Sept 1 -Sept 15," in the amount of $699,999.99. Likewise the September 30, 2006 invoice list an amount of $4,666,666.50, "For The Balance Due on Purified Bottled Water Capacity Sevices [sic] Base Period 16 September thru 30 September 2006," and a "Deduction for Performance below AQL- AL Taqqadum Sept 16 -Sept 30," in the amount of $699,999.99.

As noted above, in the negotiations for modification P00011, Paul Morell sent an August 1, 2006 email to Phil Morrell and Paul Jeffries, copying Alan Morrell and Dan Petsche, which indicated:

> I've tried a lot of complicated algorithms to try to make a solution that is equitable to both the Military and US. I've concluded that the most equitable approach for everyone is the following: We gat [sic] paid a flat $112,000,000/year just as the contract states or $9,333,333/month (5/6th of that until TQ comes online). We agree to deliver up to 32,000,000 cases per

---

[38] The court notes that in plaintiff's complaint, plaintiff originally argued that "[t]he Government erroneously interpreted P00011 as implementing the minimum AQL production requirements effective September 1, 2006."

year in aggregate with an annual reconciliation if the actual deliveries exceed that amount.

Paul Morrell anticipated that Oasis would not be paid the full monthly fee so long as TQ was not producing bottled water in accordance with AQL, otherwise the government would be paying the flat monthly fee with only 5 of the 6 bottled water facilities producing water.[39]  On August 12, 2006, Paul Morrell and Colonel Richardson executed modification P00011, which was generally consistent with the Option II draft proposal, quoted below, and established a payment structure by which Oasis would be paid $9,333,333.33 per month, independent of any amount of water. The Option II proposal outlined the following:

**Option II**.  Complete the construction of TQ in Oct 2006.

Close Base Period

| Item No. | Description | | PRICE | |
|---|---|---|---|---|
| 1001 | BASE Period of Performance from 24 May 2005 to 15 August 2006 | | $50,225,000 | |
| | Allocation for uncompleted Plant (TQ) 1/6th | .167 | ($ 8,370,833) | |
| | Allowance for capital purchases to complete TQ.  Allowed due to military delay of Land. | | $ 5,500,000 | Estimate |
| | Funds to Purchase Pall Aria to filter QW Water. | 1 | $ 300,000 | |
| | Purchase RO's to improve SP water flow | 1 | $ 300,000 | |
| | Creation and distribution of Water information campaign posters "its just water" | 100+ | 0 | |
| | conversion and support of Class 1 Water sites at each of its locations | 5 | 0 | |
| | Previous invoices through 8.5.06 | | (23,268,860) | |
| | **Net Due Oasis At Close of Clin 1001 08.15.06** | | **$24,685,307** | |

---

[39] The court notes that the daily penalty, assuming 30 days in a month, would be $51,851.85, assuming the 5/6th payment structure in Paul Morrell's email, or slightly more than the $46,666.66 in Modification P00011.

Furthermore, as noted by defendant, the amount due Oasis to close out the base year, $24,542,387.00, included an "Allowance for capital purchases to complete TQ. Allowed due to military delay of Land," valued at "$ 5,500,000 Estimate." Therefore, even though Colonel Richardson gave approval for Oasis to construct the plant at TQ on August 11, 2006, one day before modification P00011 was executed, modification P00011 included an estimated $5.5 million to compensate Oasis for the delays related to TQ. Moreover, Oasis itself, in agreeing to modification P00011 agreed to the structure and timing of any delays moving for TQ moving forward, as indicated by an August 11, 2006 email Paul Morell sent to Alan Morrell, copying Phil Morrell, Paul Jeffries, and Dan Petsche, which stated:

> Alan,
>
> Because we've moved to a daily penalty for each day this site is late we need to monitor military caused delays very closely.  I'd like you to go to TQ and establish a baseline of what we need from the military and begin working the issues and tracking the delays. The delays should be reported and accumulated on your daily sitrep report to the military. Historical delays are a non-issue for this exercise as the clock just started over.
>
> Thanks,
>
> Paul

As noted above, plaintiff's submission states that "[t]he Court has found that P00011 was valid. As such, the Court has also found that the AQL penalty **structure** was also valid (*i.e.* $46,666.66 per day absent excusable delay). However, the fact that the AQL penalty structure was valid does not mean that all of the **assessed** penalties were valid." (citation omitted; emphasis in original).  The court, however, agrees with defendant that plaintiff's argument "is premised upon the invalidation of daily deductions agreed to in P00011," and as the court has found modification P00011 to be a valid modification, plaintiff's careful attempt to thread the needle of its argument must fail.

Regarding the delays Paul Morell focused on in his August 11, 2006 email, the court notes 45 days after modification P00011 was executed, on September 25, 2006, Oasis requested 40.5 days of excusable delay. After TQ was completed 8 days after the agreed to October 15, 2006 date in modification P00011, the parties executed modification P00013, on October 24, 2006, which granted plaintiff eight days of excusable delay. As noted above, modification P00013 stated:

> The purpose of this modification is to administratively establish an agreement between the Government and Oasis International Waters, Inc. that eight days of delay, with regards to the establishment of Bottled Water Production Capability at Taqqadum, Iraq, is excusable. Oasis International Waters, Inc. shall apply the excusable delay to their invoice submitted for

the period of performance of 01 - 31 October 2006. All other contract terms and conditions remain unchanged.

Defendant argues that "bilateral modification P00013 is an accord and satisfaction that defeats Count 7 as a matter of law."  Defendant also argues that

> Oasis submitted a request for 40.5 days of excusable delay on September 25, 2006, and, following negotiations, the parties agreed upon eight days of delay in P00013. Given that P00013 contained no reservation of rights and addressed excusable delays (the same subject as count 7), the doctrine of accord and satisfaction bars Oasis's delay claims.

(internal references omitted).  Plaintiff responds by noting that, "[w]hen a contractor signs a valid bilateral modification, it is barred under the doctrine of accord and satisfaction from pursuing claims that were clearly resolved by the terms of the modification itself," but argues that "P00013 does not include a waiver, a release, or any language indicating that it was intended to resolve any matters not explicitly mentioned."

The court notes that, unlike modification P00006 and modification P00011, plaintiff did not argue at trial or in the post-trial filings that modification P00013 was executed under duress.  Plaintiff's witnesses at trial pointed to the fact that Oasis did not sign a waiver of claims for modification P00013, and in plaintiff's May 30, 2017 submission to the court addressing Count 5, plaintiff argues that "as P00013 did not include any waiver language and the contemporaneous documentation shows that the parties intended to preserve unaddressed days."  As the court determined above, as it related to Count 5, however, "a supplemental agreement entered into between a contractor and the government operates as a bar to all claims not specifically reserved." Fraass Surgical Mfg. Co. v. United States, 202 Ct. Cl. at 594, 505 F.2d at 712. As explained by the United States Court of Appeals for the Federal Circuit:

> Discharge of a claim by accord and satisfaction occurs when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim. Brock & Blevins Co. v. United States, 343 F.2d 951, 955, 170 Ct. Cl. 52 (1965). However, courts may refuse to bar a claim based upon the defense of accord and satisfaction where the parties continue to consider the claim after execution of a release. Winn–Senter Constr. Co. v. United States, 75 F. Supp. 255, 110 Ct. Cl. 34 (1948). "Such conduct manifests an intent that the parties never construed the release as an abandonment of plaintiff's earlier claim." A & K Plumbing & Mechanical, Inc. v. United States, 1 Cl. Ct. 716, 723 (1983).

Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993);[40] see also Meridian Eng'g Co. v. United States, 122 Fed. Cl. 381, 411 (2015).  As also explained by a Judge of the United States Court of Federal Claims:

> The doctrine of accord and satisfaction is an absolute defense that terminates any previous right that a party may have had to assert a claim of the same subject matter. See C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 252 (1996) (quoting Chesapeake & Potomac Tel. Co. v. United States, 228 Ct. Cl. 101, 108, 654 F.2d 711, 716 (1981)); accord McLain Plumbing & Elec. Svc., Inc. v. United States, 30 Fed. Cl. 70, 79–80 (1993). An "accord" is a contract under which both parties agree that one party will render additional or alternative performance in order to settle an existing claim made by the other party, and "satisfaction" is the actual performance of the accord. See id. The party asserting an accord and satisfaction defense must establish four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. See id.; accord Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 59, 343 F.2d 951, 955 (1965). An executed bilateral modification with a release provision usually constitutes an accord and satisfaction unless that release is either ambiguous or limited in scope. See Merritt–Chapman & Scott Corp. v. United States, 198 Ct. Cl. 223, 228–30, 458 F.2d 42 (1972); Brock & Blevins Co. v. United States, 170 Ct. Cl. at 59, 343 F.2d at 954-55.

Jackson Constr. Co. v. United States, 62 Fed. Cl. 84, 92 (2004).

The court notes that there is no suggestion in the record that both sides were not competent to execute medication P00013. The court believes the testimony of Marcus Overbay and Paul Jefferies satisfies the requirements of the meeting of the minds and consideration. Marcus Overbay, a contract specialist during the contract performance, had the following exchange with defendant's counsel regarding modification P00013:

> [Q.] Can you describe basically what this modification [P00013] was supposed to accomplish?
>
> A. Well, we saw the previous exhibit there. The contractor had filed for 40 days of excusable delays for setting up the camp. We had -- Colonel Fortenberry led discussions with Oasis to negotiate those excusable delays. There was a disagreement on -- on those, and there was a settlement reached on eight days.

---

[40] The court recognizes the precedential standard articulated by the United States Court of Appeals for the Federal Circuit in Community Heating & Plumbing, but notes that the facts and outcome are different, as the Federal Circuit determined that the plaintiff's claims were not barred by accord and satisfaction because "the evidence in the record indicates that the Navy continued to negotiate and audit Community's claims years after they were submitted." Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d at 1581.

Q. And why do you say the term "settlement"? What are you looking at in the modification that would indicate that?

A. This is a bilateral agreement for eight days, if you see the modification there, and it has -- I can't read that signature now, but someone from Oasis signed it, and then Colonel Fortenberry did.

Q. Do you remember Oasis having any resistance or push-back on this modification?

A. I don't remember that.

Mr. Overbay subsequently discussed with defendant's counsel on direct examination an email sent by Colonel Fortenberry to plaintiff that stated in part: "At any rate, we're able to offer 8 days of total excusable delays. I'm hoping that this will get you guys where you need to be." Mr. Overbay explained that "they had the -- the excusable delay request. We disagreed with the number of days, and this is the -- the total that we had offered them. So, it was -- it was a step towards negotiations." In response to defendant's counsel's question: "Was this a take-it-or-leave-it type approach?" Mr. Overbay responded: "No. We were open to discuss with them." At trial, Paul Jeffries had the following exchange with plaintiff's counsel:

Q. Were you involved in the negotiations regarding a request for delay-related days for TQ in the AQL penalties?

A. Yes, Alan [Morrell] and I -- Alan put together, as we requested, about 40 days worth of Government-responsible delays, and remember, it's not always that the Government did it, but the environment itself justified the delay. So, if you had a dust storm that shut down all trucking for a week, then that's a justifiable delay. In other cases, there may be more direct Government impacts, but, you know, those types of things. We put together 40 days worth of delays, documented delays around TQ, and they allotted us eight of the 40.

. . .

Well, what we believed by the contract would be considered excusable delays. We put together a chart of 40 days of delays, and presented those, and they allowed eight of them. And to our surprise, they allowed eight of them.

Q. Did they give you a reason for why they were only allowing eight?

A. No, they just said we would allow eight and that was the end of the discussion. So, we tried to say, wait a minute, and have that argument, but

their [sic]-- you know, there are just times when this is what we've decided, that's it. There was no further dialogue about it.

Q. Did you sign a waiver of claims at the time of P00013?

A. No.

Q. Do you recall if the eight days were related to that October 15th deadline?

A. You know, it was convenient that the eight days brought us into alignment with that October 15th deadline. It wasn't our goal or initiative -- I don't recall that it was our goal to align those dates, but it -- it may have been, but I don't recall what it was, but they miraculously aligned to ensure that we were in compliance with the contract, but paid maximum penalty on, you know, delay of TQ.

Despite plaintiff's argument that, as with Count 5, absent a waiver or release, the additional days of excusable delay must survive, and claims that "the plain language of P00013 does not, on its face, claim to resolve all of the 40.5 delay days requested by Oasis, it only resolved 8 of them," and that "[a]ll P00013 did was acknowledge that there had been eight days of delay. There is no language indicating that the eight days was a settlement and/or that Oasis was relinquishing its ability to claim for the additional 32.5 days of delay," the court agrees with the defendant that because Oasis agreed to eight days of excusable delay in modification P00013, the doctrine of accord and satisfaction bars Oasis from requesting any additional days of delay in its claim for Count 7 beyond the eight already resolved. Therefore, the court determines that given plaintiff's execution of modification P00006, modification P00011, and modification P00013, plaintiff has not demonstrated entitlement to any additional days of delay beyond the eight days the parties agreed to in modification P00013.

Moreover, although the court does not need to address the merits of plaintiff's Count 7 claim for more than the eight agreed to days of delay, the court does note defendant's observation that it took Oasis 53 days to complete TQ, which was notably quicker than it took to complete the other bottled water plants,[41] and even if plaintiff's view of the excusable delay was completely correct, and there were 40.5 days of delay, TQ would have been able to be completed in 12.5 days. Even assuming Oasis could have constructed TQ quicker as it was the only bottled water plant to construct, it seems unlikely that Oasis could have completed the entire process in 12.5 days.[42]

---

[41] As defendant notes, defendant's expert testified that "once they [Oasis] actually started physical constructions, they basically completed the construction within 120 to 140 days, typically."

[42] The defendant also points out the changing number of days of excusable delay offered by plaintiff, from citing both 22.5 days and 44 days in the certified claim, to the 40.5 days indicated in the most recent submission by plaintiff.

The court also notes that, although plaintiff argues that "it is undisputed that the 32.5 days of delay occurred," defendant disagrees, noting that "[t]he only evidence that Oasis adduced at trial related to its delay claim, a spreadsheet submitted to the Government in September 2006, seeks 40.5 days of delay, eight of which were granted in P00013, leaving Oasis with 32.5 days of alleged delay," and "Oasis failed to present any witness testimony to explain the large discrepancy between the alleged delays it presented to the contracting officer for a final decision, and the delays for which it now seeks damages." Plaintiff argues that "[d]efendant provided no witnesses and identified no documents at trial that contradict the claimed delays. Further, defendant's delay expert did not challenge the requested delay days in his expert report. As such, the Court may take it as undisputed that all 32.5 days of delay occurred and were attributable to the causes identified by Oasis in its delay matrix." (internal reference omitted). Defendant contends that "Oasis's failure to adduce witness testimony on its delay claim is also telling. Oasis never asked Alan Morrell, the Oasis employee who prepared its delay claim, a single question about the specifics of its alleged delays, only asking Mr. [Alan] Morrell the conclusory question of whether the delays were 'might be claimable under the contract.'" Further, defendant, quoted the cross examination testimony of Oasis' expert witness Douglas Masengale, who stated that Alan Morrell "didn't do a critical path analysis [for the delay claims,] so, therefore, I would not put any weight in his days." It is not clear to the court that the evidence offered by plaintiff at trial would be sufficient to prove its additional days of delay, even if the court were to consider them. In sum, plaintiff has not proven entitlement to the additional days of delay pursuant to Count 7 of its complaint.

## CONCLUSION

For the reasons explained above, the court concludes that plaintiff has not demonstrated its entitlement to payment related to site conditions or additional days of delay for establishing the bottled water facility at TQ or Camp Taqaddum. Therefore, the court finds in favor of defendant for Count 5 and Count 7.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**
